IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORPORAL TRINIDAD NAVARRO, : | |
| : | |
| Plaintiff, : | |
| : | C.A. No. 05-565 |
| v. : | |
| : | JURY TRIAL DEMANDED |
| CHRISTOPHER A. COONS, : | |
| individually and in his official capacity; : | |
| GUY H. SAPP, individually and in his : | |
| official capacity; and NEW CASTLE : | |
| COUNTY, a municipal corporation, : | |
| : | |
| Defendant. : | |
| : | |

## COMPLAINT

### PARTIES

1.   Trinidad Navarro (hereinafter "Plaintiff"), has at all times relevant to this Complaint been a resident of New Castle County, State of Delaware, and currently resides at 7 McMahon Drive, Bear DE 19701. Since September, 1991, he has been employed by New Castle County Police Department. He presently holds the rank of Corporal. At all times material hereto, he has been a diligent, honest and loyal employee who always performs his job in an exemplary manner.

2.   Defendant Christopher A. Coons (hereinafter "Coons or County Executive") at all times material hereto, has been the County Executive of New Castle County. He is sued in his individual and official capacities for retaliatory actions which were taken against Plaintiff. Defendant is subject to service through the New Castle County Government Center, 87 Reads Way, New Castle, DE 19720.

3. Defendant Guy H. Sapp (hereinafter "Sapp") at all times material hereto, has been the Director of Public Safety for New Castle County. He is sued in his individual and official capacities for retaliatory actions which were taken against Plaintiff. Defendant is subject to service through the New Castle County Police Headquarters, 3601 N. DuPont Highway, Minquadale, New Castle, DE 19720.

4. Defendant New Castle County (hereinafter "NCC") is a municipal corporation under the laws of the State of Delaware. Defendant is subject to service through the New Castle County Government Center, 87 Reads Way, New Castle, DE 19720.

**JURISDICTION**

5. Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under 42 U.S.C. §1983 and the First Amendment to the Constitution of the United States. The jurisdiction of this Court is evoked to secure protection and redress deprivation of rights secured by federal law, which prohibits adverse action against employees for exercising their federally protected right to freedom of speech and on the basis of retaliation.

**FACTUAL BACKGROUND**

6. Plaintiff began employment with NCC on or around September 30, 1991. He thereafter entered the Police Academy in or around January, 1992 and began working patrol in or around May, 1992. Plaintiff has been employed with NCC for approximately fourteen (14) years.

7. Plaintiff worked in patrol until October 1998 when he was selected for the Public Information Officer ("PIO") position. Plaintiff currently is the PIO for NCC's Police Department.

8. In the fall of 2004, Plaintiff tested for the position of police Sergeant with NCC. The testing process, administered by NCC's Human Resources Department, consists of a written examination, an oral board style interview and the addition of seniority points. The written test and oral interview each represent 47.5% of the overall score with seniority points accounting for 5% of the overall score. The oral interview panel for the fall 2004 testing consisted of Lieutenant Wendy Hudson, Lieutenant Robert Schreiber, and Captain Elmer Setting.

9. At the completion of the testing process, a certified ranking list was established to rank each officer's overall score. Plaintiff received the rank of twelve (12), meaning eleven (11) officers scored higher than him and approximately seventy-five (75) officers scored lower than Plaintiff.

10. The NCC Police Directives state that the Chief of Police has the discretion to choose whomever he/she desires for promotion, as long as the officer is ranked as one (1) of the top five (5) candidates on the certified listing. On or about December 12, 2004, the Chief of Police, Colonel David F. McAllister, (hereinafter "McAllister") promoted the following officers from the certified list: Jamie Dolan, Michael Donovan, Dominique Gregory, Joseph Merriggi, Wayne Pennington, and Robert Schlecker. At that time, McAllister filled four vacant Sergeant positions and over-promoted two additional Sergeants to fulfill management needs.

11.     As a result of McAllister filling the four (4) budgeted positions and the two (2) additional promotions, the NCC had a compliment of thirty-eight (38) Sergeants, two (2) more than the thirty-six (36) that were budgeted for by the New Castle County Council (hereinafter "Council") for fiscal year 2004. All of the officers who were promoted by McAllister were in the top five on the certified listing, but were not always in the first position.

