# EXHIBIT A

1    counseling with a professional.

2        Q.    Is there a reason for that?

3        A.    There is no reason.

4        Q.    Do you feel that you don't need any type of

5    counseling or anything for that?

6        A.    No.

7        Q.    I am sorry.  No, you don't need counseling?

8        A.    No, I don't need counseling.

9        Q.    Okay.  You indicate that, and you have just

10   stated, that you have been discriminated against and

11   you didn't get the promotion because of political

12   reasons, and you indicated that part of that reason is

13   the speech that you have stated.  Can you be specific

14   as to what speech you are referring to?

15       A.    Sure.  On several occasions, I spoke with

16   Allison Taylor Levine about her perception of the

17   dislike that the administration -- the administration

18   being Chris Coons and his staff, including Dave

19   Singleton and Guy Sapp -- the dislike that they have

20   for me because of my perceived allegiance to Dave

21   McAllister.

22                 Around April or May of last year, I spoke

23   up -- I went to our F.O.P. leadership to -- and

24   organized a group of five other officers to inquire

1    about the promotional process, to inquire about why

2    the positions weren't filled, to inquire about how

3    many positions were available.  And that was something

4    I organized.

5              Later, there was a meeting, but it was

6    another occasion where I actually spoke up.

7              Now, with regard to Allison Levine, on

8    several occasions, we had contact either in person or

9    by phone, where we discussed the fact that the

10   administration didn't like me.  She asked me to notify

11   her about certain inquiries from the media.  She asked

12   me to notify her about incidents or events of interest

13   that would generate media attention.  I indicated --

14   she also asked me to let her and/or the administration

15   know if -- what Colonel McAllister was planning with

16   regard to -- and an example was the Delaware Today

17   article, and I didn't tell her about that.  And she

18   indicated that it was my duty or my obligation to tell

19   her about media inquiries.  I told her that I could

20   not in good conscience tell her things that would

21   jeopardize my boss' position.  As a PIO or a

22   spokesperson for the Police Department, my primary

23   concern is the integrity of the Police Department and

24   protection of the reputation of the Police Department.

Corporal Trinidad Navarro

1    Allison and I had had several conversations with

2    regard to that.  She indicated her displeasure with me

3    for not forwarding that information to her.

4              I have to think for a moment.

5              There was an occasion in early -- there was

6    an occasion soon after Allison Levine was hired, where

7    we -- "we" meaning the other PIOs in the County -- met

8    to discuss strategies for media inquiries with regard

9    to the upcoming federal trial involving Tom Gordon and

10   Sherry Freebery.

11             During those meetings, there was a concern

12   about -- I don't recall who brought it up, but there

13   was a concern about the DM initials in the indictment

14   and how we would handle media inquiries about who

15   everybody believed DM was, Dave McAllister, how we

16   would handle media inquiries.  I spoke up at that

17   meeting and indicated that the initials DM in the

18   indictment, although appear to be -- alleged to be a

19   possible crime with regard to a DELJIS violation, I

20   spoke up for Dave McAllister, or DM, and indicated

21   that we had researched whether or not there was a

22   DELJIS violation, and, in fact, it was not.

23             We also spoke about the Fieldstone project

24   and the fact that our Land Use Department had

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    researched whether there was any wrongdoings, and it

2    was found that it was not.  During that conversation,

3    I had indicated that Dave McAllister had not done

4    anything wrong, and I thought they were overreacting

5    with regard to media inquiries with regard to his

6    initials.  Essentially, I spoke up for Dave McAllister

7    and attempted to assure everyone in that room that he

8    had done nothing wrong.

9              I have to think about other occasions.

10   Q.   Okay.  We can come back.  I'll ask before we

11   conclude the deposition if there is any other speech

12   that you recall.

13             Just so that we're clear.  In your

14   complaint here that you have alleged, you are not

15   claiming that you did not get the promotion due to

16   racial discrimination.  Are you?

17   A.   No.

18   Q.   Have you ever been a party to any other

19   lawsuits?

