# EXHIBIT R – PART I

Westlaw.

126 S.Ct. 1951                                                                 Page 1

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

▷
Briefs and Other Related Documents

Supreme Court of the United States
Gil GARCETTI et al., Petitioners,
v.
Richard CEBALLOS.
**No. 04-473.**

Argued March 21, 2006.
Decided May 30, 2006.

**Background:** Deputy district attorney filed § 1983
complaint against county and supervisors at district
attorneys' office, alleging that he was subject to
adverse employment actions in retaliation for
engaging in protected speech, that is, for writing a
disposition memorandum in which he recommended
dismissal of a case on the basis of purported
governmental misconduct. The United States
District Court for the Central District of California,
A. Howard Matz, J., granted defendants' motion for
summary judgment, and district attorney appealed.
The Court of Appeals for the Ninth Circuit,
Reinhardt, Circuit Judge, 361 F.3d 1168, reversed
and remanded. Certiorari was granted.

**Holdings:** The United States Supreme Court,
Justice Kennedy, held that:

10(1) when public employees make statements
pursuant to their official duties, they are not
speaking as citizens for First Amendment purposes,
and the Constitution does not insulate their
communications from employer discipline, and

11(2) here, district attorney did not speak as a
citizen when he wrote his memo and, thus, his
speech was not protected by the First Amendment.

Reversed and remanded.

Justice Stevens filed a dissenting opinion.

Justice Souter filed a dissenting opinion in which
Justices Stevens and Ginsburg joined.

Justice Breyer filed a dissenting opinion.

West Headnotes

**[1] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public
Employment. Most Cited Cases
A state cannot condition public employment on a
basis that infringes the employee's constitutionally
protected interest in freedom of expression.
U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public
Employment. Most Cited Cases
Public employees do not surrender all their First

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                          Page 2

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

Amendment rights by reason of their employment; rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(7) Labor Matters
               92k90.1(7.2) k. Public Employment. Most Cited Cases
Pursuant to *Pickering* and its progeny, two inquiries guide interpretation of the constitutional protections accorded to public employee speech: the first requires determining whether the employee spoke as a citizen on a matter of public concern; if not, the employee has no First Amendment cause of action based on the government employer's reaction to the speech, but if the answer is yes, the possibility of a First Amendment claim arises, and the question then becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(7) Labor Matters
               92k90.1(7.2) k. Public Employment. Most Cited Cases
Government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ☞82(11)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k82 Constitutional Guaranties in General
         92k82(6) Particular Rights, Limitations, and Applications
            92k82(11) k. Public Employees; Military Personnel. Most Cited Cases
First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and Limitations
            92k90.1(7) Labor Matters
               92k90.1(7.2) k. Public Employment. Most Cited Cases
So long as public employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ☞82(11)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k82 Constitutional Guaranties in General
         92k82(6) Particular Rights, Limitations, and Applications
            92k82(11) k. Public Employees; Military Personnel. Most Cited Cases
While the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

92k90.1 Particular Expressions and Limitations
92k90.1(7) Labor Matters
92k90.1(7.2) k. Public Employment. Most Cited Cases
In determining whether a public employee's speech is entitled to constitutional protection, the fact that the employee expresses his views inside his office, rather than publicly, is not dispositive; employees in some cases may receive First Amendment protection for expressions made at work. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(7) Labor Matters
92k90.1(7.2) k. Public Employment. Most Cited Cases
In determining whether a public employee's speech is entitled to constitutional protection, the fact that the speech concerns the subject matter of the employee's employment is nondispositive; the First Amendment protects some expressions related to the speaker's job. U.S.C.A. Const.Amend. 1.

**[10] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(7) Labor Matters
92k90.1(7.2) k. Public Employment. Most Cited Cases
When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. U.S.C.A. Const.Amend. 1.

**[11] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(7) Labor Matters
92k90.1(7.2) k. Public Employment. Most Cited Cases

**District and Prosecuting Attorneys 131 ☞3(1)**

131 District and Prosecuting Attorneys
131k3 Deputies, Assistants, and Substitutes
131k3(1) k. Appointment. Most Cited Cases
Deputy district attorney did not speak as a citizen when, pursuant to his official duties as a calendar deputy, he wrote a disposition memorandum in which he recommended dismissal of a pending criminal case on the basis of purported governmental misconduct, and so his speech was not protected by the First Amendment; when he went to work and performed the tasks he was paid to perform, district attorney acted as a government employee, not as a citizen, and fact that his duties sometimes required him to speak or write did not prohibit his supervisors from evaluating his performance. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[12] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(7) Labor Matters
92k90.1(7.2) k. Public Employment. Most Cited Cases
When a public employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences, which degree of scrutiny is absent when the employee is simply performing his or her job duties. U.S.C.A. Const.Amend. 1.

**[13] Constitutional Law 92 ☞90.1(7.2)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                 Page 4

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
(Cite as: 126 S.Ct. 1951)

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press
      92k90.1 Particular Expressions and Limitations
        92k90.1(7) Labor Matters
          92k90.1(7.2) k. Public Employment. Most Cited Cases
Public employers may not restrict employees' free speech rights by creating excessively broad job descriptions; the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties, for First Amendment purposes. U.S.C.A. Const.Amend. 1.
*1953 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Respondent Ceballos, a supervising deputy district attorney, was asked by defense counsel to review a case in which, counsel claimed, the affidavit police used to obtain a critical search warrant was inaccurate. Concluding after the review that the affidavit made serious misrepresentations, Ceballos relayed his findings to his supervisors, petitioners here, and followed up with a disposition memorandum recommending dismissal. Petitioners nevertheless proceeded with the prosecution. At a hearing on a defense motion to challenge the warrant, Ceballos recounted his observations about the affidavit, but the trial court rejected the challenge. Claiming that petitioners then retaliated against him for his memo in violation of the First and Fourteenth Amendments, Ceballos filed a 42 U.S.C. § 1983 suit. The District Court granted petitioners summary judgment, ruling, *inter alia*, that the memo was not protected speech because Ceballos wrote it pursuant to his employment duties. Reversing, the Ninth Circuit held that the memo's allegations were protected under the First

Amendment analysis in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708.

*Held:* When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. Pp. 1957 - 1962.

(a) Two inquiries guide interpretation of the constitutional protections accorded public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *Pickering, supra,* at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on the employer's reaction to the speech. See *Connick, supra,* at 147, 103 S.Ct. 1684. If the answer is yes, the possibility of a First Amendment claim arises. The question becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering, supra,* at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. Without a significant degree of control over its employees' words and actions, a government employer would have little chance to provide public services efficiently. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684. Thus, a government entity has broader discretion to restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations. On the other hand, a citizen who works for the government is nonetheless still a citizen. The First Amendment limits a public employer's ability to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570. So long as employees are speaking as citizens about matters of public*1954 concern, they must face

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, *e.g., Connick, supra,* at 147, 103 S.Ct. 1684. Pp. 1957 - 1959.

(b) Proper application of the Court's precedents leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail. The dispositive factor here is not that Ceballos expressed his views inside his office, rather than publicly, see, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619, nor that the memo concerned the subject matter of his employment, see, *e.g., Pickering,* 391 U. S, at 573, 88 S.Ct. 1731. Rather, the controlling factor is that Ceballos' expressions were made pursuant to his official duties. That consideration distinguishes this case from those in which the First Amendment provides protection against discipline. Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700. This result is consistent with the Court's prior emphasis on the potential societal value of employee speech and on affording government employers sufficient discretion to manage their operations. Ceballos' proposed contrary rule, adopted by the Ninth Circuit, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in the Court's precedents. The doctrinal anomaly the Court of Appeals perceived in compelling public employers to tolerate certain employee speech made publicly but not speech made pursuant to an employee's assigned duties misconceives the theoretical underpinnings of this Court's decisions and is unfounded as a practical matter. Pp. 1959 - 1962.

