# EXHIBIT I

1  promoted to Communications Director of DHSS?

2  A.  It was official on February 7th of whatever
3  year that would be, 2001.

4  Q.  All right.  And how long did you continue in
5  that position?

6  A.  Until March 2005.

7  Q.  And what happened at that point?

8  A.  I was hired by the county executive, by New
9  Castle County Executive Chris Coons.

10 Q.  How was it that you received that position?

11 A.  I had sent a résumé when Chris was elected, and
12 my colleague, Karen Murtha --

13 Q.  Karen, I'm sorry?

14 A.  Karen Murtha, K-a-R-E-N, M-u-r-t-h-a, who is
15 now Karen Murtha James, J-a-m-e-s, had been Chris's
16 campaign manager and recommended me for a position.

17 Q.  And how did you know Karen Murtha?

18 A.  Karen and I met when I was writing a story
19 about the Blood Bank several years earlier, and then
20 she had ended up working for the kids' department in
21 the State.  And because of my work, we knew each other
22 just because the PIOs sometimes associated with each
23 other and especially between DHSS and the kids'
24 department, there were sometimes overlapping issues.

```
 1      A.   One was with Rich Przywara and Nicole Majeski,
 2   M-a-j-e-s-k-i.  And one other that I recall was with
 3   Chris Coons, and Dave Singleton also came in at that
 4   point.
 5      Q.   I take it the interview with Coons and
 6   Singleton occurred after the Przywara and --
 7      A.   Yes.
 8      Q.   Okay.  What was your understanding after going
 9   through the interviews as to what the job
10   responsibilities were for communication director?
11      A.   Chris wanted someone, to quote him, who was
12   more than just a PIO.  He wanted a person who would be
13   a member of his core team, someone who would handle
14   media relations, as well as coordinating a
15   communication strategy for the County.
16           I did put some stipulations on taking the
17   position.
18      Q.   What were they?
19      A.   I asked for a lighter workday.  I agreed to
20   work 9 a.m. to 4:30 p.m. in the office, and complete
21   other work at home in the evenings because of my
22   children.
23      Q.   And was that stipulation agreed upon?
24      A.   Yes.
```



WILCOX & FETZER LTD.
Registered Professional Reporters

 1  interactions he had with the media.  And he was not
 2  doing that.  Things keep -- kept coming up in the
 3  media that we didn't know were coming -- that I didn't
 4  know were coming.
 5      Q.  Now, can you be more specific as to what items
 6  kept coming up?
 7      A.  The three, the items that I'm referring to from
 8  this conversation were the crossing guard story, the
 9  *Delaware Today* story, and the Cris Barrish contact.
10      Q.  Okay.  And did you have any understanding as to
11  how Corporal Navarro handled that information?
12      A.  I don't understand that question.
13      Q.  You were upset, as I understand, that he did
14  not come directly to you.  Is that fair to say?
15      A.  I expected Trini, as I expected of all the
16  PIOs, to tell me when they had interactions with the
17  media.  And I had requested that of Trini individually
18  and as part of the group of PIOs, both verbally in
19  person, and in writing.
20      Q.  All right.  You said before, I think, that
21  Trini Navarro was not a direct report of yours.  Is
22  that correct?
23      A.  Correct.
24      Q.  Okay.  Did you learn later on as to what



```
 1    appoint the African-American because they don't like
 2    me?
 3       A.   No, no.
 4       Q.   Okay.  How about his, let's say, pessimistic
 5    assessment of his chances going forward to get the
 6    remaining, any further promotions before that list
 7    expired.  Did he say that anyone had it in for him,
 8    that he'd never get another position, another shot at
 9    a promotion because of that?
10       A.   I don't remember him saying that.
11       Q.   So the matter of the reduction in promotional
12    opportunities and the curtailing of his chance, we'll
13    say, or his pessimistic assessment of his chances to
14    get a promotion, did he ever ascribe that to any
15    negative sentiments by Coons or Singleton or Sapp?  Or
16    was promotion a separate topic?
17       A.   I don't remember him attributing it to anybody
18    in the administration.
19       Q.   More to how the system works, he would
20    attribute it more to how the system works?
21       A.   Yes.  And that reminds me, the phrase about
22    "that's how politics works," that -- when I said that,
23    I was referring to the change in the number of
24    sergeant positions, because what I was attempting to
```

1  say was that the number of sergeants needed had
2  changed. The administration decided fewer sergeants
3  were needed because they wanted more patrolmen to stay
4  on, and there was -- because there was a change in the
5  administration, there was a change in the number of
6  sergeants required from a policy point of view.
7     Q. Was there also -- you may have been involved in
8  this, in some measure of this or the handling of it.
9  Wasn't there a lawsuit pending when Mr. Coons took
10 office brought by a civic activist named Korn, maybe
11 Richard Korn, who was attacking the whole county
12 financial structure, that this whole large surplus
13 built up would have to be spent, and if he had won his
14 lawsuit, I mean the county was really in for difficult
15 financial times?
16    A. I don't know if that was still pending at this
17 time. And I don't know if it had any relation to the
18 promotion process. I do know that the case existed.
19    Q. You were asked whether Chris Coons had ever
20 told you that, "Corporal Navarro will never be
21 promoted so long as I'm executive or never be
22 promoted," and you said he had never told you that.
23    A. He never told me that.
24    Q. And I should have objected to the question as



WILCOX & FETZER LTD.
Registered Professional Reporters