# EXHIBIT B

# UNREPORTED CASE(S)

Westlaw.

Not Reported in F.Supp.2d    Page 1

Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Amir FATIR, Plaintiff,
v.
David DOWDY, Patrick Ryan, Barry Hawlk, Lawrence McGuigan, Robert Snyder, Carl Danberg, Stanley Taylor, and Colleen T. Schotzberger, Defendants.
No. Civ.A. 95-677-GMS.

Sept. 4, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On April 6, 1995, Amir Fatir, a prisoner, filed a complaint against the defendants pursuant to 42 U.S.C. § 1983. His allegations stem from various actions taken by the defendants, all employees of the Delaware Correctional Center ("DCC") in Smyrna, Delaware. At the time he filed his complaint, Fatir was proceeding *pro se.* Among other things, Fatir's original complaint ("the 1995 complaint") alleged that certain of the defendants had tampered with his mail and had taken property belonging to him from his work area.

In May 1996, Fatir wrote the court expressing his concern that the defendants had begun to retaliate against him for filing this lawsuit. This letter added further facts supporting the claims previously filed in the original complaint. Although Fatir stated that the letter was a motion for a preliminary injunction and did not attach an amended complaint, The Honorable Roderick R. McKelvie *sua sponte* decided to treat the letter as a motion to amend. Judge McKelvie granted the motion.

In the summer of 1996, Fatir was transferred to an Arizona prison. In January 1997, he sought to amend his complaint to add claims of retaliatory transfer and retaliation for speech protected under the First Amendment. Apparently, Fatir did not file any grievances with prison authorities regarding these claims prior to amending his complaint.

The case was eventually reassigned to this court. After the case was reassigned, Fatir filed a second motion for appointment of counsel. Although Fatir demonstrated that he was quite capable of prosecuting his lawsuit *pro se,* given the problems he encountered during the discovery period and the practical difficulties presented by his transfer to Arizona, the court appointed counsel on June 20, 2000 (D.I.57). In November 2000, Fatir, by and through his counsel, filed a motion to amend his complaint. On January 29, 2001, the court granted this motion with the provision that the defendants would be permitted to retain any and all applicable defenses. After the third motion to amend was granted, the court entered a scheduling order which set the dispositive motion deadline at November 16, 2001.

Presently before the court are two motions. The first is the defendants' motion for summary judgment filed on November 16, 2001. In this motion, the defendants raise several defenses to the plaintiff's claims, including the plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e. In the plaintiff's response to that motion, filed on February 15, 2002, he asserts that since his complaint was filed after the PLRA was enacted, his claims are not subject to any exhaustion requirements. The defendants respond that although this is true for the claims contained in the 1995 complaint, the new claims presented in Fatir's first, second, and third amended complaints were filed after the PLRA's enactment and are therefore subject to its exhaustion requirements.

*2 The second motion before the court is the plaintiff's motion for leave to file a fourth amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 2
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

complaint. This motion was filed on February 19, 2002, four days after the plaintiff's response to the defendants' motion for summary judgment. The proposed fourth amended complaint will amend Count Eight of the third amended complaint-which currently states a claim for deprivation of property-to state a claim for conversion. The defendants allege that this motion is the product of undue delay and will result in prejudice to their ability to defend this case. Additionally, the defendants allege that the proposed conversion claim is futile. The plaintiff responds that the amendment is not futile, and that the motion is not the result of undue delay.

Upon review of the lengthy record, the submissions of the parties, and the applicable law, the court reaches the following conclusions. First, the motion to amend will be denied. The court finds the fact that the motion was filed four days after the plaintiff's response to the motion for summary judgment supports a finding that the motion is the product of undue delay. For this reason, the court also finds that granting the motion will unreasonably prejudice the defendants and the court. Second, with regard to summary judgment, the court finds that certain of the plaintiff's claims either did not require exhaustion or were properly exhausted. The court finds, however, that there is scant evidence of exhaustion of the claims in Counts Four and Eight. Therefore, the court will order that those particular claims must be dismissed without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims. While the plaintiff is exhausting his remedies pertaining to these claims, this case will be stayed with respect to all other claims. Since the court is staying the case, the court will not decide the other legal issues in this case until the plaintiff has exhausted his remedies. The court will now more fully explain the reasons for is ruling.

II. FACTS [FN1]

FN1. As indicated above, the court will not address the legal merits of the plaintiff's claims at this time. Thus, the court will only provide those facts that are pertinent to the motion to amend and the exhaustion issue raised in the motion for summary judgment.

In 1975, Amir Fatir was arrested and charged with crimes stemming from an armed robbery and murder which occurred earlier that year. In March 1976, the plaintiff was found guilty of the charges and was sentenced to life in prison. [FN2] Fatir was classified to serve his imprisonment at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Although the plaintiff presented a serious disciplinary problem at the beginning of his incarceration, by 1987, he had become a model prisoner. He became an active participant in positive aspects of prison life. He even began new programs designed to help prisoners cope with life behind bars. Fatir also became an author and sought after lecturer on prison life. Most important for the purposes of the present motion, after his initial infractions, Fatir was deemed to be a low security risk and was permitted to work in the prison's Central Supply as a clerk and computer programmer. [FN3]

FN2. The plaintiff was originally sentenced to death, but due to the constitutional infirmity of the Delaware death penalty statute, this sentence was later reduced to life without parole.

