--- F.Supp.2d ----, 2006 WL 1888326 (D.Kan.)

United States District Court,
D. Kansas.
Juanita RYAN, Plaintiff,
v.
SHAWNEE MISSION UNIFIED SCHOOL DISTRICT NO. 512 and Diane Hansen, Defendants.
No. 05-2213-JWL.
July 7, 2006.

Court would allow amendment of complaint, in suit brought by physical therapist claiming that school district violated Rehabilitation Act through its treatment of handicapped students, to seek reinstatement following allegedly coerced resignation; amendments were to be generally allowed, and district made no showing of prejudice. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

Kelly L. Jackson, Leawood, KS, for Plaintiff.

Curtis L. Tideman, Tammy M. Somogye, Lathrop & Gage, LC--OP, Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

**\*1** Plaintiff Juanita Ryan was formerly a physical therapist with the defendant Shawnee Mission Unified School District No. 512. She asserts claims against the school district and her former supervisor, Diane Hansen, for retaliation and wrongful termination for violations of her First Amendment free speech rights, pursuant to 42 U.S.C. § 1983, and § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794(a). This matter is currently before the court on Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment (docs. # 66 & # 69). For the reasons explained below, the court will grant defendants' motion with respect to plaintiff's First Amendment retaliation claim and will deny it as to plaintiff's Rehabilitation Act claim. Having granted summary judgment in favor of defendants on plaintiff's First Amendment retaliation claim, the court will deny plaintiff's motion for partial summary judgment as moot because it pertains to one of defendants' asserted defenses on that claim.

## STATEMENT OF MATERIAL FACTS

The court's analysis of the facts of this case is complicated significantly by two considerations. First and foremost, plaintiff has largely failed to support any of her factual allegations with admissible evidence. At the summary judgment stage, facts must be established by evidence which would be admissible at trial. Fed.R.Civ.P. 56(e); *Pastran v. K-Mart Corp.,* 210 F.3d 1201, 1203 n. 1 (10th Cir.2000). To be sure, the parties do not need to present evidence in a form that would be admissible at trial (e.g., live testimony), but the content or substance of the evidence must be admissible. *Bryant v. Farmers Ins. Exchange,* 432 F.3d 1114, 1122 (10th Cir.2005); *Pastran,* 210 F.3d at 1203 n. 1. Thus, factual allegations must be supported by evidence "identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm,* 289 F.3d 671, 675 (10th Cir.2002) (quotation omitted). In this case, plaintiff's factual allegations are largely supported by references to notes, emails, and other documents that are not authenticated or part of a sworn affidavit or other testimony. Thus, the majority of exhibits plaintiff filed in support of her response are not proper Rule 56 evidence. *See, e.g., Hayes v. Marriott,* 70 F.3d 1144, 1148 (10th Cir.1995) (unsworn statements do not raise factual issues precluding summary judgment); Fed.R.Civ.P. 56(c) & (e); D. Kan. Rule 56.1(d). In addition to plaintiff's failure to establish the admissibility of most of her exhibits, many of her numbered fact paragraphs rely on inadmissible hearsay. "[I]f that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility,

*i.e.,* the evidence must be based on personal knowledge." *Bryant,* 432 F.3d at 1122. Consequently, inadmissible hearsay will not defeat summary judgment. *Lozano v. Ashcroft,* 258 F.3d 1160, 1166 (10th Cir.2001); *Hardy v. S.F. Phosphates Ltd. Co.,* 185 F.3d 1076, 1082 n. 5 (10th Cir.1999); *Treff v. Galetka,* 74 F.3d 191, 195 (10th Cir.1996).

**\*2** Defendants raised these evidentiary objections for the first time in their reply brief. The court granted plaintiff leave to file a surreply brief, explaining that plaintiff could use her surreply to respond to issues which defendants had raised anew for the first time in their reply brief. Thus, in allowing plaintiff to file a surreply the court gave plaintiff the opportunity to respond to the defendants' evidentiary objections. Notwithstanding the opportunity to respond (perhaps by authenticating documents or pointing to a hearsay exception), plaintiff did not respond to those objections. Instead, she filed a motion to amend her response to defendants' motion for summary judgment (doc. # 100). In that motion, she seeks to correct references to the evidence in twenty-one numbered fact paragraphs by changing references to deposition testimony and by submitting a few different exhibits. Plaintiff contends that her previous errors in failing to refer to and attach the appropriate evidence were inadvertent. The court will deny plaintiff's motion to amend her response because, first, plaintiff had the opportunity to marshal her evidence in response to defendants' motion for summary judgment when she filed her response to the motion and again when she filed her surreply. Moreover, even if the court were to permit her to amend her response, most of the prior evidentiary deficiencies would not be cured. Far most importantly, the court denies the motion because the court would reach the same result with or without the proposed changed evidentiary citations in any event. In addition to plaintiff's failure to properly support her factual allegations with admissible evidence, the second and related consideration which further complicates the court's analysis of the facts of this case is that the parties submitted voluminous statements of fact. The statement of facts contained in defendants' motion consists of 249 fact paragraphs spanning fifty-four pages. In response, plaintiff really did not controvert defendants' factual allegations in any significant respect. Instead, she asserted factual allegations which essentially added to fifty-five of defendants' fact paragraphs. Additionally, the statement of facts contained in her response to defendants' motion consists of 190 fact paragraphs spanning thirty-three pages. A significant portion of both of the parties' factual allegations are immaterial to the court's resolution of defendants' motion for summary judgment in the sense that, although they are helpful to the court's understanding of the background of the case, they do not impact the court's determination of whether summary judgment is warranted on either of plaintiff's claims. Because of the parties' unnecessarily voluminous statements of fact, then, the court will not resolve each and every one of defendants' evidentiary objections. Instead, in an abundance of caution, the court has thoroughly reviewed the record in an effort to ensure that plaintiff is not deprived of her day in court simply because her counsel has not marshaled the evidence in the manner required by summary judgment practice and applicable rules. In doing so, the court has attempted to anticipate potential hearsay exceptions and exclusions which might apply despite the fact that plaintiff's counsel did not raise those arguments. Ultimately, the court finds that plaintiff's failure to support her factual allegations is immaterial to the court's resolution of defendants' motion for summary judgment. With or without those factual allegations, plaintiff has failed to establish that a genuine issue of material fact exists to withstand summary judgment on her First Amendment retaliation claim and, conversely, the school district has failed to establish that it is entitled to summary judgment on her Rehabilitation Act claim. Accordingly, consistent with the well established summary judgment standard, the court accepts the facts which are uncontroverted or relates them in the light most favorable to plaintiff, the nonmoving party.

## A. *The School District's Special Education Department* [FN1]

**\*3** The school district has fifty-one schools. Each school building is managed by a principal who supervises the staff assigned to work exclusively in that building. Nearly five thousand students in the school district have individualized education plans (IEPs).

Of those, 3,481 students have identified educational disabilities that impact their ability to receive a free and appropriate education (FAPE). Students with IEPs are commonly called "special education students." Some have health impairments which impact their ability to make educational progress and are the ones with whom physical therapists (PTs) work. Plaintiff was formerly employed by the school district as one of the PTs and, as such, she worked with those students.

The school district's hierarchy relating to plaintiff's employment with the school district is as follows. [FN2] The school district's Director of Special Education is Deborah Haltom. The school district is divided into five areas for purposes of managing special education resources: the East area, the South area, the North area, the Northwest area, and the West area. The school district assigns coordinators to manage the special education resources in each of those five areas. Ms. Haltom supervises these area coordinators. The area coordinators, in addition to managing their respective areas, have specialized areas of responsibility. Defendant Diane Hansen is the coordinator for the East area and also supervises the PTs and a physical therapy assistant (PTA). Pona Piekarski is the coordinator for the South area to which plaintiff was assigned. Several types of specialists work with special education students such as PTs, occupational therapists (OTs), autism specialists, school psychologists, speech pathologists, social workers, and vision specialists. These specialists, including PTs, are assigned to several schools within the district.

When the school district suspects that a student needs special education services, or at a parent's request, a diagnostic team meets with the student's parent(s) to develop an evaluation plan and determine the appropriate way to collect data to determine whether the student qualifies for such services. The student is then evaluated by different specialists who compile an evaluation report and provide it to the parents. If a student is found to be in need of special education services, an IEP meeting is scheduled to develop an IEP for the student. IEP meetings can involve as many as ten or more service providers, all of whom are invited to attend. IEP meetings must be attended by a local educational agency representative (i.e., a school principal or other person licensed to provide or supervise special education services), a special education teacher, and a parent. The purpose of an IEP meeting is to discuss the evaluation, consider the recommendations of all team members, and reach consensus about the program that should be provided to the student.

