# EXHIBIT A

Corporal Trinidad Navarro
13

1          A.    I am not sure.    I did obtain an associate's

2     degree.    I have taken one class at Wilmington College.

3     I am presently enrolled in a class, but there are

4     several classes that I won't have to take for what's

5     called PLA, that you could provide a portfolio in

6     those classes -- you'll have to pay for it, but you

7     won't have to take and there is about five or six of

8     those classes.    So I am not sure how many credits I'll

9     have after that time.

10         Q.    The class you are currently taking, does it

11    meet at night?

12         A.    Pardon me?

13         Q.    It meets at night?

14         A.    Yes.

15         Q.    You are only just taking that one class?

16         A.    Yes.    It's a seven-week block class.

17         Q.    When did you start your employment with New

18    Castle County?

19         A.    September 30th, 1991.

20         Q.    And what did you do prior to that?

21         A.    Several things.    I sold life insurance.    I

22    drove a school bus.

23         Q.    Can you give me some time frames of how long

24    you did each?

1    Q.    During that time, do you recall who your

2  immediate supervisor was when you worked at B Squad?

3    A.    My first supervisor was Lieutenant James

4  Sharkey.

5    Q.    Do you recall who the chief of police was when

6  you were hired?

7    A.    Yes.  It was Tom Gordon.

8    Q.    Then you left B Squad October 28th of what

9  year?

10    A.    It was October 1998.

11    Q.    Okay.  Then from there?

12    A.    I was assigned to the Public Information Office

13  for the Police Department.

14    Q.    Was that a job you applied for?

15    A.    No.  Well, I did submit memorandums for that

16  position as well as memorandums for the criminal

17  investigation unit.

18    Q.    Do you still have copies of those memorandums?

19    A.    I do not.

20    Q.    At that time, who was chief of police?

21    A.    John Cunningham.

22    Q.    Were those memos directed to him?

23    A.    Yes.  Through the chain of command.

24    Q.    Can you summarize for us what the memorandums

1   Lieutenant Colonel Scott McLaren?

2       A.      That's correct.

3       Q.      When you first took the position as PIO, what

4   did you believe your duties and responsibilities were

5   going to be?

6       A.      To promote the department; to protect the

7   department from negative press; to inform the media of

8   day-to-day police operations, arrests, programs, those

9   types of -- I was the media coordinator for the Police

10  Department.

11      Q.      Who was your immediate -- I guess who was and

12  is your immediate supervisor as the PIO?

13      A.      When I first started in 1998, Lieutenant Vince

14  Kowal was my immediate supervisor.  He has since

15  retired.  And since then, I did work for or with

16  Lieutenant Patrick Crowell for some time.  I don't

17  recall if at that point he was my supervisor or if I

18  fell directly under the chief of police.  But I do

19  recall lieutenant Crowell did do my evaluations.

20      Q.      After Lieutenant Crowell, assuming he may have

21  been a supervisor at that time, after he was no longer

22  serving in that capacity, who would have done your

23  evaluations?

24      A.      I know that Jack Cunningham did do some of my

1    Q.    So, theoretically, Guy Sapp and David Singleton

2    are in your chain of command?

3    A.    I would say that they're my superiors.  My

4    chain of command is chief of police.  Typically, a

5    corporal would have, perhaps, a sergeant in the

6    command, a lieutenant, then a captain and then major

7    and acting lieutenant colonel and colonel.  I work

8    directly for the chief of police.

9              MR. MARTIN:  Michele, is this a good spot

10    to take a break?

11              MS. ALLEN:  This is an excellent spot to

12    take a break.

13              (Recess taken.)

14    BY MS. ALLEN:

15    Q.    Mr. Navarro, I wanted to talk to you a little

16    more in detail about your position as PIO for the New

17    Castle County Police Department.  I think much earlier

18    on in the deposition you described your duties and

19    responsibilities as PIO.  Has that changed over the

20    years?

21    A.    Well, I had other duties assigned to me that

22    weren't necessarily media relations related, but my

23    duties have not changed.

24    Q.    Do you enjoy being the PIO?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Josepose-1 Trinidad Navarro

1     It was impossible for me to tell her about all the

2     contacts I had with the media.  It was sort of

3     understood.

4        Q.    I guess I am trying to get a fair assessment of

5     what you felt -- because you did report some stuff to

6     her; correct?

7        A.    Major crimes, things like that.

8        Q.    Okay.

9        A.    But I reported -- it wasn't a phone call.  What

10    you have to understand is I would send every single

11    press release I put out to Allison.  And that was

12    enough.  That was enough.

13       Q.    Was there going to be a press release on the

14    Delaware Today article?

15       A.    No.

16       Q.    When Chief McAllister told you not to report

17    the Delaware Today article to Allison, did you have

18    any information as to what the Delaware Today article

19    was supposed to be about?

20       A.    The story was about Dave McAllister.  The

21    actual content of the story I did not know.

