IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL TRINIDAD NAVARRO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 05-565 (GMS) |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| CHRISTOPHER A. COONS, | : | |
| individually and in his official capacity; | : | |
| GUY H. SAPP, individually and in his | : | |
| official capacity; and NEW CASTLE | : | |
| COUNTY, a municipal corporation, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE (# 2407)
TIMOTHY J. WILSON, ESQUIRE (#4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
jmartin@martinandwilson.com
twilson@martinandwilson.com
(302)777-4681
*Attorneys for Plaintiff*

DATED: May 25, 2007

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

I.     NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

II.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

III.   SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

    A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

    B. Chief David McAllister: Terminated by the Coons Administration . . . . . . . . . . 10

    C. Chief McAllister's Ill-Fated Attempt to Promote Plaintiff to Sergeant . . . . . . . .12

    D. County Administration Reduces the Number of Sergeant Slots . . . . . . . . . . . . . .13

    E. Off-Site Meeting Between Levine and Navarro: June 29, 2005 . . . . . . . . . . . . .15

    F. County Administration's Role in NCCPD . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    G. Acts of Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

IV.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.    Defendants Coons and Sapp/Frazier May be Held Liable in Their
           Official Capacities Because: 1) They Are Not Entitled to
           Automatic Dismissal; and 2) They Failed to Proffer Any Defenses
           that Would Be Available to New Castle County . . . . . . . . . . . . . . . . . . . . . . 22

           1.    Substitution of Frazier for Sapp for Claims Against Sapp
                 in His Official Capacity is Appropriate . . . . . . . . . . . . . . . . . . . . . . .22

           2.    Summary Judgment that Would Dismiss Defendants
                 Coons and Sapp/Frazier in Their Official Capacities
                 Must be Denied Because Defendants Have Not Set
                 Forth Any Viable Defenses That Would Be Available
                 to New Castle County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

C.    Based Upon the Evidence Contained in the Record, a
      Reasonable Jury Drawing All Inferences and Viewing the
      Facts in a Light Most Favorable to Plaintiff Could
      Find That Defendants Retaliated Against Plaintiff Based
      Upon His Political Association Thereby Violating His First
      Amendment Right to Freedom of Expression . . . . . . . . . . . . . . . . . . . . . . 23

      1.    Plaintiff's Position Did Not Require Political Affiliation . . . . . . . 25

      2.    Plaintiff Engaged in Protected Activity . . . . . . . . . . . . . . . . . . . . .25

      3.    Plaintiff's Protected Activity Was a Motivating
            Factor in Defendants Retaliation Against Plaintiff . . . . . . . . . . .28

            i.    Whether the Protected Activity Was a Motivating
                  Factor is a Factual Issue Best Left for the Fact Finder . . .28

            ii.   Genuine Issues of Material Fact Remain as to Whether
                  Plaintiff's Political Activity was a Motivating Factor in
                  Defendants' Retaliation Against Plaintiff . . . . . . . . . . . .29

      4.    Defendants' Contention that They Would Have Taken the
            Same Action Absent Plaintiff's Protected Conduct . . . . . . . . . . . 31

D.    Liability against New Castle County is Proper Because a Reasonable
      Jury Could Find that the Decision to Not Promote Plaintiff, Based
      Upon His Political Association Represents Official New Castle
      County Policy Because It was Implemented by New Castle
      County's Chief Executive and the Director of Public Safety . . . . . . . . .32

E.    Defendants Coons and Sapp, in Their Individual Capacities, Are
      Not Entitled to Qualified Immunity Because the Facts, When Viewed
      in a Light Most Favorable to Plaintiff, Show a Constitutional
      Violation That Was Clearly Established and Recognized by
      Defendants Coons and Sapp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

F.    Punitive Damages May be Imposed Against Defendants Coons
      and Sapp Because the Record Evidence, Viewed in a
      Light Most Favorable to Plaintiff, Establishes Their Reckless
      or Callous Disregard, or Indifference to the Constitutional
      Right to Political Association of Plaintiff . . . . . . . . . . . . . . . . . . . . . . .36

      1.    Punitive Damages May Not Be Assessed Against New
            Castle County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    2. *Punitive Damages May Be Assessed Against Coons and*
      *Sapp in Their Individual Capacities* . . . . . . . . . . . . . . . . . . . . . . .36

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

EXHIBIT 1 Deposition of County Executive Christopher A. Coons dated May 31, 2006

EXHIBIT 2 Deposition of Communication Director Allison Taylor Levine dated March 10, 2006

EXHIBIT 3 Deposition of Chief of Police David McAllister dated March 10, 2006

EXHIBIT 4 Deposition of Acting Chief of Police William Scott McLaren dated March 10, 2006

EXHIBIT 5 Deposition of Plaintiff Corporal Trinidad Navarro dated May 22, 2006

EXHIBIT 6 Deposition of Public Safety Director Guy H. Sapp dated May 31, 2006

EXHIBIT 7 Deposition of Chief Administrative Officer David Singleton dated June 1, 2006

EXHIBIT 8 Deposition of Major Stuart Snyder dated June 28, 2006

EXHIBIT 9 Affidavit of Plaintiff Trinidad Navarro

**TABLE OF AUTHORITIES**

**Page**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Couden v. Duffey*,
305 F. Supp. 2d 379, 387 (D. Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Czurlanis v. Albanese*,
721 F.2d 98, 103 (3d Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*DeFiore v. Vignola*,
823 F.Supp. 315 (E.D. Pa., 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Deibler v. City of Rehoboth Beach*,
790 F.2d 328, 332 (D. Del. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Garcetti v. Ceballos*,
545 U.S. 1161 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Goodman v. Pennsylvania Turnpike Comm'n*,
293 F.3d 655, 674 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Green v. Phila. Hous. Auth.*,
105 F.3d 882,889 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gronowski v. Spencer*,
424 F.3d 285, 294-96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 31

*Hafer v. Melo*,
502 U.S. 21, 24 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Holder v. City of Allentown*,
987 F.2d 188, 195 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Horowitz v. Fed. Kemper Life Assurance Co.*,
57 F.3d 300, 302 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Johnson v. Lincoln Univ.*
776 F.2d 443, 454 (3d Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Logan v. Commerical Un. Ins. Co.*,
96 F.3d 971, 978 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*MacDonald v. Delta Air Lines, Inc.,*
    94 F.3d 1437, 1440 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) . . . . . . . . . . . . . . . . .21

*Monell v Dept. of Soc. Services of the City of New York,*
    436 U.S. 658, 694 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,*
    429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Pa. Coal Ass'n v. Babbitt,*
    63 F.3d 231, 236 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Rodgers v. Monumental Life Ins. Co.,*
    289 F.3d 442, 448 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rutan v. Republican Party of Illinois,*
    497 U.S. 62 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
*Smith v. Wade,*
    461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Stephens v. Kerrigan,*
    122 F.3d 171 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Swineford v. Snyder County Pa.,*
    15 F.3d 1258, 1270 (3d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Troy Chemical Corp. v. Teamsters Union Local No. 408,*
    37 F.3d 123, 126 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Watters,* 55 F.3d at 892 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Zamboni v. Stamler,*
    847 F.2d 73, 79, 80 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## **OTHER CITATIONS**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. Rule. Civ. Proc. 25(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

## I.   NATURE AND STAGE OF PROCEEDINGS

On August 4, 2005, Plaintiff Corporal Trinidad Navarro ("Cpl. Navarro" or "Plaintiff") filed a Complaint alleging First Amendment retaliation against Defendants Christopher Coons ("Coons"), Guy Sapp ("Sapp"), and New Castle County ("NCC.")(collectively "Defendants"). On May 30,2006, the United States Supreme Court issued its Opinion in *Garcetti v. Ceballos*. 545 U.S. 1161 (2006). In lieu of an Answer, Defendants filed a Motion for Summary Judgment based upon the rationale contained in *Garcetti*, and thereafter Plaintiff filed a Motion to Amend Complaint in accordance with that same rationale. At oral argument on November 20, 2006, the Court granted Defendants' Motion for Summary Judgment, and also granted Plaintiff's Motion to Amend the Complaint.

