# EXHIBIT 1

053106cc aa

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,              )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )
                                       )        Civil Action No.
CHRISTOPHER A. COONS,                  )           05-565 GMS
individually and in his official)
capacity; GUY H. SAPP,                 )
individually and in his official)
capacity; and NEW CASTLE               )
COUNTY, a municipal corporation,)
                                       )
          Defendants.                  )
                                       )

          Deposition of CHRISTOPHER A. COONS taken
pursuant to notice at the offices of Margolis Edelstein,
1509 Gilpin Avenue, Wilmington, Delaware, beginning at
9:00 a.m. on Wednesday, May 31, 2006, before Anne L.
Adams, Registered Professional Reporter and Notary
Public.

APPEARANCES:

          JEFFREY K. MARTIN, ESQ.
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware   19806
            for the Plaintiff,

          JEFFREY S. GODDESS, ESQ.
          ROSENTHAL, MONHAIT, GROSS & GODDESS
            919 Market Street, Suite 1401
            Wilmington, Delaware 19899-1070
            for Defendants Coons and Sapp,

----------------------------------------------------------

                         WILCOX & FETZER
     1330 King Street  - Wilmington, Delaware 19801
                         (302) 655-0477

053106cc aa

1   APPEARANCES CONTINUED....

2           MICHELLE ALLEN, ESQ.
            JUDITH A. HILDICK, ESQ.
3           NEW CASTLE COUNTY LAW DEPARTMENT
            87 Reads Way
4           New Castle, Delaware  19720
            for New Castel County.
5

6

7                  ----------

8                CHRISTOPHER A. COONS,

9        the witness herein, having first been

10       duly sworn on oath, was examined and

11       testified as follows:

                    EXAMINATION
12  BY MR. MARTIN:

13      Q.   Good morning.  My name is Jeff Martin.  I

14  represent Corporal Trinidad Navarro in an action that's

15  been filed in the U.S. District Court against you, Guy

16  Sapp and New Castle County.  We're here this morning for

17  the purpose of taking your deposition.  And I understand

18  that you have never been deposed before; is that correct?

19      A.   That's correct.

20      Q.   I just ask you to listen carefully to the

21  questions that I ask.  My intent will be to ask one at a

22  time.  If you don't understand the question, please, let

23  me know.  I will be happy to rephrase it.  If, however,

24  you do respond, I'm going to assume that your response is


                Christopher A. Coons               3


1   responsive to the question that I put before you.  Okay?

053106cc aa

4          MR. GODDESS:  Object.  You are going to get

5     into an area of privilege.

6          MR. MARTIN:  Well, I don't want to -- I'm

7     not going to inquire as to any attorney/client privileged

8     items that you may have reviewed, something that may have

9     been prepared for your attorney.  But if it's not

10    otherwise privileged, I believe I have an opportunity to

11    ask you what it is that you reviewed.

12          MR. GODDESS:  Go ahead.

13          THE WITNESS:  Depositions.

14    BY MR. MARTIN:

15    Q.   And what depositions did you review?

16    A.   McAllister, McLaren, Levine.

17    Q.   Did you review anything other than deposition

18    transcripts?

19    A.   No.  To be clear, I had conversations with my

20    attorneys but I didn't go back and -- no is sufficient.

21    Q.   Okay.  Fair enough.  I appreciate that.  What is

22    your understanding, if any, as to why the Corporal

23    Navarro was and has not been promoted to sergeant?

24    A.   Could you rephrase the question?  I think you are


Christopher A. Coons                    5


1     asking for a broad speculation.

2     Q.   Well, in fact, one of the rules of the deposition

3     is I'm not going to ask for any type of speculation.  If

4     you know, please, respond accordingly.  If you do not

5     know, please, do not speculate or guess.

053106cc aa

6    A.    Then the simplest answer is I don't know.

7    Q.    You don't know why Corporal Navarro has not been
8    promoted to sergeant?

9    A.    I can't speak to why several chiefs did not
10   select.

11   Q.    Do you know whether there has been any other
12   individuals other than police chiefs involved in that
13   promotion decision?

14   A.    Yes.

15   Q.    And who would the others be?

16   A.    Senior staff.

17   Q.    And when you are talking about senior staff, is
18   it senior staff of the New Castle County Police
19   Department?

20   A.    Captains, majors, lieutenant, colonel.

21   Q.    Would that also include the director of public
22   safety?

23   A.    My general direction has been for the director of
24   public safety and the CAO to perform a cursory review of

Christopher A. Coons                    6

1    promotion decisions but not to be actively engaged in
2    that, that promotional decisions should be left to the
3    chief in the department.

