# EXHIBIT 2

031006al jp

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORPORAL TRINIDAD NAVARRO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action |
| | ) Number 05-565 (GMS) |
| CHRISTOPHER A. COONS, | ) |
| individually and in his | ) JURY TRIAL DEMANDED |
| official capacity; GUY H. | ) |
| SAPP, individually and in | ) |
| his official capacity; and | ) |
| NEW CASTLE COUNTY, a | ) |
| municipal corporation, | ) |
| | ) |
| Defendants. | ) |

            Deposition of ALLISON TAYLOR LEVINE, taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:04 a.m., on Friday, March 10, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          On behalf of Plaintiff

        JEFFREY S. GODDESS, ESQUIRE
        ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
          919 Market Street, Suite 1401
          Wilmington, Delaware  19899-1070
          On behalf of Defendants Coons and Sapp


                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

                Allison Taylor Levine            2



1    APPEARANCES CONT'D:

2            MICHELE D. ALLEN, ESQUIRE
        MEGAN SANFRANCESCO, ESQUIRE

```
                               031006al jp
 3                    NEW CASTLE COUNTY LAW DEPARTMENT
                            87 Reads Way
 4                      New Castle, Delaware  19707
                        On behalf of Defendant New Castle County
 5
                  ALSO PRESENT:  TRINIDAD NAVARRO
 6

 7                          - - - - -

 8                       ALLISON TAYLOR LEVINE,

 9              the deponent herein, having first been duly

10              sworn on oath, was examined and testified as

11              follows:

12       BY MR. MARTIN:

13          Q.   Good morning.  My name is Jeff Martin.  I

14       represent the plaintiff in this matter, Trinidad

15       Navarro.

16                  I want to make sure I understand, call you

17       by your correct name.  Should I call you Ms. Taylor

18       Levine, Ms. Levine?

19          A.   Just Levine is fine.

20          Q.   Okay, thank you.

21          A.   Allison is even finer.

22          Q.   Okay, thank you, Allison.

23                  Could you give us your current address,

24       please?

                     Allison Taylor Levine            3
```

```
 1          A.   203 Waterview Drive, New Castle, 19720.

 2          Q.   And how long have you resided at that address?

 3          A.   Three and a half years.

 4          Q.   Do you anticipate continuing to reside at that

 5       address over the next couple of years?

 6          A.   I don't know.

 7          Q.   Okay.  With whom do you reside?
```

Page 2

031006al jp

14    the County Police at some point soon after I started.

15    And I was a routinely put on cop shifts, which is just

16    part of the regular practice at the News Journal.

17    Everybody takes a turn doing cop shifts.  So I would

18    communicate with Trini on reporting issues.

19        Q.   How would you characterize your relationship

20    from the time you met Mr. Navarro up until the time

21    you assumed your position as communications director

22    for the County?

23        A.   Friendly, casual acquaintances.

24        Q.   Did you have any impression as to how well

                       Allison Taylor Levine            24


1    Mr. Navarro was able to do his job?

2        A.   As a reporter, I thought he was very accessible

3    and always helpful, which was very important to a

4    reporter.

5        Q.   Did that change during your other positions?

6        A.   I don't understand the question.

7        Q.   You answered that question as you were a

8    reporter at the News Journal, and I wondered if your

9    understanding of his ability changed at all as you

10   went on to other positions?

11       A.   I had less interaction with Trini, I believe,

12   while I was at Public Health.  It picked up again when

13   I became the department communications director,

14   because I was dealing with the Office of the Chief

15   Medical Examiner, or I was, I was the spokeswoman

16   essentially for the OCME, and we sometimes overlapped

17   on homicide cases and would communicate about those.

18                   And no, it didn't change, he was still
                              Page 20

031006al jp

19    accessible and helpful and willing to work with me.

20        Q.    Do you recall that Trini ever called you to

21    congratulate you as you moved along in your career?

22        A.    I recall that when I received the position at

23    New Castle County, that we spoke on the phone about

24    another case related to OCME.  And I told him I was

Allison Taylor Levine                25


1     going to be coming to the county, and he said yes, he

2     had heard, and he was really looking forward to

3     working with me.  But I don't recall who initiated the

4     call.

5         Q.    Were you looking forward to working with him at

6     that point?

7         A.    Yes.

8         Q.    Did that change at all during your tenure as

9     the communications director at the county?

