# EXHIBIT 3

031006dm jp

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,    )
                             )
       Plaintiff,           )
                             )
     v.                  ) Civil Action
                             ) Number 05-565 (GMS)
CHRISTOPHER A. COONS,        )
individually and in his      ) JURY TRIAL DEMANDED
official capacity; GUY H.     )
SAPP, individually and in    )
his official capacity; and   )
NEW CASTLE COUNTY, a         )
municipal corporation,      )
                             )
       Defendants.         )

        Deposition of DAVID McALLISTER, taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 3:43 p.m., on Friday, March 10, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:

       JEFFREY K. MARTIN, ESQUIRE
       MARGOLIS EDELSTEIN
         1509 Gilpin Avenue
         Wilmington, Delaware  19806
         On behalf of Plaintiff

       JEFFREY S. GODDESS, ESQUIRE
       ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
         919 Market Street, Suite 1401
         Wilmington, Delaware  19899-1070
         On behalf of Defendants Coons and Sapp

               WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477

             David McAllister         2

1   APPEARANCES CONT'D:

2        MICHELE D. ALLEN, ESQUIRE
         JUDITH A. HIDLICK, ESQUIRE

031006dm jp
NEW CASTLE COUNTY LAW DEPARTMENT
87 Reads Way
New Castle, Delaware  19707
On behalf of Defendant New Castle County

ALSO PRESENT:  TRINIDAD NAVARRO

- - - - -

DAVID McALLISTER,

the deponent herein, having first been duly

sworn on oath, was examined and testified as

follows:

BY MR. MARTIN:

Q.   Afternoon, sir.  My name is Jeff Martin.  I am

the attorney for Trinidad Navarro in a claim filed

against Christopher Coons, Guy Sapp and New Castle

County.

First, let me ask how I may refer to you

during the course of this deposition?

A.   David is fine.

Q.   All right, Colonel.

A.   That works also.

Q.   Let me first get your -- well, let me ask you.

Have you been through the deposition process before?

A.   I have.

David McAllister                    3

Q.   Okay.  If you need to take a break at any time,

please just let us know and we won't even ask, okay?

A.   Okay.

Q.   All right.  Let me have your current address,

please.  Excuse me a second.

MR. MARTIN:  Can I ask that, Michele?

MS. ALLEN:  You want to give your current

Page 2

031006dm jp
18   college when I was at the University of Delaware, and
19   then when I graduated, I left the bank, I did a little
20   tree work on the side while I was trying to get on the
21   police force, and then went back to the bank briefly
22   because it didn't look like I was going to get on the
23   police force, and then things changed.
24        Q.   All right.  So how long did you spend with

                         David McAllister                    6


1    MBNA?
2         A.   Oh, total time, a couple of years.  I mean part
3    time in some of that capacity.
4         Q.   All right.  When did you receive your degree
5    from University of Delaware?
6         A.   1991.  I have to think about that.  1991.
7         Q.   And what did you major in?
8         A.   I had a degree in history.
9         Q.   Do you have any education beyond University of
10   Delaware bachelor's degree?
11        A.   Yes.  I have a master's degree from Wilmington
12   College in, a master's in management, a concentration
13   in human resources.
14        Q.   And when did you receive that?
15        A.   2000 and -- 2002, I believe.
16        Q.   All right.  You began with the New Castle
17   County Police Department in what year?
18        A.   1992, January 6, 1992.
19        Q.   And before you were promoted to chief, what was
20   your rank?
21        A.   Lieutenant.
22        Q.   Was it customary for a lieutenant to be

031006dm jp

23    promoted to chief?

24    A.    They had just changed the law to allow

David McAllister                    7

1    lieutenants to compete.

2    Q.    By whom were you promoted to the position of

3    police chief?

4    A.    Tom Gordon.

5    Q.    And at that time he was county executive?

6    A.    That's correct.

7    Q.    When was it that you were appointed police

8    chief?

9    A.    July of '03.

10    Q.    And how long did you continue to serve in that

11    capacity?

12    A.    Till October 18th of '05.

13    Q.    And what happened at that point?

14    A.    I resigned.

15    Q.    Have you had an opportunity to review the

16    allegations in the complaint of Navarro vs. Coons?

17    A.    Not in any great detail.  I've reviewed them on

18    the phone with County.

19    Q.    When you say "county," you're talking about the

20    County Law Department?

21    A.    Yes.

22    Q.    Did you do anything else in preparation for

23    your deposition here today?

24    A.    I did not.

David McAllister                    8

1    Q.    When is the first time you met Chris Coons?

031006dm jp

2      A.      The first time that I had had a conversation
3      with Chris Coons, I mean I had seen him at some County
4      Council meetings, never really talked with him.   The
5      first time I had any conversation of any substance was
6      shortly after I got promoted to chief.   I met with all
7      the council members.

8      Q.      Do you recall the nature of your conversation
9      with him?

10     A.      It was a sort of a general welcome aboard
11     conversation.   It was, you know, what are my thoughts,
12     plans for the department, very general in nature.

13     Q.      Did you just have that with Mr. Coons, or was
14     that with other councilmen as well?

15     A.      That was with every council member I scheduled
16     that.

17     Q.      How would you describe your relationship with
18     Mr. Coons from the time you were promoted to chief
19     until the time Mr. Coons was elected county executive?

20     A.      I thought we had a -- I mean we had some
21     disagreements on some issues, but I thought we had a
22     professional relationship.   I would not call it overly
23     friendly, but a professional relationship.

24     Q.      Do you recall the nature of the disagreements

                        David McAllister            9


1      that you had?

2      A.      We had disagreements concerning a promotion to
3      lieutenant colonel and major.   I felt that he was
4      getting, getting a little bit inappropriate in his
5      questioning concerning who I was going to promote.   He
6      made some statements concerning a particular captain,

                        Page 7

031006dm jp

```
 7      Captain Elmer Setting -- excuse me, was at the time
 8      Lieutenant Elmer Setting, that council would be very
 9      disappointed if I were to promote him and it would set
10      sort of a bad precedent.  So we had sort of a
11      disagreement over that.  We seemed to work through
12      that, I thought.
13          Q.   Let me try to get a time reference for that,
14      please.
15          A.   That was roughly the fall after I had been
16      promoted to colonel.  We created a position of
17      lieutenant colonel, and it was sometime in the October
18      range, I mean that's --
19          Q.   This is '03?
20          A.   '03, yes, sir.
21          Q.   Did Mr. Coons give you any idea as to why he
22      disapproved of Elmer Setting being appointed to, was
23      it lieutenant colonel position?
24          A.   Lieutenant colonel or major.  I had both of the
                         David McAllister              10
```

```
 1      positions open.  He indicated that Elmer had a
 2      reputation as being very close with Sherry Freebery at
 3      the time.  You know, just said he had, you know, a bad
 4      reputation and that that, you know, that promoting
 5      him, you know, I was I guess going to adopt that bad
 6      reputation.  We exchanged some letters over that.
 7                  But as I said, I thought we sort of worked
 8      through that issue.
 9          Q.   Was Setting actually promoted?
10          A.   He was not.  Scott McLaren was promoted to
11      lieutenant colonel, and major -- or then Captain
                         Page 8
```

031006dm jp

12    Snyder was promoted to major.  Later on I promoted

13    Lieutenant Setting to Captain Setting.

14        Q.    Did the disagreement that Mr. Coons had with

15    regard to then Lieutenant Setting have anything to do

16    with him not being promoted at that time?

