# EXHIBIT 4

031006wm jp

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL TRINIDAD NAVARRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | Number 05-565 (GMS) |
| CHRISTOPHER A. COONS, | ) | |
| individually and in his | ) | JURY TRIAL DEMANDED |
| official capacity; GUY H. | ) | |
| SAPP, individually and in | ) | |
| his official capacity; and | ) | |
| NEW CASTLE COUNTY, a | ) | |
| municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

        Deposition of WILLIAM SCOTT McLAREN, taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 2:03 p.m., on Friday, March 10, 2006,
before Julie H. Parrack, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQUIRE
        MARGOLIS EDELSTEIN
         1509 Gilpin Avenue
         Wilmington, Delaware  19806
         On behalf of Plaintiff

        JEFFREY S. GODDESS, ESQUIRE
        ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
         919 Market Street, Suite 1401
         Wilmington, Delaware  19899-1070
         On behalf of Defendants Coons and Sapp


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

            William Scott McLaren                    2



1    APPEARANCES CONT'D:

2            MICHELE D. ALLEN, ESQUIRE
             MEGAN SANFRANCESCO, ESQUIRE
                    Page 1

031006wm jp

```
 3          NEW CASTLE COUNTY LAW DEPARTMENT
                   87 Reads Way
 4              New Castle, Delaware  19707
                On behalf of Defendant New Castle County
 5
            ALSO PRESENT:  TRINIDAD NAVARRO
 6

 7                        - - - - -

 8                    WILLIAM SCOTT McLAREN,

 9              the deponent herein, having first been duly

10              sworn on oath, was examined and testified as

11              follows:

12          BY MR. MARTIN:

13              Q.   Colonel, my name is Jeff Martin, and I

14          represent Trinidad Navarro in this litigation.

15                   First, let me ask whether you've ever had

16          your deposition taken?

17              A.   Yes, sir.

18              Q.   Okay.  So you understand the basic rules?

19              A.   Yes, sir.

20              Q.   If you have any questions or concerns, please

21          don't hesitate to ask.  And certainly if you need to

22          take a break at any time, we would invite you to do

23          that.  I don't expect to be real long.  Actually, I'm

24          hoping we can wrap this up in less than an hour, but
                            William Scott McLaren          3
```

```
 1          that all depends on the answers you give and any

 2          follow-ups I have.  So with that in mind, why don't we

 3          commence.

 4                   May I have your current rank, please?

 5              A.   It's acting chief of police.

 6              Q.   Okay, for New Castle County Police, correct?

 7              A.   Correct.
```

031006wm jp

17    operational and administrative sections of the
18    department.
19        Q.    And in that interval from the end of July until
20    now, have you had any change in your responsibilities
21    as acting chief?
22        A.    Yes.  As far as being involved in more
23    interaction with County Council, attending committee
24    meetings, statewide committee participation,

William Scott McLaren                    12

1    discipline matters, hiring academies.
2        Q.    I'm not sure what you're saying.  Are you
3    saying that these various items have changed in some
4    way?
5        A.    This is -- as I took on the role of acting
6    chief, the acting chief is the only one that can
7    initiate internal investigation and do discipline and
8    make recommendations to the chief human resource
9    officer.  The chief of police makes recommendations as
10    far as hiring and termination for officers, and
11    involvement in promotional process.
12        Q.    You said involved in the promotional process.
13    What do you mean by that?
14        A.    Depending on the situation that we're in, if
15    there is a current list and if there is a current
16    vacancy to look at that list, receive authority to
17    make that promotion through a req procedure, an
18    electronic req.
19        Q.    Requisition?
20        A.    Yes, being filled.
21        Q.    What interaction do you have with the director

Page 10

031006wm jp

22    of public safety?

23    A.    Daily interaction.

24    Q.    Now, your office is located at the police

William Scott McLaren                13

1     department headquarters; is that correct?

2     A.    Yes, sir.

3     Q.    Where is the office of the director of public

4     safety?

5     A.    Directly across the hall.

6     Q.    And what types of interactions do you have, as

7     you said, on a daily basis with the director?

8     A.    E-mails, meetings, conversations over a host of

9     subjects.  If he gets any complaints or has any issues

10    from County Council, it gets forwarded to me to look

11    at.  It changes every day.

12    Q.    All right.  I'd like to try to understand your

13    role as acting chief in terms of managing and

14    controlling what happens in New Castle County Police

15    Department versus the role that Mr. Sapp, who is the

16    director of public safety, may have.

17          Can you please try to address that?

18    A.    It's my understanding that the director has

19    overall authority over the Department of Public Safety

20    for New Castle County, which is police, EMS,

21    communications, 911, crossing guard, so forth, so on.

