# EXHIBIT 5

0522v1tn 1r

Volume One                                      1


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,      )   Volume 1
            Plaintiff,          )   Civil Action
                                )   No. 05-565 GMS
v.                              )
CHRISTOPHER A. COONS,           )
individually and in his         )
official capacity; GUY H. SAPP, )
individually and in his official)
capacity; and NEW CASTLE        )
COUNTY, a municipal corporation,)
                                )
            Defendants.         )

     Deposition of CORPORAL TRINIDAD NAVARRO taken
pursuant to notice at the New Castle County Law
Department, 87 Reads Way, New Castle, Delaware,
beginning at 9:28 a.m. on Monday, May 22, 2006, before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        Margolis Edelstein
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiff Trinidad Navarro

        MICHELE ALLEN, ESQ.
        MEGAN SANFRANCESCO, ESQ.
        JUDITH A. HILDICK, ESQ.
        New Castle County Law Department
          87 Reads Way
          New Castle, Delaware 19720-1648
          for the Defendant New Castle County

        JEFFREY S. GODDESS
        Rosenthal, Monhait & Goddess, P.A.
          919 N. Market Street, Suite 1401
          Wilmington, Delaware 19801
          for the Defendants Christopher A. Coons
          and Guy H. Sapp

            WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

                                                2


1               CORPORAL TRINIDAD NAVARRO,

2       the witness herein, having first been

0522v1tn 1r

18    interrogatories in preparation for your deposition?

19        A.   I was assuming the interrogatories were part of

20    this, so if I did state that, I was confused.

21        Q.   You have never reviewed these with your

22    attorney?

23        A.   I have not.

24        Q.   I am going to ask you then to focus on the

Corporal Trinidad Navarro                6

1    complaint for me which you have indicated you have

2    reviewed.  Part of the claims that you are claiming is

3    that you've had some type of emotional pain or anguish

4    due to the fact that you were not promoted.  Can you

5    explain that in detail?

6        A.   Well, for about the last, nearly eight years, I

7    have been the public information officer.  During that

8    time, I have witnessed countless promotions.  I don't

9    know exactly how many, but several.  And each time it

10   happens, I am somewhat disappointed that I wasn't

11   promoted.  I know that I can do the job.  I know that

12   I have done my job very well, and I know that the

13   leadership of the Police Department wanted to promote

14   me.

15            This past time, I tested like everyone

16   else, appeared or scored number 12 on the test.  The

17   positions were available.  And they weren't filled

18   because of the County's dislike for me.  Because of

19   that, I have had to witness, just on Friday, the

20   handshakes -- there were promotions on Friday -- the

21   handshakes, the congratulations, the hugs, the phone

22   calls.  It was disheartening, knowing that I should

0522v1tn 1r

23    have been promoted last year and it was withheld for
24    political reasons.

                    Corporal Trinidad Navarro                    7


1                    I'll forever be the person who had to sue
2     to get promoted.  I have been a loyal employee for the
3     Police Department for -- a company man -- for almost
4     15 years.  Because I wasn't promoted, it's upsetting.
5        Q.   You said that you were upset because you saw
6     several people promoted, and one of them was not you.
7     Correct?
8        A.   Over the years, yes.
9        Q.   But over the years, the only time you have been
10    eligible for the promotion has been on the 2004 list?
11       A.   That's correct.
12       Q.   All the times people were promoted you weren't
13    eligible?
14       A.   I was not.
15       Q.   And I understand that the not being promoted
16    off the 2004 list upset you.  Have you sought any
17    treatment by a doctor?
18       A.   I have not.
19       Q.   Have you received any type of counseling or
20    anything?
21       A.   I have not.
22       Q.   In relation to the emotional stress.
23       A.   No formal counseling.  I have spoken with my
24    wife, my family, friends, but no actual formal
                    Corporal Trinidad Navarro                    8

0522v1tn 1r

1    counseling with a professional.

2        Q.    Is there a reason for that?

3        A.    There is no reason.

4        Q.    Do you feel that you don't need any type of

5    counseling or anything for that?

6        A.    No.

7        Q.    I am sorry.  No, you don't need counseling?

8        A.    No, I don't need counseling.

9        Q.    Okay.  You indicate that, and you have just

10   stated, that you have been discriminated against and

11   you didn't get the promotion because of political

12   reasons, and you indicated that part of that reason is

13   the speech that you have stated.  Can you be specific

14   as to what speech you are referring to?

15       A.    Sure.  On several occasions, I spoke with

16   Allison Taylor Levine about her perception of the

17   dislike that the administration -- the administration

18   being Chris Coons and his staff, including Dave

19   Singleton and Guy Sapp -- the dislike that they have

20   for me because of my perceived allegiance to Dave

21   McAllister.

22               Around April or May of last year, I spoke

23   up -- I went to our F.O.P. leadership to -- and

24   organized a group of five other officers to inquire

                    Corporal Trinidad Navarro            9


1    about the promotional process, to inquire about why

2    the positions weren't filled, to inquire about how

3    many positions were available.  And that was something

4    I organized.

5               Later, there was a meeting, but it was

                    Page 7

0522v1tn 1r

6    another occasion where I actually spoke up.

7              Now, with regard to Allison Levine, on

8    several occasions, we had contact either in person or

9    by phone, where we discussed the fact that the

10   administration didn't like me.  She asked me to notify

11   her about certain inquiries from the media.  She asked

12   me to notify her about incidents or events of interest

13   that would generate media attention.  I indicated --

14   she also asked me to let her and/or the administration

15   know if -- what Colonel McAllister was planning with

16   regard to -- and an example was the Delaware Today

17   article, and I didn't tell her about that.  And she

18   indicated that it was my duty or my obligation to tell

19   her about media inquiries.  I told her that I could

20   not in good conscience tell her things that would

21   jeopardize my boss' position.  As a PIO or a

22   spokesperson for the Police Department, my primary

23   concern is the integrity of the Police Department and

24   protection of the reputation of the Police Department.

                     Corporal Trinidad Navarro              10


1    Allison and I had had several conversations with

2    regard to that.  She indicated her displeasure with me

3    for not forwarding that information to her.

4              I have to think for a moment.

5              There was an occasion in early -- there was

6    an occasion soon after Allison Levine was hired, where

7    we -- "we" meaning the other PIOs in the County -- met

8    to discuss strategies for media inquiries with regard

9    to the upcoming federal trial involving Tom Gordon and

10   Sherry Freebery.

0522v1tn 1r

11       During those meetings, there was a concern
12    about -- I don't recall who brought it up, but there
13    was a concern about the DM initials in the indictment
14    and how we would handle media inquiries about who
15    everybody believed DM was, Dave McAllister, how we
16    would handle media inquiries.  I spoke up at that
17    meeting and indicated that the initials DM in the
18    indictment, although appear to be -- alleged to be a
19    possible crime with regard to a DELJIS violation, I
20    spoke up for Dave McAllister, or DM, and indicated
21    that we had researched whether or not there was a
22    DELJIS violation, and, in fact, it was not.
23        We also spoke about the Fieldstone project
24    and the fact that our Land Use Department had

Corporal Trinidad Navarro            11


1    researched whether there was any wrongdoings, and it
2    was found that it was not.  During that conversation,
3    I had indicated that Dave McAllister had not done
4    anything wrong, and I thought they were overreacting
5    with regard to media inquiries with regard to his
6    initials.  Essentially, I spoke up for Dave McAllister
7    and attempted to assure everyone in that room that he
8    had done nothing wrong.
9        I have to think about other occasions.
10    Q.    Okay.  We can come back.  I'll ask before we
11    conclude the deposition if there is any other speech
12    that you recall.
13        Just so that we're clear.  In your
14    complaint here that you have alleged, you are not
15    claiming that you did not get the promotion due to

Page 9

0522v1tn 1r

21    Q.    What are you currently studying at Wilmington

22  College?

23    A.    Undergrad, criminal justice.

24    Q.    How many credits do you have so far?

                    Corporal Trinidad Navarro          13


1     A.    I am not sure.  I did obtain an associate's

2   degree.  I have taken one class at Wilmington College.

3   I am presently enrolled in a class, but there are

4   several classes that I won't have to take for what's

5   called PLA, that you could provide a portfolio in

6   those classes -- you'll have to pay for it, but you

7   won't have to take and there is about five or six of

8   those classes.  So I am not sure how many credits I'll

9   have after that time.

10    Q.    The class you are currently taking, does it

11  meet at night?

12    A.    Pardon me?

13    Q.    It meets at night?

14    A.    Yes.

15    Q.    You are only just taking that one class?

16    A.    Yes.  It's a seven-week block class.

17    Q.    When did you start your employment with New

18  Castle County?

19    A.    September 30th, 1991.

20    Q.    And what did you do prior to that?

21    A.    Several things.  I sold life insurance.  I

22  drove a school bus.

23    Q.    Can you give me some time frames of how long

24  you did each?

                    Corporal Trinidad Navarro          14

                        Page 11

0522v1tn 1r

1    A.    When I was 15-years old, which would have been
2    around 1984, I started my first job at the Miller's
3    Carpet Center.  I really don't recall how long I
4    worked there.  Probably a couple months.  There I went
5    to the Air Base Carpet Mart, where I worked for a few
6    years during high school.
7              When I graduated from high school, I worked
8    for Sutton Bus Company for, I want to say, two years.
9    I worked for a liquor store.  I don't remember the
10   name of the place.  But it was by -- I think it was
11   Willow Run Liquors.  I also, around that time, worked
12   for American General -- it's a life and health
13   insurance company -- and worked there until I became a
14   police officer.
15   Q.    When you first applied for a job at New Castle
16   County it was as a police officer?
17   A.    Yes.
18   Q.    Can you just give me a little bit of your
19   career history as a police officer starting from after
20   you graduated, I guess, from the academy?
21   A.    I was assigned to B Squad in patrol.  I worked
22   until -- I'm sorry.  I graduated from the academy, I
23   want to say on May 28th, 1992.  I worked in patrol
24   from that period until October 1998.

                         Corporal Trinidad Navarro              15


1    Q.    During that time, do you recall who your
2    immediate supervisor was when you worked at B Squad?
3    A.    My first supervisor was Lieutenant James
4    Sharkey.

                         Page 12

0522v1tn 1r

5    Q.   Do you recall who the chief of police was when

6    you were hired?