12.     In the spring of 2005, McAllister submitted the police budget to the Council and the County Executive. In the budget, McAllister requested two (2) additional Sergeant positions for fiscal year 2005 which began July 1, 2005. In May 2005, the budget was approved by Council and the County Executive authorizing a total of thirty-eight (38) Sergeant positions.

13.     Since the last promotions in December 2004, three (3) Sergeants terminated their employment with the Defendant, making available three (3) vacant positions. In the beginning of May 2005, Plaintiff contacted the following six (6) officers who were eligible for the now available Sergeant positions: Patricia Davies, Richard Dunning, Wendy Feeser, L. Rob Joseph, Joseph Trala and John Treadwell. All of the officers, with the exception of Richard Dunning, agreed to collectively contact the Fraternal Order of Police (hereinafter "FOP") to inquire about the available Sergeant positions.

14.     On or about May 16, 2005, Plaintiff and the above-listed officers met with McAllister and Sapp. During the meeting, McAllister and Sapp indicated that the Police Department had only one vacant, budgeted Sergeant position. They indicated the position would not be filled until the new fiscal year due to a $500,000.00 operating

deficit. McAllister further advised he sought two (2) additional Sergeant positions for the upcoming fiscal year. Sapp asked the Sergeant candidates to be patient and wait until the new fiscal year, at which time they would promote three (3) individuals to the rank of Sergeant.

15. On May 20, 2005, the FOP submitted a memorandum to McAllister requesting that one (1) Sergeant position be filled immediately. The memo further stated, "if the two Sergeant positions are approved for the next fiscal year, we ask that those positions be filled, without a Chief's interview."

16. On June 27, 2005, McAllister submitted a memorandum to Sapp formally requesting the three (3) positions be released to him so that he could exercise his authority to promote three (3) eligible officers to the rank of Sergeant.

17. Upon information and belief, McAllister met with Sapp on two separate occasions to discuss promotions. McAllister advised Sapp he intended to promote a black male, a Hispanic male, and a female from the current certified list. Plaintiff was the only Hispanic male on the certified list eligible for promotion.

18. On June 26th and/or June 27th, Plaintiff received a telephone call from Cris Barrish (hereinafter "Barrish"), a reporter from the News Journal. Barrish posed specific questions to Plaintiff regarding the alleged initials of McAllister referred to in the federal indictment involving former County Executive Tom Gordon (hereinafter "Gordon") and former Chief Administrative Officer Sherry Freebery (hereinafter "Freebery"). At the conclusion of the telephone conversation, Plaintiff immediately notified McAllister and informed him of the inquiry from Barrish. Plaintiff's intention was to advise McAllister that the integrity of the Police Department and NCC was being questioned. McAllister

thereafter notified Sapp, who, based upon information and belief, notified the County Executive. Plaintiff went through his proper chain of command for notification purposes regarding the contact from Barrish.

19. Later that same date, Plaintiff received an unpleasant telephone call from Ms. Allison Levine (hereinafter "Levine"), County Executive Director of Communications. Levine angrily inquired about the telephone call from Barrish and reminded Plaintiff that he was required to contact her regarding any media inquiries relating to the pending Gordon and Freebery indictment. Plaintiff informed Levine that she was not in his chain of command, therefore he was not required to notify her of the telephone call. She informed Plaintiff that the incident was unacceptable and indicated that Plaintiff had several bosses who were above McAllister.

20. Also during the telephone conversation, Levine asked Plaintiff about an upcoming article featuring McAllister in the *Delaware Today* magazine. Plaintiff advised Levine that he, in fact, knew about the article and explained to her his limited involvement in the story. Levine again appeared to be very agitated because Plaintiff had not advised her of the *Delaware Today* article. Plaintiff advised Levine that he would not, in good conscience, do anything to assist her or the administration to ruin McAllister's reputation. At the conclusion of the telephone call, Plaintiff suggested that he and Levine meet in person to discuss what she described as a bad situation in which he [Plaintiff] was involved.