20   A.   No.

21   Q.   Have you ever filed any complaints with any

22   other governmental agencies, such as the EEOC or the

23   Department of Labor?

24   A.   I have not.

```
 1        Q.    Are you married?

 2        A.    I am.

 3        Q.    Do you have any children?

 4        A.    I do.

 5        Q.    How many?

 6        A.    Three.

 7        Q.    Their ages?

 8        A.    10, 8 and 18 months.

 9        Q.    And have you ever been married before?

10        A.    Yes.

11        Q.    Where did you go to high school?

12        A.    William Penn High School.

13        Q.    And have you gone any further than high school?

14   Any degrees further than that?

15        A.    Yes.  I graduated from Delaware Technical

16   Community College, and I am presently enrolled in

17   Wilmington College for criminal justice.

18        Q.    When did you graduate from Delaware Technical

19   School?

20        A.    In 2000.

21        Q.    What are you currently studying at Wilmington

22   College?

23        A.    Undergrad, criminal justice.

24        Q.    How many credits do you have so far?
```



1    A.    I am not sure.  I did obtain an associate's

2    degree.  I have taken one class at Wilmington College.

3    I am presently enrolled in a class, but there are

4    several classes that I won't have to take for what's

5    called PLA, that you could provide a portfolio in

6    those classes -- you'll have to pay for it, but you

7    won't have to take and there is about five or six of

8    those classes.  So I am not sure how many credits I'll

9    have after that time.

10    Q.    The class you are currently taking, does it

11    meet at night?

12    A.    Pardon me?

13    Q.    It meets at night?

14    A.    Yes.

15    Q.    You are only just taking that one class?

16    A.    Yes.  It's a seven-week block class.

17    Q.    When did you start your employment with New

18    Castle County?

19    A.    September 30th, 1991.

20    Q.    And what did you do prior to that?

21    A.    Several things.  I sold life insurance.  I

22    drove a school bus.

23    Q.    Can you give me some time frames of how long

24    you did each?

Corporal Trinidad Navarro

1    A.    When I was 15-years old, which would have been

2    around 1984, I started my first job at the Miller's

3    Carpet Center.  I really don't recall how long I

4    worked there.  Probably a couple months.  There I went

5    to the Air Base Carpet Mart, where I worked for a few

6    years during high school.

7            When I graduated from high school, I worked

8    for Sutton Bus Company for, I want to say, two years.

9    I worked for a liquor store.  I don't remember the

10   name of the place.  But it was by -- I think it was

11   Willow Run Liquors.  I also, around that time, worked

12   for American General -- it's a life and health

13   insurance company -- and worked there until I became a

14   police officer.

15   Q.    When you first applied for a job at New Castle

16   County it was as a police officer?

17   A.    Yes.

18   Q.    Can you just give me a little bit of your

19   career history as a police officer starting from after

20   you graduated, I guess, from the academy?

21   A.    I was assigned to B Squad in patrol.  I worked

22   until -- I'm sorry.  I graduated from the academy, I

23   want to say on May 28th, 1992.  I worked in patrol

24   from that period until October 1998.

1    Q.    During that time, do you recall who your

2    immediate supervisor was when you worked at B Squad?

3    A.    My first supervisor was Lieutenant James

4    Sharkey.

5    Q.    Do you recall who the chief of police was when

6    you were hired?

7    A.    Yes.  It was Tom Gordon.

8    Q.    Then you left B Squad October 28th of what

9    year?

10    A.    It was October 1998.

11    Q.    Okay.  Then from there?

12    A.    I was assigned to the Public Information Office

13    for the Police Department.

14    Q.    Was that a job you applied for?

15    A.    No.  Well, I did submit memorandums for that

16    position as well as memorandums for the criminal

17    investigation unit.

18    Q.    Do you still have copies of those memorandums?

19    A.    I do not.

20    Q.    At that time, who was chief of police?

21    A.    John Cunningham.

22    Q.    Were those memos directed to him?

23    A.    Yes.  Through the chain of command.

24    Q.    Can you summarize for us what the memorandums

Corporal Trinidad Navarro                                    20

```
 1        Q.    How long did he serve as PIO, if you recall?

 2        A.    I am not sure.  I would say, again, several

 3   months, perhaps two or more years.

 4        Q.    And you said is it Pat Crowell?

 5        A.    Yes.

 6        Q.    How long did he serve as PIO, do you recall?

 7        A.    I don't know.  Around the same time as everyone

 8   else.

 9        Q.    Around two years?

10        A.    I am guessing.

11        Q.    Okay.  And how long have you currently been

12   serving -- are you still currently the PIO for the New

13   Castle County Police Department?

14        A.    I am.

15        Q.    How long have you been serving in that

16   position?

17        A.    Seven years and about eight months.

18        Q.    So when you came into the PIO position,

19   Cunningham was the chief?

20        A.    Yes, ma'am.

21        Q.    And you also served under McAllister; is that

22   correct?

23        A.    Yes, ma'am.

24        Q.    And currently serving under the acting chief,
```

1    Lieutenant Colonel Scott McLaren?

2        A.    That's correct.

3        Q.    When you first took the position as PIO, what

4    did you believe your duties and responsibilities were

5    going to be?