(c) Exposing governmental inefficiency and misconduct is a matter of considerable significance, and various measures have been adopted to protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. These include federal and state whistle-blower protection laws and labor codes and, for government attorneys, rules of conduct and constitutional obligations apart from the First Amendment. However, the Court's precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job. P. 1962.

361 F.3d 1168, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS , and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined. BREYER, J., filed a dissenting opinion.

***1955** Dan Himmelfarb, for the United States as amicus curiae, by special leave of the Court, supporting the petitioners.
Bonnie E. Robin-Vergeer, for respondent.
Cindy S. Lee, Counsel of Record, Jin S. Choi, Franscell, Strickland, Roberts & Lawrence, Glendale, California, Office Of The County Counsel, Raymond G. Fortner, Jr., County Counsel, Philip S. Miller, Assistant County Counsel, Doraine F. Meyer, Senior Deputy County Counsel, Los Angeles, California, Counsel for Petitioners.
Cindy S. Lee, Counsel of Record, Jin S. Choi, Franscell, Strickland, Roberts & Lawrence, Glendale, California, Counsel for Petitioners

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                        Page 6

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
(Cite as: 126 S.Ct. 1951)

Admitted to the Bar of the Supreme Court on July 17, 1998.
Bonnie I. Robin-Vergeer, Counsel of Record, Scott L. Nelson, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, Humberto Guizar Moreno, Becerra, Guerrero & Casillas, Montebello, CA, Counsel for Respondent.For U.S. Supreme Court briefs, see:2005 WL 1317482 (Pet.Brief)2005 WL 1801035 (Resp.Brief)2005 WL 2072142 (Reply.Brief)
Justice KENNEDY delivered the opinion of the Court.
[1] It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The question presented by the instant case is whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties.

I

Respondent Richard Ceballos has been employed since 1989 as a deputy district attorney for the Los Angeles County District Attorney's Office. During the period relevant to this case, Ceballos was a calendar deputy in the office's Pomona branch, and in this capacity he exercised certain supervisory responsibilities over other lawyers. In February 2000, a defense attorney contacted Ceballos about a pending criminal case. The defense attorney said there were inaccuracies in an affidavit used to obtain a critical search warrant. The attorney informed Ceballos that he had filed a motion to traverse, or challenge, the warrant, but he also wanted Ceballos to review the case. According to Ceballos, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases.

After examining the affidavit and visiting the location it described, Ceballos determined the affidavit contained serious misrepresentations. The affidavit called a long driveway what Ceballos thought should have been referred to as a separate roadway. Ceballos also questioned the affidavit's statement that tire tracks led from a stripped-down truck to the premises covered by the warrant. His doubts arose from his conclusion that the roadway's composition in some places made it difficult or impossible to leave visible tire tracks.

Ceballos spoke on the telephone to the warrant affiant, a deputy sheriff from the Los Angeles County Sheriff's Department, but he did not receive a satisfactory explanation for the perceived inaccuracies. He relayed his findings to his supervisors, petitioners Carol Najera and Frank Sundstedt, and followed up by preparing a disposition memorandum. The memo explained *1956 Ceballos' concerns and recommended dismissal of the case. On March 2, 2000, Ceballos submitted the memo to Sundstedt for his review. A few days later, Ceballos presented Sundstedt with another memo, this one describing a second telephone conversation between Ceballos and the warrant affiant.

Based on Ceballos' statements, a meeting was held to discuss the affidavit. Attendees included Ceballos, Sundstedt, and Najera, as well as the warrant affiant and other employees from the sheriff's department. The meeting allegedly became heated, with one lieutenant sharply criticizing Ceballos for his handling of the case.

Despite Ceballos' concerns, Sundstedt decided to proceed with the prosecution, pending disposition of the defense motion to traverse. The trial court held a hearing on the motion. Ceballos was called by the defense and recounted his observations about the affidavit, but the trial court rejected the challenge to the warrant.

Ceballos claims that in the aftermath of these events he was subjected to a series of retaliatory employment actions. The actions included reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion. Ceballos initiated an employment grievance, but the grievance was denied based on a finding that he had not suffered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                   Page 7

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

any retaliation. Unsatisfied, Ceballos sued in the United States District Court for the Central District of California, asserting, as relevant here, a claim under Rev. Stat. § 1979, 42 U.S.C. § 1983. He alleged petitioners violated the First and Fourteenth Amendments by retaliating against him based on his memo of March 2.

Petitioners responded that no retaliatory actions were taken against Ceballos and that all the actions of which he complained were explained by legitimate reasons such as staffing needs. They further contended that, in any event, Ceballos' memo was not protected speech under the First Amendment. Petitioners moved for summary judgment, and the District Court granted their motion. Noting that Ceballos wrote his memo pursuant to his employment duties, the court concluded he was not entitled to First Amendment protection for the memo's contents. It held in the alternative that even if Ceballos' speech was constitutionally protected, petitioners had qualified immunity because the rights Ceballos asserted were not clearly established.

The Court of Appeals for the Ninth Circuit reversed, holding that "Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment." 361 F.3d 1168, 1173 (C.A.9 2004). In reaching its conclusion the court looked to the First Amendment analysis set forth in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick,* 461 U.S. 138, 103 S.Ct. 1684. *Connick* instructs courts to begin by considering whether the expressions in question were made by the speaker "as a citizen upon matters of public concern." See *id.,* at 146-147, 103 S.Ct. 1684. The Court of Appeals determined that Ceballos' memo, which recited what he thought to be governmental misconduct, was "inherently a matter of public concern." 361 F.3d, at 1174. The court did not, however, consider whether the speech was made in Ceballos' capacity as a citizen. Rather, it relied on Circuit precedent rejecting the idea that "a public employee's speech is deprived of First Amendment protection whenever those views are

expressed, to government workers or others, pursuant to an employment responsibility." *Id.,* at 1174-1175 (citing cases including **\*1957** *Roth v. Veteran's Admin. of Govt. of United States,* 856 F.2d 1401 (C.A.9 1988)).

Having concluded that Ceballos' memo satisfied the public-concern requirement, the Court of Appeals proceeded to balance Ceballos' interest in his speech against his supervisors' interest in responding to it. See *Pickering, supra,* at 568, 88 S.Ct. 1731. The court struck the balance in Ceballos' favor, noting that petitioners "failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office" as a result of the memo. See 361 F.3d, at 1180. The court further concluded that Ceballos' First Amendment rights were clearly established and that petitioners' actions were not objectively reasonable. See *id.,* at 1181-1182.

Judge O'Scannlain specially concurred. Agreeing that the panel's decision was compelled by Circuit precedent, he nevertheless concluded Circuit law should be revisited and overruled. See *id.,* at 1185. Judge O'Scannlain emphasized the distinction " between speech offered by a public employee acting *as an employee* carrying out his or her ordinary job duties and that spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import." *Id.,* at 1187. In his view, "when public employees speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech that gives rise to a First Amendment right." *Id.,* at 1189.

We granted certiorari, 543 U.S. 1186, 125 S.Ct. 1395, 161 L.Ed.2d 188 (2005), and we now reverse.

II

[2] As the Court's decisions have noted, for many years "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment-including those which restricted the exercise of constitutional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                      Page 8

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

rights." *Connick,* 461 U.S., at 143, 103 S.Ct. 1684. That dogma has been qualified in important respects. See *id.,* at 144-145, 103 S.Ct. 1684. The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. See, *e.g., Pickering, supra,* at 568, 88 S.Ct. 1731; *Connick, supra,* at 147, 103 S.Ct. 1684; *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *United States v. Treasury Employees,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

*Pickering* provides a useful starting point in explaining the Court's doctrine. There the relevant speech was a teacher's letter to a local newspaper addressing issues including the funding policies of his school board. 391 U.S., at 566, 88 S.Ct. 1731. " The problem in any case," the Court stated, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.,* at 568, 88 S.Ct. 1731. The Court found the teacher's speech "neither [was] shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id.,* at 572-573, 88 S.Ct. 1731 (footnote omitted). Thus, the Court concluded that "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution **\*1958** by any member of the general public." *Id.,* at 573, 88 S.Ct. 1731.