FN3. The Central Supply was technically on the prison grounds, but it was beyond the secure area of the prison fences. Thus, only inmates who presented low security risks were permitted to work in this area.

*3 On April 6, 1995, Fatir filed a complaint against the defendants. [FN4] The complaint asserted several causes of action. First, Fatir claimed, "Defendants violated plaintiff's constitutional protection against unreasonable searches and seizures and free speech by searching his computer and copying files without his permission." (D.I. 2 at 7.) Fatir also alleged, " For the past year, Plaintiff's mail has been tampered with by mailroom officers.... Plaintiff has had incoming mail returned to sender without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

explanation and in violation of institutional mail regulations which require the mailroom officers to notify the inmates of any mail that they intend to send back to sender." (*Id.* at 10.)

> FN4. The defendants Danberg, Taylor, and Schotzberger were not added until 1997. Additionally, Fatir has voluntarily withdrawn certain claims. Therefore, the defendants Boyle, Hosterman, Cunningham, and Gullege are no longer defendants in this action.

On May 16, 1996, Fatir wrote a letter to the court. (D.I.19.) In the letter, Fatir alleged that "On May 14, 1996, Major Barry Halwk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (*Id.*) Fatir also asserted that " Defendant Dowdy has repeatedly mishandled legal mail coming into the institution for me. He has also stopped mail leaving the institution from directly going to the persons to whom the mail is addressed." (*Id.*) Fatir further stated, "I would request that the court please treat this letter as a Motion for a Preliminary Injunction." (Id.) At no point did Fatir refer to his letter as a motion to amend.

On May 23, 1996, Judge McKelvie issued an order addressing Fatir's letter-motion. The order stated as follows:
On May 20, 1996, plaintiff sent a letter to the court stating that ... Major Barry Hawk and McGwiggen [sic], had seized his personal computer, his file for this litigation, certain books, including plaintiff's " The Prisoner's Self-Help Litigation Manual," and computer disks. In addition, the plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal and legal mail. Plaintiff seeks a temporary restraining order and preliminary injunction to order the return of his property and to prevent DCC officials from tampering with his mail. The court will construe plaintiff's letter as a proposed amendment to his original complaint and as a motion for injunctive relief.
Plaintiff's proposed amendment to his complaint appears to claim that Hawk and McGwiggen's [sic] seizure of his personal property violates his Fourteenth Amendment right to due process. In addition, he appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts. As plaintiff still lacks the funds to maintain this action, and as these claims do not appear frivolous, the court will allow plaintiff to proceed *in forma pauperis* on these claims in addition to those identified by the court's October 31, 1995 Order granting plaintiff [sic] to proceed *in forma pauperis* against defendants Dowdy and Ryan.

*4 (D.I. 20 at 1)(emphasis added).

On June 22, 1996, approximately three months after Judge McKelvie granted the "motion to amend," Fatir gave a speech which criticized the policies of the warden, the defendant Robert Snyder, as racist. One week later, on June 29, 1996, Fatir was informed that he would be transferred to an Arizona prison pursuant to the Interstate Corrections Compact. Fatir arrived at Santa Rita prison in Arizona on July 5, 1996. On January 10, 1997, Fatir filed a motion to amend with a new complaint attached. (D.I.30.) In that complaint he alleged retaliatory transfer, retaliation for First Amendment violations, and deprivation of due process resulting from the seizure of certain of his personal effects lost during his transfer, including books, a television, a radio, legal materials, a computer, cosmetics, and other assorted items. (*Id.* at 5.) In their response to the motion, the defendants asserted that the retaliation claims should be considered separate causes of action under section 1983. (D.I.41.) Without addressing the defendants' contention, Judge McKelvie granted Fatir's motion to amend. (D.I. 44 .)

In April 1998, Fatir filed a second motion for appointment of counsel.[FN5] In September 1998, the case was reassigned to this court. The court granted the motion for appointment of counsel on June 20, 2000. Upon securing new counsel, the plaintiff was permitted to file an amended complaint over the objection of the defendants. The amended complaint ("the 2001 complaint") was deemed filed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

on January 29, 2001. The 2001 Complaint asserted nine causes of action, seven of which remain in this litigation.[FN6] The 2001 complaint did not present new causes of action. Rather, it contained reformulations of Fatir's prior allegations. Count One alleged that the defendants had tampered with Fatir's "personal correspondence and legal mail." (D.I. 80 at 19.) Count Two alleged interference with Fatir's legal mail, specifically. (*Id.* at 20.) Count Four asserted that Hawlk and McGuigan had violated Fatir's Fourth Amendment rights against unreasonable searches and seizures and his Fourteenth Amendment right to due process by seizing his litigation materials and the other items listed in the May 1996 letter. (*Id.* at 21.) Count Five asserts that Fatir was retaliated against for engaging in speech protected by the First Amendment. Count Six contends that the plaintiff was transferred in retaliation for filing this lawsuit. Count Eight asserts that the defendants violated the plaintiff's right to due process and deprived him of his property when they removed certain property, including books, a radio, a television, legal material, a computer, cosmetics, stamps, shoes, clothing, and two photo albums. (*Id.* at 24.) Count Nine alleges that the defendants' interference with his legal mail violated his right to have access to the courts. (*Id.* at 25.)