The IEP identifies, among other things, the goals for a student, how the student's progress toward the goals will be measured, the type of related services the school district agrees to provide a student, how often a student is to receive certain specified services, and if any assistive technology is required for the student. "Related services" is a term of art in the field of special education. It means development, corrective, and supportive services required to assist a child who has been identified as qualified to receive special education. Some examples include physical therapy, occupational therapy, social work services, assistive technology, speech therapy, and transportation. "Assistive technology" is another special education term of art and means items, pieces of equipment or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability. Some examples include things as simple as a velcro strap to assist a student in holding a pencil, crayon, cup, or spoon; a ramp built out of wood for a student to roll a bowling ball down a bowling alley; or a paper towel holder attached to a wheelchair for a student who needs easy access to it; and more complicated items such as a word processor; an eye signal (light beam) button; an auditory output device; an electric wheelchair; or a switch that is noise or light sensitive and activates a radio or other electronic device.

**\*4** A student with an IEP may receive several different related services such as physical therapy, occupational therapy, and speech therapy. If the service is not consultative in nature, the therapists providing these services must schedule regular times to see the student within the school. In addition to providing services to students on their caseload, therapists are called on to attend meetings to discuss students' cases (sometimes

referred to as team meetings) or report students' progress, evaluate students suspected of being in need of special education, evaluate new students coming to the school district, and train the paraprofessionals serving the students on their case loads. According to plaintiff, PTs are also required to perform equipment adjustments, locate equipment, obtain equipment, provide re-evaluations for students, supervise the PTA, supervise the paraprofessionals, and plan PT services. Plaintiff also points out that PTs often contact the parents directly for signed permission for evaluations or returning doctor's notes, or to discuss matters such as physical therapy, "in-home" activities, equipment needs, positioning and handling of a child, and the results of doctor's visits.

Each student with an IEP has a case manager who coordinates meetings, serves as a point person for contact with the parents, and checks that services are being provided as required on the student's IEP. It is often difficult to schedule meetings because there are so many individuals' calendars to coordinate. Also, some service providers work less than full time schedules, as did plaintiff in this case, and are not working on days when meetings are scheduled. Persons who coordinate meetings try to schedule meetings when the most service providers can attend. Some part-time service providers will attend a meeting scheduled on a regular work day off and later adjust their schedules by taking off a scheduled work day when students are out of school or coming in later or leaving early on regularly scheduled work days. Plaintiff's schedule did not allow her to take time out of a regular day without missing necessary duties. Sometimes, a meeting is scheduled for one student when a service provider is scheduled to serve another student. In order to attend the meeting, the service provider has to cancel his or her regular student visit.

When Ms. Hansen was the supervisor for the PTs, the PTs met without her and determined their caseloads and then Ms. Hansen reviewed what the PTs proposed. Caseloads were divided by number of students. Plaintiff did not agree with this method of dividing the caseloads, believing that it should be divided by the number of visits instead. On average, a full time PT has approximately forty students on his or her caseload. PTs working three days a week have twenty to twenty-five students on their caseloads. Ms. Hansen met with the PTs and OTs, on average, once per month. The PTs also met on occasion without Ms. Hansen to address issues they were having as a group and to try to help each other out. PTs had concerns about talking to administration for various reasons.

**\*5** The school district's PTA, Ann LaHue, visits students and provides the physical therapy services called for on IEPs, obtains equipment, and prepares equipment requests. Often, if a student's IEP calls for more than one visit in a week, Ms. LaHue will see the student one time per week and the PT will see the student the other time. Ms. LaHue worked with some of the students on plaintiff's caseload.

Paraprofessionals working in the school buildings receive training from various disciplines to be able to work with students throughout the school day when the service providers are visiting other students. PTs may only delegate certain duties to paraprofessionals. PTs are responsible for training the paraprofessionals who work with the students on their caseload who receive physical therapy services. Ideally, the student is present during the PT's training of the paraprofessional. Training is particularly difficult at the beginning of the school year because it takes new paraprofessionals working with students awhile to learn students' problems. Scheduling this training is also difficult when there are many paraprofessionals to train. During the relevant time period, the Kansas Department of Education (KSDE) required PTs to supervise paraprofessionals working with students on physical therapy two times per month. PTs are responsible for keeping track of when they supervise paraprofessionals.

## B. *Plaintiff's Employment with the School District*

The school district hired plaintiff as a physical therapist in 1999. Plaintiff accepted a contract with the school district for the 2003-2004 school year working 0.6 of a full time schedule. The events that are the subject of this lawsuit occurred during the 2003-2004 school year.

*1. Handling of M.J. at Rosehill Elementary*

The record reflects that one of the students on plaintiff's caseload, M.J. at Rosehill Elementary School, was a source of significant friction between plaintiff and the staff at Rosehill. **(1) On August 21, 2003, plaintiff made a recommendation to Karen Kittell, the resource room teacher at Rosehill, that M.J. needed to have a wheelchair and that M.J. needed the wheelchair regardless of what the IEP team recommended. [FN3] (2) On September 17, 2003, plaintiff told Ms. Kittell that M.J. should be allowed to walk in the hallway, that plaintiff only had time to provide services to M.J. for thirty minutes per week as reflected in M.J.'s IEP, that plaintiff did not have time to provide supervision to several different paraprofessionals serving M.J., and that plaintiff therefore needed to train and supervise one primary paraprofessional.**

The Rosehill team convened a meeting on October 16, 2003, concerning M.J. The principal at Rosehill, Brenda Boyd, was present at this meeting. During the meeting, **(3) plaintiff stated that she was assessing the equipment needs and activities to be implemented during M.J.'s therapies. Plaintiff requested that M.J. be allowed to walk in the hallway and be evaluated by a vision specialist who worked on mobility needs for visually impaired students. Plaintiff also stated that she needed to train one primary paraprofessional so that she could limit the time necessary to supervise paraprofessionals and she stated that she did not have sufficient time in her schedule to attend monthly team meetings for M.J. Plaintiff discussed other activities and other related equipment for M.J. She recommended removing the toys from the floor and requiring M.J. to sit at a chair and table instead of crawling and sitting on the floor. Plaintiff also stated that she had spoken to M.J.'s parents and they did not object to M.J. walking in the hallway or interacting with other children.**

**\*6** On October 20, 2003, plaintiff requested direction from Ms. Hansen as to whether she was required to attend all of the team meetings being scheduled for M.J. Ms. Hansen responded, in essence, that plaintiff "can't do everything. Ask them what they want you to do the most." Plaintiff requested that Ms. Hansen speak with Ms. Boyd about the matter and Ms. Hansen indicated that she would do so. On November 5, 2003, Ms. Piekarski emailed plaintiff and stated that she had been told that plaintiff was not providing services at Rosehill. Plaintiff emailed Ms. Hansen, copying Ms. Haltom and Ms. Piekarski, and stated that Ms. Hansen told her that "direct services" included in-service training to paraprofessionals and team meetings. Plaintiff explained all of the activities she had performed and meetings she had attended on behalf of M.J. Her email stated: "Yet, I have recently obtained an email from Pona Piekarski indicating that I have not provided PT services for this student in several weeks. Are not the activities as referenced in this paragraph considered PT services? If not, what exactly does constitute PT services?" Ms. Piekarski had told Ms. Boyd that "direct services" were only "hands-on activities with the student and staff training with the student present."

**(4) At the November 6, 2003, Rosehill team meeting, plaintiff stated that she had received an email from Ms. Piekarski indicating that someone from Rosehill had indicated to plaintiff that she had not been providing PT services for over three weeks. Plaintiff indicated to the team that she was disappointed that someone would say this and wanted to reassure the parent and team that plaintiff, in fact, had been delivering PT services and did not want them or the team members to be misled by someone who was sending unsubstantiated emails. Plaintiff further stated that M.J. was spending too much time on the floor which decreased mobility and increased the risk for decreased joint range and contractors, that student and staff safety were impaired during ambulation into and out of the school building and within the building, and that M.J. had too little interaction with her peers.**

After the meeting, Ms. Boyd met with plaintiff to discuss her comments. Ms. Boyd explained to plaintiff that she thought her behavior was unprofessional because it had nothing to do with talking about M.J. **(5) Plaintiff defended her discussion of the email, claiming that her intent in bringing up the email at the meeting was**

**"integrity." She stated: "[A]pparently whoever sent this email did not have sufficient integrity/self-esteem to have contacted me personally at which time I could have answer[ed] any questions which they might have had in regards to the type/extent of PT services which I was providing.... [P]erhaps an email to Piekarski should not have been sent when [you] could have spoken directly to me regarding [your] service concerns." Plaintiff also told Ms. Boyd that she was concerned with M.J.'s isolation from her peers, her unduly restrictive placement, and the fact that M.J. was not being allowed to walk in the hallway.** Ms. Piekarski believed that the Rosehill team "was not communicating well with each other" and "there were a lot of mixed communications between the team[ ] about service and when service would be provided."