22       Q.    You indicate in the complaint that I guess you

23    were having difficulty in the PIO position, that it

24    was becoming difficult because there was, I guess,



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    some type of struggle between the administration and

2    the chief of police?

3        A.    Yes.    There was an obvious dislike between the

4    County administration and the chief of police.

5        Q.    Do you think that made your job more difficult?

6        A.    It made my job uncomfortable.

7        Q.    At some point, you told Allison that you in

8    fact actually wanted out of the PIO position because

9    of that?

10       A.    Because of the politics associated with the

11   position, yes.

12       Q.    But you never applied for a transfer out of the

13   PIO position?

14       A.    I did not.

15       Q.    Is there a particular reason why?

16       A.    Well, up until about 18 months ago, I loved my

17   job.    There's good days and bad days associated with

18   the job.    But even before, for the last eight years

19   that's been the case, but I still like to do what I

20   do.    What I do I believe I do well.

21       Q.    As we talked about before, the first time you

22   were eligible for promotion was on the 2004 sergeant

23   list?

24       A.    Yes, ma'am.

1    Q.    So there were no promotions made for the

2  remaining eight months?

3    A.    I don't know.  I don't recall.

4    Q.    And then in July of '03, the year closest to

5  this, the one that leads to this lawsuit, you came in

6  53rd?

7    A.    Yes, sir.

8    Q.    And this despite the fact that McAllister gave

9  you a maximum 100 rating points.  Correct?

10    A.    Yes, yes.

11    Q.    That was disappointing, wasn't it?

12    A.    Sure, it was.

13    Q.    So 12th was -- when you came in 12th the year

14  after that was the best you had ever done?

15    A.    Yes.

16    Q.    Do you have any idea why you did better that

17  year than you had in the past which, with the

18  exception of November of '01, were in numbers in the

19  40s and 50s?

20    A.    I know why in '03 I came out 53.

21    Q.    Why is that?

22    A.    It was the same test was administered that year

23  as the previous year.  We were allowed to review that

24  test.  And people who reviewed that test scored much

Trinidad Navarro

282

```
 1      Q.    Do you recall whether or not you voted in the

 2   2004 general election for County Executive?

 3      A.    I did.

 4      Q.    Who did you vote for?

 5      A.    I voted for the Democratic candidate, Chris

 6   Coons.

 7      Q.    Did you make any financial contributions to

 8   either Sherry Freebery -- well, I'll ask you

 9   separately.

10            Did you make any financial contributions

11   to Sherry Freebery?

12      A.    I did not.

13      Q.    Did you make any financial contributions to

14   Chris Coons' campaign?

15      A.    I did not.

16      Q.    What about the Republican candidate who was...

17      A.    Castagno maybe.

18      Q.    That sounds about right, yes.

19            Did you make any contributions to

20   Castagno?

21      A.    I did not.

22      Q.    Did you go to any fundraisers for Sherry

23   Freebery for County Executive?

24      A.    I do not believe so.
```



**WILCOX & FETZER LTD.**

Registered Professional Reporters

Trinidad Navarro

286

1    others.  I just don't recall.

2      Q.    So there's no way for someone in the public to

3    find a list of who's on this McAllister team?

4      A.    There's no list that exists, so I don't know if

5    the public would find such a list if it doesn't exist.

6      Q.    Did the people that you have listed as well as

7    any other people that you might think of later on, did

8    you meet collectively as a group?

9      A.    Sometimes socially but not necessarily a group

10    type meeting/setting, if that makes sense.  Sorry.

11      Q.    When you may have met socially, was it

12    considered a meeting of the McAllister team?

13      A.    No.

14      Q.    Did you pay any dues to this McAllister team or

15    fees?

16      A.    I did not.

17      Q.    Did anybody else that you know of?

18      A.    No.

19      Q.    Was there any type of policy or agenda that

20    this team decided it was going to put forward?

21      A.    No.

22      Q.    Were there any type of membership cards?

23      A.    No, ma'am.

24      Q.    Did the McAllister team make any endorsements,

287

1 political endorsements?

2   A.   Could you clarify "endorsements"?

3   Q.   Well, let's say for the 2004 County Executive

4 race, whether it be the primary or the general, did

5 the McAllister team endorse and say we support X or Y?

6   A.   Well, Dave McAllister and I spoke about

7 individuals who were running for certain offices but

8 not as a team, no.

9   Q.   Did the team collectively endorse anybody?

10   A.   No.   I mean not that I'm aware of.

11   Q.   Do you know who the remaining members of the

12 team, other than yourself, do you know who they voted

13 for in the 2004 either primary or general election for

14 County Executive?

15   A.   I do not know.

16   Q.   A lot of your amended complaint has to deal

17 with your allegiance and loyalty to David McAllister.

18 Is that correct?

19   A.   Yes, ma'am.

20   Q.   But you were never asked to do anything to ruin

21 Dave McAllister's reputation, were you?

22   A.   Allison Taylor-Levine asked me several times to

23 keep her informed on certain things, media topics

24 related to the police department.   She never asked me

Trinidad Navarro

290

1          Can you give any examples of that and what

2    you used to support that allegation?