Plaintiff's Amended Complaint was deemed to be filed as of November 20, 2006. The gravamen of the Amended Complaint is a violation of Plaintiff's civil rights and retaliation based upon his First Amendment right to freedom of political association.

Defendants filed their Motion for Summary Judgment on May 4, 2007. This is Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment.

II.   **SUMMARY OF ARGUMENT**

1.   **DEFENDANTS IN OFFICIAL CAPACITY SUITS ARE ONLY ENTITILED TO THE IMMUNITIES AFFORDED TO THE MUNICIPALITY; AS DEFENDANTS COONS AND SAPP/FRAZIER ASSERTED NO IMMUNITY DEFENSES IN THEIR MOTION FOR SUMMARY JUDGMENT, THE COURT CANNOT CORRECTLY DISMISS THEM IN THEIR OFFICAL CAPAICTIES.**

2.   **SUFFICIENT EVIDENCE EXISTS IN THE RECORD FOR A REAONABLE JURY TO FIND THAT DEFENDANTS RETALIATED AGAINST PLAINTIFF BASED UPON HIS POLITICAL ASSOCIATION THEREBY VIOLATING HIS FIRST AMENDMENT RIGHT TO FREEDOM OF POLITICAL ASSOCIATION.**

3.   **LIABILITY AGAINST NCC IS PROPER AS A RESONABLE JURY COULD FIND THAT THE DECISION TO NOT PROMOTE PLAINTIFF BASED UPON HIS POLITICAL ASSOCIATION REPRESENTS OFFICIAL NCC POLICY AS IT WAS IMPLIMENTED BY NCC'S COUNTY EXECUTIVE AND DIRECTOR OF PUBLIC SAFETY.**

4.   **DEFENDANTS COONS AND SAPP IN THEIR INDIVIDUAL CAPACITIES ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE FACTS, VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFF, SHOW A CONSTITUTIONAL VIOLATION AND SUCH CONSTITUTIONAL VIOLATION WAS CLEARLY ESTABLISHED AND RECOGNIZED BY DEFENDANTS COONS AND SAPP.**

5.   **PUNITIVE DAMAGES MAY BE IMPOSED AGAINST DEFENDANTS COONS AND SAPP BECAUSE THE RECORD EVIDENCE, VIEWED IN A LIGHT MOST FAVORABLE TO PLAINTIFF, ESTABLISHES THEIR RECKLESS OR CALLOUS DISREGARD, OR INDIFFERENCE TO THE CONSTITUIONAL RIGHT TO POLITICAL ASSOCIATION OF PLAINTIFF.**

## III.    SUMMARY OF FACTS

### A. Introduction

Corporal Trinidad Navarro ("Plaintiff" or "Navarro") filed this action against Defendants Christopher Coons, Guy Sapp, and New Castle County on the basis of violations of his First Amendment rights under the United States Constitution. Specifically, Plaintiff claims that Defendants violated his rights of freedom of political association guaranteed by the First Amendment. Pursuant to the promotions practice of the NCCPD ("NCCPD") in 2005, Plaintiff applied for and was selected by the Chief of Police to be promoted to Sergeant on or about July 1, 2005. (Ex 2 at 62).[1]  However, just days prior to the announcement of his promotion, the New Castle County Executive Branch determined that the two budgeted positions for Sergeant would no longer be available and would not be filled. (Defs' Ex O under seal).

The incidents herein occurred during the first year of Defendant Coons' assumption of the position of New Castle County Executive. The Coons administration succeeded the Gordon administration. (Ex 9)  Gordon's Chief Administrative Officer, Sherry Freebery, sought election as the County Executive but lost at the primary election to Defendant Coons. (Ex 9).

In the course of the race between Coons and Freebery for County Executive, a bitter rivalry developed between the Gordon/Freebery camp and the Coons camp. (Ex 9).  Many County employees, including sworn officers with the NCCPD, were identified with the candidate for whom they cast their political support. (Ex 9).

---

[1] Plaintiff's citations to Exhibits may be cross-referenced as follows:
    Exhibit 1 – Chris Coons deposition transcript;
    Exhibit 2 – Allison Levine deposition transcript;
    Exhibit 3 – David McAllister deposition transcript;
    Exhibit 4 – William Scott McClaren deposition transcript;
    Exhibit 5 – Trinidad Navarro deposition transcript;
    Exhibit 6 - Guy Sapp deposition transcript;
    Exhibit 7 – David Singleton transcript; and
    Exhibit 8 – Stuart Snyder deposition transcript.
    Exhibit 9 – Affidavit of Trinidad Navarro

Navarro is a police officer with the NCCPD, faithfully serving the citizens of New Castle County for the past 15 years. He began his career under then Chief of Police, Tom Gordon in 1992. In 1998, Navarro was appointed Public Information Officer ("PIO") for the NCCPD by Chief Jack Cunningham. (Ex 5 at 20). In that capacity, he has served under four chiefs: Chief Jack Cunningham, Chief David McAllister, Acting Chief Scott McLaren and the current Chief, Rick Gregory. (Ex. 5 at 20).

A summary of the events that occurred in 2005 involving Corporal Navarro, his quest for promotion and actions taken against him by Defendants follows:

### B.  Chief David McAllister: Terminated by the Coons Administration

David McAllister was the Chief of the NCCPD in 2005 when the Coons administration took office. McAllister had been promoted to Chief by Tom Gordon. (Ex. 3 at 7). Before Defendant Coons became County Executive and while he served as President of New Castle County Council, Defendant Coons attempted to influence the proposed promotion of Lieutenant Elmer Setting ("Setting") of the NCCPD to Lieutenant Colonel. (Ex. 3 at 9; Ex. 1 at 37). Coons had been the only member on County Council who concerned himself with promotions within the police department. (Ex. 3 at 11). During his intervention into Setting's proposed promotion, Coons advised McAllister that Setting had a close relationship with Sherry Freebery, former NCCPD Chief and then Chief Administrative Officer under County Executive Gordon, and that due to this relationship, Setting may adopt Freebery's "bad reputation." (Ex. 3 at 10). Thereafter, and based upon this intervention by Coons, Setting was not promoted to Lieutenant Colonel as had been recommended by Chief McAllister. (Ex. 3 at 10).