4    Q.    But at your direction, the CAO and director of
5    public safety do cursory reviews?

6    A.    Yes.

7    Q.    And that's at your instruction?

053106cc aa

8    A.    Well, let me take a step back.  My general

9    instruction to them with regards to the police department

10   back when I brought both of them on -- and they started

11   several months apart -- with regard to the department was

12   to leave operating issues as much as possible in the

13   hands of the department and its leadership but to provide

14   oversight to ensure that there weren't inappropriate

15   decisions being made on a whole range of issues, training

16   transfer, promotion, budgetary decisions.

17        So it's my general expectation that

18   operating decisions and decisions like promotions should

19   be led by or directed by the professional judgment of the

20   senior staff and the chief or acting chief.

21   Q.    And this is something that you discussed with the

22   CAO and the director of public safety?

23   A.    Briefly, yes.

24   Q.    Is that memorialized in writing in any place?

Christopher A. Coons                    7

1    A.    Not that I'm aware of.  I didn't write them a

2    formal memo to that effect.

3    Q.    As understood, I think the second part of your

4    response was with regard to oversight.  You wanted to

5    make sure there weren't any problems in the training,

6    transfer or promotion area?

7    A.    Correct.

8    Q.    What type of problems, if that's the correct

9    term, are you concerned about?

053106cc aa

10   A.   To put this in a broader context, when I was
11   elected county executive, we had a police department that
12   was in a very difficult situation. The last three chiefs
13   had been indicted in the federal criminal process. There
14   were lots of rumors flying around, internally and
15   externally, about what had or had not happened. I think
16   there were serious morale and leadership issues resulting
17   from a prolonged federal investigation.
18         And I chose to bring in two people, my CAO,
19   David Singleton, and director of public safety, Guy Sapp,
20   who were new to county government, who had very
21   distinguished careers in other governments, both state
22   and city. And my general direction to them was this is
23   one area of our government that has been under intense
24   scrutiny, where there is a lot of internal conflict and

Christopher A. Coons       8

1   where there is no certainty or clarity yet about what
2   happened and what didn't happen. And we won't know that
3   until after the federal criminal trial. So between now
4   and then and when I started in January of '05, we had
5   expected then would be October or so of '05 and now it's
6   delayed perhaps indefinitely.
7   Q.   And when you talk about the federal criminal
8   trial, you are talking about the trial of Gordon and
9   Freebery?
10   A.   Correct. So my general direction to them was
11   between now and when they began in early '05 and whenever

053106cc aa

12  those issues get resolved, do your best to apply your
13  professional judgment to a whole series of areas where
14  there has been allegations of inappropriate or
15  overreaching political interference in decision making.
16          I will point to one of many places that that
17  concern is rooted.  The Southern Police Institute did a
18  review of the county department in 1999 that was based on
19  interviews with officers at all levels in the department.
20  And that concluded both that the department was
21  operationally strong, that the caliber of officers, their
22  training, education, equipment was quite strong, but at
23  all level officers pointed to pervasive, inappropriate
24  political activity and intervention in things such as

Christopher A. Coons                    9

1   training opportunities, promotion, budgetary decisions.
2           And so with that general context, I said to
3   these two gentlemen, come in and provide some oversight
4   and direction.  Now, CAO Singleton had a much broader
5   range of issues to tackle.  But that's partly why I also
6   moved to install a director of public safety who had a, I
7   think, well regarded character and strong career in both
8   city and state government.
9   Q.   What was your CAO's background in police
10  functions?
11  A.   He served as Director of Public Safety for the
12  City of Wilmington, I believe, under the McLaughlin
13  administration, but I may be wrong.  But he had no direct

Page 8

053106cc aa

14    experience as a police officer.  Neither did I.  And part

15    of the point of bringing in a director who was a career

16    police officer rather than a director from any of the

17    other public safety disciplines was to be able to rely on

18    Guy Sapp's independent judgment of what was and wasn't

19    going on in this department.

20        Q.   You gave me a lot of areas I'm going to ask you

21    about.  First of all, you talked about the last three

22    police chiefs having been indicted.  To whom are you

23    referring?

24        A.   I believe Sherry Freebery, Tom Gordon and Jack

☐

Christopher A. Coons                    10

1    Cunningham.

2        Q.   And as I think I understand your testimony, you

3    were concerned, in part, about political interference

4    within the police department.

5        A.   Correct.

6        Q.   And specifically, political interference with

7    regard to promotions.

8            MS. ALLEN:  Objection.  I object to the

9    form.  I don't think he stated that.