10        A.    I think that's a very broad question.  Could

11    you narrow it down?

12        Q.    Yeah, be happy to.  You said that you were

13    looking forward to working with him, as he was looking

14    forward to working with you when you began as the

15    communications director in March of 2005.  Correct?

16        A.    Yes.

17        Q.    Did your feeling change at all during your

18    tenure as communications director?

19        A.    After I had been on the job for a while, it

20    became clear that there was some tension between the

21    executive branch, between the administration and the

22    police department, and it became more challenging to

23    work with Trini, which I did not believe was through

Page 21

031006al jp

24     his own fault at the time.  I still found Trini to be

                    Allison Taylor Levine          26


 1     easy to reach, willing to step up and help me.  He was

 2     not a direct report, as none of the PIOs were direct

 3     reports to me, but he was one of the people who, when

 4     I was overwhelmed, I could call and ask for help.  It

 5     became more challenging, but I still enjoyed working

 6     with Trini.

 7        Q.  You mentioned that when you became overwhelmed;

 8     how often did you become overwhelmed when you were the

 9     communications director?

10        A.  The whole position was quite overwhelming.

11     Working for Chris is very, very demanding.

12        Q.  More so than you had anticipated when you

13     accepted the position?

14        A.  I anticipated it, I didn't necessarily accept

15     it, I guess.  The schedule that the administration

16     and -- well, that Chris and I had agreed upon was

17     tough to stick to, because he was accustomed to having

18     people available and working with him 14 to 20 hours a

19     day.  And he had a lot of requirements, and I often

20     called on the other PIOs for support.

21        Q.  What do you mean "he had a lot of

22     requirements"?

23        A.  Chris is a very active public speaker.  I was

24     writing for him between six and 10 speeches a week,

                    Allison Taylor Levine          27


 1     plus conducting events, writing a similar number of

                    Page 22

031006al jp

2  press releases, preparing a communication strategy,

3  dealing with daily meetings, plus media calls which

4  averaged between six and 12 a day, depending on what

5  was going on in the press, and attending events with

6  Chris.  And he expected a lot of a communications

7  director.

8      Q.  He expected you to attend many of the events?

9      A.  Yes.

10     Q.  Were you aware of that when you took the

11  position?

12     A.  Some of them.  Not quite as many as he --

13     Q.  I take it that your stipulation as to a

14  somewhat limited work schedule did not really pan out?

15     A.  He allowed me to stick to the hours, but the

16  workload was more than anybody could accomplish within

17  a reasonable work schedule, which was par for the

18  course with Chris.

19     Q.  What do you mean by that?

20     A.  Everybody was working 16, 18, 20-hour days, and

21  still not getting everything done that Chris wanted to

22  have done, including Chris.

23     Q.  All right, let me go back on a couple areas

24  that you mentioned in your answers.  You talked about,

                        Allison Taylor Levine              28


1  I think you said a clear tension between the executive

2  branch and the police department.

3      A.  Yes.

4      Q.  Is that right?

5      A.  Yes.

6      Q.  Can you describe what you're referring to?

031006al jp

7    A.    Chris Coons and Dave Singleton and Lynn Howard
8    and Nicole Majeski made it very clear that they were
9    not happy with how things were going in the police
10   department.  They were not happy with the chief, and
11   frequently that they were not happy with Trini.  And
12   there was an active investigation into the police
13   department from the time I started, pretty much.
14   There was also the hiring of the public safety
15   director, Guy Sapp.
16      Q.    What was your understanding, if any, as to the
17   role of Sapp with regard to the police department?
18      A.    He was supposed to clean it up.
19      Q.    Was he supposed to run it as well?
20      A.    I don't know.
21      Q.    And how was he supposed to clean it up?
22      A.    I don't know.
23      Q.    Was he supposed to get rid of the chief?
24      A.    Yes.

                    Allison Taylor Levine          29


1       Q.    And were there any plans put forth as to how
2    they would get rid of the chief?
3       A.    They were trying to solidify information that
4    showed he was doing things wrong.
5       Q.    Now, when you say "they," let's be clear.  This
6    is the core group, meaning Coons and the four or five
7    other people that you mentioned?
8       A.    Yes, it was primarily Chris, Dave Silverman,
9    and Guy Sapp, I believe, were the primary ones working
10   on that.
11      Q.    Dave Silverman?