17        A.    I would say that it did.  I mean I thought

18    Elmer was a good candidate, but, you know, when you

19    make promotions you have to weigh all the factors.

20    And I did not want to start off my tenure with a bad,

21    with a bad council, you know.  I mean obviously we

22    were trying for a new building, we were trying for

23    additional cops.  I didn't need that kind of

24    resistance.

                        David McAllister                11


 1        Q.    Were there any other city council people who

 2    were --

 3        A.    County Council.

 4        Q.    I'm sorry, County Council, thank you,

 5    expressing any desire, concern about potential

 6    promotions?

 7        A.    No.

 8        Q.    It was just Mr. Coons?

 9        A.    Yes.

10        Q.    Did you find that unusual at the time?

11        A.    I did, and I wrote him a letter stating so.

12        Q.    Did you address his concern about Setting?

13        A.    You're going to have to -- I'm not sure what

14    you mean by that.  I wrote him a letter stating that I

15    really didn't think it was appropriate to really get

16    into the nitty-gritty of promotions from an elected

                              Page 9

031006dm jp

17    official.

18        Q.    Okay.

19        A.    I don't know if that answers your question or

20    not.

21        Q.    Well, it does.  And did he respond to that in

22    any fashion?

23        A.    He did.  He wrote me a letter back saying

24    essentially that I was -- I'm going to paraphrase now.

                                David McAllister                12


1    I may still have the letters, quite frankly, but I'm

2    moving and everything is packed up.  But something to

3    the effect that I was sort of childish.  And I wrote

4    him a letter back saying, you know, again we're just

5    going to have to agree to disagree.

6            His concerns about Captain Setting, you

7    know, you know, sort of rumors of just wild, just wild

8    rumors that were unfounded.

9        Q.    Such as?

10        A.    Oh, he participated in a murder in Las Vegas,

11    you know, he owns a great big mansion and can't pay

12    for it.  You know, and I knew that these rumors had

13    caused then Lieutenant Setting already to some -- you

14    know, the IRS showed up at his house and investigated

15    him.  So I knew that those complaints were unfounded.

16        Q.    In light of what you've testified to, you felt

17    that you were able to resolve your disagreements with

18    Mr. Coons?

19        A.    I thought we agreed to disagree, you know.  I

20    mean, and that's certainly within a professional

21    setting, that happens.  We don't all get, always get
                                Page 10

031006dm jp

22      along.

23          Q.    Okay.   What was the next time you had any

24      dealings with Mr. Coons?

                        David McAllister                13


1           A.    Over, you know, I mean he was council

2       president, so we did a number of things, you know, the

3       building.   And so I'm not sure I can answer your

4       question.   I saw him on, you know, a semi-regular

5       basis, any council meeting.

6           Q.    Do you have any recollection of any interaction

7       that you had with him that stands out from the others

8       in terms of being particularly good or particularly

9       bad?

10          A.    No, I mean about the same relationship I had

11      with most council people, relatively friendly.   I

12      can't think of anything.

13          Q.    All right.   So that didn't really change until

14      the time of his -- I'm taking you up to the time of

15      his election, correct?

16          A.    Correct.

17          Q.    All right.   Now, let's go from his election

18      forward.   Can you tell us?

19          A.    Shortly after his election, of course I called

20      to congratulate him.   We set up a meeting, we met at,

21      we met at -- I'm trying to think of the name of the

22      restaurant.   It's in the City of Wilmington.   We had

23      breakfast, like a cup of coffee.   We talked, looked

24      like things were going to get started on the right

                        David McAllister                14

031006dm jp

```
1   foot.  I mean, that was the next interaction.  And
2   then after that, I never spoke to him again directly.
3       Q.   After that meeting?
4       A.   That's correct.
5       Q.   Following his election?
6       A.   That's correct.
7       Q.   And was this meeting before --
8       A.   Before he had taken --
9       Q.   -- before the time he had been sworn in?
10      A.   Yeah, before the time he had been sworn in.
11      Q.   Okay, so that was the last time you had ever
12   spoken with him at all?
13      A.   I saw him at a couple of public events where he
14   said hello to me, but I had never had a conversation
15   of substance with him again.
16      Q.   Other than not having spoken following his
17   election, or following his swearing in, how would you
18   describe your relationship with Mr. Coons?
19      A.   Well, I can only take it as a relationship with
20   his administration, because I didn't have a
21   relationship with Mr. Coons.  But his administration
22   would be tense.  Clearly it was very obvious to me
23   within the first sort of minute and a half of them
24   arriving that I wasn't going to have a particularly
```

David McAllister            15

```
1   good relationship.  It was very tense, very strained.
2       Q.   Well, give me some idea, please, why you
3   characterized it as very tense or strained.
4       A.   You know, a series of e-mails, up to 16 to 20 a
```
Page 12

031006dm jp

5   day, some of them very accusatory in nature of, you

6   know, "why do you do this?  What is this?"  You know,

7   almost to the point of, I mean I kind of got the sense

8   of -- you could just, the tone of the e-mails, mostly,

9   that I actually tried to get a meeting, I requested a

10  meeting with the county executive to try to resolve

11  some of these issues.

12          Instead, I got a meeting with Rich

13  Przywara, and at that point I was told that

14  essentially I wasn't there on move-in day, I didn't

15  help them get furniture back.  And I said, "I don't

16  know what you're talking about."  I mean I didn't

17  know, "You didn't have furniture."  I mean I wasn't

18  sort of over at the Government Center.  I didn't

19  involve myself in that.

20          And he said, you know, essentially you

21  know, if there's a relationship issue, it's more my

22  issue, and, you know, but he would pass on my concerns

23  to the county executive, and I never heard anything

24  else.

                    David McAllister           16


1    Q.   So you had a face-to-face meeting with Rich

2   Przywara?

3    A.   That's correct.

4    Q.   And was that over at the Government Center?

5    A.   It was actually over at the City/County

6   Building.

7    Q.   And approximately when was that?

8    A.   I want to say it was within, within a few

9   months of him taking office.  I mean it really

                    Page 13

031006dm jp

9     Q.    When you say you, is that something out of your
10    pocket?

11    A.    That's correct.

12    Q.    So you remained within the merit system during
13    your employment with New Castle County?

14    A.    That's correct.

15    Q.    And as to the appointment of Guy Sapp as
16    director of public safety, I understand that you did
17    not have any input as to his selection; is that
18    correct?