22          My role is day-to-day operations for the

23    division.

24    Q.    Do you recall that there have been two budgeted

William Scott McLaren                14

Page 11

031006wm jp

1    positions for the rank of sergeant that were not

2    filled at the end of the last fiscal year?

3        A.    I don't have any direct knowledge of that.

4    When the colonel was still here, Colonel McAllister,

5    he did make me aware of that, but he was more or less

6    involved in the process at that time with the

7    director.

8        Q.    And your tenure began as acting chief, you

9    said, July 25, correct?

10       A.    Yes, sir.

11       Q.    Okay.  Were you aware of Mr. Sapp saying that

12   New Castle County needed more police officers on the

13   street rather than having sergeants in a non-street

14   capacity?

15       A.    That was involving one conversation.  We were

16   concerned if taking from patrol at that point was

17   appropriate to make sergeants.

18       Q.    So this is a conversation that you had with

19   Mr. Sapp?

20       A.    Yes.

21       Q.    And can you give me the approximate time frame

22   for that conversation?

23       A.    It was during the process, just prior to the

24   two sergeants that were the most recent sergeants.  I

                        William Scott McLaren            15


1    don't have exact date.

2        Q.    Did this happen in the last month or two?

3        A.    No, '05 I would have to guess around October,

4    November, and that would be a guess.

                        Page 12

031006wm jp

 9     Q.   Okay.  In what instances did you, as the acting
10    chief, approach the director and say you wanted to
11    make these changes?  Was that in all moves, transfers?
12    A.   Yes.
13    Q.   And why is it that you had to get Mr. Sapp's
14    okay before making these transfers?
15    A.   When Mr. Sapp first came -- well, when I was
16    moved into the acting position, we sat down and he
17    asked just to keep, continuing to keep the department
18    running, and that we knew in the future there would
19    probably be some suggestions for transfers or
20    whatever, that he would want to be kept in the loop
21    before any of that actually comes out on paper.
22    Q.   So this is something that Mr. Sapp told you
23    that he needed to sign off on before you made these
24    transfers?

                    William Scott McLaren              23


 1     A.   Yes, sir.
 2     Q.   All right.  And did Mr. Sapp likewise have a
 3    role in terms of signing off on a promotion when a
 4    promotion was made?
 5     A.   The process had to be explained to him on how
 6    we came about a name, and then it was moved on from
 7    his office.
 8     Q.   All right, you said the process had to be
 9    explained to him.
10    A.   Yes.
11    Q.   What do you mean by that?
12    A.   In how we came about the name, if there was any
13    consensus with that, who was involved in the decision
                           Page 19

031006wm jp

14    making, if all staff was present and agreed on whoever

15    the person was selected.

16        Q.    All right.  So that's something that you

17    reported on each time --

18        A.    Yes, sir.

19        Q.    -- to him?

20        A.    Yes, sir.

21        Q.    And was it necessary before you made a

22    promotion that Mr. Sapp signed off on it?

23        A.    Yes, sir.

24        Q.    Did you understand that this had been the

                          William Scott McLaren              24


1    procedure before you became acting chief?

2        A.    No.

3        Q.    No, meaning what?

4        A.    No, it wasn't the procedure.  Well, I mean,

5    there was no public safety director prior to Mr. Sapp,

6    unless you go back years, to Mr. Dave Chillas, which

7    was 10 years ago.  So I really can't speak of the

8    process that then Colonel McAllister had and went

9    through.  I only can speak about the process that I

10    had to go through.

11        Q.    Well, when McAllister was the acting, or the

12    chief, what was your position within the department?

13        A.    Lieutenant colonel.

14        Q.    And were you the deputy --

15        A.    Yes, sir.

16        Q.    -- chief?  So were you conferring with Colonel

17    McAllister on these various issues, such as transfers

18    and promotions?

Page 20

031006wm jp

19    A.    Yes, sir.

20    Q.    All right.  Do you know whether Colonel

21    McAllister had Mr. Sapp sign off on transfers and

22    promotions during his tenure?

23    A.    I don't believe so.

24    Q.    So is it fair to say then your understanding is

William Scott McLaren              25


1    that this process changed when you were appointed

2    acting police chief?

3    A.    Yes, sir.

4    Q.    And were you told during this time period that

5    this process was going to change?

6    A.    No.  Like I said, when I was moved into the

7    acting position, the director came in and asked that

8    any time any major move or any item of substance came

9    up, as far as like a homicide or something like that,

10    he wanted to be kept in the loop and advised before

11    any actions are taken.  I shouldn't say actions with

12    homicide, but actions with internal movements.