7    A.   Yes.  It was Tom Gordon.

8    Q.   Then you left B Squad October 28th of what

9    year?

10   A.   It was October 1998.

11   Q.   Okay.  Then from there?

12   A.   I was assigned to the Public Information Office

13   for the Police Department.

14   Q.   Was that a job you applied for?

15   A.   No.  Well, I did submit memorandums for that

16   position as well as memorandums for the criminal

17   investigation unit.

18   Q.   Do you still have copies of those memorandums?

19   A.   I do not.

20   Q.   At that time, who was chief of police?

21   A.   John Cunningham.

22   Q.   Were those memos directed to him?

23   A.   Yes.  Through the chain of command.

24   Q.   Can you summarize for us what the memorandums

Corporal Trinidad Navarro          16


1    stated?  Did they request that you go into the PIO

2    position?

3    A.   In summary, I would say, sir, writer

4    respectfully requests the opportunity to work in the

5    position of, or as a detective and/or the PIO.  They

6    were separate memorandums, but they, essentially, read

7    the same, just with different positions.

8    Q.   And why did you want to go into the PIO

9    position?

Page 13

0522v1tn 1r

10    A.    Because I was approached by a Sergeant Vince

11    Kowal at the time.  We spoke about the position.  He

12    thought that I would do well in that position.  So I

13    entered or submitted a memorandum for that position as

14    well as for detectives.

15    Q.    Was there a person in the PIO position prior to

16    you submitting this memorandum?

17    A.    Yes.

18    Q.    Do you recall who that was?

19    A.    I don't recall the exact date when I first

20    submitted for the position, but I think it may have

21    been lieutenant -- well, at the time, Pat Crowell.

22    He's now a lieutenant.  I don't recall his rank at the

23    time.  Or it may have been Elmer Setting, who was also

24    a PIO.

Corporal Trinidad Navarro                17


1    Q.    Do you remember why the position was becoming

2    available?  Were they leaving?  Was the person leaving

3    that position, or were they just rotating in new

4    people?

5    A.    My recollection was that they weren't happy

6    with the PIO who I replaced.  He is Joe Lavelle.

7    Q.    You do recall replacing, is it Joe Lavelle?

8    A.    Yes.

9    Q.    And you do recall replacing him?

10    A.    Yes.

11    Q.    And when you said they weren't happy with him,

12    who was "they"?

13    A.    The police administration were not happy with

14    the PIO position, the performance of the PIO.  It was

Page 14

0522v1tn 1r

15    shortly after -- I don't know if he requested to come

16    out or if he was told he was coming out.  But around

17    that time period, I was told that I was going to

18    detectives.  Shortly thereafter, I was approached

19    again by Vince Kowal, who had said that he wanted me

20    to work for him in the PIO office.

21        Q.    Again, you said the police administration.  Can

22    you be more specific who exactly?  Was it the chief of

23    police that was unhappy with the PIO?

24        A.    I don't know for sure.

Corporal Trinidad Navarro            18


1        Q.    Do you know what the specific complaints were?

2        A.    I don't know a lot about the Joe Lavelle's

3    track record as a PIO.  I do know that when he left,

4    he didn't really provide me with much material to

5    learn the job.  So I don't know specifically why they

6    were unhappy.  I do surmise that he left rather

7    quickly and left without leaving anything for me to

8    learn from.

9        Q.    When you were approached by Vince Kowal, did he

10    give you any vision as to what they wanted this PIO

11    position to entail?

12        A.    I don't recall if we actually discussed what

13    the job was about.  I do know or recall that I went to

14    Major Joe Bryant and asked to speak with him about the

15    position.

16        Q.    And you so you eventually took the PIO

17    position; is that correct?

18        A.    I did after speaking with Major Bryant.  He had

19    asked me a very candid question, and that question

Page 15

0522v1tn 1r

20    was:  Do you see your position here -- do you want to
21    be promoted?  That's not verbatim, but that was, you
22    know, if you want to be promoted, you should probably
23    take the PIO position because that is traditionally
24    the position that officers are promoted from.

                    Corporal Trinidad Navarro          19


1     Q.    So you chose to go into the PIO position
2     instead of going into detectives?
3          A.    Yes.
4          Q.    And people are routinely promoted from
5     detectives?
6          A.    I didn't say that.
7          Q.    I know.  I am asking.
8          A.    Okay.  I'm sorry.  Some of the promotions, yes.
9     Routinely, I am not sure.
10         Q.    Do you recall what Joe Lavelle's rank was when
11    he held the PIO position?
12         A.    I believe he was an officer.
13         Q.    When he left the position, was he still an
14    officer?
15         A.    Well, he has not been promoted, if that answers
16    your question.  I don't know if he was a corporal when
17    he left or still an officer.
18         Q.    How long was he PIO?
19         A.    I am not sure.  It was several months.  Maybe a
20    year or two.  I am not sure.
21         Q.    You had also said that to the best of your
22    knowledge Elmer Setting also served as PIO at some
23    point?
24         A.    Yes.

                    Page 16

0522v1tn 1r

Corporal Trinidad Navarro                    20

1     Q.   How long did he serve as PIO, if you recall?
2     A.   I am not sure.  I would say, again, several
3  months, perhaps two or more years.
4     Q.   And you said is it Pat Crowell?
5     A.   Yes.
6     Q.   How long did he serve as PIO, do you recall?
7     A.   I don't know.  Around the same time as everyone
8  else.
9     Q.   Around two years?
10    A.   I am guessing.
11    Q.   Okay.  And how long have you currently been
12  serving -- are you still currently the PIO for the New
13  Castle County Police Department?
14    A.   I am.
15    Q.   How long have you been serving in that
16  position?
17    A.   Seven years and about eight months.
18    Q.   So when you came into the PIO position,
19  Cunningham was the chief?
20    A.   Yes, ma'am.
21    Q.   And you also served under McAllister; is that
22  correct?
23    A.   Yes, ma'am.
24    Q.   And currently serving under the acting chief,

Corporal Trinidad Navarro                    21

1  Lieutenant Colonel Scott McLaren?
2     A.   That's correct.

Page 17

0522v1tn 1r

3    Q.    When you first took the position as PIO, what
4    did you believe your duties and responsibilities were
5    going to be?

6    A.    To promote the department; to protect the
7    department from negative press; to inform the media of
8    day-to-day police operations, arrests, programs, those
9    types of -- I was the media coordinator for the Police
10   Department.

11   Q.    who was your immediate -- I guess who was and
12   is your immediate supervisor as the PIO?

13   A.    When I first started in 1998, Lieutenant Vince
14   Kowal was my immediate supervisor.  He has since
15   retired.  And since then, I did work for or with
16   Lieutenant Patrick Crowell for some time.  I don't
17   recall if at that point he was my supervisor or if I
18   fell directly under the chief of police.  But I do
19   recall lieutenant Crowell did do my evaluations.

20   Q.    After Lieutenant Crowell, assuming he may have
21   been a supervisor at that time, after he was no longer
22   serving in that capacity, who would have done your
23   evaluations?

24   A.    I know that Jack Cunningham did do some of my

                    Corporal Trinidad Navarro          22


1    evaluations.  And I do know that Dave McAllister did
2    do some of my evaluations.

3    Q.    And during the time under, I guess, during the
4    time you held the PIO position, other than David
5    Singleton, who was the other chief administrative
6    officer?

7    A.    Well, before Sherry Freebery, I am not sure.

Page 18

0522v1tn 1r

1    refer to?

2        A.    Not that I can recall.

3        Q.    But you don't recall whether or not David

4    Singleton or Chris Coons or Guy Sapp specifically

5    directed that transfer?

6        A.    I don't recall who it was.  I do recall that

7    that was a transfer that Scott McLaren had to make.

8        Q.    Did you hear that from Scott McLaren?

9        A.    No.  I don't -- no.

10       Q.    Anything else with respect to transfers, any

11   specific instances?

12       A.    None that I can recall.

13       Q.    Did you have any knowledge or did you ever hear

14   that Sherry Freebery while she was chief

15   administrative officer had any involvement in

16   transfers within the Police Department?

17       A.    No.

18       Q.    No, you didn't hear that or, no, she did not?

19       A.    I have no direct knowledge of Sherry Freebery

20   being involved in transfers within the Police

21   Department.

22       Q.    You also indicated that David Singleton, the

23   current CAO, was involved in disciplinary procedures

24   within the Police Department?  Can you tell me how you

                    Corporal Trinidad Navarro          34


1    know that and what specifically you are referring to?

2        A.    Dave McAllister told me that for disciplinary

3    investigations, he had to prepare documents for Dave

4    Singleton.  I know that for -- Dave Singleton reviewed

                    Page 28

0522v1tn 1r
5   personnel files, disciplinary files.

6       Q.   Do you know specifically of anybody in

7   particular?

8       A.   Yes.  Bruce Pinkett.  Wendy Hudson.  And

9   officers who were up for promotion, officers who were

10  eligible for promotion from the last list.

11      Q.   Okay.  And you know about this how?

12      A.   I saw the files.  My file is one of them that

13  was in Colonel McAllister's office.  And it was

14  indicated those files were going up to the Government

15  Center to be reviewed by Dave Singleton.

16      Q.   You indicated you saw the other files?

17      A.   I saw folders like this with names on it of

18  other officers, including my own.

19      Q.   And they were personnel files or PSU files?

20      A.   I didn't look into the files.  I am not sure

21  what was in the files.  But Dave McAllister indicated

22  that they were personnel files, files that would

23  contain discipline.  So I don't know if that means

24  professional standard files.  I am assuming.  That

                Corporal Trinidad Navarro         35


1   kind -- those kind of files.

2       Q.   The files that you were saw were -- and I don't

3   mean the inside of them, but as you said, the names,

4   were yourself, Wendy Hudson, Bruce Pinkett?

5       A.   No.  The files that I saw were myself; Wendi

6   Feeser; John Treadwell; Rich Dunning; Joe Trala, and I

7   think, Rob.

8       Q.   Joseph?

9       A.   Rob Joseph.

0522v1tn 1r

10   Q.   And Colonel McAllister told you those files

11   were going over to the Government Center?