21. On or about June 29, 2005, Plaintiff met with Levine. She candidly informed Plaintiff that he was perceived as a person who could not be trusted due to his loyalties to McAllister. She further stated that he [Plaintiff] was not liked by the County

Executive or his administration. She stated that, Plaintiff was on the losing team and his career would be harmed if he [Plaintiff] continued to stay on the "McAllister team." Levine also stated that "[Plaintiff] would have a long and difficult seven years ahead of him assuming Executive Coons seeks re-election." Levine indicated she believed McAllister would soon be arrested for the alleged DELJIS violations and indicated if he went down, Plaintiff would go down with him.

22. Plaintiff told Levine that he was tired of the politics associated with his position and commented, "I want out of it". Levine's response was, "well, you still have six years until you can retire." Plaintiff then clarified, that he did not want to leave the police department, but possibly wanted out of the PIO position. Levine suggested that Plaintiff seek a job transfer to another job within the County rather than stay as the PIO to avoid being labeled as "not on Chris' team." Plaintiff understood this suggestion to get away from McAllister and be loyal to Coons, not McAllister.

23. Levine went on to say that she heard Plaintiff had been the PIO for so many years, because "you do as you are told to do." She then advised Plaintiff that she had heard rumors regarding Plaintiff's involvement in an investigation relating to a murder that occurred in Las Vegas, Nevada. Plaintiff advised Levine that she had gotten her rumors crossed and indicated Plaintiff did not personally know anyone involved in the murder investigation. The allegation was that Plaintiff flew to Las Vegas, Nevada to influence the investigation regarding Lisa D. Moseley. Plaintiff denied having done so.

24. During this conversation with Levine, Plaintiff and she discussed his possible promotion to Sergeant. Plaintiff advised Levine that he had heard the requisition for Sergeants was going to be withheld by the administration essentially negating the

possibility of Plaintiff's promotion. Levine replied, "well, that's how politics work" Plaintiff then told her, politics should not be involved in any promotional opportunity. Levine responded, "well, Chris [referring to County Executive Coons] butters the bread."

25. At the end of the conversation, Levine stated she had several candid conversations with the County Executive and advised him, "Trini is one of the few people who I can depend on to get the job done." Levine indicated that she frequently commented to the County Executive about Plaintiff's performance as the PIO. Levine stated, "I think you [Plaintiff] do an excellent job with the media dating all the way back to the days when I was a reporter at the News Journal."

26. Based upon information and belief, the statements made by Levine to Plaintiff during the conversations set forth herein reflect statements made by Coons to Levine.

27. Later in the day, on June 29, 2005, Sapp forwarded a memorandum to McAllister stating, "I have reviewed the police department's staff requirements and determined that the need to maintain patrol officer strength is more critical than the need for Sergeants. Therefore, at this time, I will not authorize the requisitions of two of the Sergeant positions requested in your memorandum." The memorandum was forwarded to the FOP Board of Directors and the top seven (7) officers on the list.

28. On June 30, 2005, John Treadwell was promoted to the rank of Sergeant after Sapp released only one requisition. On June 30 or July 1, 2005, Sapp met with the remaining six (6) officers and apologized for making a "mistake." He said he should not have promised to make the three promotions on July 1st. Sapp, who does not have the authority to withhold police promotions, went on to say he [Sapp] might not allow any

further promotions due to the police officer staffing shortage. Sapp further stated that this was his and only his decision to withhold the promotions.

29. Plaintiff specifically asked Sapp if that meant he [Sapp] would simply allow the current certified list to expire if no additional officers were hired. Sapp replied that he could not make any decisions at the present time, but mentioned the lack of a current certified list for the rank of Lieutenant. He did, however, state that he was working on a fair promotional process with the assistance of an outside agency.

## COUNT I
### (First Amendment – Free Speech Public Employee Retaliation)

30. Plaintiff repeats and realleges paragraphs 1 through 29 set out above.

31. Plaintiff spoke out on issues of public concern under the First Amendment including, but not limited to, his allegiance to McAllister.

32. By its content, form and context, at all times Plaintiff spoke out about matters of public concern.

33. All of Plaintiff's speech was non-disruptive of any interest of his employer and it was of concern to the public at large.