6        A.    To promote the department; to protect the

7    department from negative press; to inform the media of

8    day-to-day police operations, arrests, programs, those

9    types of -- I was the media coordinator for the Police

10    Department.

11        Q.    Who was your immediate -- I guess who was and

12    is your immediate supervisor as the PIO?

13        A.    When I first started in 1998, Lieutenant Vince

14    Kowal was my immediate supervisor.  He has since

15    retired.  And since then, I did work for or with

16    Lieutenant Patrick Crowell for some time.  I don't

17    recall if at that point he was my supervisor or if I

18    fell directly under the chief of police.  But I do

19    recall lieutenant Crowell did do my evaluations.

20        Q.    After Lieutenant Crowell, assuming he may have

21    been a supervisor at that time, after he was no longer

22    serving in that capacity, who would have done your

23    evaluations?

24        A.    I know that Jack Cunningham did do some of my

Corporal Trinidad Navarro                    43

```
 1      Q.    Okay.

 2      A.    I think that the day-to-day operations are

 3   conducted by Colonel McLaren.  However, Dave Singleton

 4   involved in many of the major decisions that occur --

 5   perhaps not daily, but that occur within the Police

 6   Department.

 7      Q.    Can you give any examples?

 8      A.    I can't give specific examples.  I can tell you

 9   that from what I have heard from Lieutenant Colonel

10   McLaren, Major Snyder, and just others who were

11   speaking, and I don't recall specifically who, that

12   Guy Sapp makes no decisions and that Guy Sapp has to

13   have approval for any decisions within the Police

14   Department from Dave Singleton.

15      Q.    Who do you believe is Guy Sapp's direct

16   supervisor?

17      A.    I am assuming it's either Dave Singleton or

18   Chris Coons.

19      Q.    And who do you think that Lieutenant Colonel

20   McLaren answers ho is his direct supervisor?

21      A.    The director of public safety.

22      Q.    And is Lieutenant Colonel McLaren your direct

23   supervisor?

24      A.    Yes.
```



1    Q.    So, theoretically, Guy Sapp and David Singleton

2    are in your chain of command?

3    A.    I would say that they're my superiors.  My

4    chain of command is chief of police.  Typically, a

5    corporal would have, perhaps, a sergeant in the

6    command, a lieutenant, then a captain and then major

7    and acting lieutenant colonel and colonel.  I work

8    directly for the chief of police.

9              MR. MARTIN:  Michele, is this a good spot

10   to take a break?

11             MS. ALLEN:  This is an excellent spot to

12   take a break.

13             (Recess taken.)

14   BY MS. ALLEN:

15   Q.    Mr. Navarro, I wanted to talk to you a little

16   more in detail about your position as PIO for the New

17   Castle County Police Department.  I think much earlier

18   on in the deposition you described your duties and

19   responsibilities as PIO.  Has that changed over the

20   years?

21   A.    Well, I had other duties assigned to me that

22   weren't necessarily media relations related, but my

23   duties have not changed.

24   Q.    Do you enjoy being the PIO?



1    sure.

2        Q.    Why do you think?

3        A.    Well, Rich Dunning had recently been suspended

4    for tampering with evidence, was -- received major

5    discipline for that.  And I don't think that he

6    believed he was in the running.

7        Q.    Why would he not do anything to assist just

8    specifically only in yours and Treadwell's promotion?

9        A.    I don't know.

10       Q.    Other than Dunning, everybody else agreed they

11   wanted the information as well?

12       A.    Yes.

13               (Navarro Deposition Exhibit No. 3 was

14   marked for identification.)

15   BY MS. ALLEN:

16       Q.    I am showing you what's been marked as Exhibit

17   3.  It appears to be a memorandum to the F.O.P. board

18   of directors from yourself and the other officers that

19   you reached out to.  Is that a fair assessment?

20       A.    I apologize.  I was reading.

21       Q.    That's okay.  I just asked you:  Is this a

22   memorandum to the F.O.P. from yourself and the other

23   officers who you reached out to?

24       A.    Yes.  I typed that memo.

1    Q.    And I guess, can you just give me a little more

2    detail on this?  Is this something officially you have

3    to do for the F.O.P.?

4    A.    Well, I have never sought the assistance of the

5    F.O.P. in the past.  Never been disciplined or

6    investigated with the exception of a departmental

7    shooting that I was involved in.  So I don't

8    specifically know whether this is the appropriate way

9    to notify or ask for assistance.  I did this this way

10   so that my request was documented.