[3][4] *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *id.,* at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First

Amendment cause of action based on his or her employer's reaction to the speech. See *Connick, supra,* at 147, 103 S.Ct. 1684. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering,* 391 U.S., at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

To be sure, conducting these inquiries sometimes has proved difficult. This is the necessary product of "the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors ... to furnish grounds for dismissal." *Id.,* at 569., 88 S.Ct. 1731 The Court's overarching objectives, though, are evident.

When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. See, *e.g., Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684 ("[G]overnment offices could not function if every employment decision became a constitutional matter"). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

[5][6] At the same time, the Court has recognized that a citizen who works for the government is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                                          Page 9

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
(Cite as: 126 S.Ct. 1951)

nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, *e.g., Connick, supra,* at 147, 103 S.Ct. 1684 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").

The Court's employee-speech jurisprudence protects, of course, the constitutional rights of public employees. Yet the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion. *Pickering* again provides an instructive example. The Court characterized its *1959 holding as rejecting the attempt of school administrators to "limi[t] teachers' opportunities to contribute to public debate." 391 U.S., at 573, 88 S.Ct. 1731. It also noted that teachers are "the members of a community most likely to have informed and definite opinions" about school expenditures. *Id.,* at 572, 88 S.Ct. 1731. The Court's approach acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed. The Court's more recent cases have expressed similar concerns. See, *e.g., San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam)* ("Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it" (citation omitted)); cf. *Treasury Employees,* 513 U.S., at 470, 115 S.Ct. 1003 ("The large-scale disincentive to Government employees'

expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said").

[7] The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. See, *e.g., Rankin,* 483 U.S., at 384, 107 S.Ct. 2891 (recognizing "the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment"). Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick,* 461 U.S., at 154, 103 S.Ct. 1684.

III

[8] With these principles in mind we turn to the instant case. Respondent Ceballos believed the affidavit used to obtain a search warrant contained serious misrepresentations. He conveyed his opinion and recommendation in a memo to his supervisor. That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work. See, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public," *Pickering,* 391 U.S., at 573, 88 S.Ct. 1731, to hold that all speech within the office is automatically exposed to restriction.

[9] The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job. See, *e.g., ibid.; Givhan, supra,* at 414, 99 S.Ct. 693. As the Court noted in *Pickering:* "Teachers are, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                                    Page 10

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S., at 572, 88 S.Ct. 1731. The same is true of many other categories of public employees.

[10][11] The controlling factor in Ceballos' case is that his expressions were **\*1960** made pursuant to his duties as a calendar deputy. See Brief for Respondent 4 ("Ceballos does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor' "). That consideration-the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case-distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Contrast, for example, the expressions made by the speaker in *Pickering,* whose letter to the newspaper had no official significance and bore similarities to letters

submitted by numerous citizens every day.

Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

This result is consistent with our precedents' attention to the potential societal value of employee speech. See *supra,* at 1958 - 1959. Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit.

Our holding likewise is supported by the emphasis of our precedents on affording government employers sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or **\*1961** misguided, they had the authority to take proper corrective action.

[12] Ceballos' proposed contrary rule, adopted by the Court of Appeals, would commit state and federal courts to a new, permanent, and intrusive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12 of 27

Case 1:05-cv-00565-GMS    Document 60-2    Filed 07/17/2006    Page 12 of 26

126 S.Ct. 1951                                                                  Page 11

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

The Court of Appeals based its holding in part on what it perceived as a doctrinal anomaly. The court suggested it would be inconsistent to compel public employers to tolerate certain employee speech made publicly but not speech made pursuant to an employee's assigned duties. See 361 F.3d, at 1176. This objection misconceives the theoretical underpinnings of our decisions. Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see *Pickering,* 391 U.S. 563, 88 S.Ct. 1731, or discussing politics with a co-worker, see *Rankin,* 483 U.S. 378, 107 S.Ct. 2891. When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

The Court of Appeals' concern also is unfounded as a practical matter. The perceived anomaly, it should be noted, is limited in scope: It relates only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick* ) that are made outside the duties of employment. If, moreover, a government

employer is troubled by the perceived anomaly, it has the means at hand to avoid it. A public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public.

Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail.

[13] Two final points warrant mentioning. First, as indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. See *post,* at 1965, n. 2 (SOUTER, J., dissenting). The proper inquiry is a practical one. *1962 Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Second, Justice SOUTER suggests today's decision may have important ramifications for academic freedom, at least as a constitutional value. See *post,* at 1969 - 1970. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                              Page 12

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

would apply in the same manner to a case involving speech related to scholarship or teaching.

## IV

Exposing governmental inefficiency and misconduct is a matter of considerable significance. As the Court noted in *Connick*, public employers should, "as a matter of good judgment," be " receptive to constructive criticism offered by their employees." 461 U.S., at 149, 103 S.Ct. 1684. The dictates of sound judgment are reinforced by the powerful network of legislative enactments-such as whistle-blower protection laws and labor codes-available to those who seek to expose wrongdoing. See, *e.g.*, 5 U.S.C. § 2302(b)(8); Cal. Govt.Code Ann. § 8547.8 (West 2005); Cal. Lab.Code Ann. § 1102.5 (West Supp.2006). Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment. See, *e.g.*, Cal. Rule Prof. Conduct 5-110 (2005) ( "A member in government service shall not institute or cause to be instituted criminal charges when the member knows or should know that the charges are not supported by probable cause"); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These imperatives, as well as obligations arising from any other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions.

We reject, however, the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties. Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, dissenting.
The proper answer to the question "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties," *ante*, at 1955, is " Sometimes," not "Never." Of course a supervisor may take corrective action when such speech is " inflammatory or misguided," *ante*, at 1960 - 1961. But what if it is just unwelcome speech because it reveals facts that the supervisor would rather not have anyone else discover? FN*

> FN* See, *e.g.*, *Branton v. Dallas*, 272 F.3d 730 (C.A.5 2001) (police internal investigator demoted by police chief after bringing the false testimony of a fellow officer to the attention of a city official); *Miller v. Jones*, 444 F.3d 929, 936 (C.A.7 2006) (police officer demoted after opposing the police chief's attempt to " us[e] his official position to coerce a financially independent organization into a potentially ruinous merger"); *Delgado v. Jones*, 282 F.3d 511 (C.A.7 2002) (police officer sanctioned for reporting criminal activity that implicated a local political figure who was a good friend of the police chief); *Herts v. Smith*, 345 F.3d 581 (C.A.8 2003) (school district official's contract was not renewed after she gave frank testimony about the district's desegregation efforts); *Kincade v. Blue Springs*, 64 F.3d 389 (C.A.8 1995) (engineer fired after reporting to his supervisors that contractors were failing to complete dam-related projects and that the resulting dam might be structurally unstable); *Fox v. District of Columbia*, 83 F.3d 1491, 1494 (C.A.D.C.1996) (D.C. Lottery Board security officer fired after informing the police about a theft made possible by "rather drastic managerial ineptitude").