> FN5. Fatir filed his first motion for appointment of counsel in August 1997. This motion was denied by Judge McKelvie in November 1997. (D.I.44.)
>
> FN6. The plaintiff has voluntarily withdrawn Count Three, an equal protection claim, and Count Seven, a due process claim based upon the plaintiff's reclassification upon arrival in Arizona. Since these claims are no longer being litigated, the court will not address them.

The court issued a scheduling order in this case on May 10, 2001. That order set the dispositive motion deadline at September 28, 2001. However, by agreement of the parties and the court, the deadline was later changed to November 16, 2001. Thus, dispositive motions were to be filed on November 16, 2001, the answering briefs were due on January 25, 2002, and the reply briefs were due on February 1, 2002.

*5 The defendants filed their summary judgment motion on November 16, 2001, as scheduled. The motion argues, *inter alia,* that summary judgment should be granted in the defendants' favor because Fatir had failed to exhaust his administrative remedies before filing his complaint as required by the PLRA. The record indicates that the DCC had a formal grievance procedure for certain claims. The defendants have submitted an inmate grievance handbook and other materials establishing the existence of this grievance procedure. Also, Fatir testified at his deposition that there was a grievance procedure at the DCC. (D.I. 130 at A073.) When asked about his attempts at exhaustion during his deposition, Fatir testified as follows:

Q: Did you ever file a grievance?
A: Yes.
Q: More than one?
A: I can only recall one ...
Q: [T]here's a form they use, correct?
A: There ... was, I think, a letter you had to write to begin the grievance process.
Q: It was a form you had to fill in wasn't it?
A: Maybe. I don't know. I don't recall.
Q: And when you filled in this form, where would it go?
A: When the grievance procedure was functioning as ordered by the court, it would go to the grievance coordinator.
Q: And then from where? Would there be a hearing scheduled for it?
A: There would be a hearing for it.
Q: And after that there would be a decision made?
A: Yes.
Q: And after that you could appeal the decision?
A: Yes.
Q: To who [sic]?
A: To the warden.
....
A: The person who would be the statewide grievance coordinator [left], and the grievance procedure pretty much collapsed.
Q: There are still people that file grievances aren't there?
A: I would imagine so.
...

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 5
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Q: In any event, in none of the instances that you complained about in the second amended complaint did you in any way file a grievance form and turn it in, correct?
A: After having been told that my issues were nongrievable ...
Q: My question was did you actually file a written grievance and the answer is no?
A: No, I did not.
Q: Now, what things were you told were not grievable?
A: I was told that the mail tampering was not grievable. I was told that my job issues were not grievable because they were classification, and I was told that classification matters are not grievable. I was told that all the seizure of my materials, my computer itself, was not grievable, and--
Q: Just so we're clear--
A: the grievance board is not going to handle anything else from here.
Q: But you never filed a grievance and had the grievance board say that?
A: Well, the grievance coordinator said--
Q: My question is still the same. You never actually filed a grievance and had them say, "This is not grievable"?
A: That's a two part question ...
Q: Did you ever file a grievance form?
A: No.
Q: Since you never filed a grievance, you never heard back from the grievance board?
*6 A: I heard back. They don't have them.

In his answer to the defendant's motion, filed on February 15, 2002, the plaintiff responded that the PLRA was enacted on April 26, 1996. Fatir thus argued that since his original complaint was filed in 1995, and the PLRA was not retroactive, his case was exempt from the exhaustion requirements of the PLRA. He also argued that with regard to the 1997 claims surrounding his transfer to Arizona, there was no available "formal" grievance procedure. The defendants assert that upon his transfer, Fatir was instructed to "contact the Interstate Compact Administrator for any legal issues." (D.I. 143 at 21-22.) The defendants, however, cite no record evidence in support of this claim. A review of the depositions given by those responsible for the transfer (namely the defendants Shotzberger, Ryan, Danberg, Taylor, as well as Mr. Stanley Turner) fails to clearly identify exactly how Fatir could have or would have been able to file a grievance regarding his transfer claims. When asked how an inmate who disagreed with a transfer might challenge this decision, the defendant Taylor testified that "They write letters all the time. They write grievances all the time." (D.I. 130 at 157 .) However, Taylor offered no testimony as to the exact operation or regulations of the purported grievance system, or to whom the grievance would be sent. Colleen Shotzberger, the Interstate Compact Administrator, testified that she gave Fatir a memo concerning the transfer of his legal materials, but did not testify that this memo or any other document notified Fatir of the appropriate grievance procedure for his transfer. (*Id.* at 299.) The prison hearing officer, Scott Turner, testified that if Fatir had indicated that he had a problem with the transfer, Turner might have been able to intervene. Additionally, Turner stated that there was no appeal from the decision to transfer. However, when Turner gave these responses, he was not specifically being asked about grievance procedures. (*Id.* at 120.) The record thus fails to clearly demonstrate how, or to whom, Fatir might appeal the transfer decision.