*\*7* On November 11, 2003, plaintiff called Ms. Hansen to inform her that she needed to miss M.J.'s direct service time to attend an IEP meeting. Plaintiff asked Ms. Hansen what she should do. Plaintiff did not receive an answer from Ms. Hansen.

In a meeting on November 19, 2003, Ms. Piekarski ordered plaintiff to schedule a meeting with Ms. Boyd so that plaintiff could apologize to Ms. Boyd.

**(6) In an email dated December 3, 2003, plaintiff told Ms. Kittell, with a copy to Ms. Boyd, that the wheelchair provided for M.J.'s needs was not safe and that another wheelchair needed to be provided.** This email was also provided to Ms. Piekarski. Ms. LaHue spoke with the nurse at Rosehill about providing the wheelchair which was stored in the nurse's office for M.J.'s use. Shortly thereafter, someone at the school told the nurse: "Don't give them anything."

On December 12, 2003, plaintiff met with Ms. Boyd, Ms. Piekarski, and Lisa Elliott, an NEA representative who attended at plaintiff's request. According to Ms. Piekarski, the intent of the meeting was to discuss how the team could communicate better. **(7) At that meeting, plaintiff stated that she would not apologize to Ms. Boyd for the comments she made during the November 6, 2003, team meeting at Rosehill Elementary School.**

**(8) On January 15, 2004, plaintiff continued to advocate for additional services for M.J. at a staff meeting to prepare for M.J.'s upcoming IEP meeting. She advocated that M.J. be allowed to interact with other students, that services be increased, and that the paraprofessionals provide services as per her matrix of activities she had provided to Ms. Kittell and Ms. Boyd.**

Shortly thereafter, Ms. Boyd sent a letter to plaintiff removing her from the Rosehill team. The second paragraph of the letter stated: "You are not to contact the parents of [M.J.], or any member of that team." Ms. Piekarski dictated the language ordering plaintiff not to speak to anyone. Ms. Hansen approved the letter. On January 29, 2004, an IEP meeting took place which reduced services to M.J.

*2. Problems with Paraprofessionals at South High School*

During the 2003-2004 school year, plaintiff also had problems at South High School with not being able to find students when she arrived at the building to provide their services. For example, plaintiff arrived at South High School on November 13, 2003, to provide services to students with IEPs. The paraprofessionals did not meet her with the students. Plaintiff located the case manager and Ms. Piekarski and informed them that she was unable to provide the students with services because the paraprofessionals did not meet her with the students as planned. In December of 2003, Ms. Piekarski contacted Lisa Ross regarding this issue and requested that they meet to resolve the problem. Ms. Ross and plaintiff met. Ms. Ross reported the results of the meeting to Ms. Piekarski.

At a November 19, 2003, meeting with plaintiff, Ms. Piekarski, Ms. Haltom, and Ms. Hansen, one of the topics of discussion was the issue at South High School in which the paraprofessionals were not bringing the students to plaintiff in time for their physical therapy appointments. Ms. Piekarski chided plaintiff for not providing services at South High School. **(9) Plaintiff stated that Ms. Piekarski knew the problem was that the paraprofessionals were not bringing the students for their therapy sessions because Ms. Piekarski was there on November 13th when it happened and she refused to do anything about it.**

*3. Provision of Services Without Doctor's Orders*

**\*8** On October 9, 2003, plaintiff learned of a student at South High School having been assigned to her caseload. Plaintiff questioned whether this student was supposed to be receiving physical therapy because she had not evaluated him for these services. She sent a request for doctor's orders to the student's parents.

**(10) On October 13, 2003, plaintiff contacted Larry Buening with the Kansas State Board of Healing Arts regarding whether a physical therapist was required to have doctor's orders prior to seeing a "consult" student.**

**(11) During an OT/PT meeting on October 15, 2003, plaintiff had a conversation with Ms. Hansen in which she raised the question of delivery of PT service without doctor's orders.** Ms. Hansen indicated that PT services should not be provided without doctor's orders.

On November 5, 2003, Ms. Piekarski sent plaintiff an email that stated: "I spoke with Diane [Hansen], and you do not need doctor's orders regarding [student name]. His IEP says 30 minutes 1x a quarter consult--that would be talking to Mr. Lucas. [FN4] Should he ask about positioning or request you to provide, then you would need doctors orders. Please see that you make contact with him this week."

**(12) In an email of November 14, 2003, plaintiff asked Ms. Piekarski how it was determined whether or not physical therapy services could be provided to a child without doctor's orders. She asked Ms. Piekarski where she found the information stated in the November 5 email so that she "might refer/review this information also in the event this situation should arise again."**

On November 19, 2003, plaintiff met with Ms. Haltom, Ms. Hansen, and Ms. Piekarski. Plaintiff claims that during this meeting, Ms. Piekarski directed her to provide physical therapy services to two students at South High School assigned to her caseload who did not have doctor's orders. **(13) Plaintiff replied that to provide physical therapy without doctor's orders would be a violation of Kansas law.** Ms. Piekarski replied: "If I say it's so, then it is." Ms. Piekarski indicated to plaintiff that if she did not comply with the directive to see this student at South High School without doctor's orders, plaintiff would be in breach of her contract and Ms. Piekarski would contact the school district's legal personnel and take action against plaintiff. **(14) Plaintiff attempted to inform Ms. Piekarski that the student without doctor's order also apparently had an error in his IEP: where it said he was to receive physical therapy services it really meant that he was to receive occupational therapy services.** Ms. Piekarski ended the conversation and required plaintiff to provide her with a detailed schedule of plaintiff's activities.

Plaintiff contacted and met with Marilyn Flannigan with the NEA. **(15) Plaintiff met with Ms. Flannigan and spoke with her about whether Ms. Piekarski could terminate her for not following orders.** Ms. Flannigan said that she could be terminated for not following orders.

**\*9 (16) Following a PT/OT meeting on January 21, 2004, Ms. Hansen and Ms. Haltom met with the PTs. Plaintiff stated to Ms. Haltom, while Ms. Hansen was present, that Ms. Haltom had not resolved the issue regarding supervision of paraprofessionals or the provision of physical therapy services without doctor's orders.** Ms. Haltom replied that it was not the purpose of that meeting to discuss those things and that she had already had this discussion with plaintiff. Ms. Haltom or Ms. Hansen stated that the therapists should only make up services for those students whose parents would notice or might file a lawsuit. **(17) Plaintiff stated that this was unethical.**

*4. Inadequate Staffing Concerns*

During the 2003-2004 school year, a change in the early childhood program caused the PTs to have heightened anxiety and time concerns. **(18) At one time, plaintiff inquired of Ms. Hansen via email as to how to handle ECSE evaluations (evaluations for preschool students), meaning whether they should be handled by canceling her students' IEP time or by setting time aside in her schedule to regularly perform these evaluations.** The change in early childhood services and

making up missed visits caused difficulty with PT staffing. The PTs complained that this change and the change requiring them to make up missed visits required them to put in more time to complete their jobs. During PT meetings with Ms. Haltom regarding the integrated service delivery model, they discussed using trained paraprofessionals to help satisfy the minutes on the IEP. This entailed utilizing a different code (integrated therapy) to describe that the PT would be providing some services and paraprofessionals would be providing some services. As a group, the PTs did not agree with delegating physical therapy service minutes to other staff, even if it was described in the IEP that others would be performing the service, because they believed that the Physical Therapy Practice Act did not allow anyone but PTs to perform physical therapy. All of the PTs believed their caseloads were full. They complained to Ms. Hansen that they were having trouble getting paraprofessional training accomplished.

**(19) On September 22, 2003, plaintiff had a telephone conversation with Ms. Hansen in which she indicated that she did not have sufficient time in her schedule to see all of her scheduled IEP students.** Ms. Hansen responded that the school district would not hire any more PTs, that the school district was struggling financially and that plaintiff should decrease physical therapy services to severely and mentally disabled IEP students, saying that she doubted that they made much, if any, progress anyway. Ms. Hansen also said that the school district had encountered legal problems with some parents and those were the students whose services should be made up. **(20) Plaintiff indicated that this was unethical and offensive.** Ms. Hansen replied that plaintiff should just get used to putting in longer hours then, including coming in on her days off and getting her job done.

**\*10** On September 23, 2003, Ms. Haltom and the area coordinators discussed whether part-time staff could be told to come in on their days off to attend meetings. They acknowledged that they could not do this unless they were willing to give them "comp" time.