3          A.    Well, Allison Taylor-Levine told me in person

4    as well as in her deposition that remaining loyal to

5    the chief and being on the McAllister team would harm

6    my career as a New Castle County police officer.

7          Q.    Can you give an example as to what you mean by

8    your loyalty to the chief?

9          A.    Colonel McAllister asked me on several

10   occasions to release information to the media without

11   the knowledge or without notifying Allison

12   Taylor-Levine.    He reminded me on several occasions

13   that I worked for him and not for her and that it's

14   been that way for many years, meaning the PIO does not

15   work for the communications director for the

16   government.    The PIO works for the chief of police.

17         Q.    Is it fair to say that the PIO also works

18   ultimately for the County Executive?

19         A.    Yes, ma'am.

20         Q.    And Allison Taylor-Levine at the time you're

21   referring to worked for the County Executive?

22         A.    She did.

23         Q.    Any other examples of your loyalty to the chief

24   other than not reporting media events that the chief

305

1    to you or from which you deduced there was a rift was

2    that McAllister ordered you to not report certain

3    things or not report the daily news basically to

4    Allison Levine?

5        A.    Yes.

6        Q.    Was that unprecedented in your experience?  Was

7    that at all surprising?

8        A.    I can only speak of my previous interaction

9    with the previous administration's communication

10   directors and never did they ask me to send them all

11   my press releases, never did they ask me to do

12   anything which was contrary to what the chief was

13   asking me to do.

14       Q.    The last three police chiefs of New Castle

15   County were indicted, correct?

16       A.    I can tell you that Sherry Freebery and Tom

17   Gordon were indicted.

18       Q.    How about Chief Cunningham?

19       A.    He was actually arrested.

20       Q.    Arrested.  Okay.

21            Inherently do you find anything wrong with

22   an administration wanting to keep close herd on a

23   police department where the past three chiefs have

24   either been arrested or indicted?  Try to detach

Trinidad Navarro

306

1   yourself.   Say you're a consultant down in Bluffton.

2      A.    Could you repeat the question, sir?

3      Q.    First I wanted to establish as a fact and ask

4   you had the past three police chiefs been indicted and

5   you said two had been and one had been arrested.

6          And I'm now asking you as a professional

7   who has been in government and related to previous

8   administrations, is there anything inherently wrong

9   about an administration wanting to keep close tabs on

10  a police department where the head of the department,

11  three successive heads have run into that kind of

12  trouble?

13     A.    I think if you're speaking about the previous

14  chiefs, yes.

15          If you're speaking about the current

16  chief, I've never seen that type of interference with

17  day-to-day activities.   And when I say day-to-day

18  activities, I mean what has been spoken about before

19  in other depositions, such as who has what vehicle,

20  who gets to drive what car.

21     Q.    Would the term micromanagement fit that in

22  closely managing the day-to-day affairs that

23  previously hadn't been managed?   Did it seem like the

24  current administration wanted to micromanage the

307

1   department when McAllister was chief?

2      A.   I'm not really sure about the definition of

3   micromanagement, but you also said the administration.

4   I don't know if it was Guy Sapp and/or the CAO who

5   were involved in what you term as micromanagement.

6      Q.   Tell me about the conversation in which

7   McAllister told you about not reporting media contacts

8   to the administration.  Was that the sole subject of

9   the conversation or did it get to that from something

10  else?

11     A.   We had several conversations about requests

12  from Allison Levine.  She requested that I send her

13  all my press releases, which I did.  I added her to my

14  e-mail list.  She requested that I tell her about

15  significant incidents that affected the police

16  department, which I did.

17          Colonel McAllister asked me not to

18  specifically run things past her because I didn't work

19  for her.  She was upset about a phone call I received

20  from Chris Barrish because I didn't immediately tell

21  her, but what I did do is immediately told Colonel

22  McAllister, who told his supervisor.  So I didn't call

23  her on that, and I know that she was particularly

24  upset about that.  In fact, she called me and was

309

1   county government employee outside of the police

2   department receive a copy of your press releases?

3       A.   No.

4       Q.   Is there anything inherently wrong about the

5   director of communications asking to be the 101st

6   person on your list?

7       A.   No.

8       Q.   But McAllister didn't like it and he told you

9   to take her off?

10      A.   No, he never told me to take her off.  She was

11  on it even after she left, but he wasn't concerned

12  about her being on the list.  His concern was her

13  trying to influence what I released and not just the

14  things we spoke about, but I recall her commenting on

15  a release I put out about a house that had deplorable

16  conditions inside with children living inside.  And

17  she responded to me that she didn't like the way it

18  was worded or something like that, but it was clearly

19  too late because it was out and she received the same

20  copy that everyone else received.

21           So she wasn't proofreading them

22  necessarily.  She was receiving them but not always

23  agreeing with what I released.

24      Q.   What was it -- I don't mean to belabor this