After Coons won the election for County Executive, Chief McAllister never spoke to him again other than to congratulate Coons following the election. (Ex. 3 at 14; Ex. 1 at 37). During

the seven months that McAllister served as Chief of the NCCPD unders Coons, their relationship was strained and "very tense.", (Ex. 3 at 15; Ex. 2 at 25) and was characterized by County Communications Director Levine as a "vigorous pissing match." McAllister requested a meeting with Defendant Coons following the election, but Coons flatly denied that request. (Ex. 3 at 15).

It was no secret that Coons was unhappy with Chief McAllister, (Ex. 2 at 28), and that neither he nor his wife, Annie, liked McAllister. (Ex. 2 at 50). In fact, Coons' issues with McAllister ran so deep that he and Defendant Sapp, the Director of Public Safety for the Coons administration, were digging for information to use in order to justify the termination of Chief McAllister. (Ex. 3 at 29). Coons' issues had nothing to do with McAllister's performance as on several occasions he recognized McAllister's initiatives, characterizing them as "very positive" and even complimented McAllister on same. (Ex. 1 at 37). David McAllister remained Chief of NCCPD until July 25, 2005 at which time he was placed on administrative leave. (Ex. 3 at 44). His title and duties as Chief ended in October of 2005 when McAllister resigned as Chief of Police. (Ex. 3 at 7).

The Coons' transition team studied the NCCPD and issued a report on its operations. The report was a favorable one, citing many strengths of the department. (Ex. 3 at 56). Curiously, (or perhaps not curiously given the retaliatory actions of the Coons administration that would follow) despite the contents of this report, Defendant Coons, referred to the NCCPD as being in a "difficult situation." (Ex. 1 at 7). Coons then raised the issue of the indictments of the past three Chiefs indicating that serious morale and leadership issues existed with the NCCPD. (Ex. 1 at 7).

While he was on suspension, David McAllister became aware that the County hired an investigator to do surveillance on his home. (Ex. 3 at 53, 60). The surveillance continued when

11

the investigator followed him to a grocery store. (Ex. 3 at 60). McAllister asked Defendant

Sapp, the identity of the surveillance agency. (Ex. 3 at 61). Sapp falsely denied that anyone had

been hired to do surveillance on McAllister. (Ex. 3 at 61). McAllister later received an apology

from the County attorney who said, "I'm really sorry for all this…This really isn't right." (Ex. 3

at 62).

### C.    Chief McAllister's Ill-Fated Attempt to Promote Plaintiff to Sergeant

Plaintiff became eligible for promotion to Sergeant in July 2005. (Ex 3 at 25-34). In late

June, Chief McAllister advised Navarro and others that he planned to promote, "a black, an

Hispanic and a woman" with the three promotions that had been budgeted and approved by

County Council. (Ex. 5 at 62). The Chief of the NCCPD is entitled to promote individual

officers at his discretion provided they are within a certain ranking based upon recent test scores.

(Ex 3 at 39, Ex 4 at 63). Of the police officers deemed eligible for promotion to Sergeant,

Trinidad Navarro was the lone Hispanic, leading to the obvious conclusion that he was in line to

be promoted. (Ex 3 at 26). Chief McAllister also advised Defendant Sapp and Lieutenant

Colonel McLaren that McAllister intended to promote Navarro to the rank of Sergeant. (Ex. 3 at

26, 30, 63).

Sapp initially agreed to promote the three candidates selected by Chief McAllister. (Ex 3

at 38-40). However, following a meeting with Chief Administrative Officer Singleton on June

29, 2005, Sapp was persuaded to change his mind. (Ex 7 at 50).

Plaintiff's promotional aptitude was recognized by his superiors. Acting Chief of Police

Scott McLaren described Corporal Navarro as doing an "excellent job" and, in his opinion, was

promotable to the position of Sergeant. (Ex. 4 at 43). Many of those same supervisors who

lauded Plaintiff's promotability, also believe that his not being promoted was retaliatory conduct

by the Coons administration and unjustified. Asked whether Navarro was retaliated against, Acting Chief McLaren did not say no. (Ex. 4 at 46). Rather, he responded that it was difficult to put himself in that position but that there is a "host of officers that could probably say yes that didn't get promoted." (Ex. 4 at 46).

Major Snyder, Chief of Operations at NCCPD, testified that he believed that Trinidad Navarro was passed over for promotion. (Ex. 8 at 14). Major Snyder also testified that he believed that the two Sergeant positions were held in abeyance in July of 2005, "in other words, not filled in order not to promote him [Navarro] or in order to eliminate the possibility that he gets promoted." (Ex. 8 at 16). In response to defense counsel's inquiry, Major Snyder testified that the decision to withhold two Sergeant positions was "intentional to deprive Trini Navarro of a promotion." (Ex. 8 at 20). Snyder testified that the reason that this occurred was because of Guy Sapp. (Ex. 8 at 16).

This instinct of retaliation was sensed by Plaintiff himself following his meeting with Allison Taylor Levine as he perceived that the County administrators disliked him because of his allegiance to Chief McAllister, as well as Tom Gordon and Sherry Freebery. (Ex. 5 at 8, Ex 9).

At that meeting, Levine told Plaintiff that Defendant Coons was not happy with Navarro (Ex 2 at 28) and, indeed was "upset with Trini Navarro" because County administrators believed he had been involved in criminal activities. (Ex. 2 at 28, 31). Specifically, Coons believed that Navarro had been involved with campaigning on County time during the Gordon/Freebery administration. (Ex. 2 at 32).

D.    **County Administration Reduces the Number of Sergeant Slots**

New Castle County Council voted in mid-May 2005 to include three new budgeted positions for Sergeants. (Ex 3 at 31). Initially, there had been only one Sergeant position

prompting both Chief McAllister and the Fraternal Order of Police ("FOP") to ask for the two additional positions. (Ex 3 at 31; Def's Ex M under seal). By letter dated May 20, 2005 to Chief David McAllister from Marge Ellwein, FOP President, she asked Chief McAllister to fill the one position that was open immediately and to request two additional Sergeant openings. (Defs.' Ex. M under seal).

By way of memo from Chief McAllister to Defendant Sapp dated June 27, 2005, there was an acknowledgment that County Council had approved the three Sergeant positions that would be available on July 1, 2006. (Defs.' Ex. N under seal). Chief McAllister asked that the requisitions for these positions be released to him so the promotions could be made in the very near future. Id.

Sapp went to the Government Center on June 29, 2005 where County administration has its offices and came back to the police department with "his stance changed." (Ex. 3 at 35). This was the first notice that the two Sergeant positions would not be filled. On that same date, Defendant Sapp issued a memo to Chief McAllister advising him that the "need to maintain patrol officers' strength is more critical than the need for Sergeants." (Defs' Ex O under seal). Accordingly, Sapp did not authorize requisitions for two of the Sergeant positions that had been budgeted by County Council. (Defs.' Ex. O under seal). Chief McAllister disagreed with Sapp's conclusions indicating that there were plenty of patrol officers but the lack of Sergeants was taxing the existing Sergeants. (Ex. 3 at 41). He stated that there were not enough supervisors to go around. (Ex. 3 at 42).