10   BY MR. MARTIN:

11       Q.   Well, okay.  You may answer as best you can.

12       A.   Promotions was one of several areas where there

13   had been allegations of persistent interference.

14       Q.   And would you agree with me that politics should

15   play no role with regard to promotions within the police

Page 9

16    department?    053106cc aa

17    A.    You must have read several of my campaign

18    speeches.  I agree.

19    Q.    Now, with regard to this oversight function

20    performed by the CAO and the public safety -- and we are

21    abbreviating CAO for David Singleton and public safety

22    for Guy Sapp, correct?

23    A.    Correct.

24    Q.    What are their specific charges that you have

Christopher A. Coons                11

1    given them in your discussion with them as to oversight

2    of the police department?

3    A.    Director Sapp's charge was to provide general

4    oversight of the whole department.  This is not just

5    police, I would remind you, but also EMS, 911 or the

6    emergency communications and the Office of Emergency

7    Management.  It's a substantial department with roughly

8    600 full-time personnel and operating budget that's about

9    47 percent of our total 230 million dollar budget.

10         So Director Sapp's charge is a fairly broad

11    one, which was to ensure that they are meeting their

12    budgetary targets, that they are operating

13    professionally, that internal conflict within the senior

14    staff was managed and that the team was focused on

15    policing, within the police department, that the senior

16    leadership team of the department was focused on

17    policing, not on what I had perceived to be a recent

053106cc aa

18    pattern of internal conflict.

19        Q.    When you say senior leadership, you are talking

20    about the senior staff now?

21        A.    Yes.

22        Q.    Sorry to interrupt you.

23                MR. GODDESS:    Were you done with your

24    answer?

Christopher A. Coons                    12

1                THE WITNESS:    Well, he had also asked about

2    CAO Singleton's general charge.    And I will simply be

3    restating, I think, that my charge to him with regards to

4    the police department was to ensure that they were

5    meeting their budgetary obligations, operating

6    professionally, but that the details of operations and

7    execution were left to the senior staff.

8    BY MR. MARTIN:

9        Q.    I'm going to try to understand the relationship

10    between the CAO and the director of public safety, if

11    any.

12        A.    The director of --

13                MR. GODDESS:    There was no question there.

14    I don't know if I'm objecting to you or my client here.

15    BY MR. MARTIN:

16        Q.    Let me try that again.    What relationship, if

17    any, is there between the CAO and the director of public

18    safety?

19        A.    The director is one of the CAO's many direct

053106cc aa

20  reports.  He meets with them weekly and reviews all

21  financial and operational issues that come up through him

22  through that chain of command.

23      Q.   Does the director of public safety have any

24  authority independent of the CAO to make decisions within

Christopher A. Coons                    13

1   the New Castle County Police Department?

2       A.   Yes, to the extent that every general manager has

3   the authority to make decisions within their department,

4   but not in contradiction of general direction offered by

5   the CAO.

6       Q.   In other words, though, does he have authority to

7   make a decision, I understand you said, it has to be

8   consistent with what the CAO has set fort, correct?

9       A.   Correct.

10      Q.   But does he have to go and get the blessing of

11  Mr. Singleton every time a decision is being considered?

12      A.   He shouldn't.

13      Q.   Should not.  What is your understanding, if any,

14  as to what specific authority the director of public

15  safety has in terms of decisions that can be made

16  independent of the CAO but, of course, consistent with

17  the CAO?

18              MR. GODDESS:  You are asking currently?

19              MR. MARTIN:  Yes.

20              THE WITNESS:  Perhaps you could clarify what

21  you are getting at.

22    BY MR. MARTIN:              053106cc aa

23         Q.   I want to understand what you understand would be

24    the director's authority to make decisions independent of

Christopher A. Coons                    14

1     the CAO.

2          A.   Independent of. Let me try again to see if I can

3     be helpful here. We've got general managers in every

4     department. The general managers I expect to work out

5     lots and lots of minor operating, budgetary,

6     interdepartmental issues without having to raise them all

7     the way up to the CAO and to me. So I could come up with

8     a dozen hypotheticals for you of things that I really

9     don't think should require the CAO's active knowledge or

10    involvement. I can't speak to how frequently Director

11    Sapp did or didn't, does or doesn't consult with the CAO.

12              I know that they meet weekly. The director,

13    for the last couple of months, has filed weekly reports

14    that are shared with all the general managers so that we

15    have a general sense -- all the general managers file

16    weekly reports that are internal updates on general

17    operating issues.

18         Q.   You consider Director Sapp to be a general

19    manager, correct?