                        Page 24

031006al jp

12      A.   Singleton.

13      Q.   I'm sorry.

14      A.   Excuse me.

15      Q.   That's what I thought you -- okay.  I'm sorry,

16   Allison, you said that they were trying to solidify

17   something, and I'm not quite sure what you meant by

18   that.

19      A.   They had information about, or I heard them say

20   they had information about the chief's wrongdoing, and

21   they were reviewing the information to determine

22   whether it was enough information to justify

23   terminating his employment and whether it would stand

24   up to council, before council.

Allison Taylor Levine                   30


1      Q.   What was your understanding, if any, as to what

2   the specific allegations of wrongdoing were?

3      A.   I didn't have much information about that.

4   What I heard was talk about the pay jobs fund, which I

5   don't fully understand, but it had to do with officers

6   who were paid to do jobs outside of their regular

7   duties, like directing traffic at parades and church

8   functions.

9      Q.   That was your understanding as to what they

10   were talking about?

11      A.   Yes.

12      Q.   Did you have a further understanding that there

13   was an issue regarding an alleged DELJIS violation?

14      A.   Yes, I did hear about that.

15      Q.   And was this another of the grounds that they

16   were using to -- they were looking at in order to

Page 25

031006a1 jp

17    terminate the chief's employment?

18      A.    I don't really know.

19      Q.    All right, a moment ago when I asked you about

20    what the core group was doing, you said they were not

21    happy with the chief.  We've explored some of that.

22    You said also that they were not happy with, or words

23    to that effect, I think, with Trinidad Navarro.  Is

24    that fair to say?

                Allison Taylor Levine              31


1      A.    Correct.

2      Q.    Okay.  Can you tell me why, what their

3    reasoning was for not being happy with Corporal

4    Navarro?

5      A.    I didn't really understand all the reasons.  I

6    often said to Chris, "When there's too much going on,

7    Trini is one of the few people I can ask for help and

8    count on to get something done."

9      Q.    What kind of response, if any, did Chris give

10    you?

11      A.    I don't remember.

12      Q.    Did it appear that Chris, like the others, was

13    upset with Trini Navarro?

14      A.    Yes.  They believed that he had been involved

15    in criminal activities.

16      Q.    That Corporal Navarro was involved in criminal

17    activities?

18      A.    Yes.

19      Q.    Can you be more specific?

20      A.    They believed that he had been involved with

21    campaigning on county time.

                    Page 26

031006a1 jp

22    Q.   And this campaigning, was this the campaign

23    that resulted in the election of Chris Coons?

24    A.   I don't know.  I don't know.

Allison Taylor Levine      32

1    Q.   Okay.  You don't have any further understanding

2    as to when this campaigning may have been done?

3    A.   It was, I believe it was done under the

4    Gordon/Freebery administration, but I didn't really

5    know what it, what exactly it pertained to.

6    Q.   All right.  Other than that, were there any

7    other allegations of criminal wrongdoing for Corporal

8    Navarro?

9    A.   There were lots of rumors, but nothing that I

10    heard that was specific.

11    Q.   Where did you hear the rumors from?

12    A.   I don't recall.

13    Q.   Did you hear any rumors from Chris Coons?

14    A.   I don't recall.

15    Q.   Do you recall any of the rumors?

16    A.   There were some rumors that Trini had been

17    involved in a coverup in Las Vegas, but I don't

18    remember where that came from.

19    Q.   Is it fair to say, though, that you heard that

20    rumor from someone in the core group?

21    A.   I don't think I said that.

22    Q.   I'm not sure you did.  I'm asking you that

23    question.

24    A.   I just don't know where I heard that from.

Allison Taylor Levine      33

Page 27

031006a1 jp

1    Q.    How many times did you have an opportunity to
2    speak with Chris Coons about Trini Navarro?
3    A.    I don't remember.
4    Q.    More than a few times?
5    A.    A handful probably.
6    Q.    During that time, do you recall that Chris
7    Coons ever said anything positive about Trini Navarro?
8    A.    I don't remember.
9    Q.    Do you recall anything that Chris Coons told
10   you about Trinidad Navarro?
11   A.    He was upset on an occasion when Trini didn't
12   tell us about some media contact.
13   Q.    Was that the media contact with Cris Barrish at
14   the News Journal?
15   A.    I don't remember.  There were several things
16   that came up.  I don't remember what he specifically
17   talked about.
18   Q.    You said "there were several things that came
19   up."  What do you mean by that?
20   A.    There were a couple of specific media items.
21   One was the story about the chief in Delaware Today.
22   There was a story about a crossing guard, Elsie or
23   Elise Poore, P-o-o-r-e, in which the chief was quoted,
24   and the Cris Barrish contact.