19    A.    That's correct.

20    Q.    Did you have any input as to this notion of
21    revival or re-creation of this position?

22    A.    I think at one point I was asked, and I think I
23    prepared something to the effect as to why it really
24    wasn't necessary.

                    David McAllister                    23


1     Q.    You think you put something in writing about
2     that?

3     A.    I believe I did.  It was a while ago, so...

4     Q.    Now you've talked about e-mails that you're
5     getting and putting something in writing.  Was that in
6     the form of an e-mail?

7     A.    I think I wrote a memo on that one.

8     Q.    All right.  Where would that memo be?  Would
9     that be on your hard drive?

10    A.    My secretary at the time, Betty, would always
11    type my memos, so it would probably be on -- she would
12    either have a hard copy of it or, or it would be on
13    her hard drive.  I would dictate, I wouldn't type.

031006dm jp

14    I'm a hunt-and-pecker.  It's really difficult, it

15    would take me forever to type something.

16        Q.    Let's talk about promotions within the New

17    Castle County Police Department.

18        A.    Okay.

19        Q.    And let me ask you, first of all, what your

20    understanding was as to your authority as chief of

21    police to promote police officers to positions of

22    let's say sergeant and lieutenant?

23        A.    It's my role to promote them.  I mean there's a

24    testing process.  There's a list.  You're provided the

David McAllister              24

1    top five names for one position, and you can promote

2    and choose out of that top five names.

3        Q.    When Mr. Sapp came aboard, did that change

4    that, your authority or your procedures with regard to

5    promotion?

6        A.    Yes.  What happened was prior to Mr. Sapp

7    coming aboard, I had open sergeants' positions and I

8    was trying to move to promote them.  I had probably

9    several conversations with Mr. Singleton, didn't

10    receive any answers concerning promoting.  His sort of

11    final answer was, "Well, just wait till Mr. Sapp comes

12    on board."  So, you know, I approached the issue with

13    Mr. Sapp.  We had several conversations.  He agreed,

14    you know, that we're going to promote -- you know, he

15    agreed that we were going to promote.  Then later on,

16    after returning from the Government Center, he told

17    me, "Well, you know, we need to really look at the

18    money of this."

031006dm jp

19        So I looked at the money, showed him that,
20    you know, the difference between a patrol officer and
21    a sergeant is minimal in nature.  He said, "Okay, I'll
22    get back to you."  And then he came back and said,
23    "No, you know, we're going to promote after the new
24    budget year," which is July 1.  I said, "Well, the

David McAllister                    25


1    problem is, you know, we have an agreement with the
2    FOP that says we will fill open positions."  He said,
3    "Okay, well let's meet with them."  So we met with
4    them.
5        And I had told him during the meetings
6    that I disagree.  I think, you know, frontline
7    supervision is the most, it's probably the most
8    critical position we have in the police department
9    with a very, very young work force.
10        We had a meeting with the FOP and the sort
11    of involved parties, the eligible parties, and he said
12    that after July 1 we would promote.  I think it was
13    after July 1 or after the budget.
14    Q.    How many?
15    A.    Three.  At which point, you know, it was
16    getting to the point to do the promotions, and then he
17    came back and said, "No, we need more patrol officers
18    than we need sergeants."  And not going to let me
19    promote.  We discussed it further.  He came back from
20    a management meeting, said, "Okay, we're going to
21    allow to promote one."
22        At which point something that had never
23    occurred before, I had to go over to the Government

031006dm jp

24     Center with the selections, the top five, and justify

David McAllister          26

1     why I was choosing a particular person, including, you
2     know, kind of going through their IA files and saying
3     what sort of discipline they had. And I had to
4     justify it before Mr. Sapp and Mr. Singleton, and that
5     has never occurred before.
6          During my conversations with Mr. Sapp, and
7     this is the quote and I spoke to the county about, you
8     know, that I told him that we had three positions, and
9     I told him who I wanted to promote, that I wanted to
10    promote Mr. Treadwell, John Treadwell, Trini Navarro,
11    and that there was -- the third position there were
12    two candidates, one was a Trish Davies and one was
13    Wendi Feeser. I think both could have developed into
14    good sergeants, but I was leaning towards Wendi Feeser
15    because Trish Davies had some negative reports from
16    her supervisors concerning her working as a team,
17    teamwork ability. She was a bit of a loaner. Wendi
18    Feeser had a higher education, was known as a team
19    player. So I was leaning towards Wendi Feeser.
20         And I said that that would give us a
21    black, a Hispanic and a female, which is an area that
22    the county was weak in in terms of minority
23    promotions. That's something I had been trying to
24    change since I've taken office, and something I recall

David McAllister          27

1     at some time having a conversation with the county

Page 22

031006dm jp

2  executive many, many years ago when I first took over

3  about, you know, minority promotions and diversity in

4  promotions.

5      Q.   You're talking about, when you said county

6  executive, you're talking about Tom Gordon at that

7  point?

8      A.   I'm sorry, then it would have been Council

9  President Coons.  You know, I knew he was interested

10  in diversity.  I think we had had a conversation about

11  the Diversity Commission.

12          So, you know, my thought was we could

13  really -- when I took over as chief of police, we had

14  one Hispanic sergeant, we had one African-American

15  captain, one, I think one African-American lieutenant,

16  and maybe one African-American sergeant.  We had one

17  female captain and two female sergeant, and that's it.

18  And so we were trying to, you know, obviously better

19  that situation and be more reflective of the

20  community.

21      Q.   And this was with a police force of 350 plus?

22      A.   That's correct.  It was not particularly good

23  numbers.

24      Q.   Now, when you talked about the three positions,

                        David McAllister          28


1  let me make sure I understand where this fell into the

2  context.  Was this when you went over to the

3  Government Center to talk with Sapp and Singleton?

4      A.   No, this was, the three positions, there were

5  conversations in Mr. Sapp's office back when we

6  started talking, first talking about promotions.  And

                        Page 23

031006dm jp
```
 7   he agreed, let's do it.  Then he came back and said
 8   no, let's not do it, it's because of money.
 9          I pulled the sort of the fiscal aspect of
10   it, had William Dill come down and talk with him,
11   Butch Dill, showed him that the money didn't really,
12   it didn't, that didn't make sense, it's really a
13   nominal bit of money.  But he sort of held with that,
14   and then later on it became now we need more patrol
15   officers than we need the sergeants.
16          But all the while I kept talking about the
17   ones that I wanted to promote.  So the conversation
18   concerning that probably took place a couple of
19   different times.  When we only had one sergeant
20   position, when they only released one, was when John
21   Treadwell was promoted.
22   Q.   Why was that?
23   A.   Because at that point he was, John was, at that
24   point the top of the list, but also a good candidate.
```
                          David McAllister          29


```
 1   And compared to the other four, the other four at that
 2   particular time in that top five really weren't viable
 3   candidates, in my assessment.  One had received major
 4   discipline for evidence violations.  One was, he had
 5   worked for me before.  He had been facing discipline
 6   for failure to complete his reports.  He had had a bit
 7   of a nervous breakdown during the accreditation
 8   process.  I don't want to qualify as a nervous
 9   breakdown, because I'm not a psychologist.  He had --
10   he was known as a person who could do one thing and
11   one thing only at a time.  And I think promoting him
```
                          Page 24

031006dm jp

12    to sergeant would be -- well, he just, he didn't fit

13    what a sergeant should be at all.