13    Q.    What was your understanding, if any, as to the

14    authority that Mr. Sapp had for making this demand

15    upon you?

16    A.    The fact that he was the director of public

17    safety appointed by the county executive.

18    Q.    Do you know whether there was any statutory

19    authority that the public safety director had or has?

20    A.    Now, yes.  Then, no.

21    Q.    Okay.  When you say "now, yes," when do you

22    mean "now"?

23    A.    There was a recent county ordinance passed

Page 21

031006wm jp

24      giving the director of public safety full authority

                    William Scott McLaren              26


1       over all public safety, police, EMS, communications.

2          Q.   All right.  And what's your understanding as to

3       when that ordinance was passed?

4          A.   Just recently.

5          Q.   All right, does that mean in the last month or

6       so?

7          A.   I believe in the last two months maybe.  Two,

8       possibly three.

9          Q.   All right.  How do you feel as police chief?

10      How does that affect your role as police chief?

11         A.   How does what affect it?

12         Q.   This new ordinance.

13         A.   It changes the police chief's role a little

14      bit, whereas other people have to be involved in the

15      decision-making process.

16         Q.   So I take it that your understanding is that

17      before this ordinance was passed, it was the police

18      chief's authority to transfer and to promote without

19      having someone above him or her to sign off; is that

20      fair to say?

21         A.   Under state law, yes.

22         Q.   Now, last summer after you came on, were you

23      aware that many of your police officers were being --

24      I'm not sure if loaned is the correct term -- but

                    William Scott McLaren              27


1       redeployed to work in the City of Wilmington?

                           Page 22

031006wm jp

17   speak to County Law shortly after we had that

18   conversation --

19       Q.   All right, well please don't tell me what

20   County Law said.

21       A.   Okay.

22       Q.   I mean that's forbidden under our circumstances

23   here.  I just want to let you know, okay.

24                All right, but when I said did you

William Scott McLaren            31


1    challenge that, I mean was there anything that you did

2    during your tenure as acting chief, which I know

3    continues to this day, for which you received some

4    type of discipline or some type of other -- well,

5    let's say discipline from Mr. Sapp or Mr. Coons?

6        A.   I've never been disciplined or threatened with

7    discipline.  I was concerned, again, another gray area

8    that if I was given an order and didn't follow it, if

9    it would be insubordination or whatever that would

10   fall under.

11       Q.   All right.  Were there any of those

12   circumstances?

13       A.   There was one I made the director aware of that

14   recent deployment or request for deployment, and I

15   talked to the staff about it, and the staff questioned

16   my legal authority to give that order.

17       Q.   But you're the chief.

18       A.   Correct.

19       Q.   What was the basis --

20       A.   Acting chief.

21       Q.   I'm sorry?

Page 26

031006wm jp

22    A.    Acting chief.

23    Q.    Acting chief.  Well, you're serving as the

24    chief, are you not?

William Scott McLaren                    32


1    A.    Yes, sir.

2    Q.    I mean do you have -- let me ask.  As acting

3    chief, do you not have the full powers of the chief of

4    police?

5    A.    Yes.

6    Q.    Yes, you do have the full powers?

7    A.    Yes, I do.

8    Q.    Okay.  So in this circumstance that you just

9    discussed, do you understand the basis why your staff

10    may have challenged your authority to act?

11    A.    Because at the time it did not fully agree with

12    the direction that other people wanted to go in.

13    Q.    Can you be more specific?

14    A.    Yes, the director wanted me to deploy resources

15    into the City of Wilmington.

16    Q.    What resources?

17    A.    Detectives.

18    Q.    For what purpose?

19    A.    To assist the City of Wilmington with a recent

20    homicide they had this year.  I don't have the exact

21    date.

22    Q.    And what was your response?

23    A.    That Wilmington Police did not call and ask for

24    assistance, and that I would call Chief Sczerba and

William Scott McLaren                    33


Page 27

031006wm jp

1    see if he needed any assistance, which I did.

2    Q.    And did you end up sending detectives there?

3    A.    Ended up sending the then commander of the

4    investigative section, Captain Mark Hitch in with a

5    couple detectives to sit down with detectives from the

6    City of Wilmington where they explained their case,

7    what they had, and we offered resources to them at

8    that point.

9    Q.    So if that's the case, how is it that you may

10   have violated what the director wanted you to do?

11   A.    I didn't, there's -- when you're -- there's an

12   investigation mode, and then there's a briefing mode,

13   which is totally different, night and day.