12   A.   Yes.

13   Q.   All of those people were up for promotion?

14   A.   Yes.

15   Q.   How did you know that or how do you have the

16   information that Wendy Hudson and -- is it Bruce

17   Pinkett did you say?

18   A.   Yes.

19   Q.   -- that their files were reviewed by the CAO?

20   A.   Bruce Pinkett was selected to go to the FBI

21   academy.  Dave McAllister indicated that Guy Sapp was

22   not happy with that selection because Dave Singleton

23   was not happy with that selection.  Dave McAllister

24   indicated that Dave Singleton asked to review

Corporal Trinidad Navarro          36


1   personnel files of Bruce Pinkett with respect to that

2   training or that training opportunity.

3   Q.   I am sorry.  Do you recall when he was supposed

4   to have gone, what time frame, and when that review

5   would have occurred?

6   A.   It would have been within the first few months

7   of Chris Coons' administration.

8   Q.   Okay.

9   A.   Before -- I believe it was before Guy Sapp

10   was -- or right around the time Guy Sapp was hired as

11   director of public safety.

12   Q.   Anybody else's files that you are aware of?

13   A.   Well, I know that he requested Lieutenant Wendy

14   Hudson's file because he had objected to --

Page 30

0522v1tn lr

9    was on the list?

10   A.    I don't recall.  She scored higher than I did.

11   Q.    And you stated you are not really aware of what

12   her background or job performance or anything was?

13   A.    Well, I do know she was a detective for years.

14   I know she served in patrol for years.  I never

15   personally worked with her.

16   Q.    What about Lloyd Joseph?  Do you recall what

17   his rank was?

18   A.    No.  But I can tell you that he scored higher

19   than I did.

20   Q.    Do you have any background information on him?

21   A.    Again, I worked with him in patrol for years.

22   I know that he worked in our fleet management position

23   for some time.  I know that he worked in detectives

24   for some time.

                    Corporal Trinidad Navarro          61


1    Q.    Do you know whether or not either one of them

2    had recently been acting sergeants?

3    A.    I believe they both had been.

4    Q.    Have you heard or do you know how the

5    conclusions were reached to promote those two?

6    A.    Well, the previous promotions were made by the

7    chief of police.  Most recently, the promotions have

8    been chosen sort of as a consensus among the chief and

9    the staff.

10   Q.    Do you know who that staff consists of?

11   A.    Yes, ma'am.

12   Q.    Can you tell me?

13   A.    Lieutenant Colonel Scott McLaren; Major James

                          Page 51

0522v1tn 1r

14    Hedrick; Major Stewart Snyder; Captain Debra Rees;

15    Captain Mark Hitch; Captain Quentin Watson; Captain

16    Matthew Jameson.  Is that five?

17        Q.    It should be five and two majors?

18        A.    Five captains, two majors and lieutenant

19    colonel.

20        Q.    They all had input on the promotion of Trish

21    Davies and Lloyd Joseph; is that correct?

22        A.    I don't know specifically, but I assume so.

23        Q.    That's your understanding?  That's what you've

24    heard?

Corporal Trinidad Navarro                62

1         A.    Yes.

2         Q.    Did Colonel McAllister ever tell you you were

3    the Hispanic he intended to promote?

4         A.    Yes.

5         Q.    When did he tell you that?

6         A.    Sometime in the spring of 2005.

7         Q.    Do you recall where the conversation took

8    place?

9         A.    In our office.  We -- I worked -- my desk is in

10    his office.

11        Q.    Do you recall how the conversation came up?

12        A.    Not specifically, no.

13        Q.    Did he tell you any other time that you were

14    the person he intended to promote?

15        A.    We had discussions after Mr. Sapp chose to only

16    release one requisition.  Colonel McAllister and I had

17    discussions that he had indicated that he did intend

18    to promote me, John Treadwell and a female officer.

Page 52

0522v1tn 1r

19    Q.   Did he tell you who the female officer was?

20    A.   He -- I now know he was leaning toward Wendi

21    Feeser, but I don't know that he ever told me which

22    one of the two.  Two being Wendi Feeser and Trish

23    Davies.  I don't know if he ever told me which one it

24    would be.

Corporal Trinidad Navarro                63

1    Q.   Do you know whether or not he ever articulated

2    that to anybody else?

3    A.   Specifically?

4    Q.   Yes.

5    A.   I believe he articulated that to Guy Sapp, to

6    Scott McLaren.  I don't know if he spoke to other

7    members of his staff or not.

8    Q.   How do you know that?

9    A.   Dave McAllister told me.

10    Q.   The complaint references that you engaged in

11    protected activities on matters of public concern and

12    that after you participated in that activity, you were

13    advised that the two additional budgeted positions

14    would not be filled.  And that is paragraph 34 and 35

15    (a) of the complaint, Exhibit 1.  Can you tell me

16    specifically what the protected activity was that you

17    engaged in?

18    A.   Well, I am not an attorney, but my free speech.

19    I spoke up against -- well, not against, but for

20    myself and the other officers who weren't promoted.  I

21    went to the F.O.P. president, Marge Ellwein.  Marge

22    Ellwein worked on Chris Coons' campaign.  Marge

23    Ellwein spent a lag amount of time in Guy Sapp's

0522v1tn 1r

24     office.  I spoke up at the PIO meetings in defense for

Corporal Trinidad Navarro                    64


1      Dave McAllister and the Police Department.

2         Q.    During those meetings, did you ever speak up

3      for the County as a whole in general?

4         A.    Sure.  Yes.

5         Q.    Can you be specific?

6         A.    Well, I indicated that the initials in the

7      indictment were -- should not have been in there

8      because it appears as if the chief of police had done

9      something wrong.

10              I also indicated that I did not believe --

11     let me rephrase that.  I indicated that there may not

12     even be a federal trial with respect to Tom and Sherry

13     because I alluded that many of the things I read in

14     the indictment I, believe, were frivolous.

15        Q.    Was it your -- any other protected activity

16     that you engaged in?

17        A.    None that I recall.

18        Q.    What were the matters -- are there any other

19     matters of public concern?

20        A.    None that I can recall.

21        Q.    When you took the written exam for the 2004

22     sergeants test, did you have any knowledge of the

23     questions beforehand?

24        A.    No.

Corporal Trinidad Navarro                    65


1         Q.    Did you speak with anybody about the test

2      beforehand?

Page 54

0522v1tn 1r

10    asked her again, what has changed?  This was your

11    opinion -- and if you have the document, it's dated --

12    this is your opinion, and what has since changed?  She

13    could not provide a response.

14                (Navarro Deposition Exhibit No. 5 was

15    marked for identification.)

16    BY MS. ALLEN:

17        Q.   Did you have any personal conversation with

18    Marge?

19        A.   Very few.

20        Q.   Regarding this issue.

21        A.   Which issue?  I'm sorry.

22        Q.   Just the promotional issue in general.

23        A.   I did speak with Marge.  I don't recall

24    specifically a date.  I talked to her in the hallway

                    Corporal Trinidad Navarro              80

1    about the positions.  Again, she had indicated that --

2    because it affected so few, they weren't going to get

3    involved.  "They" meaning the F.O.P.

4        Q.   Okay.  You indicated that immediately after --

5    and it appears from the memo from Marge Ellwein that

6    the meeting happened on May 16th, 2005.  Would that

7    make sense to you that --

8        A.   It would, yes, ma'am.

9        Q.   You indicated after that meeting you spoke to

10    the officers outside?

11        A.   Yes.

12        Q.   Can you tell me about the conversation there?

13        A.   Well, the conversation was pretty light.  We

14    were actually somewhat relieved that there was an

                            Page 67

0522v1tn 1r

15    answer to our question and that they were going to

16    move ahead with the positions.

17         Now, we all argued or, amongst ourselves,

18    that their excuse wasn't valid, simply because a

19    sergeant makes 5 percent more than an officer, and we

20    were pay actors that 5 percent premium to do 20

21    percent of the work. So we didn't agree with his

22    rationale, but we were actually sort of relieved that

23    the process was going to move forward. We actually

24    had a date where the promotions would be filled.

                    Corporal Trinidad Navarro          81


1    Q.   Was everybody who attended -- were the officers

2    who attended the meeting, were they all in agreement

3    that they thought the fiscal reasoning was an excuse?

4    A.   They thought that it was an invalid excuse. We

5    all discussed that.

6    Q.   Were there any discussions as to what any type

7    of motives or anything may have been?

8    A.   No. Not that I can recall.

9    Q.   Was there any other reasons for not immediately

10   moving ahead with the promotions that were discussed

11   at the meeting?

12   A.   None that I recall.

13        If you refer to Marge's document, the third

14   paragraph says, "We see little savings in not

15   promoting into a position that has already been

16   budgeted. No explanation was given for the deficit,

17   but certainly the budgeted sergeants position did not

18   cause the financial problem."

19             Again, that was the opinion of our F.O.P.
                          Page 68

0522v1tn 1r

20   president, Marge Ellwein.

21      Q.   Okay.  At some point, do you receive

22   information that, I guess, the July date comes and the

23   positions are not filled?

24      A.   I didn't -- I was hearing rumors.  Forgive me

Corporal Trinidad Navarro                    82


1   for not remembering who I heard these rumors from, but

2   that the positions would not be filled on July 1st

3   that, they were going to be delayed.  That was sort of

4   just talk I had heard around the building.

5      Q.   Did you do anything with respect to hearing

6   that rumor, like return to the F.O.P.?

7      A.   No.  I had had -- I was fed up with the F.O.P.

8   and their response.  They had fought other fights.

9   And I felt like they were treating us unfairly.

10           We had an officer who was arrested for

11   beating up his wife, and the F.O.P. provided funding

12   for his defense, went to bat for him.  Here in our

13   situation, the F.O.P. not only in writing said they

14   wanted the positions filled, but they agreed with the

15   officers at the time, and then for some reason they

16   changed their stance.  So I had had -- I went to them

17   for help.  They didn't help.  So I was through with

18   them.

19      Q.   Do you have any reasons or facts or anything to

20   support why you don't think they continued to push

21   this forward?

22      A.   Facts?  No.

23      Q.   It appears -- and I will have this marked.  I'm

24   sorry.

Page 69

0522v1tn 1r

Corporal Trinidad Navarro                    83

1                    (Navarro Deposition Exhibit No. 6 was

2        marked for identification.)