34. The Defendants were aware of Plaintiff's speech and they antagonized Plaintiff by withholding the already budgeted and vacant Sergeant positions.

35. There is a casual link between the First Amendment protected activity on matters of public concern and the adverse action of refusing to promote Plaintiff to Sergeant. This is demonstrated by:

>   (a) the temporal proximity of events, for example, after Plaintiff participated in protected activity, he was advised that the already budgeted and vacant Sergeant positions were not going to be filled,
>
>   (b) circumstantial evidence of a pattern of antagonism following

the protected activity, such as Sapp's decision not to allow the release of the already budgeted and vacant Sergeant positions to McAllister in order to make the promotions,

(c) personal knowledge and awareness of the protected activity by the Defendants,

(d) the fact that Plaintiff was qualified for the Sergeant position and McAllister's statement that he was planning on promoting a Hispanic male,

(e) any explanations given for not promoting Plaintiff are unworthy of credence, and

(f) the evidence as a whole.

36. First Amendment protected activity was a substantial or motivating factor in the refusal to promote Plaintiff. The natural probative force of the evidence demonstrates causation.

37. The Defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have grounds to deny Plaintiff the promotion to the rank of Sergeant.

38. The totality of retaliatory adverse action taken by the Defendants against Plaintiff is sufficient to deter any person of ordinary firmness from exercising their First Amendment right to freedom of speech.

39. Any reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with the denial of a promotion.

40. Plaintiff's constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT II
### (Retaliation – Failure to Promote)

41. Plaintiff repeats and realleges paragraphs 1 through 40 set out above.

42. Defendants, acting under color of state law pursuant to 42 U.S.C. §1983, intentionally violated Plaintiff's right to freedom of speech in violation of the First Amendment to the Constitution of the United States when he was retaliated against without justification.

43. Defendants intentionally retaliated against Plaintiff when they failed to promote him to the rank of Sergeant despite his qualifications.

44. Defendants acted with retaliatory motive and the reasons provided by the Defendants for failing to promote Plaintiff are pretextual.

45. As a direct and proximate result of Defendants' unlawful retaliation against Plaintiff, Plaintiff has suffered, and continues to suffer, a loss of employment opportunities, loss of considerable pay, past, present, future and prospective, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, mental anguish, embarrassment, emotional pain and damages to his reputation.

46. Defendants' retaliation was willful, wanton and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

47. The above-stated damages were not the result of any act or omission on the part of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court;

a) Enter a declaratory judgment declaring the acts of Defendants to be a violation of Plaintiff's constitutional rights;

b)  Enter a judgment against Defendants, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment and injury to his reputation;

c)  Enter judgment against Defendants for punitive damages;

d)  Issue a mandatory injunction directing Defendants to promote Plaintiff to the rank of Sergeant in the NCC Police Department;

e)  Award front pay to Plaintiff until Plaintiff can be promoted;

f)  Issue a reparative injunction directing that upon retirement, Plaintiff's pension and other benefits be calculated as if he had been promoted to rank of Sergeant as of July 2005;

g)  Issue a mandatory injunction ending the continuing illegal actions of Defendants and barring them from considering protected speech whenever considering the promotion of any uniformed officer of the NCC Police Department;

h)  Issue a reparative injunction directing that Defendants place a signed document in Plaintiff's personnel file indicating he was qualified to be promoted to the rank of Sergeant, effective July 2005, and that but for illegal conduct by Defendants, he would have been promoted to that rank on at least one other occasion since that date, and apologizing to Plaintiff for violating his constitutional rights;

i)  Enjoining Defendants from retaliating against Plaintiff;

j) Award Plaintiff attorney's fees, costs, pre- and post-judgment interest for this action; and

k) Require such other and further relief as the Court deems just and proper under the circumstances.

MARGOLIS EDELSTEIN

_____
Jeffrey K. Martin, Esquire (DE #2407)
Timothy J. Wilson, Esquire (DE #4323)
Keri L. Morris, Esquire (DE #4656)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680 – telephone
(302) 777-4682 – facsimile
jmartin@margolisedelstein.com
twilson@margolisedelstein.com
kmorris@margolisedeslstein.com
*Attorneys for Plaintiff*

Dated: August 4, 2005