11   Q.    And did anything come out of this request?

12   A.    Yes.  The F.O.P. president, Marge Ellwein,

13   scheduled a meeting with the chief of police and

14   director of public safety, which was --

15   Q.    Do you know when that meeting was?

16   A.    In May of 2005.

17   Q.    Do you know exactly when it was or no?

18   A.    I don't know the exact date.

19   Q.    Who was present at the meeting other than the

20   chief of police and the director of public safety?

21   A.    All of the officers you see on this list except

22   for Rich Dunning.

23   Q.    And he's not on the memorandum?

24   A.    I apologize.  He -- as you can see, all the



1    A.    Not for sure, no.  I had heard rumor that they

2  weren't going to be filled.  And Allison Levine

3  herself said in her deposition that she knew that they

4  weren't going to be filled.

5    Q.    Throughout your complaint you reference your

6  conversation with Allison and then in some portions

7  you use quotation marks to indicate certain things

8  that you claim Allison had stated.  And then in one

9  particular paragraph, I think, which is 26, you state

10  that based upon information and belief you believe

11  those statements that Allison made are attributed to

12  the County Executive Chris Coons.  Can you state your

13  basis for that?

14    A.    Well, Allison herself had said she had several

15  conversations with the County Executive with regard to

16  me and my work performance as a PIO.  She did detail

17  those in her deposition.  She, however, couldn't

18  remember what his responses were.

19         She being the PIO is in the core team.  She

20  is directly associated, involved with the County

21  Executive.  It is my opinion that what she was telling

22  me was from him -- not necessarily as a message, but

23  it was from him.  The fact that they didn't trust

24  Trini; the rumors that she had heard about my

1    involvement in some murder investigation in Las Vegas

2    and other things that she said about me I attribute

3    coming from Chris Coons.

4        Q.    But she never said to you Chris said this?

5        A.    She did not.

6        Q.    You indicate in paragraph 20 in the complaint

7    that you advised Levine that you would not in good

8    conscience do anything to assist her or the

9    administration to ruin McAllister's reputation.  Did

10   Allison ever ask you to do anything to ruin

11   McAllister's reputation?

12       A.    No.

13       Q.    Did the administration ever ask you to do

14   anything to ruin McAllister's reputation?

15       A.    No.

16       Q.    You indicate that Allison told you that you

17   were on the losing team and your career would be

18   harmed if you continue to be on McAllister's team.  I

19   apologize.  That's paragraph 21.  And that you would

20   have a long and difficult seven years ahead of you,

21   assuming Coons was reelected.  Did you ever ask her

22   what exactly she meant by those statements?

23       A.    No.

24       Q.    Again, in paragraph 22, she states you don't



Corporal Trinidad Navarro

117

1    Q.    That's what you took from Chris butters the

2    bread?

3    A.    Yes.

4    Q.    I am going talk about the conversation that

5    we've talked about it throughout the deposition, but

6    specifically about the conversation that you had with

7    Cris Barrish.   Do you recall exactly when that

8    conversation took place?

9    A.    I can look at the notes and tell you if that's

10   okay.

11   Q.    Is it in the complaint?

12   A.    Yes, ma'am.

13   Q.    It may be paragraph 18.

14   A.    On June 26th or June 27th.

15   Q.    Okay.  Who initiated the phone call?

16   A.    He called me.

17   Q.    Can you tell me what he said?

18   A.    Well, my best recollection of what he said was

19   he had had information that confirmed that the

20   initials in the document, DM, were in fact Dave

21   McAllister and that he was going to author a story to

22   say that, in effect.

23   Q.    Did he ask you for confirmation of that?

24   A.    No.



1    Q.    Was he just giving you a heads-up?

2    A.    No.   Cris is a savvy reporter who has been

3    around for a long time, who will try to make friends

4    with you and then obtain information from you sort of

5    off the record and -- well, I know better than to go

6    off the record with Cris Barrish.   We had a

7    conversation.   The way Cris talks is sort of

8    whispering, hey, you know, what can you tell me about

9    this, what can you tell me about that.   I didn't

10   answer any questions with regard to the investigation.

11   He asked about the initials.   After answering and then

12   telling him I couldn't help him, I told the chief of

13   police.

14   Q.    What did you tell -- you said you gave no

15   response to the questions about the investigation?