**\*1963** As Justice SOUTER explains, public employees are still citizens while they are in the office. The notion that there is a categorical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                  Page 13

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

difference between speaking as a citizen and speaking in the course of one's employment is quite wrong. Over a quarter of a century has passed since then-Justice Rehnquist, writing for a unanimous Court, rejected "the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). We had no difficulty recognizing that the First Amendment applied when Bessie Givhan, an English teacher, raised concerns about the school's racist employment practices to the principal. See *id.,* at 413-416, 99 S.Ct. 693. Our silence as to whether or not her speech was made pursuant to her job duties demonstrates that the point was immaterial. That is equally true today, for it is senseless to let constitutional protection for exactly the same words hinge on whether they fall within a job description. Moreover, it seems perverse to fashion a new rule that provides employees with an incentive to voice their concerns publicly before talking frankly to their superiors.

While today's novel conclusion to the contrary may not be "inflammatory," for the reasons stated in Justice SOUTER's dissenting opinion it is surely " misguided."

Justice SOUTER, with whom Justice STEVENS and Justice GINSBURG join, dissenting.
The Court holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ante,* at 1960. I respectfully dissent. I agree with the majority that a government employer has substantial interests in effectuating its chosen policy and objectives, and in demanding competence, honesty, and judgment from employees who speak for it in doing their work. But I would hold that private and public interests in addressing official wrongdoing and threats to health and safety can outweigh the government's stake in the efficient implementation of policy, and when they do public employees who speak on these

matters in the course of their duties should be eligible to claim First Amendment protection.

I

Open speech by a private citizen on a matter of public importance lies at the heart of expression subject to protection by the First Amendment. See, *e.g., Schenck v. Pro-Choice Network of Western N. Y.,* 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). At the other extreme,**1964** a statement by a government employee complaining about nothing beyond treatment under personnel rules raises no greater claim to constitutional protection against retaliatory response than the remarks of a private employee. See *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).
In between these points lies a public employee's speech unwelcome to the government but on a significant public issue. Such an employee speaking as a citizen, that is, with a citizen's interest, is protected from reprisal unless the statements are too damaging to the government's capacity to conduct public business to be justified by any individual or public benefit thought to flow from the statements. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Entitlement to protection is thus not absolute.

This significant, albeit qualified, protection of public employees who irritate the government is understood to flow from the First Amendment, in part, because a government paycheck does nothing to eliminate the value to an individual of speaking on public matters, and there is no good reason for categorically discounting a speaker's interest in commenting on a matter of public concern just because the government employs him. Still, the First Amendment safeguard rests on something more, being the value to the public of receiving the opinions and information that a public employee may disclose. "Government employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                    Page 14

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

The reason that protection of employee speech is qualified is that it can distract co-workers and supervisors from their tasks at hand and thwart the implementation of legitimate policy, the risks of which grow greater the closer the employee's speech gets to commenting on his own workplace and responsibilities. It is one thing for an office clerk to say there is waste in government and quite another to charge that his own department pays full-time salaries to part-time workers. Even so, we have regarded eligibility for protection by *Pickering* balancing as the proper approach when an employee speaks critically about the administration of his own government employer. In *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), we followed *Pickering* when a teacher was fired for complaining to a superior about the racial composition of the school's administrative, cafeteria, and library staffs, 439 U.S., at 413-414, 99 S.Ct. 693, and the same point was clear in *Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). That case was decided, in part, with reference to the *Pickering* framework, and the Court there held that a schoolteacher speaking out on behalf of himself and others at a public school board meeting could not be penalized for criticizing pending collective-bargaining negotiations affecting professional employment. *Madison* noted that the teacher "addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government." 429 U.S., at 174-175, 97 S.Ct. 421. In each case, the Court realized that a public employee can wear a citizen's hat when speaking on subjects closely tied to the employee's own job, and *Givhan* stands for the same conclusion even when the speech is not addressed to the public at large. Cf. *Pegram v. Herdrich,* 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (recognizing that, factually, a *1965 trustee under the Employee Retirement Income Security Act of 1974 can both act as ERISA fiduciary and act on behalf of the employer).

The difference between a case like *Givhan* and this one is that the subject of Ceballos's speech fell

within the scope of his job responsibilities, whereas choosing personnel was not what the teacher was hired to do. The effect of the majority's constitutional line between these two cases, then, is that a *Givhan* schoolteacher is protected when complaining to the principal about hiring policy, but a school personnel officer would not be if he protested that the principal disapproved of hiring minority job applicants. This is an odd place to draw a distinction,[FN1] and while necessary judicial line-drawing sometimes looks arbitrary, any distinction obliges a court to justify its choice. Here, there is no adequate justification for the majority's line categorically denying *Pickering* protection to any speech uttered "pursuant to ... official duties," *ante,* at 1960.

> FN1. It seems stranger still in light of the majority's concession of some First Amendment protection when a public employee repeats statements made pursuant to his duties but in a separate, public forum or in a letter to a newspaper. *Ante,* at 1961.

As all agree, the qualified speech protection embodied in *Pickering* balancing resolves the tension between individual and public interests in the speech, on the one hand, and the government's interest in operating efficiently without distraction or embarrassment by talkative or headline-grabbing employees. The need for a balance hardly disappears when an employee speaks on matters his job requires him to address; rather, it seems obvious that the individual and public value of such speech is no less, and may well be greater, when the employee speaks pursuant to his duties in addressing a subject he knows intimately for the very reason that it falls within his duties.[FN2]

> FN2. I do not say the value of speech " pursuant to ... duties" will always be greater, because I am pessimistic enough to expect that one response to the Court's holding will be moves by government employers to expand stated job

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                          Page 15

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview. Now that the government can freely penalize the school personnel officer for criticizing the principal because speech on the subject falls within the personnel officer's job responsibilities, the government may well try to limit the English teacher's options by the simple expedient of defining teachers' job responsibilities expansively, investing them with a general obligation to ensure sound administration of the school. Hence today's rule presents the regrettable prospect that protection under *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), may be diminished by expansive statements of employment duties.

The majority's response, that the enquiry to determine duties is a "practical one," *ante,* at 1961, does not alleviate this concern. It sets out a standard that will not discourage government employers from setting duties expansively, but will engender litigation to decide which stated duties were actual and which were merely formal.

As for the importance of such speech to the individual, it stands to reason that a citizen may well place a very high value on a right to speak on the public issues he decides to make the subject of his work day after day. Would anyone doubt that a school principal evaluating the performance of teachers for promotion or pay adjustment retains a citizen's interest in addressing the quality of teaching in the schools? (Still, the majority indicates he could be fired without First Amendment recourse for fair but unfavorable comment when the teacher under review is the superintendent's daughter.) Would anyone deny that a prosecutor like Richard Ceballos may claim the interest of any citizen in *1966 speaking out against a rogue law enforcement officer, simply because his job requires him to express a judgment about the officer's performance? (But the majority

says the First Amendment gives Ceballos no protection, even if his judgment in this case was sound and appropriately expressed.)

Indeed, the very idea of categorically separating the citizen's interest from the employee's interest ignores the fact that the ranks of public service include those who share the poet's "object ... to unite [m]y avocation and my vocation;"[FN3] these citizen servants are the ones whose civic interest rises highest when they speak pursuant to their duties, and these are exactly the ones government employers most want to attract.[FN4] There is no question that public employees speaking on matters they are obliged to address would generally place a high value on a right to speak, as any responsible citizen would.

FN3. R. Frost, Two Tramps in Mud Time, Collected Poems, Prose, & Plays 251, 252 (R. Poirier & M. Richardson eds.1995).