In their response to the plaintiff's motion, the defendants replied that although the PLRA might not be retroactive, thus saving the claims in the 1995 complaint, it did not save any claim asserted in an amended complaint after the PLRA was filed.

On February 19, 2002, a mere four days after answering the defendants' motion for summary judgment, the plaintiff filed a motion for leave to amend Count Eight of the 2001 Complaint. At present, Count Eight alleges that the defendants deprived Fatir of certain personal property, thus violating his due process rights. Fatir seeks to amend this count to instead assert a state law claim of conversion. The defendants oppose the amendment on two grounds. First, they assert that the plaintiff's motion is untimely, as it comes after the close of discovery and summary judgment. The defendants argue that this delay will prejudice their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 6
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

ability to defend this action. Second, the defendants assert that the plaintiff's conversion claim is futile under current law. The plaintiff responds that the motion is timely made and will not prejudice the defendants since the facts relating to the due process and conversion claims are nearly identical.

### III. DISCUSSION

*7 Since the motions to amend and for summary judgment are subject to different legal standards, the court will address each motion in turn. The court will first discuss its reasons for denying the motion to amend. The court will then discuss the exhaustion issues raised in the defendants' motion for summary judgment.

#### A. Motion to Amend

##### 1. Legal Standard

Permission to amend a pleading "shall be freely given whenever justice so requires." Fed. R. Civ. P. 15(a). *See also Foman v.. Davis*, 371 U.S. 178, 182 (1962) (same). Nevertheless, a court can deny a motion to amend if the motion is motivated by bad faith or if granting the motion will result in undue delay or prejudice to the opposing party. *See Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir.2001) (citations omitted). Furthermore, the doctrine of futility allows the court to refuse any amendment that fails to state a cause of action. *See id.*

##### 2. The Plaintiff Unduly Delayed in Bringing this Motion to Amend

As noted above, a court may deny a motion to amend where the movant has unduly delayed in bringing the motion. *See id.* However, the Third Circuit has cautioned that delay alone is usually "an insufficient ground to deny leave to amend." *Id.* Nevertheless, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* Although the original complaint was filed in 1995, over seven years ago, the court will not consider the time during which the plaintiff represented himself *pro se*. The court will only consider the time from June 20, 2000-when counsel was appointed-to the present. Counsel first amended the complaint on January 29, 2001. The motion to amend presently before the court was filed on February 19, 2002, more than one year after the first amendment by counsel. This one year delay was both undue and prejudicial for the following reasons.

The plaintiff's delay may become undue after a motion for summary judgment is filed where the movant has had previous opportunities to amend a complaint, but chose not to do so. *See Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 861-62 (7th Cir.2001) (denying leave to amend where the plaintiff "offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim" although claim was previously available). In particular, if the requested amendment is based upon facts known to the plaintiff at the time the previous complaint was amended, the amendment is disfavored. *See M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1492 (9th Cir.1983) (denying leave to amend where summary judgment was pending and amendment was not the product of newly discovery facts, but facts known at the time of the previous complaint). Similarly, if the newly presented claim and the previous claim are similar or identical, giving the plaintiff the ability to assert the new cause earlier, leave to amend is not granted. *See Coleman v. Ramada Hotel Operating Company*, 933 F.2d 470, 473 (7th Cir.1991) (denying leave to amend after filing of summary judgment motion where the new claims "merely reiterate[d]" the claims of the original complaint).

*8 In the present case, by the plaintiff's own admission, the earlier alleged deprivation of property claim and newly sought conversion claims are very similar. The plaintiff admits that the new claim stems from the exact same set of factual circumstances as its predecessor.[FN7] Although the plaintiff acknowledges that the new claim is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

factually similar, implicitly conceding that it could have been asserted previously, he offers no excuse for his failure to raise this claim earlier in this litigation. Since the new conversion claim is so similar to the prior property claim and there was no reason not to present the claim in the prior amended complaint, this delay weighs against granting the plaintiff's request for leave to amend. Moreover, this matter has been in litigation for nearly seven years. Given these facts, the court can not countenance the additional delay that would result were the plaintiff permitted the sought after amendment.

> FN7. The plaintiff stated, "The underlying facts supporting the proposed claim for conversion are exactly the same as those supporting the claim for due process/deprivation of property." (D.I. 146 at 4.-Pls.' Reply Br.)