**(21) On November 23, 2003, plaintiff provided Ms. Hansen and Ms. Piekarski with her schedule which showed a full schedule for three days at eight hours a day and specifically noted on the schedule that this did not include time for such things as equipment adjustment, location of equipment, initial evaluations or re-evaluations, team meetings, ESCE meetings, IEP team meetings, proper supervision of paraprofessionals, and additional training provided for staff. Plaintiff's schedule also stated that there was an issue as to whether her day should actually be a seven hour and forty minute workday versus the eight hours scheduled.**

Ms. Hansen, Ms. Haltom, and all of the area coordinators knew that PTs were having difficulty meeting all their direct IEP service time. Ms. Hansen depended on her PTs to tell her when there was a staffing problem. In 2003-2004 they were telling her there was a staffing problem.

*5. Difficulties at Carpenter Elementary School*

**(22) In December of 2003, plaintiff called Ms. Hansen and left a message requesting advice about Jane Gorman's (a teacher) failure to cooperate with plaintiff's attempts to schedule training and instruct staff regarding physical therapy activities for a student at Carpenter Elementary School.**

**(23) On January 30, 2004, plaintiff again called Ms. Hansen regarding difficulties with Ms. Gorman. Plaintiff stated that Ms. Gorman had once again indicated that she did not have time for plaintiff to provide instruction to paraprofessionals. Plaintiff told Ms. Hansen that this had been a recurring problem since the beginning of the school year and again requested Ms. Hansen's assistance.** Ms. Hansen never looked into the issue of Ms. Gorman making it difficult for the student to receive PT services.

**(24) On April 29, 2004, plaintiff told Cindy Herrick, Ms. Gorman, and Marilyn Webb, principal of Carpenter Elementary School, that she was unable to attend team meetings and be at the school at the times requested due to her scheduling difficulties.** They asked plaintiff if she had talked about scheduling

problems with Ms. Hansen. Plaintiff answered, yes, but that Ms. Hansen would not return her phone calls. Ms. Herrick stated that she was going to call Ms. Hansen regarding this.
C. *Events Culminating in Plaintiff's Resignation*

In April of 2004, Ms. Hansen contacted Ms. Lyon, the Certified Personnel Administrator in the Human Resources Department, to discuss her concerns about plaintiff's communication with school district staff and interpersonal issues. Ms. Hansen knew of the school district's obligation to notify PTs about contract nonrenewals by May 1. Ms. Lyon advised Ms. Hansen to have a conversation with plaintiff about what she thought the problems were and what her expectations were for the following school year, including developing a positive relationship with staff at South High School. Ms. Lyon also advised Ms. Hansen to document her conversation with plaintiff.

***11 (25) On May 3, 2004, plaintiff left a phone message for Ms. Hansen that plaintiff was trying to arrange comp time to cover days she was supposed to be off, but she came in for meetings.** Ms. Hansen did not return the phone call.
**(26) On May 4, 2004, plaintiff called and spoke with Ms. Lyon regarding taking comp time for days that she had been required to come in on her days off.** Plaintiff believed that she had fulfilled her contract days before the end of the school year because she had been called in to work on her days off. Ms. Lyon stated that she would look into it. She called plaintiff back and told her that she should attend scheduled IEP meetings on her non-scheduled workdays without expecting compensation. **(27) Plaintiff told Ms. Lyon that she did not have enough time in her schedule to get all of her physical therapy duties done.**

Ms. Hansen met with plaintiff on May 5, 2004. At that meeting, she told plaintiff that none of the schools to which she had been assigned wanted her back, that she would not allow plaintiff to switch schools, and that all of the other PTs had asked for her removal. Ms. Hansen stated that if plaintiff did not resign by May 15th the school district would enforce the $1,000 penalty for late resignations against her. The school district no longer wanted plaintiff back and they no longer had a position for her.

On May 14, 2003, plaintiff submitted her letter of resignation to Ms. Lyon. Plaintiff's stated reasons for resigning were that she was experiencing hostility from her supervisor and area coordinator; her superiors required her to perform duties she felt were in violation of the statutes of the Kansas Board of Healing Arts; and that her immediate supervisor advised her to resign. Under these conditions, she felt she had no other option but to resign.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir.2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

***12** Once the movant has met this initial burden, the burden shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial." _Spaulding,_ 279 F.3d at 904 (citing _Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,_ 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); _see also Anderson,_ 477 U.S. at 256, 106 S.Ct. 2505; _Celotex,_ 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. _Anderson,_ 477 U.S. at 256, 106 S.Ct. 2505; _Eck v. Parke, Davis & Co.,_ 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." _Mitchell v. City of Moore,_ 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting _Adler,_ 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." _Adams,_ 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " _Celotex,_ 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

As explained below, the court concludes defendants are entitled to summary judgment on plaintiff's First Amendment retaliation claim because plaintiff has not raised a genuine issue of material fact that she was speaking as a citizen on a matter of public concern with respect to any of the speech which she claims was constitutionally protected. On the other hand, plaintiff has raised a genuine issue of material fact sufficient to withstand summary judgment on her Rehabilitation Act claim. As such, defendants' motion is granted with respect to plaintiff's First Amendment retaliation claim and denied with respect to her Rehabilitation Act claim.

## I. FIRST AMENDMENT RETALIATION CLAIM

"It is settled that a government entity 'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' " _Maldonado v. City of Altus,_ 433 F.3d 1294, 1309 (10th Cir.2006) (quoting _Connick v. Myers,_ 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). At the same time, a governmental entity has an interest as an employer in regulating the speech of its employees that differs significantly from the interest it possesses in regulating the speech of the citizenry in general. _Id._ (quoting _Pickering v. Bd. of Educ.,_ 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). These conflicting values require courts to find a balance between the employee's interests, as a citizen, in commenting upon matters of public concern and the interest of the government entity, as an employer, in promoting the efficiency of the public services it performs through its employees. _Id._ (same). Thus, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' " _Garcetti v. Ceballos,_ --- U.S. ----, ----, 126 S.Ct. 1951, 1959, --- L.Ed.2d ----, ---- (2006) (quoting _Connick,_ 461 U.S. at 154, 103 S.Ct. 1684).

**\*13** [1] In determining whether a public employer has infringed an employee's First Amendment free-speech rights, the court applies the test articulated in _Pickering v. Board of Education,_ 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and _Connick v. Myers,_ 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). First, the court determines "whether the employee spoke as a citizen on a matter of public concern." _Garcetti,_ 126 S.Ct. at 1958. If so, then the possibility of a First Amendment claim arises and "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." _Id._ If these prerequisites are met, the employee's speech is protected and the plaintiff must show that his or her speech was a substantial motivating factor in the adverse employment action against the employee. _Baca v. Sklar,_ 398 F.3d 1210, 1218-19 (10th Cir.2005). The first two factors are questions of law for the court to decide; the third prong is a fact question for the jury. _Id._ [FN5]

## A. _Garcetti:_ Whether Plaintiff Was Speaking As a Citizen

[2] At the time defendants filed their motion for summary judgment on April 3, 2006, and

when plaintiff filed her response brief in opposition to defendant's motion on May 11, 2006, the court's analysis under the first prong would have begun with asking whether plaintiff's speech touched on a matter of public concern under _Connick v. Myers,_ 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), _Pickering v. Board of Education,_ 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and their progeny. While defendants' motion was pending, however, the Supreme Court decided _Garcetti v. Ceballos,_ --- U.S. ----, 126 S.Ct. 1951, --- L.Ed.2d ---- (2006), a case which instructs courts to ask and answer another question as part of the _Connick/ Pickering_ test--that is, whether the employee made the statement as a citizen or pursuant to his or her official duties. This Supreme Court decision significantly changes the landscape of this case and the extent to which plaintiff's speech was protected by the First Amendment. The court therefore begins its analysis with an examination of the Supreme Court's holding in _Garcetti._

The plaintiff in _Garcetti,_ Richard Ceballos, was employed as a deputy district attorney for the Los Angeles County District Attorney's Office. _Id._ at 1955. During the relevant time period, he was a calendar deputy. _Id._ In that capacity he exercised certain supervisory responsibilities over other lawyers and determined that an affidavit that had been used to obtain a critical search warrant contained serious misrepresentations. _Id._ He relayed those findings to his supervisors, followed up by preparing a memorandum, and recommended dismissal of the criminal case. _Id._ at 1955-56. A meeting was held to discuss the affidavit; the warrant affiant and other employees from the sheriff's department attended the meeting. _Id._ at 1956. The meeting became heated, with one lieutenant sharply criticizing Ceballos' handling of the case. _Id._ His supervisor ultimately decided to proceed with the prosecution. _Id._ In the aftermath, he was subjected to a series of retaliatory actions including reassignment, transfer, and denial of a promotion. _Id._ The Supreme Court held that his speech was not protected because it was undisputed that it was "made pursuant to his duties as a calendar deputy." _Id._ at 1959-60. He was not speaking "as a citizen." Instead, he was speaking as a prosecutor fulfilling his responsibility to advise his supervisor about how best to proceed with a pending case. _Id._ at 1960. Thus, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." _Id._ Ceballos wrote the memorandum because it was "part of what he, as a calendar deputy, was employed to do." _Id._ The Court reasoned as follows:

**\*14** Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

....

Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

_Id._ According to the Court, its "precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." _Id._ at 1962.

Plaintiff seeks to avoid summary judgment based on the Supreme Court's holding in _Garcetti_ because, plaintiff contends, the Court in _Garcetti_ pointed out the arguably limited nature of its holding. The Court emphasized that the parties in that case did not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. _Id._ at 1961. Therefore, the Court in _Garcetti_ did not have "occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." _Id._ While this court certainly recognizes this caveat to the Supreme Court's holding in _Garcetti,_ the court finds plaintiff's reliance on this portion of _Garcetti_ to

be largely misplaced because, here, the scope of plaintiff's job duties is sufficiently clear from the record that there is not "room for serious debate" about whether the overwhelming bulk of the statements that plaintiff contends constituted protected speech were made pursuant to her duties as a PT for the school district.

It is uncontroverted that the school district's PTs provide services to students on their caseloads; they are called on to attend meetings to discuss students' cases (sometimes referred to as team meetings) or report students' progress; they evaluate students suspected of being in need of special education, evaluate new students coming into the school district, and train the paraprofessionals serving the students on their caseloads. (Defs.' Statement of Uncontroverted Facts ¶ 39; *see also id.* ¶¶ 56-61 (regarding supervision of paraprofessionals).) Plaintiff asserts that PTs also were required to perform equipment adjustments, locate equipment, obtain equipment, provide re-evaluations to students, supervise the PTA, supervise paraprofessionals, and plan PT services. (Pl.'s Resp. ¶ 39.) Plaintiff also points out that PTs often contacted the parents directly either for signed permission for evaluations, returning doctor's notes, discussing physical therapy, discussing "in-home" activities, or discussing equipment needs or positioning and handling of the student and the results of doctor's visits. (*Id.* ¶ 41.) Plaintiff states that the school district required PTs to interact with the community and parents. (*Id.*) Additionally, PTs were expected to determine students' equipment needs, to check inventory for needed equipment and, if necessary, to request that the equipment be ordered, although PTs generally were discouraged from making such requests. (Defs.' Statement of Uncontroverted Facts ¶¶ 62-64; Pl.'s Resp. ¶¶ 62-64.)

**\*15** Given these uncontroverted parameters of plaintiff's official job duties as a PT for the school district, there is not room for serious debate that the overwhelming bulk of her statements were made pursuant to those duties rather than in her capacity as a citizen. As such, these statements are not protected First Amendment speech. These statements include the following:

. **(1)** Plaintiff's statements to Ms. Kittell on August 21, 2003, concerning M.J.'s needs for a wheelchair. These statements fell within plaintiff's job duties to determine students' equipment needs and to attempt to have those equipment needs fulfilled.

**(Portion of 2)** Plaintiff's statements to Ms. Kittell on September 17, 2003, regarding the fact that she only had time to provide services to M.J. for thirty minutes per week as reflected in M.J.'s IEP, that she did not have time to provide supervision to several different paraprofessionals serving M.J., and that plaintiff therefore needed to train and supervise one primary paraprofessional. These statements fell within her job duties to provide PT services to students on her caseload and to supervise paraprofessionals.

. **(3)** Plaintiff's statements during the October 16, 2003, team meeting concerning M.J. Her employment duties included attending team meetings to discuss M.J.'s case and report M.J.'s progress. She commented on equipment needs and paraprofessional supervision. She reported her interactions with M.J.'s parents. All of these were within the scope of her job duties.

. **(4)** Plaintiff's statements during the November 6, 2003, team meeting concerning M.J. As with the October 16, 2003, team meeting, she was carrying out her employment duties to attend team meetings to discuss M.J.'s case and report M.J.'s progress. She also commented on her provision of services to M.J., a topic which is within the scope of her employment duties.

. **(6)** Plaintiff's December 3, 2003, email to Ms. Kittell with a copy to Ms. Boyd. Again, this email pertained to M.J.'s equipment needs.

. **(8)** Plaintiff's statements during the January 15, 2004, staff meeting concerning M.J. Again, she was carrying out her employment duties to attend meetings to discuss M.J.'s case and report M.J.'s progress.

. **(9)** Plaintiff's statements to Ms. Piekarski on November 19, 2003, concerning the paraprofessionals at South High School not bringing students for their therapy sessions. In making this comment she was carrying out her employment duties to plan and provide PT services and to supervise paraprofessionals.

. **(10)** Plaintiff's inquiry on October 13, 2003, to the Kansas Board of Healing Arts

regarding whether a PT was required to have doctor's orders prior to seeing a "consult" student. In making this inquiry she was carrying out her employment duties to plan for the provision of PT services to students on her caseload.

. **(11)** Plaintiff's conversation with Ms. Hansen on October 15, 2003, concerning providing PT services without doctor's orders. In making this inquiry she was carrying out her employment duties to plan for the provision of PT services to students on her caseload.

**\*16** . **(12)** Plaintiff's email to Ms. Piekarski on November 14, 2003, concerning providing PT services without doctor's orders. Again, plaintiff was carrying out her employment duties to plan and provide PT services to students on her caseload.

. **(13) & (14)** Plaintiff's statements during the November 19, 2003, meeting concerning providing PT services without doctor's orders. In making these statements, plaintiff was carrying out her employment duties to plan and provide PT services to students on her caseload.

**(15)** Plaintiff's inquiry of Ms. Flannigan whether she could be terminated for not following orders (referring to providing PT services without doctor's orders). In making this inquiry, plaintiff was carrying out her employment duties to plan and provide PT services to students on her caseload.

. **(16) & (17)** Plaintiff's statements to Ms. Haltom following the PT/OT meeting on January 21, 2004. In making these statements she was carrying out her employment duties to plan for the provision of PT services to students on her caseload.

. **(18)** Plaintiff's email inquiry to Ms. Hansen concerning the scheduling of ESCE evaluations. Again, in making this inquiry she was carrying out her employment duties to evaluate students suspected of being in need for her services and to plan for the provision of PT services to students on her caseload.

. **(19) & (20)** Plaintiff's statements to Ms. Hansen on September 22, 2003, in which she stated that she did not have sufficient time in her schedule to see all of her scheduled IEP students. In making this statement, plaintiff was carrying out her employment duty to plan for the provision of PT services to students on her caseload. . **(21)** The schedule plaintiff provided to Ms. Hansen and Ms. Piekarski on November 23, 2003. In sharing this schedule she was carrying out her employment duties to plan for the provision of PT services for students on her caseload. Additionally, she was responding to a specific directive by Ms. Piekarski.

. **(22) & (23)** Plaintiff's phone messages to Ms. Hansen in December of 2003 and January of 2004 concerning difficulties she encountered with Ms. Gorman in attempting to schedule training and instruct staff regarding physical therapy activities for a student. She was carrying out her employment duties to plan for the provision of PT services for students on her caseload and to supervise paraprofessionals.

. **(24)** Plaintiff's comments during the April 29, 2004, meeting concerning scheduling difficulties. Again, she was carrying out her duties to plan for the provision of PT services to students on her caseload.

All of the above-listed speech "owes its existence to" plaintiff's professional responsibilities as a PT for the school district. Like the employee Ceballos in *Garcetti,* plaintiff made these statements as she went about conducting her daily professional activities, the scope of which is uncontroverted. As such, *Garcetti* forecloses the possibility that these statements can be considered protected speech.

### B. *Matter of Public Concern*

**\*17** Having determined that the overwhelming bulk of plaintiff's speech did not constitute protected speech under the Supreme Court's ruling in *Garcetti,* the court returns to the first prong of the more traditional *Connick/Pickering* analysis to determine whether there is any genuine issue of material fact concerning whether the remainder of plaintiff's speech involved matters of public concern. In undertaking this analysis, the court has not sought to re-examine those instances of speech which, as explained above, did not constitute protected speech under *Garcetti.* Instead, the court has focused its attention on the remainder of plaintiff's speech--that is, those instances in which plaintiff arguably was acting "as a citizen" rather than pursuant to her official job duties. For the

reasons explained below, the court finds that none of that speech involved matters of public concern. In making this determination, it has become apparent to the court that some of the statements plaintiff made pursuant to her official duties (and which therefore are not protected speech under *Garcetti* ) also did not involve matters of public concern. Consequently, the court finds, incidentally, that some of the statements are foreclosed both under *Garcetti* and under the court's matter-of-public-concern analysis. In sum, between the court's *Garcetti* and matter-of-public-concern analyses, then, the court has accounted for each of the statements which plaintiff asserts constituted protected speech and the court has determined as a matter of law that each of those statements did not constitute protected speech under *Garcetti* and/or under the matter-of- public-concern analysis.