However, Sapp's decision and memo made no economic sense because NCCPD would be informally promoting Sergeants in the field to fill the vacancies. (Ex. 8 at 18). The acting Sergeants are non-sergeants who serve in Sergeant roles and receive a 5% increase in their pay

14

which represents the increase between a Corporal's salary and a Sergeant's salary. It is actually more efficient to promote the officers as full time Sergeants and get 100% out of them rather the limitations imposed by appointing the acting Sergeants. (Ex. 8 at 18).

In addition to Sapp's change of heart regarding the Sergeant promotions, FOP President Ellwein, a Coons political supporter, did an abrupt flip-flop and changed her position from advocating for the two additional spots to adopting the administration's position wherein two of the budgeted Sergeant positions would not be filled. (Ex. 5 at 84). Not surprisingly, President Ellwein had campaigned for the election of Defendant Coons as County Executive. (Ex. 5 at 63). After the election, Ellwein was rewarded for her campaign efforts by being named to the transition team for the incoming Coons administration. (Ex. 5 at 100).

Previous to Coons taking office, the FOP listed all officers who contributed to Sherry Freebery during her losing primary campaign against Defendant Coons. (Ex. 5 at 156). All such contributing police officers were said to be "finished" once Coons assumed office. (Ex. 5 at 156).

Defendant Coons acknowledged that the County spent some money to have studies of the police department completed. These studies included staffing needs. The PERF report was received in early 2006 and determined that several Sergeant positions had not been filled. (Ex. 1 at 20).

### E.    Off-Site Meeting Between Levine and Navarro: June 29, 2005

Defendant Coons' Communication Director, Allison Taylor Levine, and Navarro met on the morning of June 29, 2005. During this meeting, Levine discussed with Navarro the "clear tension" between the administration and the police department and the fact that her boss, Chris

Coons, was not happy with Chief McAllister nor was he happy with Trini Navarro. (Ex. 2 at 25-28).

Levine contacted Navarro at the direction of Defendant Coons because Coons was upset with the information being relayed by Navarro to Levine. (Ex. 2 at 36). Navarro explained that as the Public Information Officer for NCCPD, he had to report directly to his Chief David McAllister. Levine explained to Navarro that Navarro had several bosses who were above Chief McAllister. (Ex. 2 at 37). Levine advised Navarro that Navarro's bosses included Defendants Coons and Sapp and "to some degree myself as an arm of Chris Coons." (Ex. 2 at 37, 38).

Levine cautioned Navarro against being on the losing team, "the McAllister team." (Ex. 2 at 107). While Levine testified that she had no recall of using the term "McAllister team," she did recall telling Navarro that McAllister was going to lose. (Ex. 2 at 47). David Singleton, the Chief Administrative Officer, testified that when Levine spoke with him immediately after the meeting with Navarro, that she had used the word "team." (Ex. 7 at 61).

Levine recognized that Navarro was unhappy in his position "because of politics." (Ex. 2 at 47). Levine questioned Navarro as to whether Navarro would be more comfortable in a position that was "less in the midst of the political stuff." She acknowledged that was what Navarro seemed to be most concerned about. (Ex. 2 at 47).

Levine urged Navarro that rather than be on McAllister's team to be on "Chris' team." [referring to Defendant Coons]. (Ex. 5 at 107). Levine advised Navarro that she was aware that the number of Sergeant positions was going to be reduced. She testified that she had heard that earlier in the week. (Ex. 2 at 43). Levine explained this to Navarro by saying, "well, that's how *politics* work." (Ex 5 at 115). When Plaintiff told her that politics should not be involved in any

promotional opportunity for a government position, Levine responded by saying, "well, Chris [referring to Defendant Coons] butters the bread."

Within a couple of days of the filing of this lawsuit, Levine was fired by Defendant Coons. (Ex. 2 at 52). David Singleton recalled that Levine, "verbally offered her resignation." (Ex. 7 at 59).

Defendant Coons was not sure how Levine found out prior to June 29, 2005 about the Sergeant positions that were not going to be filled. (Ex. 1 at 45). Coons acknowledged that he asked for Levine's resignation "because she had shown some real errors in judgment." (Ex. 1 at 53).

### F.    County Administration's Role in NCCPD

Defendant Coons described his predecessor's administration [the Gordon administration] as causing "persistent political interference" within the NCCPD. (Ex. 1 at 10). Coons testified that politics should pay no role in the promotional process within the department. (Ex. 1 at 10). Decisions for promotion and transfer should be made on the basis of merit and professional concerns rather than friendship or politics, according to Coons. (Ex. 1 at 18).

Defendant Coons acknowledged that Defendant Sapp in his position as Director of Public Safety has independent authority to make decisions regarding the police department. (Ex. 1 at 12). Coons expects that the CAO's role in making decisions within the police department is "very limited." (Ex. 1 at 15). Coons would not expect that the CAO would be involved in any details about promotional decisions in the police department. (Ex. 1 at 25). Coons disagreed that the promotions in November 2005 were held up by the Government Center (the Executive Branch), rather he said that they were held up by the police department. (Ex. 1 at 16).

Major Snyder testified that Defendant Sapp "meddles in simple police department matters." (Ex. 8 at 20). Snyder described much interference and meddling by the County administration. Snyder noted much delay with Sapp's decisions. (Ex. 8 at 25). Snyder further testified that both the Chief and Sapp had to present a Sergeant candidate to Chief Administrative Officer Singleton for his approval. (Ex. 8 at 26). Snyder believes that there was "absolutely interference or interjection by County administration into first line supervisor promotions." (Ex. 8 at 26).

Testifying while he was Acting Chief, Lieutenant Colonel McLaren testified that the final authority for promotions went through the Public Safety Director and through the CAO to the County Executive. (Ex. 4 at 34).

### G.   Acts of Retaliation

During Plaintiff's June 29, 2005 meeting with Levine, he took notes of what transpired.. (Ex. 5 at 106). However, when he went to retrieve those notes a few months later, he found that his computer and desk had been searched. (Ex. 5 at 107). He also learned that his hard drive was changed out sometime after his lawsuit was filed. (Ex. 5 at 109).

Plaintiff detailed in summary fashion during his deposition that the following officers, all of whom were friendly with David McAllister, had the following incidents occur:

- Lieutenant Elmer Setting, close friend of McAllister, was transferred from patrol responsibilities where he had a command of over 240 officers to records division where he had command of 7 individuals. (Ex. 5 at 158). Major Snyder characterized Setting's transfer as "punitive" because it so drastically reduced his command. (Ex. 8 at 56).

- Lieutenant Wendy Hudson, was a good friend of McAllister and was considered his confidante. She was put on a long investigation without the knowledge or authorization

18

of Acting Chief Scott McLaren. (Ex. 4 at 37). She was disciplined for forgetting to send someone to a Council meeting and was then charged with insubordination. (Ex. 5 at 159).

- Lieutenant Robert McLucas was suddenly transferred from detective to patrol (from a day work job to a shift work job). He did not request same and did not understand the reason for his transfer. (Ex. 5 at 160).

- Sergeant Fred Calhoun, questioned during at roll call why, as a police department, the union did not have a contract. He was later investigated for criticism and investigated by Professional Standards for criticizing the County Executive. They were moving to terminate Sergeant Calhoun. (Ex. 5 at 161).

- Sergeant Joseph Meriggi was disciplined for a series of allegations with respect to the pay job account. Meriggi was acting in accordance with his training. (Ex. 5 at 162).