20         A.   Correct.

21         Q.   And he's a general manager of the --

22         A.   Department of Public Safety.

23         Q.   Which includes the police department, EMS --

Page 13

053106cc aa

24    A.    Emergency communications and the Office of

Christopher A. Coons                    15

1    Emergency Management.  There is essentially four chiefs
2    and four divisions beneath the director of public safety.
3        Q.    And you said before that Mr. Singleton has a
4    number of direct reports.  And I think you characterized
5    them all as general managers; is that fair to say?
6        A.    Yes.
7        Q.    Can you give me some idea as to what, how many
8    and what departments are involved?
9        A.    The Department of Community Services, the
10    Department of Special Services, the Department of
11    Administrative Services, law, finance, human resources,
12    public safety.  I suspect I've overlooked one.
13            MR. GODDESS:  Don't look at me.
14        A.    Did I say land use?  Land use.
15        Q.    What is your understanding as to the CAO's role
16    with regard to making decisions within the New Castle
17    County Police Department?
18        A.    I expect the CAO's role in making decisions
19    within the police department to be very limited.
20        Q.    Very limited?
21        A.    Uh-huh.
22        Q.    Were you aware that Mr. Singleton rejected the
23    last group of promotions to sergeant within New Castle
24    County?

053106cc aa

Christopher A. Coons                16

1      A.    That's not correct.

2      Q.    That's not correct?

3      A.    We had a specific discussion about that.

4      Q.    Do you have an understanding that the promotions

5   that were made were at least initially rejected?

6      A.    I don't believe that's correct.  You are

7   referring to the most recent promotions?

8      Q.    Yes.  I believe there were approximately six.

9      A.    I believe there were three promotions to

10  lieutenant and three promotions to sergeant.  And I was

11  somewhat concerned that we follow my general direction

12  that those decisions that were made by the senior staff

13  and the acting chief not be changed by anyone in the

14  executive office or at the Government Center.  There was

15  apparently about a week delay for when they were

16  finalized by the leadership of the police department and

17  when they were announced.  And when I inquired as to what

18  the delay was, the chief human resources officer had

19  apparently looked at the list and said there needs to be

20  some more detailed internal documentation on your

21  decision-making process.

22          When I was given her explanation for that, I

23  understood she was simply trying to do her job to ensure

24  that the promotional decision, given the promotion

Page 15

053106cc aa

Christopher A. Coons                    17

1    decision seemed to produce litigation with some frequency

2    in the police context, were appropriately and thoroughly

3    documented.  But I have been assured that that list was

4    not changed.

5        Q.   What was your understanding, if any, as to the

6    role of senior staff before your administration in terms

7    of making promotions within the police department?

8        A.   I have been told -- but I don't know how correct

9    this is -- that they were minimally involved if at all,

10   that police promotions were handled almost entirely by

11   the chief in consultation with the CAO.

12       Q.   And that was your understanding that the chief

13   had to get clearance from the CAO before your

14   administration?

15       A.   That's my understanding.  And so to that point,

16   it was exactly because I am trying to set a different

17   course and direction in terms of involvement in the

18   details of operations of departments.  That's why I was

19   clear about the details of the most recent list.  I had

20   directed the CAO to be minimally involved in that.

21       Q.   Was it changed during your administration in

22   terms of the role of the senior staff with regard to

23   promotions?

24       A.   Well, I think it's important for the

Christopher A. Coons                    18

053106cc aa

1    promotions -- there is a whole series of processes in our
2    police department.  The selection of folks for training
3    opportunities, the selection of folks for promotion,
4    decisions about transfers, take-home cars, that in my
5    view should be made based on merit and professional
6    concerns rather than friendships or politics.
7              And so you invested a fair amount of money
8    in bringing in both the IACP and PERF, International
9    Association of Chiefs of Police and the Police Executive
10   Research Forum, to look at deployment within the
11   department, to look at the promotional process, to look
12   at the testing process, and to put in place a process,
13   particularly this most recent sergeant and lieutenant
14   testing process, an oral board that is as independent of
15   political or personal concerns as is possible.
16   Q.    Was there a specific guideline and direction that
17   you followed in order to have the senior staff involved
18   in promotions?  For instance, you mentioned PERF.  And I
19   have the most recent PERF report.  And I was going to ask
20   you about that in a few minutes.
21             Did you get any guidance from that
22   organization or any other organization in terms of
23   involving the senior staff with the promotions rather
24   than the, what you acknowledge was the previous matter,

Christopher A. Coons                    19

1    and that was the involvement almost exclusively of the
2    police chief and, perhaps, with the CAO.  And I'm
                        Page 17

053106cc aa

3    wondering what prompted that change, if any.