                          Allison Taylor Levine            34


1    Q.    A moment ago you said that several things came
2    up.  Were you suggesting they came up at one time or
3    over a course of your conversations with Chris Coons?
4    A.    I don't remember.
5    Q.    You believe that Chris Coons was not happy with
                          Page 28

031006al jp
9   me, near the State Hospital.

10   Q.   Okay.  Do you recall approximately how long you

11   met?

12   A.   About an hour.

13   Q.   And when was this meeting in relation to when

14   you had this telephone call with Corporal Navarro?

15   A.   The following morning.

16   Q.   Do you recall any of the discussion you had

17   with Corporal Navarro as of the time?

18        MS. SANFRANCESCO:  I'm sorry, place an

19   objection.  I just wanted to clarify one matter.

20             Earlier when this case was first filed you

21   had, Jeff, you had talked to the county attorney Gregg

22   Wilson about the fact there was no tape recording of

23   the conversation.  We had sent a letter to you about

24   two days ago.  I just want to confirm for the record

                    Allison Taylor Levine          42


1   there is no tape recording and no transcript of that

2   conversation.

3        MR. MARTIN:  That's correct.  And I'm

4   sorry, I believe the letter said call if there is or

5   something, and I've been in depositions, but there is

6   not.

7        MS. SANFRANCESCO:  Thank you.

8   BY MR. MARTIN:

9   Q.   Okay.  Do you recall what was discussed at that

10   meeting?

11   A.   Yes.

12   Q.   Okay, can you tell us in as much detail as you

13   can recall?

Page 35

031006al jp

14    A.    It was a very long conversation.  I arrived

15    first.  I had bought a muffin and something to drink

16    and sat down.  I was doing some work while I was

17    waiting for Trini.  And he arrived, and I asked him if

18    he wanted to get something to drink or eat.  And he

19    said no, he had a knot in his stomach because he was

20    so upset.  And he was talking about the sergeant

21    promotion.  He was afraid he wasn't going to get

22    promoted because the number of positions for sergeant

23    had been reduced.

24              And I didn't really understand -- at that

Allison Taylor Levine        43


1    point I didn't know that sergeant was the next step.

2    I didn't understand the process, so I did not really,

3    I think until that day, understand that you went from

4    corporal to sergeant.  I had overheard somebody

5    talking earlier in the week or the month about a

6    number of positions being changed, but I didn't really

7    know what it meant.

8    Q.    When you say you overheard someone, are you

9    talking about within the core group?

10   A.    I don't know.

11   Q.    And was there any explanation given for the

12   number of openings being changed?

13   A.    I don't know.  I heard, just in passing I

14   think, somebody saying the number was changing.

15   Q.    But you don't recall who that was?

16   A.    No.

17   Q.    Okay.  Did you relay that to Corporal Navarro

18   during your meeting?

Page 36

031006al jp

19    A.    I don't remember.

20    Q.    Okay.

21    A.    I might have said that I had heard something

22    was changing, but I don't -- I didn't know any more

23    than that, so I wouldn't have said any more than that.

24    Q.    Okay.  What else did you discuss?

Allison Taylor Levine                    44


1    A.    We went on to talk about the promotions for a

2    while, because Trini was explaining to me the process

3    and the number of candidates.  And at some point I

4    said, "Well, the decision hasn't been made yet, right?

5    So you could still get this."  I think I was

6    encouraging him not to worry about it until the

7    decision was made.

8                And he was explaining to me that there was

9    an African-American man, I think his name was John, or

10   John Wagner, something like that, who he felt was

11   going to get that promotion rather than him because

12   the guy was an African-American man who had not

13   received a promotion previously.

14               So I asked about when the next time would

15   be, even if he didn't get it on this occasion, which I

16   didn't take as a definite yet, when would the next

17   time be that he could be considered for a promotion.