14                One had, was facing being removed out of

15    the detectives for, again, some misuse with some

16    attendance and not being a team player.

17        Q.    All right, let me go back.  You said when there

18    was one position that you were able to fill, that was

19    John Treadwell, correct?

20        A.    That's correct, yes.

21        Q.    All right.  And you said there were four others

22    who were on that list at that point, correct?

23        A.    Correct.

24        Q.    Can you name the four others that were on that

                            David McAllister              30


1    list?

2        A.    One was L. Rob Joseph.  One was Rich Dunning.

3    I think one was Rich Trala, that was the one who was

4    facing coming out of -- excuse me, Joe Trala.  Joe

5    Trala.  And the other one escapes my thought at this

6    very moment.

7        Q.    All right.  I'm going to have to go back and

8    get some -- you've said a lot of things and I want to

9    go back and make sure we understand what the sequence

10    is.

11                You said, I believe, that you had a

12    conversation with Mr. Sapp on a couple of occasions

13    that when there were three positions open you told him

14    who the three were going to be, or at least who two

15    were going to be, and the choice between the third.

16        A.    Correct.

                            Page 25

031006dm jp

17    Q.    Is that fair to say?

18    A.    That's fair to say.

19    Q.    And --

20    A.    I essentially told him who the three were going

21    to be.  There was -- the third between Wendi Feeser

22    and Trish Davies, there was some, some debate among

23    the staff about, about that.  I mean so that was not a

24    foregone conclusion, but I think we pretty much had

David McAllister            31


1    agreed that Wendi Feeser was going to be the choice.

2    Q.    All right.  And you said you had this chat with

3    Sapp on a couple of occasions.

4    A.    Correct.

5    Q.    Did you mention by name the people that you

6    were --

7    A.    Yes.

8    Q.    Okay.  And so you said Treadwell, Navarro, and

9    then you had Davies or Feeser, correct?

10   A.    Yeah, with Feeser being my choice.

11   Q.    Okay.  Now, I'm a little confused about, as I

12   understand it --

13   A.    I think we probably all are.

14   Q.    There were three positions that he had agreed

15   to initially.  Correct?

16   A.    There were three budgeted positions.

17   Q.    Right.  And when you say budgeted, they were

18   budgeted by County Council?

19   A.    That's correct.

20   Q.    Okay.  And did that change at all at any time

21   during July and August of '05?

031006dm jp
22    A.    No.    In fact, two of them were just added in

23    the newly adopted budget.

24    Q.    Okay.

David McAllister                    32

1    A.    So --

2    Q.    And that was the budget beginning July 1st,

3    2005?

4    A.    Correct.

5    Q.    Okay.    But as I understand it, it was the

6    decision of Mr. Sapp and maybe someone else that they

7    not be filled, correct?

8    A.    Yes.  Yes, initially he said, "Let's fill

9    them."  Then he went over to the Government Center, he

10    came back, it's a money issue.  We sort of disproved

11    that.  He said, "I'll get back to you.  Let's -- we're

12    still going to hold off till July 1 for the money."

13    He met with folks.

14            I was, I was preparing to go forward with

15    those promotions, you know, July 1 or, I think he

16    allowed us to do one and then the two were going to

17    wait.  And then it was kind of -- I started getting

18    the sense that they weren't going to move forward with

19    the two.  I had another conversation with him.  He

20    said, "No, you know, we're going to move forward."

21    And then it changed.

22    Q.    All right.  And then as I understand what

23    happened was one of the three budgeted positions was

24    filled --

David McAllister                    33

Page 27

031006dm jp

```
 1    A.   Correct.
 2    Q.   -- for sergeant, correct, with a promotion?
 3    A.   Yes.
 4    Q.   And that was Sergeant Treadwell --
 5    A.   Correct.
 6    Q.   -- who was promoted.  And I understand, and I'm
 7  confused about this, you said that there were four
 8  others who were I guess eligible to be promoted but
 9  were not viable candidates?
10    A.   Yes.  And they're not viable for a lot of
11  reasons, just, you know, the sergeant's process
12  doesn't take into account anything other than what you
13  score on the test in the 20 minutes you're in an oral
14  board.  Later on you have to assess overall whether a
15  candidate's going to make a good sergeant or whether
16  he's going to be a good fit at that time.
17            You know, my process for promoting was to
18  discuss it with staff, with the lieutenant colonel,
19  and to look what our needs were at the time.  For
20  example, when I first became sergeant, I felt we had
21  the need for a very strong operational sergeants with
22  some seniority, with some -- and that's what I looked
23  for.  Then, you know, then as --
24    Q.   When was that?
```

                    David McAllister                34


```
 1    A.   In July of '03.  I made a series of promotions
 2  either July or August.  So, you know, you tried to
 3  look for what your needs are at that particular time.
 4    Q.   All right.  What I don't understand is when you
 5  said Treadwell was promoted, you said there were four
```
                          Page 28

031006dm jp

6    other viable candidates who were not considered
7    viable.

8        A.    Correct.

9        Q.    But, you know, you had previously indicated
10   that the three positions were going to go to
11   Treadwell, Navarro, and either Davies or Feeser.

12       A.    Because you have your choice of five for one.
13   Once you promote that number, six moves up.  Then No.
14   7 moves up, as you continue to have positions.  So
15   when I had three positions, I had a choice -- I would
16   have had a choice of five, six, seven, the top seven,
17   not just the top five.  That would have brought in the
18   additional candidates, which would have been Navarro
19   and Feeser, or Navarro and Davies, I can't remember.

20       Q.    I see, okay.  How did you respond to Mr. Sapp's
21   statement that you could not fill those two budgeted
22   positions?