14   Q.    All right --

15   A.    In my opinion.

16   Q.    When I started asking on this line of

17   questions, I thought you had suggested that there was

18   a circumstance where you did not follow what the

19   director wanted you to do.

20   A.    Not to the letter of the law.  He wanted me to

21   send detectives in the City of Wilmington to

22   investigate a homicide without being, the request

23   coming from the City of Wilmington.  There's such

24   things as home rule that affect that, mutual aid

                    William Scott McLaren            34


1    agreements, and the fact that I had been a detective

2    for 11 years, and it's not very good to have two

3    separate entities investigating the same homicide.

4              So more or less a compromise was struck

5    where I sent people in, they were briefed on the case,

                    Page 28

031006wm jp

6    and a proffer was put at that time to the City of

7    Wilmington if they need any assistance, they would

8    contact us.

9    Q.   Is it fair to say that with any significant

10   decision you make as acting chief, you clear that with

11   the director of public safety?

12   A.   If it's something --

13            MS. SANFRANCESCO:   I object.  Can you just

14   clarify what you mean by "significant decision"?

15            MR. MARTIN:   Well, if I may, I mean I

16   think you can make an objection, and he can answer the

17   question.  I don't know that I have a --

18            MS. SANFRANCESCO:   Then I'll just object

19   to the form of the question then.

20            MR. MARTIN:   Okay, that's fine.

21   Q.   Do you understand what the question was?

22   A.   Yes.  If I have a time and there's a long-term

23   or short-term plan or a change in the organization,

24   then I have time to sit down with the director, yes, I

                    William Scott McLaren          35


1    will.  If it's an operational issue, such as

2    something's going on with an investigation where funds

3    have to be freed up, additional people have to be

4    called in, overtime issues, evidence being sent to a

5    certain location, that decision is made on the spot.

6    And those decisions have to be made on the spot.

7    Q.   Okay.  There's a process in the New Castle

8    County Police Department for investigations of

9    officers.  Is that fair to say?

10   A.   Yes, sir.

                    Page 29

031006wm jp

11    Q.    And is that through professional standards?

12    A.    Yes, sir.

13    Q.    Do you recall whether there have been any

14    investigations of New Castle County Police officers

15    that have been done without your knowledge or

16    approval?

17    A.    This is getting into a little bit of a gray

18    area, because I'm prohibited to talk about any

19    internal investigations by the police --

20    Q.    I'm not going to ask you specifics on that.

21    A.    Okay, can you -- question again?

22            MS. SANFRANCESCO:  I'm going to object to

23    the form of the question as well for the record.

24            MR. MARTIN:  Okay.  Julie, can you help me

                    William Scott McLaren            36


1    here, please?

2            (The requested portion was read.)

3    Q.    All I'm asking for is a yes or no without any

4    details as to what the investigations are.

5    A.    It's hard to answer yes or no, because there's

6    investigations and there's inquiries.  So I guess to

7    answer your question, yes.

8    Q.    Do you know whether that type of thing occurred

9    during the administrations of past New Castle County

10    Police chiefs?

11    A.    I would be guessing, and I really have no

12    direct knowledge.

13    Q.    All right, well I don't want you to guess.  But

14    you were deputy chief under McAllister, correct?

15    A.    Yes.

                    Page 30

031006wm jp

16      Q.   What was your understanding, if any, as to
17    whether investigations of your officers could be
18    conducted without the chief being advised?
19      A.   It was my understanding the chief of police has
20    to sign off on the professional standards unit
21    complaint form before an investigation is initiated.
22      Q.   All right, so this is, indeed, a change?
23              MS. SANFRANCESCO:  I'm going to object
24    again, just to the form of the question, in terms of

William Scott McLaren          37

1    his earlier testimony about inquiries versus
2    investigation in that question.
3      Q.   All right, I'll withdraw the question.  I think
4    it may have been asked and answered.
5              Do you know whether there have been
6    investigations conducted on New Castle County Police
7    officers that have not been authorized or assigned to
8    professional standards?
9      A.   Yes.
10      Q.   Have there been any situations where you've
11    been forced to discipline officers who you believe did
12    not deserve the punishment that they deserved?
13      A.   Forced to, no.
14      Q.   Is Mr. Sapp involved in any decisions with
15    regard to officer discipline?
16      A.   I would keep Mr. Sapp apprised of what's going
17    on with the investigation, but as far as him saying
18    this is what this officer should or shouldn't get, no.
19      Q.   No, that has not happened?
20      A.   Discussions have happened about discipline.
Page 31

031006wm jp

21    Q.    Right.

22    A.    And only his, his direction was I had the last

23    call on discipline, and whatever I deemed was

24    appropriate, it would stand.