3        BY MS. ALLEN:

4            Q.    Did you have another meeting with the director

5        of public safety in which you were informed that the

6        two additional positions would not be filled?

7            A.    Yes.

8            Q.    Who was present at that meeting, if you recall?

9            A.    The same officers as before with the addition

10       of Rich Dunning.

11           Q.    What about John Treadwell?

12           A.    I don't remember.  I don't remember if John had

13       already been promoted or if he was still waiting.

14           Q.    Was Marge present at this meeting?

15           A.    Yes.

16           Q.    Anybody else?

17           A.    The director, the officers, and Marge.

18           Q.    And what was your understanding of the meeting?

19           A.    Mr. Sapp indicated -- he apologized and said he

20       should not have promised to fill the positions.   He

21       had reviewed the department, and even though we had

22       several acting positions, thought we needed more

23       officers, less supervisors.

24                    Marge Ellwein, who was supposed to be the

Corporal Trinidad Navarro                    84

1        voice for the membership, said herself that -- when we

2        asked, does that mean when more openings come up or

Page 70

0522v1tn 1r

3    retirements come up for lieutenants and above, does

4    that mean you won't fill those positions, as has been

5    done in the past?  And Marge Ellwein spoke up and said

6    that's the administration's decision.  And we looked

7    at Marge.  She was, essentially, speaking for the

8    administration rather than the membership.

9        Q.    Well, just so that I am clear, you are saying

10   that it has been the procedure in the past to not fill

11   higher ranking positions, for example, sergeant,

12   lieutenant, to keep the patrol strength large?

13       A.    No, I didn't say that.  The position in the

14   past would be if, for example, a lieutenant retired,

15   they would fill an extra sergeant spot knowing that a

16   sergeant would be promoted to that lieutenant spot.

17   The past practice has sort of been they overpromote

18   sergeants because they know they are going to promote

19   a lieutenant.  That happened countless times.

20            (Discussion off the record.)

21   BY MS. ALLEN:

22       Q.    You sort of referred to in your answer -- and I

23   know it's referred to in your interrogatory

24   responses -- is that Marge was putting forward the

                  Corporal Trinidad Navarro            85


1    position of the administration versus, I guess, what

2    you believe to be the position of the F.O.P.?

3        A.    In that meeting with Mr. Sapp, yes.

4        Q.    But I just didn't quite hear or possibly

5    understand because all she said is that's for the

6    administration to decide later on.  Is that --

7        A.    We -- myself and several of the other officers

                        Page 71

0522v1tn 1r

8    in that room were understandably upset because the

9    positions were supposed to be -- they promised to be

10   filled on the 1st. He then indicated that he wasn't

11   going to fill those positions. We asked candid

12   questions. Does that mean if there are other

13   openings, are you not going to fill them? Does that

14   mean -- because there was a lieutenant who was

15   retiring. Does that mean when he retires, you are not

16   going to fill another sergeant's position as in the

17   past? Marge Ellwein answered for him rather than

18   allowing him to answer. She said that is for -- that

19   is the administration's position.

20       Q.   And that is something that the administration

21   could and would decide?

22       A.   Yes. Yes, ma'am.

23       Q.   Do you recall who called this meeting?

24       A.   I am only assuming the director. It was held

Corporal Trinidad Navarro                    86


1    in his office. But I am not certain.

2        Q.   Did you have any conversations with Marge or

3    any of the other officers or the director, for that

4    matter, after this meeting?

5        A.   Oh, yes. Yes, ma'am. We spoke in the parking

6    lot afterward. Again, we were pretty disappointed and

7    upset that the positions weren't going to be filled.

8    Even if you are not promoted, you still move up on the

9    list. So for people who may not have been chosen,

10   their chances -- and even the ones not in the top five

11   move into the top five. So it was pretty upsetting.

12            We met out in the parking lot afterward.

Page 72

0522v1tn lr

5  committee, is there a tape of that?

6    A.    No.

7    Q.    Do you know if minutes are kept?

8    A.    There may be, yes.

9    Q.    Did you take any notes?

10   A.    I did not.

11           I would like to clarify why it wasn't

12  approved.

13   Q.    Okay.

14   A.    I didn't pursue it.  The rules committee makes

15  a ruling, and then it goes to the body, the F.O.P.

16  body.  And the rules committee ruled on it, approved

17  it.  It went to the body, and it was tabled.  Exactly

18  why it was tabled, I don't specifically recall.  I

19  think it may have had something to do with initially

20  we were asking for 3,000, and then we were asking for

21  5,000.  And it was tabled.  And then I didn't pursue

22  it any further.

23   Q.    When it was tabled and when it was approved by

24  the rules committee, that's still as a group

                    Corporal Trinidad Navarro            98


1  collectively you are seeking the funds?

2    A.    No.  At that point, it was just me.

3    Q.    Even when it comes out of the rules committee,

4  it's just you?

5    A.    I apologize for being a little hazy, but I do

6  recall that Rob Joseph did stand up and speak at an

7  F.O.P. meeting with regard to the funding.  So he

8  may -- he and Joe still may have been a part of that

9  when it was first read at a F.O.P. meeting.  I don't

0522v1tn 1r

10   remember for certain.

11      Q.   What happened to the other officers on the

12   list?  Did they not want to pursue a legal opinion?

13      A.   I think they grew tired of waiting.  So at some

14   point, they dropped out.

15      Q.   Did they specifically tell you their reasoning?

16      A.   No.

17      Q.   They just said they were no longer interested?

18      A.   I didn't actually speak with them personally.

19   So I don't know what they said.

20      Q.   Did you ever at any point ask any of the

21   officers that were initially involved in this, being

22   Wendi Feeser, Trish Davies, John Treadwell, Rob

23   Joseph, Joe Trala --

24      A.   Rich Dunning.

                    Corporal Trinidad Navarro          99


1      Q.   -- and Rich Dunning, did you ever ask them to

2   join in on your lawsuit against the County?

3      A.   No.

4      Q.   You had indicated before that you had, I guess,

5   spoke out at a F.O.P. meeting where you had confronted

6   Marge about changing her position?

7      A.   Yes, ma'am.

8      Q.   Do you recall when that meeting was?

9      A.   I have attended several.  It was definitely

10   last year, either in the fall or winter, before the

11   list expired in December.

12      Q.   And you indicated there were other board

13   members that were surprised that the position was

14   being changed.  Do you know who they were?

                           Page 83

0522v1tn 1r

15    A.    I'm sorry.  I didn't follow you.  You mean

16    other F.O.P. members?

17    Q.    Yes.

18    A.    Do I remember who they were?

19    Q.    Mm-hmm.

20    A.    Well, a lot of retirees that were there came to

21    me and were -- you know, I don't understand the

22    opposition or the change of heart in light of the

23    other funding that was provided for other people.

24    Q.    Are there any minutes kept of these meetings?

Corporal Trinidad Navarro            100


1    A.    I believe so, yes.

2    Q.    Do you know if they're recorded?

3    A.    I don't think audibly recorded.  I think they

4    keep minutes.

5    Q.    Did you take any notes of them?

6    A.    I did not.

7    Q.    You talked about that Marge worked on Chris

8    Coons' campaign.  What type of relationship do you

9    think she has with the administration?

10    A.    Well, from an F.O.P. president standpoint, an

11    inappropriate relationship.  She was on his transition

12    team.  She was a part of his -- had worked on his

13    campaign.  Spent countless hours in Guy Sapp's office.

14    She and Kathy Riddell, who also was a member in the

15    F.O.P., held fundraisers.  That's their -- I

16    understand that's their prerogative.  But from the

17    president of the union's perspective, to me, in my

18    opinion, the relationship is completely inappropriate.

19    Q.    These activities they did at that time, were

Page 84

0522v1tn 1r

20    they ever done as the F.O.P. president?

21    A.    I don't know.  I simply don't know.

22    Q.    Do you know what the F.O.P.'s position has

23    historically been on officer strength versus sergeant

24    supervisor positions?

Corporal Trinidad Navarro            101

1    A.    I don't know.

2    Q.    Returning back to Exhibit 1, paragraphs 11 and

3    12.  You refer a lot to the budgetary discussions and

4    the fiscal positions the different fiscal years.  Did

5    you participate in any of the budgetary discussions?

6    A.    No, ma'am.

7    Q.    Have you had any conversation with anyone who

8    helped prepare the budget?

9    A.    No, ma'am.

10    Q.    How would you characterize your relationship

11    with Allison Levine Taylor?

12    A.    Now or when she first started?

13    Q.    You can give me both.

14    A.    Well, when she first started, very friendly.

15    Not -- we didn't go out for cocktails or anything like

16    that.  We spoke on the phone when she was hired.  I

17    called her and congratulated her.  I was looking

18    forward to working with her.  I wasn't very friendly

19    with the previous communications person from the

20    previous administration.  I was looking forward to

21    working with her.  She also -- we got along pretty

22    well.  We knew each from the News Journal.  We knew

23    while she worked for the Delaware Medical Examiner's

24    office.  We had a really good working relationship.

Page 85

0522v1tn 1r

9    off-site.  It wasn't -- I don't eat Dunkin' Donuts or

10   drink coffee or anything like that.  I think that was

11   just a decision that we got, that we would just have a

12   conversation off-site.  I don't recall it being her

13   idea or my idea.

14      Q.   Did you feel like you couldn't talk in the

15   office?

16      A.   There were, times, yeah.  There were times,

17   yeah, when I felt like I couldn't talk to her.

18      Q.   Why was that?

19      A.   Because my -- the chief of police, where I

20   work, is right in his office.  So rather than say

21   things specifically about the meeting we had, I wanted

22   to do it in privacy.

23      Q.   It says here, in your complaint on paragraph

24   20, it says here -- the last sentence in that --

                    Corporal Trinidad Navarro        105


1    "Plaintiff suggested that he and Levine meet in person

2    to discuss what he described as a bad situation."

3    When you say in person, could that have been at the

4    Police Department or do you think you suggested you

5    meet off-site?

6       A.   I don't remember if it was me or her that

7    suggested meeting off-site.  I know she didn't want to

8    meet here.  There is really no place for me to

9    privately meet with her at the Police Department.  My

10   office is in an area that is sort of a common area.

11      Q.   Did you tell anybody that you were going to

12   meet with her?