16   A.    Yes.

17   Q.    So, essentially, you gave him no answers?

18   A.    No, I don't believe so.

19   Q.    When he asked whether or not the initials were

20   DM, did you consider that a matter of public concern?

21   A.    Sure.

22   Q.    How so?

23   A.    Well, the DM is the chief of police.   He's the

24   big toe for the Police Department.   He's the face of

Corporal Trinidad Navarro                                      119

1    the Police Department.   Anyone who would try to

2    discredit himself or the Police Department without

3    proof, I believe is a public concern.

4        Q.    Who else knew about the conversation with Cris

5    Barrish other than the Chief of Police McAllister.

6        A.    Besides Cris, I mean, I don't recall telling

7    anyone else.   I don't know if McAllister told anyone

8    after that, but I don't recall telling anyone else.

9        Q.    Did McAllister tell you not to report that

10   inquiry to Allison Levine?

11       A.    No, not at all.

12       Q.    Did you notify anybody in the Law Department

13   that Cris Barrish was seeking information about the

14   investigation?

15       A.    I personally did not.   I was under the

16   assumption the chief would do that.   I have never

17   called the Law Department about anything.

18       Q.    And I think you have gotten into this before,

19   but, again, back to the initials of DM in the

20   indictment.   You indicate that you thought the

21   integrity of the Police Department was being

22   questioned.   How so?

23       A.    Well, clearly, the indictment indicated that a

24   police officer that goes by DM had committed a DELJIS

1    violation when in fact no violation occurred.  The

2    allegation was that there was a person named Joe

3    Diamond who sent a threatening letter to the County

4    Executive.  Dave McAllister researched this Joe

5    Diamond person, found there was no person named Joe

6    Diamond.  And that was the extent of his research.

7            Should the County Executive today receive a

8    letter, a threatening letter from Joe anyone, we would

9    do the exact same thing.  So it was determined that,

10   in my mind, and Colonel McAllister's mind that he did

11   not commit a DELJIS violation.

12      Q.   I think I am going to draw your attention to

13   the interrogatories.  That's Exhibit 2.

14      A.   Yes, ma'am.

15      Q.   You had stated prior to the deposition

16   beginning that you didn't have a chance to review

17   them.  Have you since had a chance to review them?

18      A.   Yes, ma'am.

19      Q.   And do you agree that the answers provided in

20   each of these questions are full and complete?

21      A.   Well, it asks specific contents of -- I don't

22   have the address of many of these people or any of

23   these people.  And I don't have the specific subject

24   matter.  So to answer your question, no.



Corporal Trinidad Navarro

184

```
 1      Q.    That's way out of range, right?

 2      A.    Well  --

 3      Q.    In terms of being considered for a sergeant's

 4   promotion.

 5      A.    It is out of range, yes.

 6      Q.    And then the next year, the year 2000, you were

 7   48th.  That's the case?

 8      A.    Yes, sir.

 9      Q.    Then in '01, you came in 17th.  Was that within

10   range?

11      A.    Within range of what?

12      Q.    The range of one could reasonably expect a

13   promotion the next year.

14      A.    Depending upon attrition, retirement.  Probably

15   not, but it could have been close.

16      Q.    You know what caught my eye about this, as I

17   was assembling this exhibit, is this list remained in

18   effect for almost two years.  Do you have any

19   recollection as to why it went from November of '01

20   until July of '03?

21      A.    This list was good for one year.  There was a

22   delay in the next test.  But the list itself only

23   lasts a year.  They don't always start another testing

24   process immediately after a list expires.
```

Corporal Trinidad Navarro
185

1      Q.    So there were no promotions made for the

2    remaining eight months?

3      A.    I don't know.  I don't recall.

4      Q.    And then in July of '03, the year closest to

5    this, the one that leads to this lawsuit, you came in

6    53rd?

7      A.    Yes, sir.

8      Q.    And this despite the fact that McAllister gave

9    you a maximum 100 rating points.  Correct?

10     A.    Yes, yes.

11     Q.    That was disappointing, wasn't it?

12     A.    Sure, it was.

13     Q.    So 12th was -- when you came in 12th the year

14   after that was the best you had ever done?

15     A.    Yes.

16     Q.    Do you have any idea why you did better that

17   year than you had in the past which, with the

18   exception of November of '01, were in numbers in the

19   40s and 50s?

20     A.    I know why in '03 I came out 53.

21     Q.    Why is that?

22     A.    It was the same test was administered that year

23   as the previous year.  We were allowed to review that

24   test.  And people who reviewed that test scored much

Corporal Trinidad Navarro

235

1      A.    Because my understanding was to go through the

2   F.O.P. to -- because they have, I guess, the request

3   would have some teeth if it came from the F.O.P.  The

4   F.O.P. traditionally files grievances for incidents

5   such as this, such as the fact that there is an active

6   list, there are openings and they haven't been filled.