FN4. Not to put too fine a point on it, the Human Resources Division of the Los Angeles County District Attorney's Office, Ceballos's employer, is telling anyone who will listen that its work "provides the personal satisfaction and fulfillment that comes with knowing you are contributing essential services to the citizens of Los Angeles County." Career Opportunities, http://da.co.la.ca.us/hr/default.htm (all Internet materials as visited May 25, 2006, and available in Clerk of Court's case file). The United States expresses the same interest in identifying the individual ideals of a citizen with its employees' obligations to the Government. See Brief as *Amicus Curiae* 25 (stating that public employees are motivated to perform their duties "to serve the public"). Right now, for example, the U.S. Food and Drug Administration is appealing to physicians, scientists, and statisticians to work in the Center for Drug Evaluation and Research, with the message that they "can give back to [their] community, state, and country by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                                    Page 16

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

making a difference in the lives of Americans everywhere." Career Opportunities at CDER: You Can Make a Difference, http:// www.fda.gov/cder/ career/default.htm. Indeed, the Congress of the United States, by concurrent resolution, has previously expressly endorsed respect for a citizen's obligations as the prime responsibility of Government employees: " Any person in Government Service should: ... [p]ut loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department, " and shall "[e]xpose corruption wherever discovered," Code of Ethics for Government Service, H. Con. Res. 175, 85th Cong., 2d Sess., 72 Stat. B12. Display of this Code in Government buildings was once required by law, 94 Stat. 855; this obligation has been repealed, Office of Government Ethics Authorization Act of 1996, Pub.L. 104-179, § 4, 110 Stat. 1566.

Nor is there any reason to raise the counterintuitive question whether the public interest in hearing informed employees evaporates when they speak as required on some subject at the core of their jobs. Two Terms ago, we recalled the public value that the *Pickering* Court perceived in the speech of public employees as a class: "Underlying the decision in *Pickering* is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam)* (citation omitted). This is not a whit less true when an employee's job duties require him to speak about such things: when, for example, a public auditor speaks on his discovery of embezzlement of public *1967 funds, when a building inspector makes an obligatory report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect. (The majority, however, places all these speakers beyond the reach of First Amendment protection against retaliation.)

Nothing, then, accountable on the individual and public side of the *Pickering* balance changes when an employee speaks "pursuant" to public duties. On the side of the government employer, however, something is different, and to this extent, I agree with the majority of the Court. The majority is rightly concerned that the employee who speaks out on matters subject to comment in doing his own work has the greater leverage to create office uproars and fracture the government's authority to set policy to be carried out coherently through the ranks. "Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission," *ante,* at 1960. Up to a point, then, the majority makes good points: government needs civility in the workplace, consistency in policy, and honesty and competence in public service.

But why do the majority's concerns, which we all share, require categorical exclusion of First Amendment protection against any official retaliation for things said on the job? Is it not possible to respect the unchallenged individual and public interests in the speech through a *Pickering* balance without drawing the strange line I mentioned before, *supra,* at 1956 - 1957? This is, to be sure, a matter of judgment, but the judgment has to account for the undoubted value of speech to those, and by those, whose specific public job responsibilities bring them face to face with wrongdoing and incompetence in government, who refuse to avert their eyes and shut their mouths. And it has to account for the need actually to disrupt government if its officials are corrupt or dangerously incompetent. See n. 4, *supra.* It is thus no adequate justification for the suppression of potentially valuable information simply to recognize that the government has a huge interest in managing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                    Page 17

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

its employees and preventing the occasionally irresponsible one from turning his job into a bully pulpit. Even there, the lesson of *Pickering* (and the object of most constitutional adjudication) is still to the point: when constitutionally significant interests clash, resist the demand for winner-take-all; try to make adjustments that serve all of the values at stake.

Two reasons in particular make me think an adjustment using the basic *Pickering* balancing scheme is perfectly feasible here. First, the extent of the government's legitimate authority over subjects of speech required by a public job can be recognized in advance by setting in effect a minimum heft for comments with any claim to outweigh it. Thus, the risks to the government are great enough for us to hold from the outset that an employee commenting on subjects in the course of duties should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it. The examples I have already given indicate the eligible subject matter, and it is fair to say that only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor. If promulgation of this standard should fail to discourage meritless actions premised on 42 U.S.C. § 1983 (or **\*1968** *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) before they get filed, the standard itself would sift them out at the summary-judgment stage.[FN5]

FN5. As I also said, a public employer is entitled (and obliged) to impose high standards of honesty, accuracy, and judgment on employees who speak in doing their work. These criteria are not, however, likely to discourage meritless litigation or provide a handle for summary judgment. The employee who has spoken out, for example, is unlikely to blame himself for prior bad judgment before he sues for retaliation.

My second reason for adapting *Pickering* to the circumstances at hand is the experience in Circuits that have recognized claims like Ceballos's here. First Amendment protection less circumscribed than what I would recognize has been available in the Ninth Circuit for over 17 years, and neither there nor in other Circuits that accept claims like this one has there been a debilitating flood of litigation. There has indeed been some: as represented by Ceballos's lawyer at oral argument, each year over the last five years, approximately 70 cases in the different Courts of Appeals and approximately 100 in the various District Courts. Tr. of Oral Arg. 58-59. But even these figures reflect a readiness to litigate that might well have been cooled by my view about the importance required before *Pickering* treatment is in order.

For that matter, the majority's position comes with no guarantee against factbound litigation over whether a public employee's statements were made " pursuant to ... official duties," *ante,* at 1960. In fact, the majority invites such litigation by describing the enquiry as a "practical one," *ante,* at 1961, apparently based on the totality of employment circumstances.[FN6] See n. 2, *supra.* Are prosecutors' discretionary statements about cases addressed to the press on the courthouse steps made "pursuant to their official duties"? Are government nuclear scientists' complaints to their supervisors about a colleague's improper handling of radioactive materials made "pursuant" to duties?

FN6. According to the majority's logic, the litigation it encourages would have the unfortunate result of "demand[ing] permanent judicial intervention in the conduct of governmental operations," *ante,* at 1961.

II

The majority seeks support in two lines of argument extraneous to *Pickering* doctrine. The one turns on a fallacious reading of cases on government speech, the other on a mistaken assessment of protection available under whistle-blower statutes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                    Page 18

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

A

The majority accepts the fallacy propounded by the
county petitioners and the Federal Government as
*amicus* that any statement made within the scope of
public employment is (or should be treated as) the
government's own speech, see *ante,* at 1960, and
should thus be differentiated as a matter of law from
the personal statements the First Amendment
protects, see *Broadrick v. Oklahoma,* 413 U.S. 601,
610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The
majority invokes the interpretation set out in
*Rosenberger v. Rector and Visitors of Univ. of Va.,*
515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700
(1995), of *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct.
1759, 114 L.Ed.2d 233 (1991), which held there
was no infringement of the speech rights of Title X
funds recipients and their staffs when the
Government forbade any on-the-job counseling in
favor of abortion as a method of family planning,
*id.,* at 192-200, 111 S.Ct. 1759. We have read *Rust*
to mean that "when the government appropriates
**\*1969** public funds to promote a particular policy
of its own it is entitled to say what it wishes."
*Rosenberger, supra,* at 833, 115 S.Ct. 2510.

The key to understanding the difference between
this case and *Rust* lies in the terms of the respective
employees' jobs and, in particular, the extent to
which those terms require espousal of a substantive
position prescribed by the government in advance.
Some public employees are hired to "promote a
particular policy" by broadcasting a particular
message set by the government, but not everyone
working for the government, after all, is hired to
speak from a government manifesto. See *Legal
Services Corporation v. Velazquez,* 531 U.S. 533,
542, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001).
There is no claim or indication that Ceballos was
hired to perform such a speaking assignment. He
was paid to enforce the law by constitutional action:
to exercise the county government's prosecutorial
power by acting honestly, competently, and
constitutionally. The only sense in which his
position apparently required him to hew to a
substantive message was at the relatively abstract
point of favoring respect for law and its evenhanded
enforcement, subjects that are not at the level of

controversy in this case and were not in *Rust.*
Unlike the doctors in *Rust,* Ceballos was not paid to
advance one specific policy among those
legitimately available, defined by a specific
message or limited by a particular message
forbidden. The county government's interest in his
speech cannot therefore be equated with the terms
of a specific, prescribed, or forbidden substantive
position comparable to the Federal Government's
interest in *Rust,* and *Rust* is no authority for the
notion that government may exercise plenary
control over every comment made by a public
employee in doing his job.