Additionally, the timing of this motion is prejudicial to the defendants and the court. The court notes that the motion to amend was filed on February 19, 2002, just four days after the plaintiff filed his response to the defendants' motion for summary judgment. Motions to amend which are filed after summary judgment motions have been filed or granted are highly disfavored. *See Cureton,* 252 F.3d at 273 ("When a party delays making a motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests in judicial economy and finality of litigation may become particularly compelling."); *Eisenmann v. Gould-National Batteries, Inc.,* 169 F.Supp. 862, 864 (E.D.Pa.1958) (denying leave to amend where "the plaintiffs waited nearly two years to move to amend the complaint and then made the motion only after a motion for summary judgment had been filed and argued"). These belated attempts at amendment are disfavored with good reason. If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been filed, not only the opponent, but the courts, would be prejudiced by the never-ending litigation.

The plaintiff notes that since discovery has been conducted regarding the deprivation of property issue, the defendants will be able to use that discovery in their defense of the conversion claim, and therefore will not be prejudiced. The court agrees, but further notes that this is not the only source of prejudice. As previously noted, motions to amend which follow the filing of a motions for summary judgment are heavily disfavored. In the present case, the timing of the motion to amend in response to the defendant's motion raises an inference that the plaintiff is attempting to bolster his legal position-and therefore avoid summary judgment-by amending the complaint. This is an unacceptable reason to amend. *See Kennedy v. Josephthal & Co.,* 814 F.2d 798, 806 (1st Cir.1987) (affirming district court's denial of leave to amend where the attempt to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *Local 472 of the United Association of Journeymen and Apprentices v. Georgia Power Co.,* 684 F.2d 721, 724-25 (11th Cir.1982) (same). Permitting such an amendment at this stage would change the focus of that portion of the litigation, thereby prejudicing the defendants. *See Torres-Rios v. LPS Laboratories, Inc.,* 152 F.3d 11, 16 (1st Cir.1998) (noting that permitting amendment after discovery had closed and summary judgment motion had been filed would prejudice defendant).

*9 For all of the above reasons, the court concludes that the plaintiff's undue and prejudicial delay requires the court to deny the plaintiff's motion to amend.

### B. The Exhaustion Issue

The court must address two questions. The first question is which claims, if any, must Fatir exhaust before proceeding. Second, the court must address whether any of these remedies were properly exhausted. The court will address the questions in turn. But first, the court will outline the applicable summary judgment standard.

#### 1. The Summary Judgment Standard

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

2. Whether Exhaustion was Required

The first question is whether exhaustion is required, and if so, for which claims. The PLRA mandates that:
no action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.
42 U.S.C. § 1997(e)(a)(1996).

The latest version of the PLRA was enacted on April 26, 1996. *See* Pub. Law No. 104-134, 110 Stat. 1321. Congress did not state whether the law should have a retroactive effect. Nevertheless, the Third Circuit has made it clear that it believes the PLRA was not intended to be retroactive. *See Ghana v. Holland,* 226 F.3d 175, 182-83 (3d Cir.2000). Therefore, while the PLRA would apply to claims brought into this case after April 26, 1996, it would not apply to claims asserted prior to that time. Therefore, any claim that was clearly or conceivably asserted in Fatir's 1995 complaint is exempt from any exhaustion requirement.FN8 However, as the defendants correctly point out, any claims that were asserted through amendment in 1996 or 1997 may need to be exhausted. The court will now consider each of the claims presented in Fatir's 2001 complaint and determine when they were first asserted in this litigation-whether explicitly or through relation back-and whether the PLRA is applicable to them.

> FN8. Although there were methods of determining exhaustion in existence prior to the enactment of the PLRA, the defendants do not assert that Fatir failed to exhaust his remedies under pre-PLRA law. They merely argue that he did not exhaust as required by the PLRA. Since the defendants did not brief the issue of pre-PLRA exhaustion, the court will consider it waived.

a. Count One

*10 Count One of the complaint states a claim for interference with mail. In Fatir's 1995 complaint, he clearly states that his "mail had been tampered with by mailroom officers." (D.I. 2 at 10.) Thus, the claims in Count One were clearly asserted prior to the enactment of the PLRA. Therefore, Fatir was not required to exhaust his remedies on this claim.

b. Count Two

Count Two states a claim for interference with legal mail. Again, in the 1995 complaint, Fatir stated that his "mail had been tampered with by mailroom officers." (*Id.* at 10.) There is no explicit mention of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 9
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

legal mail. The claims for legal mail were first explicitly asserted in the 1996 letter to Judge McKelvie. Nevertheless, the claims asserted in Count Two can be said to be an amendment or supplement that "relates back" to the 1995 complaint. Relation back is appropriate where a newly asserted claim arises out of the same conduct, transaction, or occurrence that was alleged in the original pleading. *See* Fed. R. Civ. P. 15(c). In this case, the legal mail claim arises out of the same conduct as the civilian mail claim. Judge McKelvie held as much in his May 1996 order when he stated, "[T]he plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal *and* legal mail." (D.I. 20 at 1) (emphasis added). Judge McKelvie further stated, " In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (*Id.*)(emphasis added). These statements clearly indicate the court's belief that the legal mail claim was either implicitly asserted in the 1995 complaint or was a continuation of the mail tampering conduct contained in that complaint. This court, therefore, finds that the claims contained in Count Two relate back to the 1995 complaint and are thus not subject to the PLRA.

c. Count Four

Count Four as currently written alleges that the defendants violated Fatir's Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures. Specifically, the plaintiff alleges that his rights were violated when materials were seized from his cell, including his personal computer, legal files, books including "The Prisoner's Self-Help Litigation Manual" and computer disks. These facts are not mentioned in the 1995 complaint. Rather, this claim was first asserted in Fatir's May 1996 letter to Judge McKelvie, wherein he stated, "On May 14, 1996, Major Barry Hawlk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (D.I.19.) Since this claim was first asserted in May 1996, and the PLRA was enacted in April 26, 1996, it is subject to the PLRA's exhaustion requirement.