" 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' " *Maldonado,* 433 F.3d at 1310 (quoting *Connick,* 461 U.S. at 147-48, 103 S.Ct. 1684). In determining whether the speech touches on a matter of public concern, the court looks to whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Burns v. Bd. of County Comm'rs,* 330 F.3d 1275, 1286 (10th Cir.2003). The court focuses on the speaker's motive and attempts to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. *Maldonado,* 433 F.3d at 1310; *Schrier v. University of Colorado,* 427 F.3d 1253, 1263 (10th Cir.2005) (the court must scrutinize whether the speaker's purpose was to bring an issue to the public's attention or to air a personal grievance). The speech cannot relate generally to subject matter that is of public interest, but must sufficiently inform the issue as to be helpful to the public in evaluating the government's conduct. *Id.* "Ordinarily, for an employee's work-related speech to be on a matter of public concern, the speech must be uttered with an eye to action, to improve the public welfare, not just to remedy a personal grievance." *Id.* Thus, the court looks beyond the general topic of the speech to evaluate more specifically what was said on the topic. *Schrier,* 427 F.3d at 1263; *Burns,* 330 F.3d at 1286 (emphasizing that what was *actually said* must meet the public concern threshold).

**\*18** [3] Under this standard, the court finds as a matter of law that all of plaintiff's statements relating to M.J. (1)-(8) did not involve matters of public concern. To be sure, the court recognizes that the broader issue of the treatment of individuals with disabilities generally may be a matter of political, social, or other concern to the community. But, as the Tenth Circuit noted in *Tytor v. Bd. of Trustees of Laramie Sch. Dist. No. 2,* 51 F.3d 286, 1995 WL 111450 (10th Cir. Mar.1, 1995) (unpublished table opinion), [FN6] "[c]ommunications concerning the particular educational needs of individual students are not themselves matters of public interest." *Id.* 1995 WL 111450 at \*2. In this case, the uncontroverted content, form, and context of each of plaintiff's statements relating to the school district's handling of M.J.'s educational needs does not create a genuine issue of material fact concerning whether those statements involve matters of public concern. In addition to many of the statements discussed above which the court has held do not constitute protected speech under *Garcetti,* this also includes plaintiff's statement to Ms. Kittell on September 17, 2003, that M.J. should be allowed to walk in the hallway as well as plaintiff's statements to Ms. Boyd on November 6, 2003, concerning M.J.'s isolation, restrictive placement, and not being allowed to walk in the hallway.

[4] For this same reason, the court finds that all of plaintiff's statements relating to the provision of services without doctor's orders **(10)- (16)** did not involve matters of public concern. It is uncontroverted from the record that plaintiff's inquiries and statements concerning this matter involved the provision of PT services to one or two students. As such, they did not involve a matter of political, social, or other concern to the community. [5] The court also finds as a matter of law that plaintiff's speech during her confrontations with and concerning Ms. Boyd **(5) & (7)** did not involve matters of public concern. Speech pertaining to internal personnel disputes and working conditions ordinarily is not a matter of public concern. *McFall v. Bednar,* 407 F.3d 1081, 1089 (10th Cir.2005). Therefore, plaintiff's comments to Ms. Boyd after the November 6, 2003,

Rosehill team meeting did not constitute protected speech, nor did plaintiff's statement that she would not apologize to Ms. Boyd for the comments she made during that meeting. Those statements are not a matter of political, social, or other concern to the community.

Additionally, the court finds as a matter of law that plaintiff's speech concerning comp time in early May of 2004 **(25)-(27)** did not involve matters of public concern. It is clear from what plaintiff said in her message to Ms. Hansen and her conversations with Ms. Lyon that she was seeking to redress a personal grievance, not to raise awareness on a matter of political, social, or other concern to the community. See Gragg v. Somerset Tech. College, 373 F.3d 763, 767 (6th Cir.2004) (employee's request for overtime pay was not a matter of public concern).

**\*19** In sum, the court has carefully reviewed the record and all of plaintiff's speech which she claims constituted constitutionally protected free speech. After thorough consideration of each of these statements, the court finds that no rational trier of fact could conclude--based on the content, form, and context of any of those statements-- that she was speaking as a citizen on a matter of public concern. To the contrary, the record reflects that with respect to each of these statements her speech occurred during the course of her employment duties and/or it was calculated to redress personal grievances. It is clear that plaintiff's motive was not for a broader public purpose of informing the public about matters of political, social, or other matters of concern to the community. Accordingly, none of these instances of speech constitute protected speech and defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim is granted on this basis.

## D. *Plaintiff's Motion for Summary Judgment on Defendants' Equitable Estoppel Defense*

Plaintiff's Motion for Partial Summary Judgment (doc. # 66) pertains to an equitable estoppel defense that defendants' asserted in response to plaintiff's First Amendment retaliation claim. Because the court is granting defendants' motion for summary judgment on this claim, plaintiff's motion is denied as moot.

## II. REHABILITATION ACT CLAIM

### A. *Exhaustion of Administrative Remedies*

[6] The school district contends that plaintiff's Rehabilitation Act claim should be dismissed because plaintiff was required, but failed to, exhaust her administrative remedies. In response, plaintiff explains that she has brought this action under 29 U.S.C. § 794a(a)(2) and, as such, is not required to exhaust administrative remedies. The court agrees that, under the facts and circumstances of this case, plaintiff was not required to exhaust her administrative remedies.

A brief explanation of the different remedial schemes available under the Rehabilitation Act is necessary to an understanding of the exhaustion requirement. Section 505 of the Rehabilitation Act, codified at 29 U.S.C. § 794a, sets forth essentially two different remedial schemes. Subparagraph (a)(1) provides that "[t]he remedies, procedures, and rights" of Title VII of the Civil Rights Act of 1964 are available "with respect to any complaint under section 791 of this title [§ 501 of the Act]," id. § 794a(a)(1), and of course a Title VII plaintiff must exhaust his or her administrative remedies before filing suit, Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir.2005). Importantly, however, § 501 of the Rehabilitation Act, which is codified at 29 U.S.C. § 791, is directed specifically at employment of individuals with disabilities by federal employers. Consequently, exhaustion of administrative remedies under the Rehabilitation Act generally is required if the employee is asserting a § 501 claim against a federal employer. See, e.g., Woodman v. Runyon, 132 F.3d 1330, 1341 (10th Cir.1997) (noting, in case against the Postmaster General of the United States Postal Service, that the Rehabilitation Act encompasses Title VII's exhaustion requirement); Khader v. Aspin, 1 F.3d 968, 971 n. 3 (10th Cir.1993) (same, in case against the Secretary of Defense).

**\*20** In contrast to the incorporation of Title VII rights and remedies into section 501 of the Rehabilitation Act, subparagraph (a)(2) of section 505 sets forth a separate remedial scheme. It provides that "the remedies, procedures, and rights set forth in title VI of the

Civil Rights Act of 1964" are available to "any person aggrieved" by a violation of "section 794 of this title [§ 504 of the Act.]" 29 U.S.C. § 794a(a)(2). Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794, bars discrimination on the basis of an individual's disability in all federally funded programs. Id. § 794(a). "[A]ny person aggrieved" by a violation of § 504 may seek relief under § 505(a)(2), which permits plaintiffs to invoke "[t]he remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964. See 29 U.S.C. § 794a(a)(2). Because exhaustion of administrative remedies is not a prerequisite to a Title VI claim, it is well settled that it is not a prerequisite to a private cause of action under § 505(a)(2). Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1380-82 (10th Cir.1981); see also Gean v. Hattaway, 330 F.3d 758, 775 (6th Cir.2003); Freed v. Consol. Rail Corp., 201 F.3d 188, 192-94 (3d Cir.2000); Brennan v. King, 139 F.3d 258, 268 n. 12 (1st Cir.1998); Smith v. Barton, 914 F.2d 1330, 1338 (9th Cir.1990).

In this case, the defendant school district is a recipient of federal funding, not a federal employer. As such, the applicable remedial scheme is the Title VI scheme prescribed under § 505(a)(2), not the Title VII scheme prescribed under § 505(a)(1). Therefore, plaintiff was not required to exhaust her administrative remedies before filing suit. See, e.g., M.P. ex rel. K. & D.P. v. Indep. Sch. Dist. No. 721, 439 F.3d 865, 867 (8th Cir.2006) (noting the plaintiff did not need to exhaust administrative remedies before bringing a disability discrimination claim under the Rehabilitation Act against a school district); Jeremy H. ex rel. Hunter v. Mount Lebanon Sch. Dist., 95 F.3d 272, 282 n. 17 (3d Cir.1996) (pointing out that parents' Rehabilitation Act claim against a school district was not subject to the Title VII exhaustion requirement).