- Sergeant Paul Neil, along with Meriggi, were both disciplined and received major discipline for signing each other's names on paychecks to expedite paychecks for officers. Each was a close friend of Chief McAllister and each had been promoted by Chief McAllister. They were both offered demotion and were told at one point that they would be fired. (Ex. 5 at 162Ex. 5 at).

- Sergeant Bruce Pinkett. Chief McAllister advised Navarro that CAO Singleton was attempting to block Pinkett's attendance at the FBI Academy and sought his personnel file to review same. (Ex. 5 at 164).

- Corporal Gorman Swift had been the Executive Officer who was in charge of security for Tom Gordon. He then became the Pawn Officer regarding pawning stolen property. He was reassigned, without his request and believes it was due to his allegiance to Tom Gordon. (Ex. 5 at 166).

- Joanna Burton. She and her husband were good friends of the Chief of Police. She was transferred from a day work job back to patrol and shift work. (Ex. 5 at 167).

## IV.    ARGUMENT

### A.    Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, a defendant "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The Court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

To properly apply the summary judgment standard under Rule 56, it becomes necessary to define the phrase "genuine issue of material fact." A fact is material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." *Rodgers v.*

*Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002); *see also Logan v. Commerical Un. Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute."). A material fact is "genuine" simply if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1440 (10th Cir. 1996); *see also Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3d Cir. 1994) (holding that factual issues are not "genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions).

This is a case of drawing inference from fact, i.e., the inference that Defendants' decision to not promote Plaintiff was based upon his political affiliation. Drawing inferences is typically reserved for a jury at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that drawing inferences is a jury's function so long as competing inferences are reasonable under the law).

**B.** **Defendants Coons and Sapp/Frazier May be Held Liable in Their Official Capacities Because: 1) They Are Not Entitled to Automatic Dismissal; and 2) They Failed to Proffer Any Defenses that Would Be Available to New Castle County.**

**1. Substitution of Frazier for Sapp for Claims Against Sapp in His Official Capacity is Appropriate.**

Plaintiff agrees with Defendants that because Defendant Sapp is no longer employed by NCC, his successor, E. Ronald Frazier ("Frazier"), must be substituted for Sapp for the claims against Sapp in his *official* capacity. "[W]hen officials sued in this [their official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." *Hafer v. Melo*, 502 U.S. 21, 24 (1991); *see also* Fed. Rule. Civ. Proc. 25(d)(1).

Nevertheless, the claims against Sapp in his *individual* capacity must remain as the successor only is substituted for claims in his predecessor's official capacity.

        **2.**        **Summary Judgment that Would Dismiss Defendants Coons and Sapp/Frazier in Their Official Capacities Must be Denied Because Defendants Have Not Set Forth Any Viable Defenses That Would Be Available to New Castle County.**

Plaintiff takes no issue with Defendants' contention that suits brought against public officials in their official capacities are considered to be suits against the governmental entity itself. However, dismissal of those individuals in their official capacities is not automatic as Defendants suggest. "The only immunities available to a defendant sued in an official-capacity action are those that the governmental entity possesses." *Id.*

Here, the only argument for immunity offered by Coons and Sapp/Frazier is that due to Plaintiff making a claim against New Castle County, they should therefore be dismissed from the case automatically. Significantly, they have offered no defense available to New Castle County to support dismissal in their official capacities; nor have they incorporated by reference any defenses asserted in the portion of their Opening Brief arguing against municipality liability. As a consequence, Defendants Coons and Sapp/Frazier must remain viable Defendants in this case regardless of whether the Court elects to dismiss NCC. Because these Defendants have failed to assert such defenses in their Opening Brief, they have waived their right to assert any such defenses at this point.

        **C.**        <u>**Based Upon the Evidence Contained in the Record, a Reasonable Jury Drawing All Inferences and Viewing the Facts in a Light Most Favorable to Plaintiff Could Find That Defendants Retaliated Against Plaintiff Based Upon His Political Association Thereby Violating His First Amendment Right to Freedom of Expression.**</u>

The United States Supreme Court held "that it is a violation of the First Amendment to make employment-related decisions regarding positions with public employers based on the

party affiliation or support of an applicant or employee. Accordingly, recommending someone for promotion, or making any other employment decision, based on party affiliation or support is prohibited." *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 674 (3d Cir. 2002) (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)). Here it is Plaintiff's support of the prior County Executive (Tom Gordon); Gordon's Chief Administrative Officer and a candidate for County Executive who ran against Defendant Coons in the last election (Sherry Freebery); and the former Chief of the New Castle County Police Department who served faithfully under the Gordon Administration (Col. McAllister), that inspired Defendants to retaliate against him by denying his promotion to Sergeant.

In a case with striking similarities to the case at bar, *Gronowski v. Spencer*, 424 F.3d 285, 294-96 (2d Cir. 2005), the court held that sufficient circumstantial evidence existed for the jury to find that defendant's decision to terminate the chief clerk "as part of budget cuts" was in fact, retaliation for the clerk's political support of the sitting mayor's political rival. Although the *Gronowski* opinion was written in the context of an appeal as opposed to a motion for summary judgment, the cause for the appeal was the employer's contention that insufficient evidence existed for the jury to find in the employee's favor. Given that *Gronowski* went to trial and that the court affirmed the jury's decision, it is axiomatic that facts similar to those in *Gronowski* are sufficient to support a denial of Defendants' Motion for Summary Judgment.

The facts relied upon by the court in *Gronowski* were: 1) the mayor knew of plaintiff's political affiliation, *Id.* at 294 (a matter that may be inferred when an employee proffers evidence that the information was generally known to co-workers. *Goodman*, 293 F.3d at 671; and *Stephens v. Kerrigan*, 122 F.3d 171 (3d Cir. 1997)); 2) evidence that revealed the mayor's

24

animosity toward plaintiff because of plaintiff's political affiliation, *Id.*; and 3) plaintiff was warned to cease his political affiliations, *Id.*

Likewise, in the instant case, Plaintiff was denied his promotion based upon alleged budgetary constraints. (Ex. 3 at 28). Again, much like *Goodman,* ample evidence exists in the record that Defendants knew of Plaintiff's political affiliation with Gordon, Freebery and McAllister. (Ex. 2 at 31, 32); animosity was exhibited toward Plaintiff for that political affiliation, (Ex. 5 at 106; 108, 145); and that Plaintiff was warned to cease his political affiliations. (Ex. at 116; 117).

In short, Plaintiff has produced facts in the record that support all three prongs of this test. Therefore, this case must be permitted to proceed to trial and a jury must be permitted to weigh the evidence.

### 1.    *Plaintiff's Position Did Not Require Political Affiliation*

Defendants do not dispute that Cpl. Navarro's position did not require political affiliation – the first step in a political association First Amendment claim.

### 2.    *Plaintiff Engaged in Protected Activity*

The second step in a public employee's retaliation claim for engaging in protected activity is to establish the activity in question was protected. *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993). Political loyalty to an elected official who subsequently loses an election is a considered a "protected activity" in a First Amendment/Political Association claim. *See, DeFiore v. Vignola*, 823 F.Supp. 315 (E.D. Pa., 1993); and *Gronowski v. Spencer, supra.* "The right of association extends beyond the mere formation of a political group. The right encompasses the availability of political opportunity for the group." *Deibler v. City of Rehoboth Beach*, 790 F.2d 328, 332 (D. Del. 1986).