4        A.    Frankly, that was a suggestion by acting chief
5    McLaren is my understanding.  But it also strikes me as
6    common sense that one of the challenges the police
7    department faced in 2004, early 2005 was a senior staff
8    that had not been and actively engaged in making policy
9    decisions and that was not acting as a team.  I was
10   aware, as I think was everybody in the police community,
11   that there were some fairly intense divisions in the
12   senior leadership team in our department.  And involving
13   them in at least making recommendations about and giving
14   input on important decisions for the future of the
15   department is a critical strategy for building any sense
16   of ownership in the future direction of the department.
17   So it didn't require a professional study to give that
18   input.

19       Q.    You mentioned a PERF.  You are aware of the
20   recent study completed by PERF; is that correct?

21       A.    Yes.

22       Q.    And is that something that you requested in your
23   capacity as county executive?

24       A.    Yes.


Christopher A. Coons                    20


1        Q.    And were you aware that the analysis that was
2    done by way of the report dated April 7, 2006, indicated
3    that there were at least several sergeant positions that
4    were not filled?

053106cc aa

5    A.    I don't specifically recall that.  I did not

6   review that report in advance of today's deposition.

7    Q.    So you don't remember one way or another as to

8   whether --

9    A.    No.

10    Q.    The report says what it says.  And I'm not sure

11   we need to go through that?

12    A.    To give you some general context on the report,

13   the tough situation we faced was having an ongoing budget

14   deficit.  And we were looking for outside professional

15   advice on how to ensure that we were moving as many

16   officers on the street and to patrol as possible.  Those

17   are always contentious decisions in a department.  My

18   understanding was the director and acting chief thought

19   this was a good path forward for helping make that

20   decision.

21    Q.    The PERF study?

22    A.    Yes.

23    Q.    Speaking of staffing, what is your understanding,

24   if any, as to the staffing of the New Castle County

Christopher A. Coons                    21

1   Police Department since July 1 of last year?

2                MR. GODDESS:  Objection.  That's too vague

3   for a fair answer.

4                MR. MARTIN:  You may answer.

5                MR. GODDESS:  What is your impression of

6   staffing; that's the question?

053106cc aa

7          MR. MARTIN:  Yeah.  You can interpose an
8    objection, but that doesn't take him off the hook in
9    terms of providing a response.
10         THE WITNESS:  Are you asking about the
11   adequacy of staffing levels?
12   BY MR. MARTIN:
13     Q.   Yes, sir.
14     A.   Or quality and caliber of the staff?
15     Q.   No, the accuracy of the numbers of officers out
16   on the street.
17     A.   There have been consistent concerns expressed by
18   the general populous and by my senior leadership team and
19   by me about the number of officers that we are able to
20   put on patrol in response to calls for service.
21     Q.   Okay.  Are you aware, for example, that since
22   July 1 of last year the police department lost 19
23   officers?
24     A.   Yes.


Christopher A. Coons                    22

1     Q.   And that was addressed somewhat in December, was
2    it not, with regard to seven officers being appointed?
3     A.   Yes.  You are referring to the so-called ready
4    cop class?
5     Q.   Yes.
6     A.   That's partly why we adopted that approach was to
7    meet some of the hard vacancies.
8     Q.   Let me ask you some specific questions about the
                        Page 20

053106cc aa

9    complaint.  I'll give you a copy.  It was marked during
10   Corporal Navarro's deposition as Navarro 1.  Let me
11   direct your attention to Paragraph 10.  That first
12   sentence referring to the New Castle County police
13   directives, are you familiar with the New Castle County
14   police directives?

15       A.    Not specifically, no.

16       Q.    Was it your understanding that the chief of
17   police has the discretion to choose whomever he or she
18   desires for promotion as long as that officer is ranked
19   as one of the top five officers in the listing?

20       A.    That's what this states, the document that's in
21   front of me, that's correct.

22       Q.    Well, wait a minute.  To be fair, this is a
23   complaint.  And I don't ask you to accept anything on its
24   face.  I'm asking if you have knowledge.

Christopher A. Coons          23

1        A.    It is my general understanding that the
2    established practice of the New Castle County merit
3    system is that each of the general managers, which at
4    that point included the chief of police, has the
5    opportunity to select any one of the top five ranked
6    candidates in a certified list merit system promotion
7    process, yes.

8        Q.    Now, you just referred to the chief of police as
9    a general manager.  Is that your understanding of the
10   current situation with the chief of police or the acting

Page 21

053106cc aa

11    chief of police?