18   And I don't remember what the answer was to that, but

19   it was something he wasn't happy about.  He didn't

20   want -- that wouldn't work for him for some -- I can't

21   remember if it was the tests didn't -- I don't know

22   what the reason was.  But that wasn't good.

23               So I inquired about some other options.

Page 37

031006al jp

24    Q.    Did you say at some point that you felt he had

Allison Taylor Levine                45

1    a good chance of being promoted because of his strong

2    years as a PIO?

3    A.    I don't remember.  I didn't know if he had a

4    good chance or not.

5    Q.    Go ahead, I'm sorry to interrupt you.

6    A.    At some point he said that he just wanted to be

7    promoted.  He wanted to be out of the PIO position.

8    And he was convinced he was not going to get this

9    promotion.

10          So I said, "Well, you know, if you really

11    want to just get out of that position, then what are

12    the other options?"  Because I didn't know.  I asked

13    some questions about whether it was possible to move

14    laterally.  He said that it would be embarrassing.  He

15    said that never before had a PIO left the PIO position

16    without being promoted, and to do that would be a slap

17    in the face if he had to leave the PIO position

18    without being promoted to sergeant.

19          And I inquired about other options,

20    because he was saying he was really unhappy.  And I

21    didn't know what the other possibilities were, so I

22    asked some questions about whether he could -- if it

23    would work -- if he even wanted to stay in the police

24    force, if he wanted to move to another part of the

Allison Taylor Levine                46

1    county, if he wanted to still be a police officer but

2    could he go to the state or city.  I just was asking

Page 38

031006a1 jp

3    what the options were.

4              And he explained to me that there was the

5    county, he had -- he was close to having his

6    retirement and he could not change without interfering

7    with his timing for retirement.

8    Q.   So he told you that he wanted to get out of the

9    position as PIO?

10   A.   Yes.  And he said he didn't really -- he said

11   he just wanted to be promoted.  He just wanted to be

12   back on the street.  He recognized that it was a plum

13   job, that he could be at home with his family, he had

14   a baby, he could be at home with her more.  But it was

15   just too much.  He'd been in there too long, it was

16   too hot between the political stuff.  So that's when I

17   was asking about the other options.

18   Q.   Do you recall suggesting to Trini that he might

19   want to transfer out of that PIO position to another

20   position?

21   A.   I asked if it was something he would want to

22   do.

23   Q.   Okay.  Do you recall saying something to the

24   effect that it would be good to transfer so that

                      Allison Taylor Levine          47


1    you're not being labeled as being on a particular

2    team?

3    A.   I think I said maybe would he be more

4    comfortable.  I think I was posing it as a question,

5    would he be more comfortable in a position that was

6    less in the midst of the political stuff.  Because

7    that's what he was most concerned about.
                      Page 39

031006al jp

 8    Q.   And you knew that the politics issue was
 9    important to his career, did you not?
10    A.   I didn't know what impact it had on his career.
11    I knew that from what he said that he was unhappy in
12    the position because of the politics.
13    Q.   Did you tell Trini during that meeting that the
14    county executive did not like him?
15    A.   I don't recall.
16    Q.   Do you recall stating that Trini would be on
17    the losing team if he continued to stay on the
18    McAllister team?
19    A.   I remember saying that the chief was going to
20    lose.  I don't remember if I said the "McAllister
21    team" or not.
22    Q.   And what did you mean by McAllister will lose?
23    A.   I believed that the chief would ultimately
24    either resign or be removed from his position.  During

                    Allison Taylor Levine            48


 1    that conversation -- should I continue?
 2    Q.   Please.
 3    A.   Trini also told me about his grand jury
 4    testimony.  He said that his attorney had advised him
 5    that he had not participated in any illegal
 6    activities.  He told me that he had done some
 7    campaigning on county time and in uniform, primarily
 8    soliciting help from other police officers.  And this
 9    came up because we were talking about the negative
10    rumors that surrounded the chief and him, the chief
11    and Trini.  And he volunteered, he said, "I'll tell
12    you exactly what I told the grand jury."  And he told
                            Page 40

031006a1 jp

13    me what things he did. And he said that his attorneys
14    had told him he hadn't done anything wrong, anything
15    illegal.
16        Q.    When you met with Trini at the Dunkin' Donuts,
17    did you talk about the rumors regarding his
18    involvement in an investigation of a murder in Las
19    Vegas?
20        A.    I told him -- he asked me specifically what
21    negative rumors were there about him. And I said
22    something along the lines of, "I hope to God it's not
23    true, but this is one of the rumors I'm hearing, that
24    you were actually in Las Vegas." And I asked him, I