23       A.    Which time?  I mean there was kind of a, there
24   was sort of a -- the first time when he said it was

                    David McAllister          35


1    money, I, you know, we had a, I would say, we had a, I
2    would say healthy debate about it.  It was clear he
3    didn't understand the budget of the New Castle County
4    Police, so I sort of sat with him and I brought Butch
5    Dill down and explained how it worked.  It seemed to
6    me that he was on board to promote, and he said -- you
7    know, you know, it was, it was a strange situation.
8    He would sort of go over to the Government Center,
9    then he would come back and his sort of stance would
10   have changed, is the only thing I can say.  I don't
                    Page 29

031006dm jp

11    know what happened over there.

12        Q.    All right.    I want to just try to get some

13    dates on these occurrences that you've testified to.

14    And I'm going to show you a couple of documents and

15    ask you some date-specific questions.

16        A.    I'll do my best.

17        Q.    All right.    Let's start with, we'll mark this

18    as McAllister 1.

19              (McAllister Exhibits No. 1 through 4 were

20    marked for identification.)

21        Q.    Let's look first at Exhibit 1, which is a memo

22    from you to all police personnel dated May 10, 2005.

23        A.    Yes.

24        Q.    And in the seconds paragraph it says, "Once a

                              David McAllister              36


1    vacancy for sergeant has been created, every

2    reasonable effort shall be made to fill said vacancy

3    within 60 days from the certified promotion list."  Is

4    that -- I mean that's what you said.

5        A.    Yes.    This was a restating of an agreement that

6    had been reached after a grievance with then I think

7    Colonel Cunningham.  So we were just restating the

8    agreement.

9        Q.    Okay.  All right, on No. 2, this is an FOP

10    document, and I think you had referred to in your

11    testimony your conversation with the FOP about filling

12    slots.

13        A.    Yes.  As I read this, I would tell you that

14    they -- "We were told by the colonel there's one

15    sergeant's position open."  I think that might be a

031006dm jp

16    bit -- I didn't do that much speaking at that meeting.

17    So I think they're attributing conversations or words

18    to me that probably came out of the director of public

19    safety's mouth, not mine.

20       Q.   Well, and the date is May 20.

21       A.   Right.

22       Q.   Does that date make any difference in terms of

23    what the possibilities were at that point?

24       A.   I'm not sure I really understand what you're

David McAllister                    37


1    asking me.

2       Q.   Well --

3       A.   This was following the meeting, and this was

4    the FOP's response, I believe, back to me saying fill

5    the vacancies.

6       Q.   All right.  And if you look on the second page

7    of that document, that last full paragraph, it says

8    there, "If two additional sergeants' positions are

9    approved for the next fiscal year, we ask that those

10    positions be filled, without a chief's interview."

11       A.   Oh, okay.  I see what you're asking.  The three

12    spots were -- and it's been the past practice that you

13    could overpromote positions and then make it right in

14    the following fiscal year.  In other words, you know,

15    you convert a patrol officer to a sergeant.  You pay

16    for that with salary savings that the department

17    consistently has, then you make it right in the next

18    fiscal year.

19           We had done that.  We had promoted up to

20    38 sergeants.  Those positions were vacant again.  We

Page 31

031006dm jp

21    promoted up to 38, and then like anything else, you

22    lose back down. We had made it right in the current

23    budget. In other words, that budget, and I don't know

24    when the county budget was approved, but I believe it

                        David McAllister            38


1    was approved by May 20th, it had already been. So

2    what they were saying was, the county's position of

3    waiting till July 1 was those two positions became,

4    quote, hard positions.

5            My position was we promoted already up to

6    38, they were now vacated, July 1 they became hard

7    positions, we could still fill them.

8            I don't know if that's clear.

9    Q.   Okay.

10   A.   It's a little bit confusing. The chief's

11   interview, there was some discussion about whether we

12   should have a chief's interview for, it's not

13   required, it wasn't posted with the exam. The FOP's

14   position, and rightly so, was that if people had been

15   promoted off that list without a chief's interview,

16   there should not be a chief's interview now.

17   Q.   Okay.

18   A.   The county's position to me was they wanted to

19   have a couple of people sit in the office while I

20   interviewed people so, quote, nobody would hand me a

21   stack of money to be promoted. That was a direct

22   quote from the director of public safety.

23   Q.   Okay. Now, let's look at Exhibit 3. And this

24   is a memo that you wrote --

                        David McAllister            39
                        Page 32

031006dm jp

4     A.    Yeah, that's correct.  Two days later.

5     Q.    This is a response, was this a direct response

6     to your memo of June 27?

7     A.    It was.

8     Q.    Okay.  And that was from Guy Sapp?

9     A.    That's correct.

10    Q.    Saying that he will not authorize the

11    requisitions for two of the sergeant positions

12    requested in the memorandum.

13    A.    That's correct.

14    Q.    Okay.  And what was your understanding as to

15    why he took that position at that time?

16    A.    Well, now it had become we need more patrol

17    officers.

18    Q.    All right.  And what was your reaction, if any,

19    to his statement that you need new patrol officers?

20    A.    Well, a number of thoughts went through my

21    head.  Number one, I disagreed.  I think that we were

22    taxing our sergeants on the patrol to handle too large

23    of an area.  So it was always our operational plan to

24    split what is known as the eastern side or central

David McAllister                    41


1     into two different sectors so that a sergeant would

2     not have to travel basically from the Maryland line to

3     New Castle.

4              We had plenty of patrol officers out

5     there, in my assessment, and in any study which I did

6     routinely of committed time versus uncommitted time of

7     patrol officers, you'd find that routinely officers

8     had four hours of uncommitted time in a 10-hour shift.

Page 34

031006dm jp
9    That would not be the case if, in fact, they were so

10    busy that they, that they couldn't handle their job.

11    And the four hours on average, four hours of a 10-hour

12    shift they were uncommitted.

13            So those are some of the things that I

14    disagreed with him.  I mean I felt that we had a young

15    work force with -- and many years ago we went to a new

16    patrol shift.  We went from four platoons to five

17    platoons.  The department was authorized 30 sergeants.

18    It's been authorized 30 sergeants since I think its

19    creation, but I'm not sure.  I mean it's been so long

20    nobody can remember how long.

21            With five patrol shifts, the bulk, it

22    almost left no sergeants to do special units,

23    detectives, mounted patrol, traffic.  There were not

24    enough supervisors to go around.  So we really did

                    David McAllister            42


1    need more sergeants.  We'd had experiments where we

2    tried to run units without supervisors, like the

3    mounted unit.  We tried to combine the drug unit and

4    the property squad into one sergeant.  Well, that

5    doesn't work at all.  You can't -- you know, it's like

6    having two, essentially two different tasks.

7            So we were, you know, we needed more

8    sergeants.