                        William Scott McLaren        38


1    Q.    Okay.  I understand you have pretty close

2    contact with Mr. Sapp, the director of public safety,

3    because he's right across the hall from you, correct?

4    A.    Professional.

5    Q.    I'm sorry?

6    A.    Professional contact, yes.

7    Q.    Well, that's what I meant.

8    A.    Right.

9    Q.    I didn't mean anything otherwise.

10            What is your understanding as to whether,

11    when you present something to Guy Sapp, whether he's

12    able to make a decision on that or whether he has to,

13    in turn, contact the Government Center before a

14    decision is rendered?

15    A.    A lot of times he would ask to -- you know, he

16    would think about it.  He would ask if we have to move

17    on this right away, and the majority of issues that we

18    don't have to move on right away, he would say he

19    would like to get back to me on those issues.  I don't

20    know what kind of marching orders he has or orders

21    that he has to abide by.  We've never discussed that.

22    Q.    So he doesn't tell you with whom he may speak

23    about these various issues?

24    A.    No.

                        William Scott McLaren        39
                            Page 32

031006wm jp

15  separate line for that, but we do of course have an
16  overtime line, so I imagine it would be coming out of
17  one of those lines.
18      Q.  All right.  Well, just so you have some fair
19  warning, I'm going to make that request of your
20  attorneys, and I hope that doesn't have to put a lot
21  of additional burdens on you.  But maybe you could get
22  somebody who can take care of that for us.
23              (Discussion held off the record.)
24              MR. MARTIN:  All right.  Let's go back on.
                    William Scott McLaren          62


1               Last, let me mark this as McLaren 1,
2   please.
3               (McLaren Exhibit No. 1 was marked for
4   identification.)
5   BY MR. MARTIN:
6       Q.  All right, I've handed you, and it's been
7   marked as McLaren 1, what is marked on top as noted as
8   "Directive 34, Promotions" is the heading, "Revised
9   1-1-04."  First of all, are you familiar with this
10  document?
11      A.  Yes, I am.
12      Q.  Do you know whether this document is still in
13  effect?
14      A.  Yes, it is.
15      Q.  And do you know whether there have been any
16  revisions since 1-1-04?
17      A.  No.
18      Q.  No, there have not been?
19      A.  No, there has not been, but the most recent
                        Page 52

031006wm jp

20    promotion process is being redesigned as we speak as
21    far as using an outside assessment center.
22        Q.    Okay.
23        A.    So it's a two-part answer.
24        Q.    I see that, all right.  The promotional process

William Scott McLaren                63


1    will involve this outside entity that's not --
2        A.    That's right.
3        Q.    -- set forth in this Directive 34.
4        A.    Yes, sir, correct.
5        Q.    Let me just direct your attention to part 1,
6    section B, where it says, and I quote, the, "The chief
7    of police or designee shall perform that function for
8    promotions below the rank of captain."
9            Do you know whether that's still
10    effective?
11        A.    Yes, it's still a directive.
12        Q.    All right.  And part C, where it says, "The
13    chief of police is the authority for all promotions
14    within the police department."
15        A.    Yes.
16        Q.    That's still in effect?
17        A.    Yes.
18        Q.    Now, has this in any way been modified by the
19    new ordinances that you referred to during your
20    deposition testimony?
21        A.    I'm being told by the director yes.
22        Q.    You're being told that these particular items
23    that we have enumerated may be changed?
24        A.    I don't want to -- not these items per se, but
                              Page 53

031006wm jp

William Scott McLaren                    64

1    as far as overall full authority to make decisions

2    based on this new ordinance rests solely with the

3    director, overall authority.

4        Q.   Okay.  And this Directive 34 was in effect when

5    you were appointed acting chief at the end of July,

6    correct?

7        A.   Yes, sir, yes, sir.

8        Q.   And to the best of your knowledge, it's still

9    in effect?

10       A.   Yes, sir.

11               MR. MARTIN:  Okay, thank you.  Nothing

12   further.

13   BY MR. GODDESS:

14       Q.   Let me just ask a question I guess in a way

15   it's already been asked of you.  In addition to the

16   preparation that you mentioned in response to

17   Mr. Martin's question, did you talk to Mr. Navarro

18   before this deposition?

19       A.   Mr. Navarro works directly for me, so we talk

20   over a host of issues.  But as far as preparing for

21   this and what to say, what not to say, no.

22       Q.   Well not what to say --

23       A.   Correct.

24       Q.   -- but what you would say if asked X or Y?

William Scott McLaren                    65


1        A.   No.

2        Q.   It wasn't that kind of conversation?

Page 54