13      A.   I might have told the colonel.  I am not 100

                         Page 88

0522v1tn 1r

14    percent certain.  But I think I probably did tell him.

15    Q.    Do you think what his response was, if any?

16    A.    No.

17    Q.    And did you take any notes in the conversation

18    that day?

19    A.    Not during the conversation, no.

20    Q.    Did you take any notes afterwards?

21    A.    Yes.

22    Q.    Do you have them with you?

23    A.    No.

24    Q.    Have you provided them to us?

                    Corporal Trinidad Navarro                    106


1    A.    No.  There is a reason.

2    Q.    What's that reason?

3    A.    They're no longer on my computer.

4    Q.    Did you ever print them out?

5    A.    Yeah.  Yes, ma'am.

6    Q.    What did you do with that?

7    A.    I am not sure.

8    Q.    Do you think you still have a copy of it?

9    A.    I looked.  I don't have it.

10    Q.    Do you recall what the notes said?

11    A.    Yes, ma'am.

12    Q.    What did they say?

13    A.    They said what is in the -- in this document

14    here as far as the meeting, the location, the time,

15    what we spoke about.  That's what is in document No.

16    1.

17    Q.    Why did you take those notes?

18    A.    Well, after I came back to the building, I was

0522v1tn 1r

19    like, I can't believe she said all that.  I can't

20    believe she would tell me how much the County

21    Executive hated me; how much they distrusted me; how

22    she knew that the positions were going to be withheld

23    before even going into that meeting; how she expressed

24    that it would not be in my best interest to stay on

Corporal Trinidad Navarro          107

1     the McAllister team; that not to be labeled as someone

2     not on Chris' team.  All the things that she said, you

3     know, about Chris Coons buttering the bread, she said

4     all that stuff, and she didn't dispute it in her own

5     deposition.  After that was over, I went back and

6     wrote everything down as best as I can recall.

7     Q.    When was the last time you saw those notes?

8     A.    Shortly after writing them.

9     Q.    Did you take a copy to your attorney?

10    A.    I took a copy -- I provided a copy of documents

11    to my attorney, but it was not that specific document.

12    Q.    Did you e-mail it to anybody?

13    A.    No, ma'am.

14    Q.    Is there a reason why you erased it off your

15    computer?

16    A.    I did not erase it.

17    Q.    Did you save it?

18    A.    I did, yes.

19    Q.    You said it's no longer on your computer?

20    A.    It is not.

21    Q.    Why is that?

22    A.    I don't know for sure, but I do know that my

23    computer has been searched; my desk has been searched;

Page 90

0522v1tn 1r

my car while parked in my driveway has been searched.

                        Corporal Trinidad Navarro        108


     1    So I can only guess that it was taken off.  But that's
     2    a guess.  I don't know for sure.  I can tell you that
     3    it's not or no longer on my computer.
     4        Q.   So you did it on your work computer?
     5        A.   Yes, ma'am.
     6        Q.   And did you save it onto the G drive?
     7        A.   I saved it in the -- either my P drive or the C
     8    drive.  I save most of my documents on the P drive so
     9    it's backed up, but I am not certain that I saved
    10    that I saved it on the P drive or the C drive.
    11        Q.   When was it that you noticed it was no longer
    12    there?
    13        A.   Well, a few months ago I went to try to
    14    retrieve it to sort of rehash my recollection of the
    15    conversation, and it was not there.  I went into my
    16    files to look to see if I could find it, and I
    17    couldn't find it.
    18        Q.   And I assume you are like every other employee
    19    in the county, you have a password protected computer
    20    entry?
    21        A.   To sign onto my computer, yes, ma'am.
    22        Q.   And you indicated that your computer had been
    23    searched.  How do you know that?
    24        A.   Well, one of the -- I don't remember which --
                        Corporal Trinidad Navarro        109


     1    one of the IS guys in the building said my computer
                              Page 91

0522v1tn 1r

2      was put -- they changed out the hard drive at some

3      point after I filed suit.  They put my -- contents of

4      my computer on the network, and then at some point put

5      it back on the computer and the hard drive was

6      changed.  And I assuming my computer was searched

7      because that document is no longer on there.

8          Q.   Any other documents that are missing, that you

9      are aware?

10         A.   I couldn't tell you.

11         Q.   And you said you don't know who the person was

12     from IS who told you this?

13         A.   I am not sure if it was -- it definitely wasn't

14     Jim Shiffley.  It definitely was not Steve Morando.

15     It wasn't Joel.  There are a few newer IS guys whom I

16     don't know them by the first name.

17         Q.   Did this conversation happen in person or over

18     the phone?

19         A.   No.  It was in-person.  It was at my desk.

20         Q.   Do you recall what the person looks like?

21         A.   Yeah.  Dark hair, olive complexion.  I believe

22     it was either him -- there is two new guys in the

23     building.  Actually three new guys.  It was one of the

24     three new guys.

                    Corporal Trinidad Navarro            110


1          Q.   You also said that your desk had been searched?

2          A.   Yes, ma'am.

3          Q.   How do you know that?

4          A.   Well, I am not going to lie to you and tell you

5      I keep a tidy desk.  I sort of know where most of the

6      things are.  I keep my time sheets in a certain area.

0522v1tn 1r

7    I keep my time card in a certain area. And just other

8    things were just moved, were disturbed. So that's

9    what leads me to believe that my desk was searched.

10    Q.    Anything other than that?

11    A.    Well, Scott McLaren, when he -- he had gone

12    away -- and this was early into his tenure as acting

13    chief -- he actually put tape on his dresser -- not

14    dresser, desk drawers. And when he came back, the

15    tape was broken.

16    Q.    Anything else specific to your desk?

17    A.    No, ma'am.

18    Q.    You also, I think said your personal vehicle or

19    your police vehicle was searched?

20    A.    My police car.

21    Q.    How do you know that?

22    A.    When I went out to my car on an occasion late

23    summer, early fall, my seat -- the position of my seat

24    had been moved. I keep cups sort of in between my

Corporal Trinidad Navarro          111


1    seats. I keep change in them. Things like that.

2    They had been moved. They were actually on the floor.

3    And the cable for my laptop computer, which I don't

4    keep in my car because I don't have one any longer,

5    was out from under the seat, where it's not kept. I

6    keep it tucked under the seat. It was up on top of

7    the seat on the passenger side.

8    Q.    Do you lock your police vehicle every night?

9    A.    Mostly. I say mostly because there is

10    occasions when I take my daughter out of the car as I

11    pick her up after work from daycare, there are times

Page 93

0522v1tn 1r

12    when, because I have hands full, I forget to lock it.

13    I try to lock it every night, yes.

14        Q.    Do you recall whether or not you locked it that

15    night before?

16        A.    I think I did.  I don't know for sure.  It was

17    locked in the morning.

18        Q.    Okay.  Back to the conversation that you had

19    with Allison Levine Taylor at the Dunkin' Donuts.  Did

20    you tape-record that conversation?

21        A.    No, I did not.

22        Q.    Did you -- that day, did you discuss your

23    conversation with anybody else?  The discussion you

24    had with Allison, did you then discuss that with

Corporal Trinidad Navarro          112


1    anybody else?

2        A.    Yes.

3        Q.    Who?

4        A.    I spoke to the chief of police about it.  I

5    spoke to -- that day or after that day?

6        Q.    Either.

7        A.    I spoke to the chief of police that day.  I

8    spoke to several others, including my attorney,

9    including members of the F.O.P., including PLEA,

10    including Larry Mitchell, who is a member of the state

11    F.O.P. and a County police sergeant.

12        Q.    What did you, basically, tell them?

13        A.    Well, that I had a meeting with Allison Levine,

14    and she indicated that I was not liked by the

15    administration; that I was on the losing team; that if

16    Dave McAllister went down, I would go down with him.

Page 94

0522v1tn 1r

17    She even said I should try to get another job
18    somewhere else in the County so I wouldn't show my
19    allegiance to Dave McAllister and other stuff that's
20    in this complaint, document No. 1.
21        Q.   I'm sorry.  The meeting that you had with
22    Allison, at the time you meet with her, do you know
23    whether or not there is going to be the two additional
24    promotions?

                    Corporal Trinidad Navarro        113

1         A.   Not for sure, no.  I had heard rumor that they
2    weren't going to be filled.  And Allison Levine
3    herself said in her deposition that she knew that they
4    weren't going to be filled.
5         Q.   Throughout your complaint you reference your
6    conversation with Allison and then in some portions
7    you use quotation marks to indicate certain things
8    that you claim Allison had stated.  And then in one
9    particular paragraph, I think, which is 26, you state
10    that based upon information and belief you believe
11    those statements that Allison made are attributed to
12    the County Executive Chris Coons.  Can you state your
13    basis for that?
14        A.   Well, Allison herself had said she had several
15    conversations with the County Executive with regard to
16    me and my work performance as a PIO.  She did detail
17    those in her deposition.  She, however, couldn't
18    remember what his responses were.
19             She being the PIO is in the core team.  She
20    is directly associated, involved with the County
21    Executive.  It is my opinion that what she was telling

                         Page 95

0522v1tn 1r
22    me was from him -- not necessarily as a message, but
23    it was from him.  The fact that they didn't trust
24    Trini; the rumors that she had heard about my

Corporal Trinidad Navarro          114


1     involvement in some murder investigation in Las Vegas
2     and other things that she said about me I attribute
3     coming from Chris Coons.
4        Q.    But she never said to you Chris said this?
5        A.    She did not.
6        Q.    You indicate in paragraph 20 in the complaint
7     that you advised Levine that you would not in good
8     conscience do anything to assist her or the
9     administration to ruin McAllister's reputation.  Did
10    Allison ever ask you to do anything to ruin
11    McAllister's reputation?
12       A.    No.
13       Q.    Did the administration ever ask you to do
14    anything to ruin McAllister's reputation?
15       A.    No.
16       Q.    You indicate that Allison told you that you
17    were on the losing team and your career would be
18    harmed if you continue to be on McAllister's team.  I
19    apologize.  That's paragraph 21.  And that you would
20    have a long and difficult seven years ahead of you,
21    assuming Coons was reelected.  Did you ever ask her
22    what exactly she meant by those statements?
23       A.    No.
24       Q.    Again, in paragraph 22, she states you don't

Corporal Trinidad Navarro          115


Page 96

0522v1tn 1r

1    want to be labeled as not being on Chris' team.  Did

2    you ask her what exactly that meant?