7   So I went to the F.O.P., not accusing anyone of

8   anything.  You can see by the tone of the memo.  I

9   simply wanted to know how many openings there were and

10  why weren't they being filled.

11     Q.    And you thought the only person who could get

12  an answer to that was the F.O.P.?

13     A.    I thought that that person would be the

14  appropriate person to ask.

15     Q.    And then there was a meeting May 16th attended

16  by Colonel McAllister and public safety director Sapp

17  and the folks on that list and the F.O.P. president?

18     A.    I think that's the date, sir.

19     Q.    Well, I think your counsel has a letter in

20  front of him that may peg the date.

21     A.    Yes, sir.  May 16th.

22     Q.    Okay.  And you left that meeting -- this is the

23  form of the question -- you were somewhat relieved by

24  what you heard in that meeting.  And you heard public

Corporal Trinidad Navarro
236

1    safety director Sapp say that there would be three

2    promotions in the fiscal year, early in the new fiscal

3    year.  Is that --

4        A.    Did I leave there happy or satisfied?

5        Q.    I wouldn't use the word "happy."  I think you

6    said our concerns were relieved or something like

7    that.

8        A.    Yeah.  There was light at the end of the

9    tunnel.  We had an answer.  It was determined that

10   there were three openings and that they would be

11   filled on July 1st.  Now, we knew that the excuse of a

12   deficit was, perhaps, a shoddy excuse because we were

13   paying actors that 5 percent premium for doing 20

14   percent of the work.  But we decided, you know, we

15   were happy with that response.  And there was light at

16   the end of the tunnel.

17       Q.    But then you began hearing in June that there

18   might not be all three promotions in July; is that

19   correct?

20       A.    I would say it was probably, yes, sir, sometime

21   in June.  Exactly when I am not sure.  Rumors, as you

22   heard, are pretty rampant around the Police

23   Department.

24       Q.    Do you recall anyone who passed that level of

# EXHIBIT B

## Division 26.03.500. Certification and appointment.

### Sec. 26.03.501. Requisitions for filling vacancies.

All requisitions for the filling of vacancies shall be made on official forms as designated by the Chief Human Resources Officer and as authorized by the Finance Office and the Chief Administrative Officer.

(Ord. No. 98-047, § 1(26-231), 5-12-1998)

### Sec. 26.03.502. Anticipation of need.

A.  Insofar as possible, each vacancy shall be anticipated sufficiently in advance to permit the Chief Human Resources Officer to determine who may be available for appointment and to establish an eligible list.

B.  By December 1 and June 1 of each year, each department general manager shall have conducted a personnel utilization needs study of the department and shall have reported to the Chief Human Resources Officer anticipated personnel requirements for the forthcoming six (6) month period.

(Ord. No. 98-047, § 1(26-232), 5-12-1998)

### Sec. 26.03.503. Method of filling vacancies.

Vacancies shall be filled by certification from transfer lists, demotion lists, reemployment lists, promotional lists and open-competitive lists.

(Ord. No. 98-047, § 1(26-233), 5-12-1998)

### Sec. 26.03.504. Certification of eligibles.

Promotional and open-competitive candidates shall be certified from all available lists in order of their ranking. With respect to the open-competitive list, where candidates are held to be equal, preference in certification shall be given to the County resident over the non-County resident.

(Ord. No. 98-047, § 1(26-234), 5-12-1998)

### Sec. 26.03.505. Number of names to be certified.

A.  When a personnel requisition is received, the Chief Human Resources Officer shall certify the top five (5) names from the promotional and open-competitive lists.

B.  When multiple vacancies are to be filled from the same eligible list, the Chief Human Resources Officer shall certify the top five (5) names plus one (1) additional name in rank order from the top of the list for each additional vacancy to be filled.

(Ord. No. 98-047, § 1(26-235), 5-12-1998)

124), adopted May 26, 1998.

(Ord. No. 98-050, § 2(2-124), 5-26-1998; Ord. No. 99-135, § 1, 12-14-1999)

### Sec. 2.05.105. Board of License Inspection and Review--Rules of procedure.

The Board of License Inspection and Review shall have the power to make and revise or rescind such rules as it may deem necessary or appropriate to provide an appeal procedure and otherwise conduct its affairs.