It is not, of course, that the district attorney lacked
interest of a high order in what Ceballos might say.
If his speech undercut effective, lawful prosecution,
there would have been every reason to rein him in
or fire him; a statement that created needless
tension among law enforcement agencies would be
a fair subject of concern, and the same would be
true of inaccurate statements or false ones made in
the course of doing his work. But these interests
on the government's part are entirely distinct from
any claim that Ceballos's speech was government
speech with a preset or proscribed content as
exemplified in *Rust.* Nor did the county petitioners
here even make such a claim in their answer to
Ceballos's complaint, see n. 13, *infra.*

The fallacy of the majority's reliance on
*Rosenberger's* understanding of *Rust* doctrine,
moreover, portends a bloated notion of controllable
government speech going well beyond the
circumstances of this case. Consider the breadth of
the new formulation:
"Restricting speech that owes its existence to a
public employee's professional responsibilities does
not infringe any liberties the employee might have
enjoyed as a private citizen. It simply reflects the
exercise of employer control over what the
employer itself has commissioned or created."
*Ante,* at 1960.

This ostensible domain beyond the pale of the First
Amendment is spacious enough to include even the
teaching of a public university professor, and I have
to hope that today's majority does not mean to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                         Page 19

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write "pursuant to official duties." See *Grutter v. Bollinger,* 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ( "We have long recognized that, given the **\*1970** important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition"); *Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools' " (quoting *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960))); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (a governmental enquiry into the contents of a scholar's lectures at a state university " unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression-areas in which government should be extremely reticent to tread").

### B

The majority's second argument for its disputed limitation of *Pickering* doctrine is that the First Amendment has little or no work to do here owing to an assertedly comprehensive complement of state and national statutes protecting government whistle-blowers from vindictive bosses. See *ante,* at 1961 - 1962. But even if I close my eyes to the tenet that " '[t]he applicability of a provision of the Constitution has never depended on the vagaries of state or federal law,' " *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 680, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), the majority's counsel to rest easy fails on its own terms.[FN7]

FN7. Even though this Court has recognized that 42 U.S.C. § 1983 "does not authorize a suit for every alleged violation of federal law," *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the rule is that " § 1983 remains a generally and presumptively available remedy for claimed violations of federal law," *id.,* at 133, 114 S.Ct. 2068. Individual enforcement under § 1983 is rendered unavailable for alleged violations of federal law when the underlying statutory provision is part of a federal statutory scheme clearly incompatible with individual enforcement under § 1983. See *Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119-120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

To begin with, speech addressing official wrongdoing may well fall outside protected whistle-blowing, defined in the classic sense of exposing an official's fault to a third party or to the public; the teacher in *Givhan,* for example, who raised the issue of unconstitutional hiring bias, would not have qualified as that sort of whistle-blower, for she was fired after a private conversation with the school principal. In any event, the combined variants of statutory whistle-blower definitions and protections add up to a patchwork, not a showing that worries may be remitted to legislatures for relief. See D. Westman & N. Modesitt, Whistleblowing: Law of Retaliatory Discharge 67-75, 281-307 (2d ed.2004). Some state statutes protect all government workers, including the employees of municipalities and other subdivisions;[FN8] others stop at state employees.[FN9] Some limit protection**\*1971** to employees who tell their bosses before they speak out;[FN10] others forbid bosses from imposing any requirement to warn. [FN11] As for the federal Whistleblower Protection Act of 1989, 5 U.S.C. § 1213 *et seq.,* current case law requires an employee complaining of retaliation to show " 'irrefragable proof' " that the person criticized was not acting in good faith and in compliance with the law, see *Lachance v. White,* 174 F.3d 1378, 1381

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                 Page 20

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

(C.A.Fed.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1157, 145 L.Ed.2d 1069 (2000). And federal employees have been held to have no protection for disclosures made to immediate supervisors, see *Willis v. Department of Agriculture,* 141 F.3d 1139, 1143 (C.A.Fed.1998); *Horton v. Department of Navy,* 66 F.3d 279, 282 (C.A.Fed.1995), cert. denied, 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996), or for statements of facts publicly known already, see *Francisco v. Office of Personnel Management,* 295 F.3d 1310, 1314 (C.A.Fed.2002). Most significantly, federal employees have been held to be unprotected for statements made in connection with normal employment duties, *Huffman v. Office of Personnel Management,* 263 F.3d 1341, 1352 (C.A.Fed.2001) , the very speech that the majority says will be covered by "the powerful network of legislative enactments ... available to those who seek to expose wrongdoing," *ante,* at 1962.[FN12] My point is not to disparage particular statutes or speak here to the merits of interpretations by other federal courts, but merely to show the current understanding of statutory protection: individuals doing the same sorts of governmental jobs and saying the same sorts of things addressed to civic concerns will get different protection depending on the local, state, or federal jurisdictions that happened to employ them.

FN8. Del.Code Ann., Tit. 29, § 5115 (2003); Fla. Stat. § 112.3187 (2003); Haw.Rev.Stat. § 378-61 (1993); Ky.Rev.Stat. Ann. § 61.101 (West 2005); Mass. Gen. Laws Ann., ch. 149, § 185 (West 2004); Nev.Rev.Stat. § 281.611 (2003); N.H.Rev.Stat. Ann. § 275-E:1 (Supp.2005); Ohio Rev.Code Ann. § 4113.51 (Lexis 2001); Tenn.Code Ann. § 50-1-304 (2006 Cum.Supp.).

FN9. Ala.Code § 36-26A-1 *et seq.* (2001); Colo.Rev.Stat. § 24-50.5-101 *et seq.* (2004) ; Iowa Code Ann. § 70A.28 *et seq.* (1999) ; Kan. Stat. Ann. § 75-2973 (2003 Cum.Supp.); Mo.Rev.Stat. § 105.055 (2004 Cum.Supp.); N.C. Gen.Stat. Ann. § 126-84 (Lexis 2003); 2 Okla. Stat., Tit.

74, § 840-2.5 *et seq.* (West 2005 Supp.); Wash. Rev.Code § 42.40.010 (2000); Wyo. Stat. Ann. § 9-11-102 (2003).

FN10. Idaho Code § 6-2104(1)(a) (Lexis 2004); Me.Rev.Stat. Ann., Tit. 26, § 833(2) (1988); Mass. Gen. Laws Ann., ch. 149, § 185(c)(1) (West 2004); N.H.Rev.Stat. Ann. § 275-E:2(II) (1999); N.J. Stat. Ann. § 34:19-4 (West 2000); N.Y. Civ. Serv. Law Ann. § 75-b(2)(b) (West 1999); Wyo. Stat. Ann. § 9-11-103(b) (2003).

FN11. Kan. Stat. Ann. § 75-2973(d)(2) (Cum.Supp.2003); Ky.Rev.Stat. Ann. § 61.102(1) (West 2005); Mo.Rev.Stat. § 105.055(2) (2004 Cum.Supp.); 2 Okla. Stat., Tit. 74, § 840-2.5(B)(4) (West 2005 Supp.); Ore.Rev.Stat. § 659A.203(1)(c) (2003).