The court considered that the claims in Count Four might relate back to the 1995 complaint. Indeed, the 1995 complaint does state a claim for search and seizure based on a search of Fatir's personal computer. However, the court concludes that the claims currently asserted in this action do not relate back to the 1995 complaint. First, by Fatir's own admission in his complaint, the facts upon which Count Four relies did not occur until May 1996. Additionally, unlike the mail tampering claim, it cannot be argued that the seizure of his property was a continuing wrong related to the wrong alleged in the 1995 complaint. Rather, it appears that the search alleged in the 1995 complaint and the May 1996 allegation are two separate and unrelated incidents. Judge McKelvie acknowledged as much in his order. Although he stated that the legal mail tampering was a continuation of actions alleged in the 1995 complaint, he did not state that the May 1996 search and seizure allegations were in any way related to the 1995 complaint. Indeed, he referred to the May 1996 allegations as "new" claims. (D.I.20.) Moreover, since the 1995 and 1996 incidents were completely separate, they cannot be part of the same transaction or occurrence. The claims in Count Four do not relate back to the 1995 complaint. They are, therefore, subject to the PLRA.

d. Counts Five, Six, and Eight

\*11 Counts Five, Six, and Eight each assert claims arising from Fatir's July 1996 transfer to Arizona. Each of these claims appeared in this litigation for the first time in Fatir's January 1997 amended complaint. The PLRA was in effect at that time, and each of these claims is therefore subject to its exhaustion requirements. Moreover, since the events alleged in the 1997 complaint did not occur until 1996, there is no way they can be reasonably related to any claim asserted in the 1995 complaint. Therefore, Fatir was required to exhaust the claims asserted in Counts Five, Six, and Eight.

The court observes that the PLRA applies only to " prison conditions." Counts Five, Six, and Eight all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 10
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

state constitutional claims. Thus, it could be argued that because they are not prison conditions claims, no exhaustion is required. The court disagrees with this view. In *Booth v. Churner,* 206 F.3d 289 (3d Cir.2000), *aff'd,* 532 U.S. 731 (2001), the Third Circuit held that an excessive force claim, which is a constitutional claim, was a "prison condition" and had to be exhausted under the PLRA. *See id.* at 296. ("[E]xcessive force actions are 'prison conditions' actions and subject to the exhaustion requirements set forth in [the PLRA]."). The Third Circuit further stated that "Congress, in the PLRA, made its intent to subject all prisoner actions (save for habeas petitions) to § 1997e(a)'s exhaustion requirements ... clear." *Id.* at 295. Thus, it appears that given the Third Circuit's holding in *Booth,* even constitutional claims such as those raised in Counts Five, Six, and Eight are subject to the exhaustion requirements of the PLRA.

The Supreme affirmed the Third Circuit in *Booth,* and has also hinted that even constitutional claims might be subject to the PLRA's requirements. Indeed, in reaching its conclusion in *Booth,* the Third Circuit relied on the Supreme Court's decision in *McCarthy v. Bronson,* 500 U.S. 136 (1991). In *McCarthy,* the Supreme Court was asked to construe another section of the PLRA, 18 U.S.C. § 3626, which concerns prison conditions and is interpreted in the same manner as § 1997e(a). *See Booth,* 206 F.3d at 294 ("Because the two sections of the PLRA are directed toward similar ends and are thus substantially related, it follows that ... the identical terms used in the two sections should be read as conveying the same meaning."). The *McCarthy* Court held that the term "prison conditions" included not only continuous claims of prison conditions, but also "isolated episodes of unconstitutional conduct." *See McCarthy,* 500 U.S. at 139. Thus, *McCarthy* lends further support to the argument that even constitutional claims must be exhausted.

Finally, most recently, in *Porter v. Nussle,* 534 U.S. 516 (2002), the Supreme Court was asked to address whether an excessive force claim was a " prison condition" requiring exhaustion under the PLRA. In reversing the Second Circuit, which had held that the excessive force claim did not require exhaustion, the Supreme Court read § 1997e(a) very broadly, stating, "We hold that the PLRA's exhaustion requirement applies to all suits about prison life ... whether they allege excessive force or *some other wrong." Id.* at 992. The Supreme Court therefore did not specifically exclude constitutional claims from the purview of the PLRA.