The court finds the school district's arguments to the contrary to be without merit. The school district relies on case law involving Rehabilitation Act claims against federal employers. As such, that argument is misplaced because a different remedial scheme, which (as explained above) does not apply in this case, applies to those types of claims. Additionally, the school district relies on case law which is more than twenty years old from another judge in this district. See Wrenn v. Kansas, 561 F.Supp. 1216, 1222 (D.Kan.1983). This argument is hardly persuasive in light of governing precedent from the Tenth Circuit and other persuasive case law from the other Courts of Appeals. The school district also relies on regulations from the United States Department of Education which set forth a procedure for filing a claim with the Department of Education. See 34 C.F.R. § 104.61 (incorporating the Title VI procedures set forth in 34 C.F.R. §§ 100.6-100.10). But, the overall thrust of the type of relief afforded by those procedures is the denial of federal funding to the funding recipient. See 34 C.F.R. § 100.8(a). The Tenth Circuit has held that this is a public remedy which is an empty one for a private plaintiff and, therefore, a private plaintiff is not required to "pursue a remedy which is irrelevant to his [or her] particular need." Pushkin, 658 F.2d at 1381-82. Accordingly, exhaustion of administrative remedies under § 504 of the Rehabilitation Act is not required. Id. at 1382.

*21 In holding that plaintiff was not required to exhaust her administrative remedies, the court wishes to clarify that it has ruled out the possibility that the Individuals with Disabilities Act's (IDEA) exhaustion requirement might apply in this case. [FN7] One of plaintiff's assertions in this case is that she was protecting disabled students' rights to a Free Appropriate Public Education (FAPE), which is a right afforded to those students under the IDEA. Thus, plaintiff's Rehabilitation Act claim is somewhat intertwined with rights afforded under the IDEA. And, the IDEA states that it should not be construed to limit the rights, procedures, and remedies available under (among other statutes) the Rehabilitation Act except that administrative remedies must be exhausted to the same extent as would be required had the action been brought under the IDEA. 20 U.S.C. § 1415(l). The Tenth Circuit has interpreted the IDEA's exhaustion provision to mean that a plaintiff asserting another type of claim (e.g., a claim under § 504 of the Rehabilitation Act) must abide by the IDEA's exhaustion requirement to the extent that the plaintiff is seeking relief that is also available under the IDEA. Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063, 1066-67 (10th Cir.2002). Consequently, a plaintiff may not

circumvent the IDEA's exhaustion requirement simply by recasting the claim as one under the Rehabilitation Act. The IDEA's exhaustion requirement does not apply in this case, however, because notwithstanding plaintiff's use of IDEA concepts and theories, this court has already ruled that she is not entitled to relief under the IDEA. See _Ryan v. Shawnee Mission U.S.D. 512,_ 416 F.Supp.2d 1090, 1097-98 (D.Kan.2006). Case law does not extend the right to bring a cause of action under the IDEA beyond the disabled child or the child's parents. _Id._ at 1098. Because plaintiff is not a disabled child or the child's parents, then, relief is not available to her under the IDEA. It cannot be said that she is attempting to circumvent the IDEA's exhaustion requirement by asserting a claim under the Rehabilitation Act instead. Accordingly, the IDEA's exhaustion provision does not apply to plaintiff's Rehabilitation Act claim. See, e.g., _Duffey v. Oregon Youth Auth.,_ Case No. 03-6013, 2003 WL 23979013, at *2-*3 (D.Or. Apr.17, 2003) (nondisabled teacher asserting third-party retaliation claim under the Rehabilitation Act was not subject to IDEA exhaustion requirement because the plaintiff was not a disabled student or a parent of a disabled student).

### B. _Elements_

Section 504 of the Rehabilitation Act provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that receives federal funding. 29 U.S.C. § 794(a). In the absence of direct evidence, claims of retaliation are subject to the Supreme Court's burden-shifting framework established in _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). _Medina v. Income Support Div.,_ 413 F.3d 1131, 1135 (10th Cir.2005). Under that framework, a plaintiff must begin by putting on a prima facie case of retaliation. _Medina,_ 413 F.3d at 1135. If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action. _Id._ at 1136. If the defendant meets its burden, summary judgment is warranted unless the plaintiff shows that there is a genuine issue of fact as to whether the defendant's reason is a pretext for discrimination. _Id._

#### 1. Prima Facie Case

**\*22** [7] As to the first prong of the burden-shifting framework, plaintiff must first demonstrate a prima facie case. In employment discrimination cases alleging violations of the Rehabilitation Act, the court generally applies the standards of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 _et seq._ (ADA). 29 U.S.C. § 794(d); _McGeshick v. Principi,_ 357 F.3d 1146, 1150 (10th Cir.2004); _Schrader v. Fred A. Ray, M.D., P.C.,_ 296 F.3d 968, 971 (10th Cir.2002). Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) that the plaintiff was engaged in activity protected by the statute; (2) that the employee was subjected to adverse employment action contemporaneous with or subsequent to the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action. _Selenke v. Med. Imaging,_ 248 F.3d 1249, 1264 (10th Cir.2001); _Anderson v. Coors Brewing Co.,_ 181 F.3d 1171, 1178 (10th Cir.1999).

[8] Turning to the first element of plaintiff's prima facie case, the court finds that plaintiff engaged in protected activity. The Rehabilitation Act prohibits disability discrimination by recipients of federal funding. The statute applicable here provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that receives federal funding. 29 U.S.C. § 794(a). The court has previously explained that the Supreme Court's holding in _Jackson v. Birmingham Board of Education,_ 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005), which was a Title IX case, extends to provide plaintiff with a claim under the Rehabilitation Act based on her allegation that the school district retaliated against her for complaining about disability discrimination in the school's programs. See _Ryan,_ 416 F.Supp.2d 1090, 1095-97 (D.Kan.2006). To put a finer point on that holding, the court wishes to acknowledge that it recognizes that the Title IX anti-discrimination statute at issue in _Jackson_ broadly

prohibits discrimination by federal funding recipients "on the basis of sex," 20 U.S.C. § 1681(a), whereas the Rehabilitation Act statute at issue in this case is arguably more limited in the sense that it prohibits discrimination on the basis of "*her or his* disability," 29 U.S.C. § 794(a) (emphasis added). But the arguably more limited nature of the Rehabilitation Act prohibition is enlarged by the remedial provision that applies in this case, which provides that "any person aggrieved" by a violation is entitled to relief. 29 U.S.C. § 794a(a)(2). Given this broad language and the synonymous purposes of the two statutes (Title IX prohibits sex discrimination in federally funded programs whereas the Rehabilitation Act prohibits disability discrimination in federally funded programs), the court can find no principled distinction between the statute at issue here and the Title IX statute at issue in *Jackson. Cf. Weber v. Cranston Sch. Comm.,* 212 F.3d 41, 47-49 (1st Cir.2003) (holding that standing to assert a claim under § 504 of the Rehabilitation Act is not limited to the disabled person because of the "any person aggrieved" language contained in § 794a(a)(2); reasoning that Congress did not limit this remedial provision to disabled individuals "in apparent recognition of the fact that disabled individuals may need assistance in vindicating their rights from individuals who may have their own claim to relief under the Act"). [FN8]

**\*23** In order to establish a retaliation claim under the Rehabilitation Act, plaintiff must demonstrate a reasonable, good faith belief that the school district violated the Rehabilitation Act. *Selenke,* 248 F.3d at 1264 (ADA retaliation case). The Rehabilitation Act prohibits federal funding recipients from excluding individuals from participating in, denying individuals the benefit of, or discriminating against individuals solely by reason of their disabilities. 29 U.S.C. § 794(a). A rational trier of fact could find from the record that plaintiff reasonably believed the school district was discriminating against disabled students by failing to adequately fund its special education programs for disabled students, thus denying those students the benefits of a free appropriate public education (FAPE) which non-disabled students were receiving. In particular, it could be inferred that M.J., a severely and multiply disabled student, was not receiving a FAPE. Additionally, it could be inferred that the school district failed to provide adequate staffing to meet other disabled students' PT needs as prescribed in their IEPs, thus denying those students FAPEs, as well. Notwithstanding that the right to a FAPE arises under the Individuals with Disabilities in Education Act (IDEA), rather than the Rehabilitation Act, a school district's denial of a FAPE can constitute disability discrimination in violation of the Rehabilitation Act. *See, e.g., Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 253 (3rd Cir.1999) (reversing district court's grant of summary judgment where denial of FAPE could support claim under § 504 of the Rehabilitation Act); *Indiana Area Sch. Dist. v. H.H.,* 428 F.Supp.2d 361, 363-64 (W.D.Pa.2006) (school district's denial of FAPE could constitute discrimination under § 504 of the Rehabilitation Act); *Gabel ex rel. L.G. v. Bd. of Educ.,* 368 F.Supp.2d 313, 333-34 (S.D.N.Y.2005) (same). [FN9] Moreover, protected activity can range from filing formal charges to complaining informally to supervisors. *Medina,* 413 F.3d at 1135-36. Thus, plaintiff has established the first element of her prima facie case by presenting evidence from which it can be inferred that she engaged in protected activity by making informal complaints to her supervisors about circumstances that she reasonably believed tended to indicate that disabled students were not receiving FAPEs, and hence were being subjected to discrimination on the basis of their disabilities.