25

Following the Coons' administration's assent to the County Executive seat, remnants of the Gordon/Freebery administration (Coons' political rivals) remained in place in New Castle County Government. (Ex 5 at 155-168). Most notable in this regard was on the New Castle County Police Department where numerous individual employees remained who were very supportive of the Gordon/Freebery administration and of Sherry Freebery in her bid for County Executive running against Chris Coons. *Id.* Strong support remaining on the police force is not surprising given the fact that Tom Gordon and Sherry Freebery were both former New Castle County Police Chiefs. (Ex 1 at 9). In fact, Tom Gordon was the Chief of the New Castle County Police Department when Plaintiff joined the force. (Ex 5 at 15). Cpl. Navarro was included in the group of supporters supporting the former administration. (Ex 9).

Defendants' argument that Cpl. Navarro engaged in no "protected activity" because the "McAllister team" is not a political party, and because that loyalty to a former County employee (Chief McAllister) is not a protected act of association is misplaced due to Defendants' narrow view of the factual backdrop and the individuals whom, in fact, Cpl. Navarro supported. Specifically, Defendants focus their argument of Plaintiff's membership on the name the "McAllister team."[2] Defendants apparently view this "team" as individuals supporting only Chief McAllister. While true to a certain extent, Defendants fail to see that those on the McAllister team share political association with individuals other than McAllister – namely Tom Gordon and Sherry Freebery, Defendant Coons' political rivals. (Ex 9). It is important to keep in mind that the "McAllister team" that is mentioned so much in this lawsuit is a label originated by

---

[2]   It is unclear why the Coons Administration termed the individuals who remained loyal to Gordon and Freebery the "McAllister team." However, one can reasonably infer it was because McAllister was the highest ranking employee on the NCC Police Department remaining over from the Gordon/Freebery administration who maintained his loyalty thereto.

the Coons' Administration; not Cpl. Navarro. (Ex 5 at 107; 108). Therefore, one must look beyond the name McAllister to accurately ascertain the reality of the political association.

That reality reveals that the Coons administration's retaliation against the "McAllister team" was retaliation against individuals who remained on the NCC Police Department, including Plaintiff, who were loyal to Tom Gordon and Sherry Freebery following the election of Chris Coons. (Ex. 5 at 155-167). Therefore, Defendants' assumption that just because Ms. Levine chose to christen the group of individuals who they would retaliate against as the "McAllister team," that reference does not foreclose Plaintiff's political association with others, including Gordon and Freebery.

Evidence of the Coons administration's retaliation against those who supported Gordon and Freebery can be found throughout the testimony in the record. Following the primary election in which Defendant Coons defeated Freebery, an F.O.P. meeting was held, at which Kathy Riddell possessed a list of all the New Castle County Police Officers who contributed to Sherry Freebery's campaign. She stated that all of the individuals whose names appeared on that list which she read during a meeting were "finished." (Ex 5 at 156). In other words, those individuals would suffer negative consequences at the hands of the Coons administration based solely on their political association and support of Sherry Freebery. (Ex. 5 at 116, 117).

Unfortunately, for those on the "McAllister team" Kathy Riddell's words proved to ring true in the coming months. In addition to the retaliation taken against Cpl. Navarro, the following police officers were supporters of Gordon and/or Freebery and had the following adverse employment actions taken against them shortly after the Coons administration assumed power.

       1)    Lt. Wendy Hudson – Chief McAllister's confidant was abruptly fired. (Ex 5 at 39, 159);

27

2)   Lt. Elmer Setting – transferred from his position as commander of the patrol division, where he commanded 240 officers, to the records unit, where he was in charge of 7 civilian key operators. (Ex 5 at 139, 143; Ex 8 at 55). This transfer was punitive because it reduced Capt. Setting's command. (Ex 8 at 56);

3)   Cpl. Gorman Swift – prior to Coons Administration was Tom Gordon's security officer for years. Shortly after Col. McAllister left office he was transferred back to patrol. (Ex 5 at 165);

4)   Sgt. Bruce Pinkett – while at the FBI academy was transferred back to patrol. (Ex 5 at 35-36,164);

5)   Lt. Robert McLucas – was transferred from the detective unit back to patrol. (Ex 8 at 160);

6)   Sgt. Fred Calhoun – the Coons administration was taking steps to terminate him. (Ex 5 at 161 - 162);

7)   Sgt. Joseph Meriggi – was disciplined unjustly. (Ex 5 at 163);

8)   Sgt. Paul Neil – disciplined unjustly. (Ex 5 at 162);

9)   Jeff Hill – transferred from the mounted unit back to the patrol unit. (Ex 5 at 166);

Additional evidence of political activity is also contained in the record. For instance, Allison Levine testified that Defendant Coons was upset with Plaintiff specifically because he was campaigning on county time, (Ex 2 at 32), a political activity if ever there were one. Plaintiff also spoke up in support of Gordon and Freebery with respect to a lawsuit filed against them arising out of their operation and actions while in County office, stating that many of the claims in the indictment were frivolous. (Ex 5 at 65).

In short, Plaintiff has raised issues of fact that, when viewed in a light most favorable to him, and drawing all inferences in his favor, require that summary judgment on the issue of his political activity supporting Gordon, Freebery and McAllister be denied.

**3.   *Plaintiff's Protected Activity Was a Motivating Factor in Defendants' Retaliation Against Plaintiff.***

i.   <u>Whether the Protected Activity Was a Motivating Factor is a Factual Issue Best Left for the Fact Finder.</u>

28

Once a plaintiff establishes that he has engaged in a protected activity, he must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977); *Watters,* 55 F.3d at 892; *Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1270 (3d Cir.1994). If Plaintiff meets this burden, the public employer may attempt to rebut the claim by demonstrating that it would have reached the same decision absent the protected conduct. *Mt. Healthy, supra; Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983). "The second and third stages of this analysis present questions for the fact finder." *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 889 (3d Cir. 1997); *Zamboni v. Stamler,* 847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988) (noting that the issues of whether the protected activity acted as substantial or motivating factor in plaintiff's discharge and whether that same action would have been taken regardless are questions for jury), cert. denied, 488 U.S. 899 (1988); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 454 (3d Cir.1985) (holding "second and third questions ... should be submitted to the jury").

Defendants incorrectly argue that they are entitled to summary judgment because Plaintiff has not met his burden in establishing that his protected activity was a motivating factor in the retaliation. (Defs' Op. Br. at 14, 15). Simply put, based upon the case law outlined above, a motion for summary judgment is not the proper context in which to enter into such an inquiry. Nevertheless, sufficient evidence does exist in the record that forecloses granting summary judgment should the Court decide to entertain this argument.

ii.    Genuine Issues of Material Fact Remain as to Whether Plaintiff's Political Activity was a Motivating Factor in Defendants' Retaliation Against Plaintiff.