12        A.    I believe the acting chief or chief still retains

13    this ability, meaning the capacity to choose from among

14    the top five in a certified list, yes.

15        Q.    And as we understood from your earlier testimony,

16    that selection process would be subject to approval of

17    the director and the CAO; is that fair to say?

18        A.    Restate.

19        Q.    You agreed that the chief of police has the

20    authority to promote someone to the top of the list, the

21    certified listing that is available, correct?

22        A.    Yes.

23        Q.    Is it my understanding that the selection of the

24    candidate or candidates, in plural, to be promoted would

Christopher A. Coons                    24

1    be subject to the approval then of the director and the

2    CAO?

3        A.    My sense is that any promotion such as this is

4    subject to review by whomever is above them in our chain,

5    whether it's the CAO or general manager, for compliance

6    with budgetary restrictions or for general

7    appropriateness in terms of not violating any

8    constitutional protections.  But it should not be subject

9    to the specific approval, if that's what you are asking,

10    of the CAO.

11        Q.    You are distinguishing specific approval versus

12    kind of a veto power?

053106cc aa

13    A.    That's correct. Let's take a different
14    department. If another general manager came in and said
15    I have submitted a requisition. You've released. I have
16    gone through merit process. Here's my selection for the
17    new assistant county engineer. It is not my expectation
18    that the CAO gets involved in reading individual reports,
19    looking at the resumes, getting into the background. His
20    role simply is to review and say, actually, no, you do
21    not have the budget authority for another position here
22    or there seems to be some obvious problem. You had four
23    candidates who happened to be females and you chose the
24    fifth that happens to be male in a department where there

Christopher A. Coons                    25

1    no females in senior leadership. Could you, please,
2    articulate a reason why you did that. Those are the sort
3    of oversight questions I would expect the CAO to be
4    asking about the promotion process. I would not expect
5    him to be involved in any of the details of a promotional
6    decision way down in a department.
7        Q.    Okay. And while we were on that topic, does the
8    CAO got involved in the promotions of the other
9    departments that you set forth?
10    A.    Only in the way I just described. Lots and lots
11    of documents come through the CAO for review. But that's
12    mostly for signature. For example, on a weekly basis, I
13    sign -- yes, I'm making a gesture -- I sign a stack of
14    documents that's six inches high from every department

053106cc aa

15    for all sorts of things, grant funding for police

16    functions, sewer agreements, land development, record

17    plans, all sorts of different documents. Every one that

18    comes to me for signature has gone through the CAO for

19    his review.

20            But in almost every case, that simply means

21    his non-objection. He's aware that this is in process.

22    But he is not going into and reviewing the details of

23    every single financial transfer, contract, agreement or

24    grant. That's in the nature of any large bureaucratic

Christopher A. Coons            26

1    organization.

2        Q.    What is your understanding as to the extent of

3    your CAO's involvement in the police promotional system?

4        A.    My understanding is it's fairly minimal.

5        Q.    Do you know whether the CAO has access to the

6    personnel files of those candidates who were seeking

7    promotion?

8        A.    I don't know that. I would assume if he

9    requested it, he would. But I don't know why he would be

10    requesting that.

11        Q.    Do you have any idea whether he reviews the

12    personnel files?

13        A.    I don't.

14        Q.    Now, a moment ago I think you characterized the

15    chief of police as being a general manager. Is that your

16    current thinking about the role of the chief of police or

Page 24

053106cc aa

17    the acting chief of police?

18        A.    No.  The director is the general manager.

19        Q.    When did that role change?

20        A.    I don't recall the specific date.

21        Q.    Was that by way of county ordinance?

22        A.    Yes.

23        Q.    And what is your understanding as to that county

24    ordinance?

Christopher A. Coons                    27

1         A.    That it clarified that the existing position of

2    director of public safety had oversight of the department

3    of police, EMS, emergency communications and emergency

4    management, and that each of those four departments were,

5    essentially, on an equal footing as direct reports to the

6    director of public safety.

7              Under the previous administration, the

8    position of director of public safety had been eliminated

9    for, I think, roughly six years.  And the chief of police

10    made the head of the overall department of public safety

11    and the head of EMS, 911 and OEMS made to report to the

12    chief.  Before the end of the Gordon administration, they

13    had reinstalled the position of director of public safety

14    but did not fill it.  This ordinance was simply

15    clarifying that we were restoring the previous alignment

16    of the department.

17        Q.    Do you have any understanding as to whether your

18    CAO objected to the promotion of Corporal Navarro?

053106cc aa

5  underway.  I got some calls from members of the general

6  assembly saying they had been contacted by a lobbyist who

7  had been retained by our chief.