                    Allison Taylor Levine            49


1    said, "Could you just tell me personally, you know, if
2    it's not true, tell me it's not true and I'll believe
3    you and we'll put it away. I'll never worry about it
4    again."
5                And he said it was not true. I told him I
6    wanted to trust him and that there were just these
7    things floating around out there that I wanted to know
8    the answer to.
9        Q.    When you and Trini talked about the process for
10    selecting a sergeant and the process for having
11    openings, do you recall making a statement to the
12    effect that, "Well, that's how politics works"?
13        A.    I don't remember making that statement in that
14    context. I may have used that turn of phrase, but I
15    don't believe that politics plays a role in the
16    promotion process, so I don't think I would have said
17    that in that context.

                    Page 41

031006al jp

18    Q.   Do you recall telling Trini at the time you met
19    at the Dunkin' Donuts that you had several
20    conversations with chief -- or the county executive
21    and that you had told Chris Coons that Trini is one of
22    the few people who you can depend upon to get the job
23    done?
24    A.   Yes.

                    Allison Taylor Levine            50


1     Q.   Do you recall telling Trini during your meeting
2     that you felt that he had done an excellent job with
3     the media going back to the days when you were with
4     the News Journal?
5     A.   Yes.  I don't know if I said it on that
6     occasion at the Dunkin' Donuts, but I know I said it
7     to him at some point or another.
8     Q.   Okay.  You told us previously I believe about
9     Chris Coons saying that he did not like Colonel
10    McAllister.  Is that correct?
11    A.   Yes.
12    Q.   Do you recall that Annie Coons did not like
13    Colonel McAllister?
14    A.   I never spoke directly with Annie about that.
15    Q.   Did Chris Coons tell you that his wife did not
16    like McAllister?
17    A.   I remember that I knew that Annie did not like
18    him.  I don't remember whether I heard that, though.
19    Q.   And was it simply a do not like, or were there
20    stronger words used?
21    A.   I don't remember.
22    Q.   Do you recall Chris Coons saying at one point
                          Page 42

031006al jp

23    or another that Corporal Navarro will never be

24    promoted?

                    Allison Taylor Levine            51


 1        A.    No, not at all.  I recall reporters from the

 2    News Journal calling me to tell me that Trini told

 3    them that.

 4        Q.    That Trini told the reporters what?

 5        A.    That I said that Chris said he would never be

 6    promoted as long as he was county executive.  But I

 7    definitively did not say that.

 8             MR. MARTIN:  Okay, off the record a

 9    moment.

10             (Discussion held off the record.)

11    BY MR. MARTIN:

12        Q.    All right, Allison, I want to pick up,

13    following the meeting that you had with Trini Navarro

14    on or about June 29, 2005, did you have any further

15    contact with Trini Navarro?

16        A.    I had some routine dealings, but I don't recall

17    specific issues or conversations.

18        Q.    All right.  Did you tell anybody about your

19    meeting with Trini Navarro on or about June 29?

20        A.    I told -- I had told, before I went, I had told

21    somebody in the executive office, I don't know if it

22    was Chris or Dave Singleton.

23        Q.    Before you went to the meeting with --

24        A.    Yes, I told them I was going to meet with him

                    Allison Taylor Levine            52



                    Page 43

031006al jp
1   because he was upset and wanted to talk.

2       Q.   And you're not sure who you told, it was either

3   Chris or Dave or someone else?

4       A.   It was, it was either Chris or Dave, but I

5   don't remember who.

6       Q.   Was there any response from that individual as

7   to --

8       A.   "Just be careful."

9       Q.   Okay.  What did you understand that to mean?

10      A.   They didn't trust Trini.

11      Q.   And these were the reasons that you had

12  previously set forth, or were there other reasons?

13      A.   I think -- I don't know.  I don't know why.  I

14  don't know other reasons why.

15      Q.   All right.  And how long did you continue to

16  work at the county?