9        Q.    Did you have this discussion with Mr. Sapp?

10        A.    I did.

11        Q.    Where and when did you have this discussion?

12        A.    We had had the discussion, you know, I can't

13    say that it was necessarily -- I believe we started

                    Page 35

031006dm jp
14    having this discussion about staffing was sort of what
15    prompted me to write that memo, because I was getting
16    the feeling that now --
17        Q.    Which memo, the D 3?
18        A.    Please release the --
19        Q.    Or McAllister 3?
20        A.    Please release the reqs, because I was getting
21    a sense now all of a sudden this new thing had cropped
22    up, you know, well we're so busy, you know, you need
23    more patrol officers.  But I also found it interesting
24    because we had asked for more patrol officers in the

                    David McAllister            43


1    budget and they were cut, and we had just approved the
2    budget that we knew we couldn't hire.  You know, if we
3    need more patrol officers, we should have put in the
4    police academy.  But they weren't allowing that
5    either.
6        Q.    Did you make any observations as to what was
7    done with the various patrol officers that were out
8    there?  Did they, in other words, did they continue to
9    work in a patrol function, or were some of them
10    changed to other duties?
11        A.    We were making acting sergeants.  So, you know,
12    the vacancies were being filled in an acting capacity.
13    So it was sort of like robbing Peter to pay Paul.  It
14    was kind of the same thing.  You either make him a
15    sergeant or you don't make him a sergeant.  They're
16    not a sergeant, they're still an acting sergeant.  So
17    I wasn't sure why.
18        Q.    What was the budget impact, if you know, in

                    Page 36

031006dm jp

19    terms of making acting sergeants versus promoting to,

20    a corporal or patrolman to a sergeant position?

21        A.    It's the same, it's 5 percent over.

22        Q.    Same thing?

23        A.    Yeah, 5 percent.  You know, if you're an acting

24    you receive 5 percent.

                    David McAllister                      44


1        Q.    All right, so it would not have any budgetary

2    impact?

3        A.    No.

4        Q.    Did you make any observations as to any of the

5    patrol officers being changed out of a patrol function

6    into, you know, special unit or some other capacity?

7        A.    I know that took place, but at that point I had

8    been placed on leave.

9        Q.    Okay.

10       A.    I know they formed like a jump-out type squad.

11   We were also sending officers into the City of

12   Wilmington.  That was during the summer where we, you

13   know, where we needed more patrol officers, we were

14   sending them into the City of Wilmington.

15       Q.    When were you placed on leave?

16       A.    Near the end of July, middle to end of July.

17   And after that I think they made some transfers.

18       Q.    What was the reason you were given as to why

19   you were put on leave?

20       A.    They were investigating the extra duty account.

21       Q.    Were there any other officers placed on

22   leave --

23       A.    No.

                         Page 37

031006dm jp

24      Q.    -- for that --

David McAllister                45

1      A.    No.

2      Q.    -- allegation?  Did you have any understanding

3    why you were placed on leave for that allegation?

4      A.    The reason I was given was that I commanded IA,

5    professional standards, therefore, I needed to be

6    removed from the chain of command.

7      Q.    Did IA have its own commander?

8      A.    There was a lieutenant in charge of

9    professional standards, but they did report directly

10   to me.

11     Q.    And that lieutenant was not put on leave?

12     A.    No.

13     Q.    Let me go back and we'll talk a little bit more

14   about some promotional issues.  I just want to be able

15   to clear up our notes and see if I'm accurate with

16   some of these statements.

17           Do you recall whether at the end of

18   December, or December 12, 2004 that you made various

19   promotions to sergeant?

20     A.    Yes.

21     Q.    Did you promote the following:  Jaime Dolan?

22     A.    Yes.

23     Q.    Michael Donovan?

24     A.    Yes.

David McAllister                46

1      Q.    Domenick Gregory?

2      A.    Yes.

Page 38

031006dm jp

```
 3    Q.    Joseph Meriggi?

 4    A.    Yes.

 5    Q.    Wayne Pennington?

 6    A.    Yes.

 7    Q.    Robert Schlecker?

 8    A.    Yes.

 9    Q.    Were they all promoted to sergeant positions?

10    A.    Yes.

11    Q.    And was there some overpromotion?

12    A.    Yes, that's the two spots that later became, we

13    made right in the budget.

14    Q.    Okay.  Was that customary, that overpromotion

15    was done and it was rectified in the budget?

16    A.    Yes.  It was absolutely -- we've done it many,

17    many times.  Both me as chief and the previous chief

18    did it many times.

19    Q.    When you submitted your police budget in the

20    spring of 2005, did you request two additional

21    sergeant positions?

22    A.    I did.

23    Q.    And that request was eventually approved by

24    County Council; is that correct?
```

David McAllister                    47


```
 1    A.    Correct.

 2    Q.    After the promotions to sergeant in December of

 3    2004, I want to find out whether you had any vacant

 4    positions for the sergeant position.  Do you recall

 5    whether you had any vacant positions?

 6    A.    Once I made those promotions we were full.

 7    Q.    Okay.
```

Page 39

031006dm jp

8    A.    Through attrition we came up with openings, as

9    is sort of normal.

10    Q.    I want to make sure I understand the process in

11    terms of promotion in this case to sergeant.  Do I

12    understand correctly that if you're on that list of

13    five, you can be promoted to sergeant?

14    A.    Correct, one position, five names.

15    Q.    Okay.  And do you as chief have to select the

16    first person on that list?

17    A.    No, sir.

18    Q.    You can select any one of the five; is that

19    correct?

20    A.    That's correct, yes.

21    Q.    Okay.

22    A.    That's not just for sergeant.  That's for

23    every, essentially every position in the county.

24    Q.    At the time you were placed on leave, sometime

David McAllister                    48


1    in late July of 2005, what understanding, if any, did

2    you have as to the county executive's feelings about

3    you as chief of police?

4    A.    What understanding -- of course I could only,

5    that would only be my opinion, if that's what you're

6    asking.  I figured that he didn't wish me to be the

7    chief of police.

8    Q.    Okay.  I understand that a lot your dealings

9    with were with Mr. Singleton, as you acknowledge.

10    A.    Yes.

11    Q.    Was there any communication to you as to how

12    County Executive Coons felt about you?

Page 40

031006dm jp

23    about the upcoming article in Delaware Today magazine?

24    A.    I think Trini knew it because I told him the

David McAllister                    51

1    photographer would be coming and that a reporter would

2    be coming.  But that was something that I arranged.

3    Q.    How would you describe your relationship with

4    Trinidad Navarro?

5    A.    We're professional friends.  We went to the

6    academy together, sort of lost track of each other

7    through the early parts of our career, sort of came

8    back together working inside positions about roughly

9    the same time.  Professional friends, we don't really

10    socialize together.  Our kids don't play together.  I

11    don't know that he's ever been over to my house for a

12    social gathering.

13    Q.    Are you drinking buddies?

14    A.    No.

15    Q.    Did you have any influence in terms of Trini's,

16    Trini Navarro's application for sergeant?

17    A.    No.

18    Q.    Did you talk to anyone doing the oral board for

19    Trini Navarro?

20    A.    No.

21    Q.    Did you provide any answers to test questions,

22    promotional test questions to Mr. Navarro?