3        A.   I did not.

4        Q.   At no time did she say that Chris told her

5    that?

6        A.   She did not.

7        Q.   Do you recall Allison telling you that she

8    really she didn't know how the promotional process

9    worked.

10       A.   I don't recall that.

11       Q.   In paragraph 24, you indicate that Allison

12   said, "Well, that's how politics worked."  Did you

13   ever ask her to clarify what she meant by that?

14       A.   No.  I can tell you that that is a direct

15   quote.

16       Q.   But you never asked her what that meant?

17       A.   I don't know that I asked her what that meant

18   but I indicated to her that politics should not be

19   involved in the promotional process.

20       Q.   She never told you, though, that "that's how

21   politics worked" even referred to the promotional

22   process, did she?

23       A.   That's what she's referring to, the fact that

24   promotions were being held and I was not being

                Corporal Trinidad Navarro          116


1    promoted.  She indicated that's how politics work.

2        Q.   You were present at her deposition?

3        A.   Yes, ma'am.

4        Q.   And she articulated that when she said "that's

5    how politics worked," that she meant some

                        Page 97

0522v1tn 1r

6    administrations want more patrol strength and some
7    want more supervisory positions.  Do you recall her
8    saying that?
9        A.  Not in that context, no.
10       Q.  Again, she did not tell you ever that the
11   County Executive said, "Well, that's how politics
12   worked."  Did she?
13       A.  No, she did not say that.
14       Q.  With respect to the statement that you allege
15   she said about Chris butters the bread, did she ever
16   tell that you that was a direct quote from the County
17   Executive?
18       A.  No.
19       Q.  You didn't ask her to further clarify what she
20   meant by that?
21       A.  It was clear what she meant.
22       Q.  What did you think she meant?
23       A.  She meant if he didn't want me promoted, that
24   wasn't going to happen.

                    Corporal Trinidad Navarro          117


1        Q.  That's what you took from Chris butters the
2    bread?
3        A.  Yes.
4        Q.  I am going talk about the conversation that
5    we've talked about it throughout the deposition, but
6    specifically about the conversation that you had with
7    Cris Barrish.  Do you recall exactly when that
8    conversation took place?
9        A.  I can look at the notes and tell you if that's
10   okay.

                    Page 98

0522v1tn 1r

11    Q.   Is it in the complaint?

12    A.   Yes, ma'am.

13    Q.   It may be paragraph 18.

14    A.   On June 26th or June 27th.

15    Q.   Okay.  Who initiated the phone call?

16    A.   He called me.

17    Q.   Can you tell me what he said?

18    A.   Well, my best recollection of what he said was

19  he had had information that confirmed that the

20  initials in the document, DM, were in fact Dave

21  McAllister and that he was going to author a story to

22  say that, in effect.

23    Q.   Did he ask you for confirmation of that?

24    A.   No.

Corporal Trinidad Navarro          118


1    Q.   Was he just giving you a heads-up?

2    A.   No.  Cris is a savvy reporter who has been

3  around for a long time, who will try to make friends

4  with you and then obtain information from you sort of

5  off the record and -- well, I know better than to go

6  off the record with Cris Barrish.  We had a

7  conversation.  The way Cris talks is sort of

8  whispering, hey, you know, what can you tell me about

9  this, what can you tell me about that.  I didn't

10  answer any questions with regard to the investigation.

11  He asked about the initials.  After answering and then

12  telling him I couldn't help him, I told the chief of

13  police.

14    Q.   What did you tell -- you said you gave no

15  response to the questions about the investigation?

Page 99

0522v1tn 1r

15    know, keep your chin up.  He understands you are being

16    punished, but it's happened to him.  So, you know, try

17    to keep a positive attitude about it.

18          I know that Captain Debra Rees did the same

19    thing, also went to Captain Setting and told him, you

20    know, you are being punished, keep your chin up, you

21    will get past this.

22    Q.    What is it that Elmer Setting is allegedly

23    being punished for?

24    A.    Well, you asked questions about Elmer earlier

Corporal Trinidad Navarro          144


1    with regard to his promotions.  I know that people who

2    are loyal to Dave McAllister are being retaliated

3    against.  Elmer Setting was loyal to Dave McAllister.

4    Elmer Setting was promoted by Dave McAllister.  And I

5    believe that Elmer Setting has been retaliated against

6    because of his allegiance, not unlike how I am being

7    punished.

8    Q.    The only retaliation that you see is just being

9    transferred to a different is it, you called, unit?

10    A.    A different command.  The command was patrol.

11    Now it's records.  It's been recognized by members of

12    the staff as well.  It's not just a perception of mine

13    or his.

14    Q.    Who else on the staff you believe recognize

15    this.  You said Debra Rees.  Right?

16    A.    Yes, ma'am.  Major Hedrick and Acting Colonel

17    McLaren.

18    Q.    Anybody else?

19    A.    I never actually spoke or have knowledge of any

Page 121

0522v1tn 1r

20    of the other captains.

21        Q.    Any conversations with Allison Levine that we

22    haven't already discussed?

23        A.    No.

24        Q.    I want to draw your attention now to No. 11 in

Corporal Trinidad Navarro                145


1    the interrogatories.  This one was state the reasons

2    why you believe the statements made by Allison Levine

3    are attributed to Christopher Coons.  I didn't see

4    anywheres in the complaint here.  Can you give me a

5    specific date and time or a date as to when Allison

6    Levine told you that Christopher Coons hated you?

7        A.    On whatever date we met late in June, we met in

8    Dunkin' Donuts, some of the sentiments she shared with

9    me as far as they dislike me.  I don't know that she

10   said hate.  I don't recall specifically.  But she said

11   they don't trust me; don't yourself trust him.  Things

12   of that nature.

13       Q.    Did she ever state whether or not those

14   statements were specifically made by Chris Coons?

15       A.    She did not.

16       Q.    I draw your attention now to No. 14 in the

17   interrogatory.  It's going to be paragraph 4.  You say

18   you had a private conversation with Colonel

19   McAllister; Lieutenant Schreiber; Larry Mitchell and

20   Rob Schlecker, and that was to seek advice on how to

21   proceed with the issues, that you believe that the

22   F.O.P. no longer supported your initial -- their

23   initial position.  What was their response or what was

24   their recommendation given by those people?

Page 122

0522v1tn 1r
Corporal Trinidad Navarro          146

    1    A.    You mean the -- I'm sorry.  I lost you.
    2    Q.    What was the recommendation that -- or what
    3    exactly was the conversation that you had with Dave
    4    McAllister; Lieutenant Schreiber; Larry Mitchell and
    5    Robert Schlecker?
    6    A.    Well, I outlined what I believe was -- I was
    7    being punished for being loyal to Dave in being
    8    withheld my promotion.  And the chief of police
    9    himself, a person who has this stated authority,
   10    written out, a person who promotes, hires, fires,
   11    disciplines people on the Police Department, he
   12    himself wanted to promote me.  He made it perfectly
   13    clear.  If not for what Guy Sapp says was his decision
   14    and his decision only, it would have happened.
   15           And the other variables, including the
   16    conversations with Allison Levine, and the fact that
   17    maybe seven people were promoted until they got me.
   18    The fact that there were budgeted positions that were
   19    signed off and approved by County Council and the
   20    County Executive.  And other influences that suggest
   21    that we need more supervisors.
   22           All that was discussed.  And their
   23    conclusion was that you tried the F.O.P., they didn't
   24    help -- in fact, they said that they weren't going to
                    Corporal Trinidad Navarro          147

    1    take a position, although they have taken positions
    2    plenty of times in the past for promotions -- now you
                    Page 123

0522v1tn 1r

23    Levine.  Allison Levine also indicated that during

24    core meetings that she had with the administration's

Corporal Trinidad Navarro         152

1    core people that they discussed me.  She did say that

2    they, Dave Singleton, Lynn Howard, Nicole Majeski,

3    Rich Przywara -- I don't know specifically if she say

4    Charlotte Crowell or Guy Sapp, but she said that they

5    did not like me or trust me.

6        Q.   Did she say they had any specific examples that

7    you were corrupt?

8        A.   No.

9        Q.   How about the other people that you have

10    listed?

11        A.   She did say that she had heard that I had

12    influence in a murder investigation.  She did say that

13    I conducted campaign work on County time.  She did say

14    that she heard that I had perjured myself.  She said

15    all these things that were rumors that were generated

16    from people such as Drew Outten, Bill Harden.  I don't

17    know about Patrick Crowell.

18        Q.   Anything else that these people specifically

19    stated about the fact that you were corrupt that was

20    related to Chris Coons?

21        A.   Not that I can recall.

22        Q.   On bullet point No. 2, you say that these

23    people that are underlined have been involved in,

24    basically, you being denied a promotion and

Corporal Trinidad Navarro         153

1    retaliated -- and the retaliation of not only
Page 128

0522v1tn 1r

2    yourself, but numerous officers. How has Annie Coons
3    been involved in having you been denied promotion?
4        A.    Well, again, according to Allison Levine, Annie
5    Coons hated McAllister.  I would love to look at the
6    notes that I had put together after I this
7    conversation I had with Allison.  I don't have it
8    unfortunately.  So I don't know if she said anything
9    specific about me or not.
10            But it's clear that each and every one of
11   these individuals, their dislike for Dave McAllister,
12   I was associated with Dave McAllister, and other
13   officers, and I was retaliated against as well as
14   other officers.
15       Q.    But no specific examples what these people have
16   done to retaliate against -- aside from the examples
17   you have already given about Dave Singleton, but with
18   respect to the other people listed in No. 16, bullet
19   point 2, no specific examples of how they have denied
20   you a promotion or retaliated against you?
21       A.    Again, Dave Baylor, who was a member of the
22   transition team, knew that there -- the transition
23   team and Chris Coons' administration's ultimate goal
24   was to remove Dave McAllister from the position of

                    Corporal Trinidad Navarro        154


1    chief of police.  Guy Sapp himself said in an open
2    forum he spent his entire tenure, prior to Dave
3    leaving, in investigations into Dave McAllister.  The
4    individuals listed in this bullet point are all
5    anti-Dave McAllister, therefore, anti-Trinidad
6    Navarro.
                    Page 129

0522v1tn 1r

7    Q.  Skipping the bullet point about Marge Ellwein

8    because I think we have addressed that. Going to the

9    bullet point about Dave Singleton. I think we've

10   covered that.