(Ord. No. 98-050, § 2(2-125), 5-26-1998)

### Division 2.05.200. Department of Public Safety.

### Sec. 2.05.201. Functions.

The Department of Public Safety shall be managed by a Director of Public Safety. The Department shall be comprised of the Division of Police, the Division of Emergency Medical Services, the Division of Emergency Communications and the Office of Emergency Management.

1. a. The Division of Police shall be supervised by a Chief of Police, who shall report to and be supervised by the Director of Public Safety. The Division of Police shall perform the following functions:

i. Organize, administer, supervise, and discipline the police force of the County;

ii. Enforce traffic regulations and investigate accidents;

iii. Make legal searches, seizures, and arrests, and exercise such legal authority incident thereto;

iv. Maintain and operate lockups for the temporary confinement of prisoners;

v. Maintain peace, protect life, property and all other rights and liberties of the people, and do and perform all other lawfully assigned acts;

b. The Division of Police may perform the following functions:

i. Provide school crossing guard service in the manner and to the extent authorized by ordinance; and

ii. Establish other functions related to public safety.

2. The Division of Emergency Medical Services shall be supervised by the Chief of Emergency Medical Services, who shall report to and be supervised by the Director of Public Safety. The Division of Emergency Medical Services shall operate an emergency medical service for individuals who become unexpectedly ill or incapacitated, to include the provision of advanced life support paramedic services.

3. The Division of Emergency Communications shall be supervised by the Chief of Emergency Communications, who shall report to and be supervised by the Director of Public Safety. The Division of Emergency Communications shall operate and maintain an integrated communications system designed to facilitate the prompt, efficient, and effective performance of its function.

4.  The Office of Emergency Management shall be supervised by a Coordinator of Emergency Management, who shall report to and be supervised by the Director of Public Safety. The Office of Emergency Management shall prepare and maintain a County comprehensive emergency operations plan and other plans as appropriate to provide guidance and direction to units of County government, and which are integrated into and coordinated with emergency management plans of the federal government, State of Delaware and politicalsubdivisions in the County.

(Ord. No. 98-050, § 2(2-131), 5-26-1998; Ord. No. 05-123, § 1, 11-22-2005)

## Sec. 2.05.202. Fire And Ambulance Advisory Board--Composition; Chairperson; fire districts.

A.  The Fire and Ambulance Board shall be composed of seven (7) members. One (1) member shall be appointed from each fire district and shall represent his or her district and may not be a full-time County employee. The Chairperson shall be one (1) of the nominees submitted from the fire districts and shall be appointed by the County Executive.

B.  The fire districts shall be composed as follows:

TABLE INSET:

| District | Stations |
|---|---|
| 1 | 22-28-20 |
| 2 | 11-25-13 |
| 3 | 12-21-8 & 9 |
| 4 | 26-24-27 |
| 5 | 19-14-16 |
| 6 | 23-30-17 |
| 7 | 18-15-29 |

(Ord. No. 98-050, § 2(2-132), 5-26-1998)

## Sec. 2.05.203. Fire and Ambulance Advisory Board--Organization; appointment; terms; Vice-chairperson; duties and powers.

A.  *Members; terms; removal; Vice-chairperson; quorum.*

1.  The members of the Fire and Ambulance Advisory Board shall be appointed by the County Executive with the advice and consent of County Council. The district members shall be appointed by the County Executive from the nominees from each district as chosen by the active fire chiefs and active presidents of each district. There shall be at least two (2) nominees submitted for each district to be represented, except that one (1) nominee may be submitted to be appointed as a representative of a district if that nominee has the support and endorsement of the active fire chiefs and active presidents from all three (3) stations in that district. Such support and endorsement shall be evidenced by a nominating petition in writing, signed by all of the active fire chiefs and active presidents and sent to the County Executive.

2.  The terms of the members shall be two (2) years.

3.  A fire company may be represented on the Fire and Ambulance Advisory Board for

# EXHIBIT C

Introduced by:  J. William Bell
Date of Introduction: 11/8/2005

*Ms. Powell*

ORDINANCE NO. 05-*123*

# AN ORDINANCE TO AMEND CHAPTER 2
## OF THE *NEW CASTLE COUNTY CODE*
### REGARDING POLICE AND THE
### DEPARTMENT OF PUBLIC SAFETY

**WHEREAS,** on August 6, 2003, by Ordinance 03-067, County Council authorized the position of Director of Public Safety; and

**WHEREAS,** on January, 2005, the General Assembly of the State of Delaware passed House Bill 29 amending Section 1122 of Title 9 of the Delaware Code to re-authorize the County Executive to merge, establish and modify departments of the County and to prescribe the functions and management systems of such departments, subject to the approval of County Council; and

**WHEREAS,** the County Executive and County Council deem it important to reorganize the Police Department to more efficiently and effectively meet the needs of the citizens of New Castle County.