FN12. See n. 4, *supra.*

III

The Court remands because the Court of Appeals considered only the disposition memorandum and because Ceballos charges retaliation for some speech apparently outside the ambit of utterances " pursuant to official duties." When the Court of Appeals takes up this case once again, it should consider some of the following facts that escape emphasis in the majority opinion owing to its focus. [FN13] Ceballos says he sought his position out of a personal commitment to perform civic work. After showing his superior, petitioner Frank Sunstedt, the disposition memorandum at issue in this case, Ceballos complied with Sunstedt's direction to tone down some accusatory rhetoric out of concern that the *1972 memorandum would be unnecessarily incendiary when shown to the Sheriff's Department. After meeting with members of that department, Ceballos told his immediate supervisor, petitioner Carol Najera, that he thought *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), obliged him to give the defense his internal memorandum as exculpatory evidence. He says

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                                                    Page 21

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
(Cite as: 126 S.Ct. 1951)

that Najera responded by ordering him to write a new memorandum containing nothing but the deputy sheriff's statements, but that he balked at that. Instead, he proposed to turn over the existing memorandum with his own conclusions redacted as work product, and this is what he did. The issue over revealing his conclusions arose again in preparing for the suppression hearing. Ceballos maintains that Sunstedt ordered Najera, representing the prosecution, to give the trial judge a full picture of the circumstances, but that Najera told Ceballos he would suffer retaliation if he testified that the affidavit contained intentional fabrications. In any event, Ceballos's testimony generally stopped short of his own conclusions. After the hearing, the trial judge denied the motion to suppress, explaining that he found grounds independent of the challenged material sufficient to show probable cause for the warrant.

> FN13. This case comes to the Court on the motions of petitioners for summary judgment, and as such, "[t]he evidence of [Ceballos] is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Ceballos says that over the next six months his supervisors retaliated against him [FN14] not only for his written reports, see *ante,* at 1956, but also for his spoken statements to them and his hearing testimony in the pending criminal case. While an internal grievance filed by Ceballos challenging these actions was pending, Ceballos spoke at a meeting of the Mexican-American Bar Association about misconduct of the Sheriff's Department in the criminal case, the lack of any policy at the District Attorney's Office for handling allegations of police misconduct, and the retaliatory acts he ascribed to his supervisors. Two days later, the office dismissed Ceballos's grievance, a result he attributes in part to his Bar Association speech.

> FN14. Sunstedt demoted Ceballos to a trial

deputy; his only murder case was reassigned to a junior colleague with no experience in homicide matters, and no new murder cases were assigned to him; then-District Attorney Gil Garcetti, relying in part on Sunstedt's recommendation, denied Ceballos a promotion; finally, Sunstedt and Najera transferred him to the Office's El Monte Branch, requiring longer commuting. Before transferring Ceballos, Najera offered him a choice between transferring and remaining at the Pomona Branch prosecuting misdemeanors instead of felonies. When Ceballos refused to choose, Najera transferred him.

Ceballos's action against petitioners under 42 U.S.C. § 1983 claims that the individuals retaliated against him for exercising his First Amendment rights in submitting the memorandum, discussing the matter with Najera and Sunstedt, testifying truthfully at the hearing, and speaking at the bar meeting.[FN15] As I *1973 mentioned, the Court of Appeals saw no need to address the protection afforded to Ceballos's statements other than the disposition memorandum, which it thought was protected under the *Pickering* test. Upon remand, it will be open to the Court of Appeals to consider the application of *Pickering* to any retaliation shown for other statements; not all of those statements would have been made pursuant to official duties in any obvious sense, and the claim relating to truthful testimony in court must surely be analyzed independently to protect the integrity of the judicial process.

> FN15. The county petitioners' position on these claims is difficult to follow or, at least, puzzling. In their motion for summary judgment, they denied that any of their actions was responsive to Ceballos's criticism of the sheriff's affidavit. *E.g.,* App. 159-160, 170-172 (maintaining that Ceballos was transferred to the El Monte Branch because of the decreased workload in the Pomona Branch and because he was next in a rotation to go there to serve as a "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                    Page 22

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

filing deputy"); *id.,* at 160, 172-173 (contending that Ceballos's murder case was reassigned to a junior colleague to give that attorney murder trial experience before he was transferred to the Juvenile Division of the District Attorney's Office); *id.,* at 161-162, 173-174 (arguing that Ceballos was denied a promotion by Garcetti despite Sunstedt's stellar review of Ceballos, when Garcetti was unaware of the matter in *People v. Cuskey,* the criminal case for which Ceballos wrote the pertinent disposition memorandum). Their reply to Ceballos's opposition to summary judgment, however, shows that petitioners argued for a *Pickering* assessment (for want of a holding that Ceballos was categorically disentitled to any First Amendment protection) giving great weight in their favor to workplace disharmony and distrust caused by Ceballos's actions. *E.g.,* App. 477-478.

Justice BREYER, dissenting.

This case asks whether the First Amendment protects public employees when they engage in speech that both (1) involves matters of public concern and (2) takes place in the ordinary course of performing the duties of a government job. I write separately to explain why I cannot fully accept either the Court's or Justice SOUTER's answer to the question presented.

I

I begin with what I believe is common ground:

(1) Because virtually all human interaction takes place through speech, the First Amendment cannot offer all speech the same degree of protection. Rather, judges must apply different protective presumptions in different contexts, scrutinizing government's speech-related restrictions differently depending upon the general category of activity. Compare, *e.g., Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion), (political speech), with *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,*

447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech), and *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (government speech).

(2) Where the speech of government employees is at issue, the First Amendment offers protection only where the offer of protection itself will not unduly interfere with legitimate governmental interests, such as the interest in efficient administration. That is because the government, like any employer, must have adequate authority to direct the activities of its employees. That is also because efficient administration of legislatively authorized programs reflects the constitutional need effectively to implement the public's democratically determined will.

(3) Consequently, where a government employee speaks "as an employee upon matters only of personal interest," the First Amendment does not offer protection. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Where the employee speaks "as a citizen ... upon matters of public concern," the First Amendment offers protection but only where the speech survives a screening test. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That test, called, in legal shorthand, " *Pickering* balancing," requires a judge to "balance ... the interests" of the employee "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* See also *Connick, supra,* at 142, 103 S.Ct. 1684.

**\*1974** (4) Our prior cases do not decide what screening test a judge should apply in the circumstances before us, namely when the government employee both speaks upon a matter of public concern and does so in the course of his ordinary duties as a government employee.

II

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                          Page 23

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

The majority answers the question by holding that " when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ante,* at 1960. In a word, the majority says, "never." That word, in my view, is too absolute.

Like the majority, I understand the need to "affor[d] government employers sufficient discretion to manage their operations." *Ante,* at 1960. And I agree that the Constitution does not seek to " displac[e] ... managerial discretion by judicial supervision." *Ibid.* Nonetheless, there may well be circumstances with special demand for constitutional protection of the speech at issue, where governmental justifications may be limited, and where administrable standards seem readily available-to the point where the majority's fears of department management by lawsuit are misplaced. In such an instance, I believe that courts should apply the *Pickering* standard, even though the government employee speaks upon matters of public concern in the course of his ordinary duties.

This is such a case. The respondent, a government lawyer, complained of retaliation, in part, on the basis of speech contained in his disposition memorandum that he says fell within the scope of his obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The facts present two special circumstances that together justify First Amendment review.

First, the speech at issue is professional speech-the speech of a lawyer. Such speech is subject to independent regulation by canons of the profession. Those canons provide an obligation to speak in certain instances. And where that is so, the government's own interest in forbidding that speech is diminished. Cf. *Legal Services Corporation v. Velazquez,* 531 U.S. 533, 544, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ("Restricting LSC [Legal Services Corporation] attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys"). See also *Polk*

*County v. Dodson,* 454 U.S. 312, 321, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) ("[A] public defender is not amenable to administrative direction in the same sense as other employees of the State"). See generally *Post, Subsidized Speech,* 106 Yale L.J. 151, 172 (1996) ("[P]rofessionals must always qualify their loyalty and commitment to the vertical hierarchy of an organization by their horizontal commitment to general professional norms and standards"). The objective specificity and public availability of the profession's canons also help to diminish the risk that the courts will improperly interfere with the government's necessary authority to manage its work.