*12 In light of *Booth, McCarthy,* and *Porter,* the court finds that although the plaintiff's First Amendment constitutional claims do not appear to assert claims for prison conditions, they must be exhausted under the PLRA. *See Ghana,* 226 F.3d at 177, 179 (requiring inmate plaintiff to exhaust First Amendment claim prior to filing suit). *See also Walker v. Maschner,* 270 F.3d 573, 574 (8th Cir.2001) (same).

e. Count Nine

Count Nine is very similar to Count Two. Fatir never expressly stated a claim for denial of access to the courts in the 1995 complaint. However, in his May 1996 order, Judge McKelvie stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (D.I. 20 at 2.) The denial of access to courts claim, as worded by Judge McKelvie, is directly dependent upon the mail tampering claim. As previously noted, the mail tampering conduct was properly alleged in the 1995 complaint. Therefore, the claim alleged in Count Nine arises out of conduct, transactions, or occurrences that were plead in the original 1995 complaint. Thus, the claim in Count Nine relates back to the claim in the 1995 complaint and does not require exhaustion.

f. Conclusion

The court concludes that no exhaustion is required for Counts One, Two, and Nine. Nevertheless, exhaustion is required for Counts Four, Eight, Five, and Six. The court will now consider whether Fatir has satisfied the PLRA's exhaustion requirements with respect to these claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 11
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

### 3. Whether Fatir Properly Exhausted the Claims

As previously stated, the PLRA requires a prisoner to exhaust all available administrative remedies before bringing an action regarding prison conditions. *See Booth,* 206 F.3d at 291; *Nyhuis v. Reno,* 204 F.3d 65, 67 (3d Cir.2000). In the Third Circuit, exhaustion of remedies is an affirmative defense to be asserted by the defendant. *See Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir.2002). Thus, the burden is on the defendant to prove the facts that support its exhaustion defense. Where a prisoner has failed to exhaust, the court is required to dismiss the unexhausted claims without prejudice. *See Nyhuis,* 204 F.3d at 68 n. 2.

The exhaustion requirement is mandatory. Thus, the court cannot excuse a prisoner's failure to exhaust. *See id.* at 66. Additionally, the Third Circuit has refused to recognize a futility exception to the PLRA's exhaustion requirements. *See id.* at 71. In other words, the PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the inmate with the relief the inmate says he or she desires in the federal action. *See id.* at 71 n. 6 (noting that even where prison cannot grant requested relief, exhaustion may still be helpful) (citations omitted). Nevertheless, if there is no administrative remedy available for the plaintiff's claim, the court can find that exhaustion is not required. *See Freeman v. Snyder,* No. No. 98-636, 2001 WL 515258, at *5 (D.Del.2001), citing *Camp v. Brennan,* 219 F.3d 279, 281 (3d Cir.2000). Moreover, where the prisoner's compliance with the administrative scheme has been substantial, even if not complete, the court might find exhaustion. *See Nyhuis,* 204 F.3d at 77-78. The court will now consider whether Fatir had administrative remedies available to him, and if so, whether he had properly exhausted those remedies for Counts Four, Eight, Five, and Six.

#### a. Was there an administrative remedy available?

*13 An administrative remedy is "an administrative scheme adopted by the state department of corrections." *See Freeman,* 2001 WL 515258 at *7.

At minimum, it appears that an administrative remedy must be ascertainable by examination of statutes or regulations. *See id.* at *7 n. 9 (citing *Conception v. Morton,* 125 F.Supp.2d 111, 117 (D.N.J.2000)). Conversely, a vague, informal grievance process is "hardly a grievance procedure." *See id.* at *7. Thus, an individual administrator's decision would not qualify as a grievance procedure. *See id.* The court will now consider whether there was an administrative remedy available for Fatir for any of his claims.

#### 1). Counts Four and Eight

The court finds Fatir's deposition testimony and other evidence of record clearly establishes that there was a grievance procedure at the DCC for certain claims. The inmate was required to file a grievance with the grievance board, which could then be appealed. There was nothing vague, informal or discretionary about this procedure.

Fatir does not even attempt to argue that the claims asserted in Counts Four and Eight were not redressable through the prison grievance system. Indeed, the prison grievance procedure dictated that claims concerning actions by employees could be grievable, and further states that one of the remedies for a properly filed grievance might be "restitution of property." (D.I. 135 at B199.) It is clear that the claims in Counts Four and Eight concern employees seizing and depriving Fatir of his property in various ways. By its plain language, then, the DCC grievance system appears to be equipped to handle those allegations and provide Fatir relief by returning his property. Thus, the court finds that these claims were redressable under the DCC's grievance system, and therefore there was an administrative remedy available to Fatir for these claims.