The second element of plaintiff's prima facie case is that she must have been subjected to adverse employment action. The parties have not discussed this particular element, referring instead to their discussion of adverse employment action in connection with plaintiff's First Amendment retaliation claim without attempting to establish that the standard for determining whether a plaintiff suffered adverse employment action for purposes of a Rehabilitation Act (or ADA) retaliation claim. The court will not presume that the two standards are synonymous. Consequently, the school district has not met its initial summary judgment burden of demonstrating the absence of a genuine issue of material fact on this issue. Absent meaningful argument from the school district on this issue, then, the court assumes without deciding that plaintiff has met her burden of

establishing that she suffered adverse employment action, particularly with respect to being constructively discharged. *See Baucom v. Holiday Cos.,* 428 F.3d 764, 767 (8th Cir.2005) (circumstances amounting to constructive discharge constitute adverse employment action in ADA retaliation claim). [FN10]

**\*24** [9] Plaintiff also has met her burden of establishing a prima facie case that there was a causal connection between her protected activity and the adverse employment action. A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Miller v. Automobile Club of New Mexico, Inc.,* 420 F.3d 1098, 1121 (10th Cir.2005). The school district argues that no such causal connection exists because plaintiff has not established that the school district or its employees knew about her protected speech. The record, however, belies this argument. Drawing all reasonable inferences in plaintiff's favor, Ms. Hansen and plaintiff's other supervisors were generally aware of plaintiff's complaints that she did not have the time or the resources to provide required PT services to the students on her caseload in accordance with their IEPs. Hence, it can be inferred that they were aware that plaintiff was raising their awareness that those students were not receiving FAPEs. The school district also argues that the timing of plaintiff's protected speech is too remote to be linked to any adverse employment action. The court disagrees. Although the window between plaintiff's protected activity and the adverse employment action might be too large to infer a causal connection in the typical employment-at-will scenario, in this case plaintiff was a contract employee. It can be inferred from the record that some of plaintiff's supervisors were generally aware of and less than pleased with some of her comments throughout the school year and that Ms. Hansen seized the first opportunity to force plaintiff into resigning when her contract came up for renewal. Of course, evidence also abounds that Ms. Hansen urged plaintiff to resign for various performance-related reasons such as communication issues, but a reasonable finder of fact could conclude, when confronted with conflicting evidence, that plaintiff ultimately was urged to resign because of her advocacy for disabled students. *See, e.g., Barbier v. Durham County Bd. of Educ.,* 225 F.Supp.2d 617, 626-27 (M.D.N.C.2002) (decision not to renew teacher's contract three months after protected activity established causal connection between protected activity and adverse employment action).

### 2. Legitimate, Nondiscriminatory Reason

[10] Because plaintiff has established a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its decision. The school district explains that numerous problems arose throughout the year concerning plaintiff's communications with other members of the school district staff such as Ms. Boyd and Ms. Piekarski. According to the school district, special education requires close working relationships and problem solving. Consequently, it was incumbent upon administrators (presumably Ms. Hansen) to meet with plaintiff to discuss these matters. The court finds that the school district has satisfied its "exceedingly light" burden to provide a nondiscriminatory reason for its decision. *Goodwin v. Gen. Motors Corp.,* 275 F.3d 1005, 1008 (10th Cir.2002).

### 3. Pretext

**\*25** [11] Plaintiff, then, may resist summary judgment only by presenting evidence that defendant's reasons are pretextual (i.e., unworthy of belief) or by otherwise introducing evidence of a discriminatory motive. *Danville v. Reg'l Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir.2002). Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's preferred legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quotation omitted). When assessing whether plaintiff has made an appropriate showing of pretext, the court considers the evidence as a whole. *Id.* The court concludes that the inferences which properly may be drawn from the totality of the circumstances set forth in the record are sufficient for a reasonable jury to conclude that Ms. Hansen's comments to plaintiff on May 5, 2004, were based on plaintiff's

complaints about the school district failing to provide disabled students on her caseload with FAPEs. Viewing the evidence in the light most favorable to plaintiff, individuals within the school district's special education department such as Ms. Haltom, Ms. Hansen, and Ms. Piekarski should have been aware of the IDEA's FAPE requirement. Additionally, they should have known based on all of the complaints voiced by the PTs, including plaintiff, that their PT staffing was inadequate. Their proferred justification for the termination--the importance of good working relationships among the special education staff--is so weak that it seems implausible given the fact that plaintiff apparently enjoyed four years of solid and trouble-free (indeed, at some times commendable) employment with the school district until she started voicing concerns about the disabled students on her caseload getting shortchanged under their IEPs. Based on the record, a reasonable jury could conclude that Ms. Hansen's comments, which were geared to force plaintiff to resign almost immediately, were discriminatory in the sense that they were intended to force her to stop advocating for the rights of disabled students under their IEPs. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (evidence of pretext may, together with the elements of the prima facie case, suffice to show intentional discrimination).

## C. *Entitlement to Reinstatement*

[12] Lastly, the school district contends that plaintiff is not entitled to reinstatement on her Rehabilitation Act claim. The pretrial order states that plaintiff is seeking reinstatement, but notes that defendants object to this relief on her Rehabilitation Act claim because she did not request reinstatement in her first amended complaint. (Pretrial Order (doc. # 63), ¶ 11, at 22.) Plaintiff points out that in her first amended complaint she requested reinstatement on her First Amendment retaliation claim and, on her Rehabilitation Act claim, she prayed for "any other relief the Court deems just and equitable." (First Amended Complaint (doc. # 35), at 7.) Plaintiff urges the court to construe this prayer for relief to encompass a request for reinstatement.

**\*26** Although the court agrees with the school district that plaintiff's prayer for relief in her first amended complaint did not include a request for reinstatement, the court finds that plaintiff's request for reinstatement set forth in the pretrial order (which does not specifically pertain to either claim) is proper. An attempt to add a new claim, or, as the case is here a request for another type of relief, is evaluated by the court under the standards set forth in Rule 15(a) of the Federal Rules of Civil Procedure. *Minter v. Prime Equipment Co.,* 451 F.3d 1196, ----, 2006 WL 1775433, at \*8 (10th Cir. June 29, 2006) (publication forthcoming). As such, leave to amend " 'shall be freely given when justice so requires.' " *Id.* (quoting Fed.R.Civ.P. 15(a)). The most important factor in deciding a motion to amend the pleadings is whether the amendment would prejudice the moving party. *Id.* at ----, 2006 WL 1775433 at \* 11. Prejudice generally refers to an amendment which unfairly affects the defendants in terms of preparing their defense to the amendment. *Id.* Here, the school district has offered no reason why it would be prejudiced by plaintiff's request for reinstatement on her Rehabilitation Act claim. Plaintiff was already seeking reinstatement on her First Amendment retaliation claim. Therefore, the court is unpersuaded that allowing her to seek reinstatement on her Rehabilitation Act claim would unfairly affect the defendants in terms of preparing their defense to that form of relief. Accordingly, defendants' request for summary judgment on this issue is denied.

## CONCLUSION

In sum, plaintiff's speech does not constitute protected speech which is entitled to protection under the First Amendment. In *Garcetti v. Ceballos* the Supreme Court rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties," but pointed out that other statutes exist to "protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." --- U.S. ----, ----, 126 S.Ct. 1951, 1962, --- L.Ed.2d ---- (2006). Plaintiff's speech at issue in this case is precisely the type which is not protected under the First Amendment, but which is arguably entitled to protection under another statute--namely, § 504 of the Rehabilitation Act, which prohibits recipients

of federal funding from discriminating against disabled individuals. The issue of whether plaintiff was subjected to unlawful retaliation for engaging in protected activity by advocating for the rights of disabled students is permeated with triable issues of fact. These are issues for the jury and, as such, defendants are not entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (doc. # 69) is granted as to plaintiff's First Amendment retaliation claim and denied as to plaintiff's Rehabilitation Act claim.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Partial Summary Judgment (doc. # 66) is denied as moot.

**\*27 IT IS FURTHER ORDERED THAT** Plaintiff's Opposed Motion to Amend Plaintiff's Response to Defendants' Motion for Summary Judgment (doc. # 100) is denied.