The first bit of evidence that shows that Plaintiff's protected activity was a motivating factor is Allison Taylor Levine's statements to Plaintiff. Despite Defendant Coons' testimony to

the contrary, Ms. Levine told Plaintiff that she had several conversations with Defendant Coons regarding Plaintiff. (Ex 5 at 114). She relayed how much Chris Coons hated Cpl. Navarro (Ex 5 at 145); how it would be in Cpl. Navarro's best interest to not be viewed as being on, as she termed it "the McAllister team," (Ex 5 at 106 – 108); how it would be "better" for him to be viewed as being on "Chris' [meaning Coons'] team," (Ex 5 at 106); and how Chris Coons buttered the bread, (Ex 5 at 107, 117, 118), meaning that if Defendant Coons did not want Plaintiff promoted, he would not be promoted. (Ex 5 at 116, 117). The obvious inference to be drawn here is that if you associate with a rival political faction and do not support Defendant Coons you will not be promoted.

Levine also stated that she discussed a move back to the street with Plaintiff because "it was too hot between the political stuff [for Plaintiff to stay on as PIO]" (Ex 2 at 46). Finally she testified that Defendant Coons was frequently unhappy with Plaintiff, and one such reason was because he had been "campaigning" on County time. (Ex 2 at 28, 31-32). Significantly, that campaigning was undertaken during the Gordon/Freebery administration. These statements all derive from the individual who admitted that she was "an arm of Chris Coons." (Ex 2 at 37, 38). Moreover, these communications with Plaintiff came at the specific request of Defendant Coons. (Ex 2 at 36).

Additionally, Major Snyder testified that the Sergeant positions were intentionally not filled specifically so as to not promote Plaintiff, and that the direction to withhold the promotions came directly from the Coons administration. (Ex 8 at 16, 20 and 26). Based on these statements, and all reasonable inferences drawn therefrom, Chris Coons' own mouthpiece virtually admitted to Cpl. Navarro that he did not get his promotion because he was on the "McAllister team," and if he wanted a promotion in the future, he had better make the switch to

Chris Coons' team because Coons was the individual who made the decisions of who was promoted and who was not. (Ex 5 at 117; 118).

### 4.    Defendants' Contention that They Would Have Taken the Same Action Absent Plaintiff's Protected Conduct.

Like § C(3) above, this portion of a political association/First Amendment claim analysis is one not properly decided on a motion for summary judgment, but is appropriately reserved for the jury. *Green,* 105 F.3d at 889; and *Zamboni v. Stamler,* 847 F.2d at 79 n. 6. Nevertheless, Defendants' arguments that Cpl. Navarro did not get promoted due to budgetary constraints defies logic when viewing the facts in a light most favorable to Plaintiff. The record reveals that the promotions, including Cpl. Navarro's promotion, had already been budgeted for in that year's budget. (Ex 5 at 82). Furthermore, a Sergeant makes only 5% more than a patrol officer. (Ex 5 at 81; Ex 3 at 43)). Cutting back by only two sergeant positions would save little money for an entity such as New Castle County (Ex 3 at 43) with the operating budget of $230 million. (Ex 3 at 43; Ex 1 at 11).

In fact, patrol officers actively working in the capacity of a Sergeant, but who have yet to be promoted, still earn a Sergeant's salary. (Ex 5 at 81; Ex 3 at 43; Ex 8 at 18). As such, cutting the promotions likely saved *no money,* (Ex 8 at 43), because the County would be making, and paying, patrol officers as Sergeants in the field regardless. (Ex 8 at 18). To the contrary, it is actually more efficient to make the promotions official and get 100% effort from the Sergeants than make patrol officers acting Sergeants who typically only put forth 50% effort. (Snyder Dep. at 18). Much like the "budget cuts" in *Gronowski,* the budget savings in this case was nothing more than an attempt by the Coons administration to justify its political retaliation.

Defendants' argument that, "after serious consideration," Sapp and Singleton determined that there was a greater need for "patrol strength" than additional supervisors (Defs' Op. Br. at

31

15) also lacks logic when considered with the facts of the case. In the patrol unit, sergeants are working sergeants and actually *are* part of the patrol strength. (Ex 9). Moreover, according to the individual who arguably would have the most knowledge of the strengths and weaknesses of the police force, Chief McAllister, there were plenty of patrol officers to meet the County's needs, but the Sergeants were the ones being taxed in that there were not enough supervisors to go around. (Ex 3 at 41). Finally, the Police Executive Research Forum ("PERF") Report discredits Sapp's opinion that the New Castle County Police Department did not need more supervisors. (Ex 5 at 171, 172). Specifically, the PERF Report indicates several locations where sergeants were needed. (Ex 5 at 172).

In sum, much like the *Gronowski* case, this is case that is fraught with factual issues and such issues are appropriately reserved for jury consideration and resolution.

**D.** **Liability against New Castle County is Proper Because a Reasonable Jury Could Find that the Decision to Not Promote Plaintiff, Based Upon His Political Association Represents Official New Castle County Policy Because It was Implemented by New Castle County's Chief Executive and the Director of Public Safety.**

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v Dept. of Soc. Services of the City of New York*, 436 U.S. 658, 694 (1978).

Contrary to Defendants' arguments, the Complaint sufficiently pleads, and the record raises an issue as to Coons and Sapp's direct involvement in the policy making to retaliate against their political foes. The Complaint states:

> She [Levine] further stated that he [Plaintiff] was not liked by the
> County Executive or his administration. She stated that, Plaintiff

32

was on the losing team and his career would be harmed if he [Plaintiff] continued to stay on the "McAllister team." Levine also stated that "[Plaintiff] would have a long and difficult seven years ahead of him assuming Executive Coons seeks re-election." Levine indicated she believed McAllister would soon be arrested for the alleged DELJIS violations and indicated if he went down, Plaintiff would go down with him.

Plaintiff told Levine that he was tired of the politics associated with his position and commented, "I want out of it". Levine's response was, "well, you still have six years until you can retire." Plaintiff then clarified, that he did not want to leave the police department, but possibly wanted out of the PIO position. Levine suggested that Plaintiff seek a job transfer to another job within the County rather than stay as the PIO to avoid being labeled as "not on Chris' team." Plaintiff understood this suggestion to get away from McAllister and be loyal to Coons, not McAllister.
Levine went on to say that she heard Plaintiff had been the PIO for so many years, because "you do as you are told to do." She then advised Plaintiff that she had heard rumors regarding Plaintiff's involvement in an investigation relating to a murder that occurred in Las Vegas, Nevada. Plaintiff advised Levine that she had gotten her rumors crossed and indicated Plaintiff did not personally know anyone involved in the murder investigation. The allegation was that Plaintiff flew to Las Vegas, Nevada to influence the investigation regarding Lisa D. Moseley. Plaintiff denied having done so.

During this conversation with Levine, Plaintiff and she discussed his possible promotion to Sergeant. Plaintiff advised Levine that he had heard the requisition for Sergeants was going to be withheld by the administration essentially negating the possibility of Plaintiff's promotion. Levine replied, "well, that's how politics work." Plaintiff then told her, politics should not be involved in any promotional opportunity. Levine responded, "well, Chris [referring to County Executive Coons] butters the bread."

At the end of the conversation, Levine stated she had several candid conversations with the County Executive and advised him, "Trini is one of the few people who I can depend on to get the job done." Levine indicated that she frequently commented to the County Executive about Plaintiff's performance as the PIO. Levine stated, "I think you [Plaintiff] do an excellent job with the media dating all the way back to the days when I was a reporter at the News Journal."