8      Q.   And this is before you took office as county

9  executive?

10     A.   No.  This would have been, I think, in January.

11     Q.   I want to talk a little bit about your

12  relationship with Chief McAllister.  How did you feel

13  about Chief McAllister when you took office in January of

14  2005?

15            MS. ALLEN:  Jeff, I'm just going to object

16  and we can, actually, go off the record if you want.

17            (Thereupon, a discussion was had off the

18  record.)

19            THE WITNESS:  I can provide a general answer

20  to the question without -- feel free to caution me.  I

21  have done my level best to observe that agreement and to

22  not engage in anything that could be misunderstood as

23  disparaging.

24            Chief McAllister and I had met both while I

Christopher A. Coons                    37

1  was council president and, I believe, once when I was

2  executive.  And I tried, as I did with other general

3  managers, to set a general tone.  While I was council

4  president, he had undertaken a couple of initiatives I

5  thought were very positive and I complimented him on,

6  particularly with regard to diversity and Spanish

Page 34

053106cc aa

7    language training, release of data to the public through

8    the internet.  There were a couple of things that he

9    wanted to undertake that I supported.

10              But there were also some general concerns

11   about the police department which I think I laid out

12   previously.  I will go back to one of the first things I

13   said in this deposition, which was my objective in

14   bringing CAO Singleton and Director Sapp was to have

15   folks who had not been involved in the previous couple of

16   years of conflict and controversy in the county who had

17   strong professional experience and reputations to look at

18   every one of the general managers and departments, in CAO

19   Singleton's case, and give them a fair review of their

20   performance, their capacities, their operations so that

21   any decisions going forward about the government wouldn't

22   be, would be fair, would be based on a sort of non

23   personal reassessment of the strengths and the skills of

24   the general managers.



Christopher A. Coons                    38

1    BY MR. MARTIN:

2        Q.   Well, I appreciate that explanation.  Let me go

3    back to the complaint and pick up where I left off with

4    regard to the Delaware Today article.  Did you or anyone

5    in the administration attempt to stop the publication of

6    that article?

7        A.   No.

8        Q.   Now, with regard to your relationship with

Page 35

053106cc aa

9     Miss Levine, she had been your PIO for what period of

10    time?

11        A.    I don't recall exactly what her start date was.

12    I think it was March of '05.  She came in later in the

13    formation of my senior team.  Rich Przywarea had been my

14    chief of staff from the outset and had led the transition

15    process of hiring senior folks.  David, I believe, was on

16    board in January.  My recollection is Allison started,

17    was one of the later folks to get underway, probably mid

18    March, late March perhaps.

19        Q.    You just referred to your transition team; is

20    that correct?

21        A.    Uh-huh.

22        Q.    How many people did you have --

23        A.    Yes, I should say.

24        Q.    How many people did you have on your transition


Christopher A. Coons            39


1     team?

2         A.    Over 70.

3         Q.    I won't ask you to list them then.  You said you

4     brought David Singleton in in January?

5         A.    Yes.  Freed Sears and Lisa Blunt Bradley

6     cochaired the transition effort and helped with the

7     selection of senior folks such as David.

8         Q.    And how about David Baylor, was he on your

9     transition team as well?

10        A.    He served on one of the committees.  I believe it

053106cc aa

2    treated with respect.  And I simply asked whether she had

3    any concerns or had felt she was the subject of any

4    inappropriate comments or commentary.

5        Q.    Did you mention Navarro's name?

6        A.    I don't recall whether I did at that point.

7        Q.    But you did at some subsequent point?

8        A.    I, at some point, said that a friend within the

9    department had made a comment that she, perhaps, should

10   be mindful that she had friendships that people might try

11   to press beyond a professional limit.  She reassured me

12   that she felt comfortable that she could handle that.

13   That was something she was fully aware of and capable of

14   managing appropriately.  I said great.  I just wanted to

15   give you the opportunity to raise it if you had any

16   discomfort.

17       Q.    Was she referring to Trinidad Navarro?

18       A.    At some point she had said they were friends and

19   had known each other for a long time and she felt

20   comfortable that it was a friendship that she understood.

21       Q.    Was there any suggestion that this matter should

22   be investigated by internal affairs?

23       A.    No, not that I recall.

24       Q.    Did you and Director Sapp develop a program

Christopher A. Coons                    51

1    called Crime Mapping?

2        A.    Not specifically Director Sapp and I.  I don't

3    want to take credit for others' work.  It is something

Page 47

053106cc aa

4   that I have encouraged and supported. But there is, most

5   of the work of developing and rolling out Crime Mapping

6   was done by people within information services and the

7   police department.