17      A.   Until the day I was fired.  I think it was

18  August 9th, approximately.

19      Q.   And by whom were you fired?

20      A.   Dave Singleton, at the request of Chris Coons.

21  Lynn Howard was also in the room.

22      Q.   Was Chris Coons not available that day?

23      A.   He was not there.  I don't know where he was.

24      Q.   What was discussed?

                    Allison Taylor Levine            53


1       A.   I had -- that was a Tuesday.  I had been off on

2   Monday, which was previously scheduled because my

3   parents were in town.  I had been doing some work in

4   the morning.  I was called in, Dave Singleton asked me

5   to come into his office, and Lynn Howard was there.

                        Page 44

031006al jp

20    you not to trust him, you were going on a one-on-one
21    meeting, and perhaps in hindsight their advice was
22    right.
23        A.    Is that a question?
24                MR. MARTIN:  It's more of an argument, I

                    Allison Taylor Levine              82


1    think.
2        Q.    Well, thinking back on it, is that -- yeah,
3    there's no way to frame that a question.
4        A.    You could make that argument about working for
5    Chris Coons, too, couldn't you?
6                MR. GODDESS:  I'll withdraw the question,
7    good objection.  Keep the record going formal.
8                I have nothing further.  Thanks.
9    BY MS. SANFRANCESCO:
10        Q.    Allison, I just want to clarify something for
11    the record.  When you had that conversation with Al
12    Mascitti about what you had allegedly said to Corporal
13    Navarro, did you tell Mr. Mascitti that you had, in
14    fact, never said that?
15        A.    Yes, I did.
16        Q.    Okay.  You also talked earlier about the fact
17    that Chief McAllister instructed Corporal Navarro not
18    to tell you about certain media events.  Do you recall
19    that conversation?  Do you recall us talking about
20    that here at the deposition?
21        A.    Yes.
22        Q.    Okay.  Do you have any idea as to why the chief
23    instructed Corporal Navarro not to tell you about
24    certain media events or media events in general?

                    Page 69

031006a1 jp
Allison Taylor Levine                83

1    A.    I could speculate.

2    Q.    I want you to tell me what your understanding

3    is as to why.

4    A.    My understanding is that the county executive

5    and Chief McAllister were engaged in a vicious pissing

6    match, and neither of them wanted to give the other

7    any opportunity to look good, including in the media.

8    And the chief wouldn't want Trini to tell me about

9    these media stories because it would give Chris, the

10   county executive, the opportunity to either chime in

11   on the media stories or stop them.

12   Q.    And did Corporal Navarro ever relate to you

13   that that was, in fact, what was going on on Chief

14   McAllister's part?

15   A.    We discussed a couple of times that there was a

16   clear pissing match going on between the chief and the

17   county executive.  But we didn't -- he never said

18   that's what the chief's doing.

19         MS. SANFRANCESCO:  Nothing further.

20   BY MR. MARTIN:

21   Q.    I have a couple of follow-ups, Allison, very

22   few, I'm pleased to say.

23         You answered Mr. Goddess with regard to

24   the promotional issue and made a statement something

Allison Taylor Levine                84

1    to the effect that a fewer number of sergeants were

2    needed, instead they wanted to increase the number of

3    patrolmen, men on the street, or police officers on
                          Page 70

031006a1 jp

4      the street.  Is that --

5       A.    I think that was what it was.

6       Q.    All right.  Do you know from whence that came?

7      Was this county policy or --

8       A.    I don't remember.

9       Q.    But you heard this during your tenure as the --

10     at the county you heard them, you heard somebody say

11     that this is what they wanted to do, increase the

12     number of patrol officers on the street and therefore

13     fewer number of sergeants would be needed?

14      A.    I believe so.

15      Q.    Okay.

16      A.    That was my, my general understanding.

17      Q.    Okay.

18      A.    Of why the number of sergeant positions was

19     reduced.

20      Q.    All right.  And the time period was at the end

21     of the fiscal year going into fiscal year, or the new

22     fiscal year July 1?

23      A.    I don't really recall the specific timing.

24      Q.    Okay.  You also reference some meetings with

                        Allison Taylor Levine        85


1      PIOs, the PIOs that may not have been your direct

2      reports but were also county PIOs, you enumerated

3      seven or eight of them, correct?

4       A.    Correct.

5       Q.    Isn't it fair to say that you, a couple of your

6      meetings, if not more, the purpose was to develop

7      plans as to how to cover or react to the upcoming

8      Gordon/Freebery trial?

                        Page 71