23    A.    No.  I never saw the written test.  So no.  And

24    I wouldn't have anyway.

David McAllister                    52

Page 43

031006dm jp

```
 1    Q.   Have there been any occasions in your
 2    professional relationship with the director of public
 3    safety, Guy Sapp, that he has not been honest with
 4    you?
 5    A.   Yes.
 6    Q.   Can you describe them?
 7    A.   I don't think he was honest about the
 8    investigation and the reasons that I was put on leave.
 9    Q.   All right, let me just stop you right there.
10    How was he not being honest with you with regard to
11    your reasons for being put on leave?
12    A.   He came to my house and told me the next day
13    that, you know, you know, that this is going to be --
14    you know, "You're going to be back to work in a couple
15    of weeks, and this is no big deal. And I don't -- you
16    know, we're not trying to hurt you." You know, I
17    didn't, you know...
18         I actually, on a level, I like Mr. Sapp.
19    I thought him coming in was going to be a relief for
20    me, a pressure reliever, a, you know, a kind of a
21    buffer for the administration, so maybe our
22    relationship could get better. I don't -- didn't
23    really turn out that way.
24    Q.   It didn't turn out that way?
```

David McAllister                53


```
 1    A.   No.
 2    Q.   And you think when he came and went to your
 3    home, told you about the leave, you don't think he was
 4    being -- that he honestly believed that you were going
 5    to be back to work soon?
```

Page 44

031006dm jp

6      A.   I don't believe so.

7      Q.   You don't believe that when he said they were

8  not trying to hurt you?

9      A.   I don't believe that at all.

10     Q.   Do you have any reason to believe that the

11  Coons administration was actively seeking reasons to

12  terminate your employment?

13     A.   Yes.

14     Q.   And what's your basis for saying that?

15     A.   Well, I learned later they hired a private

16  investigator.  I also learned later that Mr. Baylor,

17  Dave Baylor, who was a candidate or at least

18  approached about the public safety director's position

19  was, it was talked over with him about what they

20  wanted to do to me, which was to get rid of me, and

21  that was the primary reason he did not take the job.

22     Q.   What kind of relationship did you have with

23  Dave Baylor?

24     A.   Professional in nature.  He was a major with

                    David McAllister        54


1  the State Police.  I think we had a good working

2  relationship.

3      Q.   And I take it this --

4      A.   He was on the transition team also.

5      Q.   Okay.  When you say also, who else was on the

6  transition team?

7      A.   Guy Sapp was on the transition team.  There

8  were a couple, there was a number of them.

9      Q.   And by this time, Dave Baylor had retired as a

10  major at Delaware State Police?

Page 45

031006dm jp
11    A.    That's correct.

12    Q.    And he had a conversation with you at some

13    point telling you that --

14    A.    No, that was relayed to me.

15    Q.    Okay.

16    A.    That was relayed to me.  So I, you know, I

17    don't have any -- you know, you hear a number of

18    things through this type of situation.

19    Q.    So you've not had a chance to speak directly to

20    Dave Baylor?

21    A.    No, nor do I have any desire to.

22    Q.    Why do you say that?

23    A.    I would rather put the county behind me and

24    move on.  I'm very happy in my new position, and God

David McAllister                55


1     works things out in mysterious ways.

2             MR. MARTIN:  All right.  I think we've

3     been going by my clock more than, well more than an

4     hour.  Can we take a short break?

5             THE WITNESS:  Fine with me.

6             MR. MARTIN:  We're going to try to

7     conclude this evening.

8             (A brief recess was taken.)

9     BY MR. MARTIN:

10    Q.    I have a few more areas.  I'm going to try to

11    wrap this up.

12            You had mentioned a few minutes ago about

13    the transition team.  Did the transition team do any

14    type of study or any type of report in terms of the

15    New Castle County Police Department?

Page 46

031006dm jp

16    A.    Yes, they did.

17    Q.    And do you know who authored that report?

18    A.    The total team, I guess.

19    Q.    Okay.  And this team included police, former

20    police officers Guy Sapp and Dave Baylor?

21    A.    Um-hum.

22    Q.    Yes?

23    A.    Yes.

24    Q.    Any other police officers on that?

David McAllister                    56


1    A.    Yes, Marge Ellwein was on the transition team,

2    the union president.

3    Q.    All right.  Did they release the findings,

4    their findings?

5    A.    Yes.

6    Q.    Was that in a written form?

7    A.    Yes.

8    Q.    Can you summarize their findings?

9    A.    It was, it was all positive.  Their

10    recommendations were written out, and then I had to

11    write a response to those.  That would be on Betty's

12    computer also.  But I think they recommended the, you

13    know, appointing a director of public safety.  They

14    recommended developing some sort of, you know, if I

15    were to get hit by a bus, you know, who takes over,

16    which didn't make sense to me since that's pretty

17    clearly spelled out in the directives.

18    Q.    You mean a successor?

19    A.    Successor.  And I avoid buses.  So they, you

20    know, they recommended, the recommendations were

Page 47

031006dm jp

21    pretty minor, I mean pretty minor.

22    Q.   How did the New Castle County Police Department

23    stack up versus other county departments, if you had a

24    reason to review those?

David McAllister                    57

1    A.   Seemed, it seemed to stack up fine.  I had a

2    chance to review Special Services, they seemed to have

3    a much longer report than we did.  I mean, you know,

4    of course it's a big area.  But seemed to stack up

5    okay.  I mean I was -- there was no recommendations

6    that I didn't, you know, I mean I, that I was

7    particularly shocked by.  I mean, they seemed almost

8    nonsensical, quite honestly.

9    Q.   On another subject, did you have any problem

10   with making a decision to send officers to special

11   training?

12   A.   I did, I did.  Both the Southern Police

13   Institute and the FBI National Academy, there were,

14   there was discussion about my choices.  In the case of

15   FBI National Academy, it was Bruce Pinkett.  In the

16   case of the FBI -- or excuse me, the Southern Police

17   Institute was Wendy Hudson.  In the case of Bruce

18   Pinkett I had to continually justify my decision, and

19   then later on I was told by Guy Sapp that he received

20   heat and people, quote, turned on him because he

21   couldn't stop my decision to send Bruce Pinkett to

22   school.

23   Q.   Did he tell you from where this heat

24   originated?

David McAllister                    58

Page 48

031006dm jp

1    A.   He did not.

2    Q.   Did you have any understanding where it came
3    from?

4    A.   I got the sense that it came from the
5    Government Center, but that would only be my read.

6    Q.   And do you have any understanding as to why
7    Pinkett's visit to the FBI Academy would cause so much
8    concern?