11         You say here "Drew Outten has spent

12   countless hours trying to locate ways to ruin Dave

13   McAllister and other officers who were loyal to him."

14   Can you explain how you know that and any specific

15   examples?

16    A.  Drew Outten at one point was commander of our

17   professional standards unit. He did do unauthorized

18   investigations into officers and their conduct.

19   Specifically, one occasion occurred with an officer,

20   Corporal Amy Keevis, who he, Drew Outten, called her

21   house to tell her ex-husband that she was seeing

22   someone else. That investigation was not only

23   inappropriate; it wasn't authorized. Corporal Keevis

24   did file a complaint. I don't know what the outcome

             Corporal Trinidad Navarro     155

1   of the complaint was.

2    Q.  How do you know all that?

3    A.  Corporal Keevis told me.

4    Q.  You don't know whether or not Drew Outten was

5   disciplined for that?

6    A.  I don't know.

7    Q.  When you say that an investigation is -- we

8   talked about this before -- unauthorized, can only the

9   chief of police authorize an investigation through

10   PSU?

11    A.  That's the way it had been written. I know

                  Page 130

0522v1tn 1r

12    they're rewriting the directives to include the

13    director of public safety.  I don't know if that's

14    been changed or not.  Traditionally the chief of

15    police has to authorize investigations.

16        Q.    PSU doesn't normally just do an investigation

17    on their own?

18        A.    They may start one if a complaint comes in, but

19    the chief will have to approve it.

20        Q.    Any other examples with respect to Drew Outten

21    and Dave McAllister?

22        A.    Yes.  Drew Outten was scheming for months.  He,

23    Marge Ellwein, and others were scheming to rid the

24    County of Dave McAllister.  I know this because Marge

                    Corporal Trinidad Navarro          156


1    Ellwein had asked people at different meetings to take

2    photographs of the chief at different meetings where

3    alcohol was being served.

4            I know this because Drew Outten, Pat

5    Crowell, Bill Harden all schemed while Colonel

6    Cunningham was still in office for ways to ruin the

7    reputation of the Police Department.  I can tell you

8    this, they -- each met and -- on several occasions

9    with not only themselves, but members of this

10    administration to do things to try to find a way to

11    rid the Police Department of Dave McAllister.  I had

12    an example in my mind, but I just lost my train of

13    thought.

14            Go to the next question, and I'll try to

15    recall.

16        Q.    Do you have any factual basis for any of the

                    Page 131

0522v1tn 1r

17    allegations you just made?

18        A.    Yes.  I apologize for the delay.  At a F.O.P.

19    meeting, in an open forum, Kathy Riddell had a list of

20    people who made contributions to Sherry Freebery.

21    Kathy Riddell said in that meeting to Bruce Pinkett,

22    who was also a member of the Police Department and a

23    member of the F.O.P., that these people who made these

24    contributions were finished.

Corporal Trinidad Navarro        157

1        Q.    Do you recall when that meeting was?

2        A.    I don't.  It was --

3        Q.    Around about?

4        A.    It had to be sometime around or shortly after

5    the primary.

6        Q.    And that was made at a F.O.P. meeting?

7        A.    It was at an F.O.P. function.

8        Q.    Do you know who else was on that list?

9        A.    I didn't see the list.

10        Q.    You've also indicated in here, and we've talked

11    about it before, that you believe that Drew Outten

12    started a rumor about you, that you perjured yourself

13    in front of the grand jury.

14        A.    Yes, ma'am.

15        Q.    What exactly did he say was the perjury?

16        A.    I don't know.  This was a rumor that was

17    rampant around the Police Department and outside the

18    Police Department.  After speaking to him about the

19    rumor that I repeated about him and confronting him

20    with that, my belief that he started that rumor, he

21    didn't deny it.

Page 132

0522v1tn 1r

22      Q.   Other than him not denying it, do you have any

23   other basis to believe that he was the one that

24   started the rumor?

                        Corporal Trinidad Navarro              158


 1      A.   Any tangible physical proof, no.

 2      Q.   Have you been questioned by the U.S. Attorney's

 3   office regarding any perjury that you may have done in

 4   front of the grand jury?

 5      A.   No.

 6      Q.   Have you been questioned by the Attorney

 7   General's office for any perjury you may have done?

 8      A.   No.

 9      Q.   In the next bullet point, you list, I guess,

10   several other officers that you are stating have been

11   retaliated against by the administration due to their

12   alliance to Dave McAllister.  I think we have gone

13   over Elmer Setting, which is you believe he was

14   transferred from patrol to records.  Is that correct?

15      A.   That's my belief and several members of the

16   chief's executive staff's belief as well.

17      Q.   Were there other people transferred?

18      A.   Yes.

19      Q.   When he was?

20      A.   Yes.  The rationale was that they wanted the

21   captains to be diversified in their command.  So they

22   transferred a lifetime detective, Captain Watson, to

23   detectives.  They moved other captains around, but it

24   didn't -- it didn't seem to make much sense with

                        Corporal Trinidad Navarro              159

                             Page 133

0522v1tn 1r

1    respect to trying to diversify the command for take
2    reason.  Again, the executive staff also concurred
3    that Captain Setting was being retaliated against.
4        Q.  Who specifically in the executive staff?
5        A.  Major Snyder, Captain Rees, Major Hedrick.  And
6    I don't know about the others.
7        Q.  What retaliation and facts do you have that
8    support your claim that Lieutenant Wendy Hudson has
9    been retaliated against?
10       A.  Lieutenant Wendy Hudson was, in Dave
11   McAllister's words, his confidante.  They were very
12   good friends.  Shortly after he was either removed or
13   retired, there was an investigation into Lieutenant
14   Hudson that lasted for a significant amount of time.
15   She was placed on administrative leave with pay for at
16   least two months.
17           She was disciplined for violations, such as
18   insubordination.  She, essentially, forgot to send
19   somebody to a council meeting, so they charged her
20   with insubordination.  She was off for two months.  I
21   know I said that.  But while everyone else was
22   working, she had to pack up her things and leave
23   during the evening tour.  Get your things out of your
24   desk and go.  Two months later, she came back to work

Corporal Trinidad Navarro            160


1    and was disciplined for a couple minor infractions.
2           According to Scott McLaren's own words, the
3    investigation was conducted by Drew Outten, and it was
4    a shabby or shoddy -- I don't remember exactly how he

Page 134

0522v1tn 1r

5   worded it, but it was not a good investigation.

6      Q.    Anything else with respect to her?  She still

7   holds the rank of lieutenant?

8      A.    She does.

9      Q.    Anything else with respect to her?

10     A.    None that I can recall.

11     Q.    What about Lieutenant Robert, is it McLucas?

12     A.    Yes.  He was mysteriously transferred from

13  detective to patrol, meaning from a day work job,

14  which is on-call, but from a day work job to shift

15  work.  I spoke to him.  He didn't request it.  He

16  didn't know why he was transferred.

17     Q.    Were any other lieutenants transferred at that

18  time?

19     A.    I don't know for sure.

20     Q.    Again, just so that I am clear, a transfer is a

21  lateral move; it doesn't interfere with your pay?

22     A.    No.  It is a lateral move.

23     Q.    Sergeant Fred Calhoun?

24     A.    Sergeant Fred Calhoun in an open forum at

                    Corporal Trinidad Navarro          161


1   roll-call questioned why we as a Police Department and

2   union did not have a contract.  He was later

3   investigated for criticism -- investigated by

4   Professional Standards for criticizing the County

5   Executive.  They were moving to terminate Sergeant

6   Calhoun.

7              Now, that did not happen.  If you are

8   accused, an officer is accused of wrongdoing, they are

9   allowed to know who came forward with that allegation.

0522v1tn 1r

10    That never happened because the administration didn't
11    want Fred Calhoun to know who reported this to the
12    administration.
13        Q.    How do you know that?  How do you know what the
14    position of the administration was?
15        A.    Fred told me.
16        Q.    Did somebody from the administration
17    specifically tell Fred that?
18        A.    No.  I don't know.  It was Fred's belief that
19    Marge Ellwein went to Guy Sapp and told him that he
20    had said some negative things about the
21    administration.  It was at that point the Professional
22    Standards conducted an investigation with the
23    intentions to remove or fire Sergeant Calhoun.
24        Q.    How do you know what the intentions -- that the

Corporal Trinidad Navarro          162

1    intention was to remove him?
2        A.    That's what Fred told me and his wife.
3        Q.    Anything else -- he is still currently here.
4    Correct?
5        A.    He is.  The investigation was dropped because
6    they were protecting Marge Ellwein, according to Fred
7    Calhoun.
8        Q.    What about Sergeant Joseph Meriggi?
9        A.    Sergeant Meriggi was disciplined for a series
10    of allegations with respect to the pay job account.
11    Sergeant Meriggi did exactly what he was trained to
12    do.  He --
13        Q.    Is that your opinion?
14        A.    No.  That's what he told me.

0522v1tn 1r

15    Q.    Okay.

16    A.    He and Sergeant Paul Neil were both

17    disciplined, received major discipline for signing

18    each other's names on paychecks to expedite paychecks

19    for officers.  They too were close friends of the

20    chief of police.  They too were promoted by the chief

21    of police.

22    Q.    Both still currently hold the rank of sergeant?

23    A.    They both do, although they were offered

24    demotion and at one point were offered -- well, were

Corporal Trinidad Navarro            163

1    told they were going to be fired.

2    Q.    But were not?

3    A.    Were not.  Were disciplined, I think, 30 days

4    each.

5    Q.    Have you had the opportunity to read the PSU

6    file with respect to the paid duty fund investigation?

7    A.    No.

8    Q.    Did you have any detailed discussions with

9    anyone regarding that PSU file?

10    A.    I had detailed discussions with Sergeant

11    Meriggi and Sergeant Neil who were both fearful that

12    they were going to lose their jobs.

13    Q.    They were part of -- they were both being

14    investigated?

15    A.    Yes.

16    Q.    Anybody outside of that?

17    A.    What was the question?

18    Q.    Had you had any conversations, specific

19    conversations regarding the PSU investigation into the

Page 137

0522v1tn lr
20   paid duty job fund?