**NOW, THEREFORE, THE COUNTY OF NEW CASTLE HEREBY ORDAINS:**

**Section 1.**      *New Castle County Code,* Chapter 2 ("Administration"), Division 2.05.200 ("Police Department"), Section 2.05.201 ("Functions") is hereby revised by the addition of the underlined text and the deletion of the text contained within brackets as set forth below:

**Division 2.05.200. [Police] Department <u>of Public Safety</u>.**

**Sec. 2.05.201. Functions.**

[A.    The Police Department, managed by a Chief of Police, shall perform the following functions:
1.      Organize, administer, supervise, and discipline the police force of the County;
2.      Enforce traffic regulations and investigate accidents;
3.      Make legal searches, seizures, and arrests, and exercise such legal authority incident thereto;
4.      Maintain and operate lockups for the temporary confinement of prisoners;
5.      Maintain peace, protect life, property and all other rights and liberties of the people, and do and perform all other lawfully assigned acts;
6.      Operate and maintain an integrated communications system designed to facilitate the prompt, efficient, and effective performance of its function and
7.      Organize, administer, supervise, and discipline a fire department created pursuant to 9 *Del.C.* §1335.

B.    The Police Department may perform the following functions:
1.      Provide school crossing guard service in the manner and to the extent authorized by ordinance;

2.      Prepare and maintain a County comprehensive emergency operations plan and other plans as appropriate to provide guidance and direction to units of County Council, and which are integrated into and coordinated with emergency management plans of the federal government, State of Delaware and political subdivisions in the County;

3.      Operate an emergency medical service for individuals who become unexpectedly ill or incapacitated, to include the provision of advanced life support paramedic services; and

4.      Establish other functions related to public safety.]

The Department of Public Safety shall be managed by a Director of Public Safety. The Department shall be comprised of the Division of Police, the Division of Emergency Medical Services, the Division of Emergency Communications and the Office of Emergency Management.

1.      a.      The Division of Police shall be supervised by a Chief of Police, who shall report to and be supervised by the Director of Public Safety. The Division of Police shall perform the following functions:

        i.      Organize, administer, supervise, and discipline the police force of the County;

        ii.     Enforce traffic regulations and investigate accidents;

        iii.    Make legal searches, seizures, and arrests, and exercise such legal authority incident thereto;

        iv.     Maintain and operate lockups for the temporary confinement of prisoners;

        v.      Maintain peace, protect life, property and all other rights and liberties of the people, and do and perform all other lawfully assigned acts;

    b.      The Division of Police may perform the following functions:

        i.      Provide school crossing guard service in the manner and to the extent authorized by ordinance; and

        ii.     Establish other functions related to public safety.

2.      The Division of Emergency Medical Services shall be supervised by the Chief of Emergency Medical Services, who shall report to and be supervised by the Director of Public Safety. The Division of Emergency Medical Services shall operate an emergency medical service for individuals who become unexpectedly ill or incapacitated, to include the provision of advanced life support paramedic services.

3.      The Division of Emergency Communications shall be supervised by the Chief of Emergency Communications, who shall report to and be supervised by the Director of Public Safety. The Division of Emergency Communications shall operate and maintain an integrated communications system designed to facilitate the prompt, efficient, and effective performance of its function.

4.      The Office of Emergency Management shall be supervised by a Coordinator of Emergency Management, who shall report to and be supervised by the Director of Public Safety. The Office of Emergency Management shall prepare and maintain a County comprehensive emergency operations plan and other plans as appropriate to provide guidance and direction to units of County government, and which are integrated into and coordinated with emergency management plans of the federal government, State of Delaware and political subdivisions in the County.

**Section 2.    Effective Date.** This ordinance shall become effective immediately upon its adoption by County Council and approval by the County Executive.

Adopted by County Council
of New Castle County on: 11/22/05

_President of County Council_
_of New Castle County_

Approved on:

County Executive
New Castle County    11/30/05

Synopsis:    This Ordinance renames the Police Department the Department of Public Safety, places the management of the Department under the authority of the Director of Public Safety, and creates three divisions, Police, Emergency Medical Services and Emergency Communications and one office, Emergency Management, within the Department.

Fiscal note:    This Ordinance, if adopted would change the name of the Department of Police to the Department of Public Safety. If approved, this legislation may result in additional administrative expenses due to changing the name of the Department on all correspondence/signage/etc.

D1412