Second, the Constitution itself here imposes speech obligations upon the government's professional employee. A prosecutor has a constitutional obligation to learn of, to preserve, and to communicate with the defense about exculpatory and impeachment evidence in the government's possession. *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Brady, supra.* So, for example, might a prison doctor have a similar constitutionally related professional obligation *1975 to communicate with superiors about seriously unsafe or unsanitary conditions in the cellblock. Cf. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). There may well be other examples.

Where professional and special constitutional obligations are both present, the need to protect the employee's speech is augmented, the need for broad government authority to control that speech is likely diminished, and administrable standards are quite likely available. Hence, I would find that the Constitution mandates special protection of employee speech in such circumstances. Thus I would apply the *Pickering* balancing test here.

III

While I agree with much of Justice SOUTER's analysis, I believe that the constitutional standard he enunciates fails to give sufficient weight to the serious managerial and administrative concerns that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                                          Page 24

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv.
4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

the majority describes. The standard would instruct courts to apply *Pickering* balancing in all cases, but says that the government should prevail unless the employee (1) "speaks on a matter of unusual importance," and (2) "satisfies high standards of responsibility in the way he does it." *Ante,* at 1967 (dissenting opinion). Justice SOUTER adds that "only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor." *Id.,* at 1967.

There are, however, far too many issues of public concern, even if defined as "matters of unusual importance," for the screen to screen out very much. Government administration typically involves matters of public concern. Why else would government be involved? And "public issues," indeed, matters of "unusual importance," are often daily bread-and-butter concerns for the police, the intelligence agencies, the military, and many whose jobs involve protecting the public's health, safety, and the environment. This aspect of Justice SOUTER's "adjustment" of "the basic *Pickering* balancing scheme" is similar to the Court's present insistence that speech be of " legitimate news interest", *ibid.,* when the employee speaks only as a private citizen. See *San Diego v. Roe,* 543 U.S. 77, 83-84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) *(per curiam).* It gives no extra weight to the government's augmented need to direct speech that is an ordinary part of the employee's job-related duties.

Moreover, the speech of vast numbers of public employees deals with wrongdoing, health, safety, and honesty: for example, police officers, firefighters, environmental protection agents, building inspectors, hospital workers, bank regulators, and so on. Indeed, this categorization could encompass speech by an employee performing almost any public function, except perhaps setting electricity rates. Nor do these categories bear any obvious relation to the constitutional importance of protecting the job-related speech at issue.

The underlying problem with this breadth of coverage is that the standard (despite predictions that the government is likely to *prevail* in the balance unless the speech concerns "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety," *ante,* at 1967), does not avoid the judicial need to *undertake the balance* in the first place. And this form of judicial activity-the ability of a dissatisfied employee to file a complaint, engage in discovery, and insist that the court undertake a balancing of interests-itself may interfere unreasonably with both the managerial function (the ability of the employer to control the way in which an employee performs his basic job) and with the use of **\*1976** other grievance-resolution mechanisms, such as arbitration, civil service review boards, and whistle-blower remedies, for which employees and employers may have bargained or which legislatures may have enacted.

At the same time, the list of categories substantially overlaps areas where the law already provides nonconstitutional protection through whistle-blower statutes and the like. See *ante,* at 1962 (majority opinion); *ante,* at 1970 - 1971 (SOUTER, J., dissenting). That overlap diminishes the need for a constitutional forum and also means that adoption of the test would authorize federal Constitution-based legal actions that threaten to upset the legislatively struck (or administratively struck) balance that those statutes (or administrative procedures) embody.

IV

I conclude that the First Amendment sometimes does authorize judicial actions based upon a government employee's speech that both (1) involves a matter of public concern and also (2) takes place in the course of ordinary job-related duties. But it does so only in the presence of augmented need for constitutional protection and diminished risk of undue judicial interference with governmental management of the public's affairs. In my view, these conditions are met in this case and *Pickering* balancing is consequently

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

126 S.Ct. 1951                                                              Page 25

126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353
**(Cite as: 126 S.Ct. 1951)**

appropriate.

With respect, I dissent.

U.S.,2006.
Garcetti v. Ceballos
126 S.Ct. 1951, 24 IER Cases 737, 2006 Daily Journal D.A.R. 6495, 74 USLW 4257, 06 Cal. Daily Op. Serv. 4453, 19 Fla. L. Weekly Fed. S 203, 87 Empl. Prac. Dec. P 42,353

Briefs and Other Related Documents (Back to top)

• 2006 WL 730444 (Appellate Brief) Brief for Elaine Mittleman as Amicus Curiae in Support of Neither Party (Mar. 2, 2006) Original Image of this Document (PDF)
• 2005 WL 2757514, 74 USLW 3270 (Oral Argument) Oral Argument (Oct. 12, 2005)
• 2005 WL 2072142 (Appellate Brief) Petitioners' Reply Brief%tc (Aug. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 1749167 (Appellate Brief) Brief for the National Treasury Employees Union as Amicus Curiae Supporting Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1767121 (Appellate Brief) Brief of Association of Deputy District Attorneys and California Prosecutors Association As Amici Curiae in Support of Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1767122 (Appellate Brief) Brief of the American Federation of Labor and Congress of Industrial Organizations as Amicus Curiae in Support of Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1767694 (Appellate Brief) Brief of the National Education Association as Amicus Curiae in Support of Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1767695 (Appellate Brief) Brief of Amici Curiae Government Accountability Project, National Employment Lawyers Association and Association of Trial Lawyers of America in Support of Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1801033 (Appellate Brief) Brief of National Association of Criminal Defense Lawyers,

the American Civil Liberties Union, and the American Civil Liberties Union of Southern California as Amici Curiae Supporting Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1801035 (Appellate Brief) Brief for Respondent%tc (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 1801034 (Appellate Brief) Brief of Amici Curiae the Thomas Jefferson Center for the Protection of Free Expression, and the American Association of University Professors%tc (Jul. 21, 2005) Original Image of this Document (PDF)
• 2005 WL 1276045 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioners%tc (May 27, 2005) Original Image of this Document (PDF)
• 2005 WL 1317482 (Appellate Brief) Petitioners' Brief on the Merits%tc (May 27, 2005) Original Image of this Document (PDF)
• 2005 WL 1317483 (Appellate Brief) Brief of the National Association of Counties, Council of State Governments, National League of Cities, National Conference of State Legislatures, and U.S. Conference of Mayors as Amici Curiae Supporting Petitioners%tc (May 27, 2005) Original Image of this Document (PDF)
• 2005 WL 1317484 (Appellate Brief) Brief of International Municipal Lawyers Association as Amicus Curiae in Support of Petitioner%tc (May 27, 2005) Original Image of this Document (PDF)
• 2005 WL 1620384 (Joint Appendix) JOINT APPENDIX, VOL. II (May 27, 2005)
• 2005 WL 1620385 (Joint Appendix) JOINT APPENDIX, VOL. I (May 27, 2005)
• 2005 WL 1620386 (Joint Appendix) JOINT APPENDIX, VOL. III (May 27, 2005)
• 2005 WL 1284578 (Appellate Brief) Brief of Amicus Curiae National School Boards Association in Support of Petitioners%tc (May 26, 2005) Original Image of this Document (PDF)
• 2005 WL 289715 (Appellate Petition, Motion and Filing) Petitioner's Reply Brief (Feb. 3, 2005)
• 2005 WL 190354 (Appellate Petition, Motion and Filing) Respondent's Brief in Opposition (Jan. 25, 2005)
• 04-473 (Docket) (Oct. 7, 2004)
• 2004 WL 2260964 (Appellate Petition, Motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.