#### 2). Counts Five and Six

With respect to Counts Five and Six, Fatir argues that the available grievance process was too vague and informal to be considered an administrative remedy. The court agrees.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 12
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Although the administrative remedies for the other claims are clearly spelled out in the DCC's grievance process, at no point did any DCC official testify that the established DCC grievance procedures were applicable to Fatir's claims regarding his interstate transfer. The court must therefore ask how an inmate might have challenged the transfer. The defendants do not argue that Fatir should have used the normal DCC grievance process. Rather, they argue that Fatir was told that he should "contact the Interstate Compact Coordinator for any legal issues" concerning his transfer. It is clear that the Interstate Compact Coordinator, Colleen Shotzberger, is an individual. This is exactly the type of "administrative remedy" that courts frown upon. *See Freeman,* 2001 WL 515258, at *7. Additionally, although the defendants assert that Fatir was told to contact Shotzberger, there is absolutely no evidence of record to support this contention. There is no testimony that Fatir was ever notified that he could contact Shotzberger regarding grievances stemming from his transfer. Since the inmate must be aware of the grievance procedure, this failure of proof was significant. For all of these reasons, the court finds this purported administrative remedy to be inadequate.

*14 Similarly, although Taylor's testimony establishes that Fatir could have "written a letter" or "written a grievance" his testimony does not establish where or to whom the grievance should be addressed. More important, it definitely does not establish that there was an administrative scheme established by the State of Delaware regarding inmates grievances of interstate transfers. Although it is quite possible that the DCC (or the applicable Interstate Compact authority) has such a grievance procedure, the defendants' evidence is woefully inadequate to demonstrate that such a procedure exists. Since exhaustion is an affirmative defense, the defendants must present evidence sufficient to prove that there was an available administrative procedure. Their failure to present any evidence on this point therefore precludes the entry of summary judgment in their favor on the exhaustion issue for these claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (noting that summary judgment is appropriate against a party who fails to present evidence on an issue on which it has the burden of proof at trial).

For these reasons, the court finds that there was no administrative remedy for Fatir to exhaust regarding the claims in Counts Five and Six. Therefore, Fatir need not comply with the PLRA's exhaustion requirements on these claims.

b. Did Fatir Substantially Comply with the Available Remedies?

The Court has determined that there was an administrative remedy available to Fatir for Counts Four and Eight. The next question is whether Fatir substantially complied with the available remedies. The court finds that he did not.

Generally, a court may find that an inmate has substantially complied with the available administrative remedies when the inmate has taken the grievance as far as he or she possibly can in the prison appeals process. *See Camp,* 219 F.3d at 281 (finding substantial compliance where inmate took grievance to "ultimate administrative authority"). In this case, Fatir's deposition testimony clearly establishes that he never filed a grievance with regard to the claims in Counts Four and Eight. Fatir's failure to file any grievance stands in stark contrast to taking a grievance as far as the grievance process will permit. Thus, the court is not inclined to find that he substantially complied with the available process.

The only argument Fatir might advance to excuse his lack of exhaustion is that he was told that he could not file a grievance regarding the seizure of his property. The court is not persuaded for two reasons. First, the terms of the grievance manual-which specially state that the prison can return property-contradict and would prevent any such "understanding." Moreover, although some courts have found substantial compliance where an inmate was told a claim was not grievable, *see Freeman,* 2001 WL 515258, at *8, this has generally only occurred where the prisoner actually files a grievance or some informal complaint and is subsequently told by the grievance board or some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

prison official that the claims are not grievable. *See id.* at *3 (noting that inmate had made repeated requests for redress before being told that claim was not grievable). Indeed, as a matter of policy, it makes little sense to find substantial compliance where an inmate simply assumes that a claim is not redressable through the grievance procedure, without waiting for the grievance board or other prison officials to inform him or her that the complaint is indeed not redressable. To hold otherwise would permit inmates to satisfy exhaustion requirements based solely upon their own beliefs regarding prison procedures. Obviously, that is an unworkable solution, both for the prisons and the courts.

*15 For these reasons, the court finds that Fatir failed to substantially comply with, or exhaust, any of the available administrative remedies for Counts Four and Eight. Therefore, the court will dismiss these claims without prejudice until such time as Fatir has exhausted these claims.

### IV. CONCLUSION

For all of the foregoing reasons, the court concludes that the motion to amend will be denied based on the plaintiff's undue delay and the resulting prejudice. Additionally, the defendants' motion for summary judgment is granted on the exhaustion issue as to Claims Four and Eight. It is, however, denied as to the exhaustion issue for all other claims. The motion is denied without prejudice in all other respects. This action will be stayed pending the plaintiff's exhaustion of his administrative remedies.

NOW, THEREFORE, IT IS HEREBY ORDERED that:
1. The Plaintiff's Motion for Leave to Amend (D.I.139) is DENIED.
2. The Defendants' Motion for Summary Judgment (D.I.128) is GRANTED with respect to the plaintiff's failure to exhaust his administrative remedies regarding Counts Four and Eight. These claims shall be DISMISSED without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims.

3. The summary judgment motion is DENIED in all other respects. This denial is without prejudice to the defendants' ability to refile this motion after the plaintiff has exhausted his remedies. However, the defendants may not reassert exhaustion as an affirmative defense as the court's decision today is *res judicata* on the exhaustion issue.
4. This action shall be STAYED until such time as the plaintiff has exhausted his administrative remedies with respect to Counts Four and Eight.

D.Del.,2002.
Fatir v. Dowdy
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.