> Based upon information and belief, the statements made by Levine to Plaintiff during the conversations set forth herein reflect statements made by Coons to Levine.
>
> Later in the day, on June 29, 2005, Sapp forwarded a memorandum to McAllister stating, "I have reviewed the police department's staff requirements and determined that the need to maintain patrol officer strength is more critical than the need for Sergeants. Therefore, at this time, I will not authorize the requisitions of two of the Sergeant positions requested in your memorandum." The memorandum was forwarded to the FOP Board of Directors and the top seven (7) officers on the list.

Amend. Comp. at ¶¶ 21-27. Clearly, Plaintiff has met his burden of notice pleading that it was Coons' and Sapp's joint decision to not promote Plaintiff in retaliation for his political association. In their capacities as County Executive and Director of Public Safety they were making County Policy – a policy to retaliate against individuals supportive of Gordon and Freebery.

Further, ample factual support exists in the record to support these allegations. Allison Taylor Levine inferred that Chris Coons "buttered the bread" for those who supported him with policy decisions rewarding them for that support. (Ex 5 at 107, 117, 118). Those statements made by Ms. Levine came directly from Defendant Coons. (Ex 5 at 113). Moreover, Chief McAllister testified that it was Coons who was making the decisions for the New Castle County Police Department. (Ex 3 at 58).

Major Snyder testified that it was Sapp who decided to hold back the Sergeant promotions. (Ex 8 at 16). Acting Chief McLaren also testified that Sapp participated in the decisions for and against promotion and approved those decisions. (Ex 4 at 24). McLaren continued, testifying that the final authority for promotions went through the Public Safety Director, Defendant Sapp, through the Chief Administrative Officer and finally through the County Executive, Defendant Coons. (Ex 4 at 44).

34

E.    **Defendants Coons and Sapp, in Their Individual Capacities, Are Not Entitled to Qualified Immunity Because the Facts, When Viewed in a Light Most Favorable to Plaintiff, Show a Constitutional Violation That Was Clearly Established and Recognized by Defendants Coons and Sapp**

In determining whether an individual defendant is entitled to qualified immunity in a §

1983 action, the court must apply a two-step test. *Couden v. Duffey*, 305 F. Supp. 2d 379, 387

(D. Del. 2004).

> First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. . . . If the plaintiff has raised a constitutional violation, the second step is to determine whether the constitutional right was clearly established. The question then becomes whether, in the factual scenario established by the plaintiff, a reasonable officer would have understood that his actions were prohibited. As a matter of law, if it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity.

*Id.* (internal citations, quotations and parentheticals omitted).

In addressing the first step, the record contains sufficient facts to establish a

Constitutional violation of Plaintiff's right to association. The Coons administration was upset

with Plaintiff's campaigning activities. (Ex 2 at 31, 32). It exhibited animosity toward him for

his political affiliations. (Ex 5 at 106, 108, 145). Plaintiff was even warned by the Coons

administration to cease his political affiliations. (Ex 5 at 116, 117).

Moving on the second step, Defendant Coons, by his own admission recognizes that

politics should not be a consideration in an employment decision. (Ex 1 at 18). Moreover, as

graduate from law school, an attorney and member of the Delaware bar, it is virtually a given

that Defendant Coons is aware of such a basic Constitutional right, and even if it were the case

that he did not, a reasonable county executive overseeing a county with a $230 million budget

*should* be aware that employment decisions must be free from political association constraints.

With regard to Defendant Sapp, as Director of Public Safety in charge of a $108 million budget (Ex 1 at 11), overseeing the police department, emergency medical services, communications, emergency 911 and crossing guards (Ex 4 at 13; Ex 1 at 11, 14), with a total of over 600 people working under him (Ex 1 at 11), would have known that the law requires that any employment decision be free from political association influence. Moreover, the record evidence in this case establishes that he did, in fact, know that Plaintiff should have been promoted. (Ex 3 at 25 - 26, 28, 30, 35; Ex 6 at 46, 48). But following conversations with individuals higher up in the Coons administration, he succumbed to pressure and changed his mind. (Ex 3 at 35; Ex 6 at 50).

**F.**    **Punitive Damages May be Imposed Against Defendants Coons and Sapp Because the Record Evidence, Viewed in a Light Most Favorable to Plaintiff, Establishes Their Reckless or Callous Disregard, or Indifference to the Constitutional Right to Political Association of Plaintiff.**

**1.**    ***Punitive Damages May Not Be Assessed Against New Castle County***

Plaintiff does not dispute that he may not properly sustain a claim for punitive damages against New Castle County under current law.

**2.**    ***Punitive Damages May Be Assessed Against Coons and Sapp in Their Individual Capacities***

Punitive damages may be awarded in a § 1983 action when the defendants exhibit "reckless or callous disregard of, or indifference to, the rights or safety of others." *Smith v. Wade,* 461 U.S. 30 (1983).

Here, sufficient evidence exists to support a finding of punitive damages against Coons and Sapp. They conspired together to deny Plaintiff a promotion that had already been promised to him and that was already budgeted for, in violation of his right to freedom of association. (Ex

36

2 at 28, 31, 32, 36; Ex 3 at 10, 24, 41, 43, 58; Ex 8 at 16, 18, 20, 26; Ex 4 at 44, 46; 47; Ex 5 at 8, 65, 106, 107, 109, 110, 116, 117, 154, 172; Ex 8 at 16, 18, 20, 26).

## V.     CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,


Jeffrey K. Martin, Esquire (# 2407)
Timothy J. Wilson, Esquire (#4323)
MARTIN & WILSON, P.A.
1509 Gilpin Avenue
Wilmington, Delaware 19806
jmartin@martinandwilson.com
twilson@martinandwilson.com
(302)777-4681
*Attorneys for Plaintiff*

Dated: May 25, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORPORAL TRINIDAD NAVARRO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 05-565 (GMS)** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **CHRISTOPHER A. COONS,** | : | |
| **individually and in his official capacity;** | : | |
| **GUY H. SAPP, individually and in his** | : | |
| **official capacity; and NEW CASTLE** | : | |
| **COUNTY, a municipal corporation,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, Esquire do hereby certify that a true and correct copy of the Plaintiff's Answering Brief was filed and serve via electronic filing on May 25, 2007 to the following:

Jeffrey S. Goddess, Esquire
Norman M. Monhait, Esquire
Rosenthal, Monhait, Gross & Goddess, P.A.
Suite 1401, 919 Market Street
P.O. Box 1070
Wilmington, DE 19899-1070

Michele D. Allen, Esquire
Judith A. Hidlick, Esquire
Megan Sanfrancesco, Esquire
New Castle County Law Department
87 Reads Way
New Castle, DE 19707

**MARTIN & WILSON, P.A.**

**JEFFREY K. MARTIN, ESQUIRE (# 2407)**
**TIMOTHY J. WILSON, ESQUIRE (#4323)**
1509 Gilpin Avenue
Wilmington, Delaware 19806
jmartin@martinandwilson.com
twilson@martinandwilson.com
(302)777-4681
*Attorneys for Plaintiff*

39