8      Q.   I think recently in one of your public addresses

9   you acknowledged that you were approving 10 new positions

10  for the police department?

11     A.   I don't think that's quite accurate. And we have

12  struggled to communicate this accurately to the public.

13  I'll give an expansive answer if I might. I'm looking to

14  counsel. Because this has come up several times.

15          I have acknowledged previously that we have

16  had a challenge as a government, in my view, in both

17  balancing our books, dealing with our ongoing financial

18  challenges, and putting the number of police in service

19  that I think our public expects and needs. Getting the

20  PERF deployment study was a piece of answering the

21  question, are we using the sworn officers we have as

22  effectively as possible to deliver service to the public?

23          This year's budget we committed to putting

24  ten more police on the street. But that is a mix of five

Christopher A. Coons                52

1   new sworn officer positions, three civilian positions

2   that should allow the deployment to the street of sworn

3   officers, and two grant funded officers I believe.

4      Q.   Are these actually --

5      A.   So I believe our authorized strength increases by

Page 48

053106cc aa

6    just five.

7        Q.    And you will need budget approval from council
8    for that?

9        A.    We have received approval in the passage in the
10   annual budget.

11               MR. MARTIN:  Why don't we take a few minutes
12   and I'm going to look through here and see if there are
13   any other areas.

14               (Thereupon, a short recess was had.)

15   BY MR. MARTIN:

16       Q.    Just a few more questions.  First of all, let me
17   ask you to characterize your relationship with Lieutenant
18   Dru Outten.

19       A.    Lieutenant Outten has been a friend probably
20   eight to ten years.

21       Q.    Are you social friends?

22       A.    Yes.

23       Q.    So you have had dinner together before?

24       A.    On a few occasions.  To be specific, when I met

Christopher A. Coons                    53

1    my now wife, she was roommates with Mary Outten, who is
2    now Dru's wife.  They were both single at the time.  So
3    we got to know each other sort of in passing because we
4    were both in the same house on a few occasions.  I think
5    they stopped living together within a matter of a few
6    months and we've stayed in occasional contact since then.

7        Q.    Now, your professional relationship with
                        Page 49

053106cc aa

8      Miss Levine ended sometime in August of '05; is that
9   correct?

10      A.   Correct.

11      Q.   And what were the circumstances of that
12   termination?

13      A.   Technically, it was a resignation. But, again,
14   to answer the question a little more broadly, I thought
15   Allison had done a great job and I enjoyed working with
16   her. She had a good sense of humor and good work ethic.
17   I was very surprised at the allegations raised in this
18   complaint and was initially hopeful that, in some way,
19   this was a misunderstanding. As she put it, her quotes
20   were taken wildly out of context.

21           But as several folks, CAO Singleton and the
22   county attorney and I spoke with her about this in some
23   detail, I, with genuine regret, reached the conclusion
24   that she'd shown some real errors in judgment and that

Christopher A. Coons                    54

1    really the only appropriate path for her was to ask for
2   her resignation.

3           MR. MARTIN:  Thank you. That's all the
4   questions I have.

5                       EXAMINATION
6   BY MR. GODDESS:

7      Q.   Chris, there was a PIO retreat in May and you
8   said you gave opening remarks.

9      A.   I know I gave opening remarks to a PIO retreat.
                       Page 50

053106cc aa

10    I don't recall if it was specifically in May.  I think
11    Allison had more than one.  But there was one that I came
12    to just to try to give a general tenure, here is where we
13    are going as a government.  My comments were, generally,
14    similar to the things I said in my speech upon being
15    sworn in, which was teamwork, positive atmosphere, let's
16    move forward.
17       Q.   The one I'm referring, at least by the agenda,
18    was held in the Bear Library.  Does that help?
19       A.   Oh, then I did not attend that.  There was a
20    meeting in the HR Conference Room of PIO's that I
21    attended.
22       Q.   Did you attend the whole meeting?
23       A.   No.
24       Q.   Or just at the start?

55

1       A.   Maybe the opening half an hour I think.
2                MR. GODDESS:  That's all.  Thanks.
3                MR. MARTIN:  Any questions?
4                MS. ALLEN:  No.
5                MR. MARTIN:  Read and sign?
6                MR. GODDESS:  You have the opportunity to
7    read this transcript, basically, for accuracy of what the
8    reporter is doing but also a chance to review if you
9    grossly misstated something, not to make wholesale
10    changes, or to just waive the reading and signing of the
11    deposition transcript assuming it's basically accurate,
                        Page 51