9    A.   Because it was my choice.  Bruce Pinkett is a
10   highly decorated, outstanding officer, and he would be
11   the first African American that we had sent to the NA,
12   or any major school in quite some time.  So...

13   Q.   Did it give you any further insight as to who
14   was making the critical decisions for the New Castle
15   County Police Department?

16   A.   Again, it would only be my speculation.  But I
17   didn't get the sense that Mr. Sapp was making the
18   decisions, because he seemed frustrated by the
19   continual questioning about this, and he seemed
20   frustrated by the fact that he received heat for it.
21   As I said, I took him at his word.  I felt that he was
22   an okay guy.

23   Q.   And what about Wendy Hudson and the Southern
24   Police Institute?

David McAllister                59

1    A.   Again, same type of thing, justify why, justify
2    how we posted the school, same type of thing as the,
3    as the National Academy.  Later on there was another
4    spot available in the Southern Police Institute.  I
Page 49

031006dm jp

5    was trying to make a selection, and they indicated
6    they weren't going to approve any of these specialized
7    schools.
8        Q.   What was the cost to the county to send
9    somebody to these type of schools?
10       A.   Zero.  We do all our training using grant
11   money.
12       Q.   Did you have any understanding at that point as
13   to why they said, you know, we're not going to send
14   anybody?
15       A.   No understanding.
16       Q.   And how important was it to the New Castle
17   County Police Department that you sent your officers
18   to these elite schools?
19       A.   I think it's very important.  To be a
20   cutting-edge, top-of-the-line police department,
21   you've got to get your managers out, talking with
22   other, you know, A, being educated, you know, the
23   Southern Police Institute teaches a strategic
24   management that is second to none in the country.  The

                    David McAllister          60


1    National Academy gives you contact lists.  While it
2    doesn't do necessarily the strategic management part,
3    what it does come away with is a resource to pull on
4    at any time throughout the country.
5        Q.   Now, on another topic, I think we may have
6    touched upon this earlier.  Did you have any
7    understanding or impression that there was any type of
8    surveillance activity as to you or your family?
9        A.   I had received -- prior to actually, prior to
                    Page 50

031006dm jp

10     actually knowing that this was going on, I had people

11     calling and telling me that it was going on.  Later on

12     while I was off I was able to see someone around the

13     corner from my house watching my house, following me

14     to a shopping center.  I received calls from various

15     friends indicating that somebody was coming and

16     talking to them.  So that's how I sort of knew about

17     that.

18     Q.    Can you give me a time frame as to when you saw

19     this particular individual?

20     A.    August, September.

21     Q.    This is while you were on leave?

22     A.    Correct.  I had gotten calls in June from

23     people saying that somebody was asking questions about

24     me.  I sort of dismissed it.

David McAllister          61

1     Q.    Did you have a chance to follow up and

2     determine who might have been watching you?

3     A.    When, when I heard in June I asked the director

4     of public safety, and he indicated to me that nobody

5     had been hired.  He indicated, excuse me, to my

6     attorney at the time, Claire DeMatteis, that nobody

7     had been hired.  And then that was clarified through

8     the county attorney that in fact somebody had been

9     hired but that that person had completed their task,

10     whatever that task was.

11     Later on, I did confirm in August or

12     September that it was a company called Assured

13     Investigations that was --

14     Q.    I'm sorry?

Page 51

031006dm jp

15    A.    Assured Investigations.  And the person's name
16    escapes me because I -- he left his name with someone.
17    Q.    But did you learn then from the county attorney
18    that this was sanctioned or requested by the county --
19    A.    At that point I didn't ask.  In August or
20    September I didn't ask.
21    Q.    Okay.  Now, you hired a private attorney
22    because you had the threat of criminal charges?
23    A.    Yes.
24    Q.    Okay.

David McAllister                    62

1    A.    There was talk of that.  There was, you know,
2    obviously my job, employment, that sort of thing.
3    Q.    All right.  And you acknowledge that the county
4    attorney had told you a little bit about the
5    surveillance.  Do you recall him also telling you that
6    he was sorry for putting you through everything the
7    administration did to you?
8    A.    Yes.  We had that conversation in the hallway
9    of the Government Center.
10    Q.    Well, rather than take my words, please, what
11    is your best recollection of that conversation?
12    A.    My best recollection is that we were walking
13    down the hall and we went into the men's room.  I'm
14    sorry, we were walking down the hall.  And he said,
15    "I'm really sorry about all that this."  Then on a
16    break from questioning, we were in the men's room, and
17    he said, "I'm really sorry for all this.  This is,
18    this is not a pleasant part of the job," or something
19    to that effect.  And then he said, "This really isn't
Page 52

031006dm jp

20    right," is what he said to me.

21        Q.    What was your understanding, if anything, as to

22    what he meant, "This isn't right"?

23        A.    I, you know, at that point, my understanding

24    was, you know, that obviously they did not wish me to

David McAllister                    63


1    be colonel and, you know, I had to come to some

2    understandings on my own.

3                MR. MARTIN:    Thank you.    I have nothing

4    further.

5    BY MR. GODDESS:

6        Q.    Mr. McAllister, I represent Chris Coons and Guy

7    Sapp in this case.    I'm going to ask you some

8    questions as well.

9        A.    Okay.

10        Q.    First, you mentioned you are familiar with the

11    deposition process?

12        A.    Yes.

13        Q.    How many times has your deposition been taken?

14        A.    I don't, I don't know.    A couple of times, I

15    think.

16        Q.    What sorts of cases?

17        A.    Oh, I think, I think I was deposed for an

18    accident that I handled once, and maybe for a lawsuit.

19    I can't remember, just a couple of times.    I'm not

20    overly familiar with it, if that helps you.    Not

21    trying to be, either.

22        Q.    As I understand the promotional process to

23    sergeant in the year 2004, it worked off of, or the

24    concept is to have a list of five names certified to

Page 53

031006dm jp

David McAllister                         64

1    the chief of police, and then the chief would pick one
2    of the five?
3        A.    Yes.
4        Q.    The list was ranked but the chief could indeed
5    pick number five?
6        A.    That's correct.
7        Q.    If he chose.
8        A.    That's correct.
9        Q.    In December of '04 you promoted what, six
10   individuals, Dolan, Donovan, Gregory, Meriggi,
11   Pennington and Schlecker?
12       A.    Yeah, yes.
13       Q.    How did there come to be six openings in
14   December of '04?
15       A.    There were four that had come open and we
16   overpromoted two.
17       Q.    Okay.  Who is "we"?
18       A.    Myself and, me, as chief of police.  I
19   overpromoted two.
20       Q.    How did there come to be four openings?
21       A.    I have --
22       Q.    Over what interval of time were there four
23   openings?
24       A.    I have, I mean it had probably been a while.  I

David McAllister                         65

1    mean, you know, through attrition.  Attrition is the
2    answer to your question.  I don't know the --

Page 54