21       A.   I had lots of conversations with people who did

22   not have direct knowledge.

23       Q.   What about Sergeant Wayne Pennington?

24       A.   Sergeant Wayne Pennington was actually fired

                          Corporal Trinidad Navarro          164


1    for his involvement with the paid job account and

2    other charges.  He's presently in the process of, the

3    last step of grievance process.  And, you know, this

4    is just my belief.  I have no factual background.  I

5    believe he will get his job back.  He was also a good

6    friend of the chief of police.  He was also promoted

7    by the chief of police, Dave McAllister.

8        Q.   Anything else with respect to him?

9        A.   No.

10       Q.   Sergeant Bruce Pinkett?

11       A.   Sergeant Pinkett was the officer we spoke about

12   earlier who was sent to the FBI Academy.  This

13   happened before Guy Sapp was hired.  He was -- Dave

14   Singleton wanted to see his personnel file and other

15   information about Bruce Pinkett in an attempt to block

16   his attendance in that FBI Academy.  This was told to

17   me by Colonel McAllister and by Sergeant Bruce Pinkett

18   himself.

19       Q.   Did Colonel McAllister, Sergeant Pinkett give

20   you any factual basis that they believe that the

21   review was to block him from going to the FBI

22   training?

23       A.   I don't know of any specifics.  That was their

24   opinion.  Coupled with the personnel files that went

                          Page 138

1    over to Mr. Singleton's office.

2      Q.   What about anything else with respect to Bruce

3    Pinkett?

4      A.   No, ma'am.

5      Q.   Currently holds the position of sergeant?

6      A.   He does.  He was, however, transferred from

7    detectives to patrol before he even came back from the

8    training.  I don't know that that's ever happened.

9      Q.   Other transfers occurred at that time?

10     A.   I am not sure.  I think, but I am not certain.

11     Q.   Corporal Gorman Swift?

12     A.   Corporal Gorman Swift was the executive officer

13   who was in charge of security for Tom Gordon.  After

14   Tom Gordon left office, Gorman Swift was assigned a

15   position in our crime analysis unit.  He was our pawn

16   officer.  He reviewed pawn sheets.  He would see who

17   was pawning stolen property.  He did an excellent job

18   in that position.  But shortly after, I would say,

19   maybe several months he was transferred from that

20   position as well.  And according to him, and it's my

21   belief, that he was transferred because of his

22   allegiance to Tom Gordon and --

23     Q.   Where was he -- go ahead.

24     A.   To the street.  I'm sorry.  He was transferred

1    because of his allegiance to Tom Gordon and Dave

2    McAllister.  He was transferred to the street from a

3    day work job, which was Monday through Friday, 8:00 to

0522v1tn 1r

4     4:00.

5         Q.    Corporal Jeffrey Hill?

6         A.    Jeffrey Hill had a disagreement with a

7     supervisor.  He complained about it and was later

8     transferred because of his complaint.  He was

9     retaliated for making a complaint against a superior.

10        Q.    Do you know who his superior was?

11        A.    Sergeant Nichole Haden.  I know the

12    investigation was conducted by Captain Mark Hitch.

13    Shortly after the completion of the investigation,

14    Jeff Hill was transferred.

15        Q.    From where to where?

16        A.    From the mounted unit to patrol.  I know this

17    because Jeff told me specifically.

18        Q.    Anything else with respect to him?

19        A.    No, ma'am.

20        Q.    Officer Joanna Burton?

21        A.    Officer Joanna Burton and her husband were good

22    friends of the chief of police.  Their children

23    attended birthday parties together, things of that

24    nature.  She was transferred from the community

                 Corporal Trinidad Navarro        167


1     services unit shortly after the colonel left office or

2     while he was in -- while he was still here.  I am not

3     sure when she was transferred from community services

4     back to patrol, which was pretty much a day work job,

5     Monday through Friday.  She went back to patrol and

6     shift work.

7         Q.    Anything else?

8         A.    There may be others.  I just can't recall off
                          Page 140

0522v1tn 1r

9    the top of my head right now.

10    Q.    Okay.  The next bullet point is you indicate

11    that there was secret unauthorized investigations

12    without the approval of the chief of police.  I am

13    assuming by the way your answer is written here that

14    those investigations were done by Bob Larrimore

15    Sergeant Yeager and retired Lieutenant Booker?

16    A.    Yes, ma'am.

17    Q.    What specific cases and unauthorized

18    investigations are you referring to?

19    A.    Lieutenant Colonel McLaren did indicate there

20    were investigations being conducted without his

21    authorization in his deposition.  I don't know

22    specifically about any investigations that were

23    presented or authorized without the colonel's

24    permission.  I think that if Sergeant Larrimore,

Corporal Trinidad Navarro          168


1    Sergeant Yeager and Lieutenant Booker were deposed and

2    answered honestly, they would share that information

3    with you.  I don't have specifics with regard to that.

4    I do know that Lieutenant Colonel McLaren did say

5    there were investigations going on without his

6    approval or authorization.

7    Q.    That's what you are basing this answer on?

8    A.    Yes, ma'am.

9    Q.    The next bullet point, you state here "The

10    following members of Dave McAllister's staff were

11    present at meetings where they discussed different

12    ways to get rid of him."  Do you mean him, Dave

13    McAllister --

Page 141

0522v1tn 1r

14    A.    Yes, ma'am.

15    Q.    -- or "him" being you?  Okay.

16    A.    I know this because Major Snyder and I think

17    Captain Setting told me that Major Hedrick in a staff

18    meeting said, "If he comes back," meaning Dave

19    McAllister, "I am going to resign."  So they were all

20    present in the staff meetings when they discussed ways

21    of getting rid of Colonel McAllister.

22    Q.    Who discussed?  You say "they."

23    A.    The people on that list, Lieutenant Colonel

24    Scott McLaren, Major Hedrick --

Corporal Trinidad Navarro          169


1    Q.    These people discussed getting rid of

2    McAllister?

3    A.    Yes.

4    Q.    So nobody from the administration?

5    A.    Clearly, the members of the administration

6    wanted to get rid of Colonel McAllister as well.

7    Q.    But I am just referring to this bullet point.

8    You are saying that in addition to the administration;

9    Scott McLaren; James Hedrick; Stewart Snyder; Mark

10    Hitch, Debra -- all these people wanted to get rid of

11    Dave McAllister?

12    A.    No, I didn't say they wanted to get rid of him.

13    But while they were present during meetings it was

14    discussed.

15    Q.    Between the police staff, not between the

16    administration?

17    A.    Between the staff meetings or during the staff

18    meetings.

Page 142

0522v1tn 1r

19      Q.     Just on No. 19 of the interrogatory, you
20    indicate in your answer that you met with Sergeant
21    Schlecker; Sergeant Mitchell; Lieutenant Schreiber;
22    Colonel McAllister, as well as Captain and Major
23    Snyder and you had conversations about your
24    dissatisfaction with the administration.   Any

                   Corporal Trinidad Navarro          170


1     dissatisfaction that you conveyed to them that you
2     have not already conveyed here today in your
3     deposition?
4       A.     None that I can recall.
5       Q.     You had indicated that you had researched the
6     DELJIS violation, is that correct, the alleged DELJIS
7     violation?
8       A.     I personally didn't research it.  I know that
9     research was conducted.
10      Q.     Do you know who did?
11      A.     I think Dave McAllister himself.  But I am not
12    certain.
13      Q.     Do you have any documents from the F.O.P.
14    regarding any of the matters that we have discussed
15    here today?
16      A.     I do.  They are the same documents that are in
17    the exhibits.
18      Q.     That we marked today?
19      A.     Yes, ma'am.
20      Q.     I am going to show you -- I am not going to
21    necessarily mark -- I'll ask you to leaf through this.
22    These are exhibits received from your attorney.  They
23    are Bates marked 0001 through 0046.  I'll ask you look
                        Page 143

0522v1tn 1r

24    at those documents and let me know if there is

Corporal Trinidad Navarro                171


1    anything else you provided your attorney that is not

2    included in there.

3       A.    The question was:  Does my attorney have

4    anything that you don't have?

5       Q.    Have you given any documents that are not

6    included in this?

7       A.    I don't believe so.  There was at least one

8    other document that I would like to see introduced and

9    I have to talk to my attorney about that, but there is

10   one other document.

11      Q.    Which is?

12      A.    The PERF study that was commissioned, that the

13   County Executive asked to have -- PERF, that's the

14   Police Executive Research Forum -- to come and do an

15   analysis of the Police Department.

16      Q.    Is that a current study requested by the

17   current County Executive?

18      A.    Yes.  It was released not long ago within the

19   last couple of months.

20      Q.    Have you seen a copy of it yet?

21      A.    I have.

22      Q.    What do you think is in that report that is --

23   supports any of your claims here today?

24      A.    Well, it sort of discredits the Guy Sapp's

Corporal Trinidad Navarro                172


1    opinion that we don't need more supervisors.  Clearly,

Page 144

0522v1tn 1r

2    in the document, it outlines several locations where

3    supervisors are needed, first-line supervisors,

4    sergeants.  So it sort of spells out the need for

5    additional supervisors, not necessarily the need for

6    officers.  Although it does say more officers, there

7    are several locations that require more sergeants or

8    first-line supervisors.

9      Q.   So it says both more sergeants and more

10   officers?

11     A.   Yes, ma'am.

12     Q.   Anything else in this study that you are aware

13   of that you feel supports your claims here today?

14     A.   No, ma'am.

15     Q.   You had asked me to remind you if there was

16   anything else that you have not already stated today

17   that you believe is your public speech or public

18   concern which you have not already stated.

19     A.   None that I can think of.

20     Q.   You also asked me to remind you or to go back

21   to whether or not there was any additional information

22   regarding the current CAO's role in the promotional

23   process, other than what we have discussed.

24     A.   No, ma'am.

Corporal Trinidad Navarro        173


1      Q.   Is it your opinion that anyone who doesn't like

2    Dave McAllister doesn't like you?

3      A.   No.  I wouldn't say that's the case.  I think

4    anyone within the Police Department who has had

5    anything to do with his removal of office, I would say

6    it's a fair assessment that they don't like me as

Page 145