# EXHIBIT 6

053106gs aa

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,          )
                                    )
            Plaintiff,              )
                                    )
    v.                              )    Civil Action No.
                                    )      05-565 GMS
CHRISTOPHER A. COONS,               )
individually and in his official)
capacity; GUY H. SAPP,             )
individually and in his official)
capacity; and NEW CASTLE            )
COUNTY, a municipal corporation,)
                                    )
            Defendants.             )

            Deposition of GUY H. SAPP taken pursuant to
notice at the offices of Margolis Edelstein, 1509 Gilpin
Avenue, Wilmington, Delaware, beginning at 11:00 a.m. on
Wednesday, May 31, 2006, before Anne L. Adams, Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware   19806
          for the Plaintiff,


        JEFFREY S. GODDESS, ESQ.
        ROSENTHAL, MONHAIT, GROSS & GODDESS
          919 Market Street, Suite 1401
          Wilmington, Delaware 19899-1070
          for Defendants Coons and Sapp,

-----------------------------------------------------
                  WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

053106gs aa

1    APPEARANCES CONTINUED....

2              MICHELLE ALLEN, ESQ.
             JUDITH A. HILDICK, ESQ.
3            NEW CASTLE COUNTY LAW DEPARTMENT
             87 Reads Way
4            New Castle, Delaware  19720
             for New Castel County.
5

6                      ----------

7                   GUY H. SAPP,

8         the witness herein, having first been

9         duly sworn on oath, was examined and

10        testified as follows:

11                  EXAMINATION

12   BY MR. MARTIN:

13      Q.   Good morning, Mr. Sapp.  I appreciate you coming

14   earlier.  I expected that we would start the deposition

15   at 1:00 today, but you were kind enough to come earlier.

16   Hopefully, that will mean we will get done sooner.

17              Have you ever had your deposition taken

18   before today?

19      A.   Once that I can recall.

20      Q.   When would that have been?

21      A.   It would have been 1993.

22      Q.   Let me refresh you a little bit.  I'm here to ask

23   questions.  My intent is to ask one at a time.  And if

24   you do not understand the question -- it's not going to

Guy H. Sapp                          3

1    be my purpose to give you any trick questions -- but if

Page 2

053106gs aa
11    Navarro was upset about anything?

12        A.    I got that understanding from the meeting on
13    Wednesday when the CO asked Allison Levine to come into
14    the office and she indicated that the meeting didn't go
15    well.   She was very upset about how the meeting went.

16        Q.    At the time you were there at the Government
17    Center on that Wednesday, what was your understanding, if
18    any, as to what Corporal Navarro's promotional status
19    was?

20        A.    I had been trying to analyze all the information
21    since joining the county.   And that day I issued a
22    memorandum to Colonel McAllister -- and I'm going to say
23    it was sometime after lunch.   I have the date on the memo
24    but not the time -- indicating that we would move forward

Guy H. Sapp                    40

1    with one promotion but not the two that were over filled
2    in December.   And I indicated we would not move forward
3    at that time.

4        Q.    Let's just reference this.   This was marked as
5    Exhibit 6 at the Navarro deposition.   I would like you to
6    reference that if you can.   Is this the letter or memo,
7    rather, that you were referring to?

8        A.    It is.

9        Q.    And it's dated June 9, which is consistent with
10    what you just testified to, correct?

11        A.    June 29th.

12        Q.    Sorry.   June 29th.   So you said that you were

Page 37

053106gs aa

13  moving ahead with one rather than three sergeant

14  positions, correct?

15      A.    That is correct.

16      Q.    And what was your understanding, if any, as to

17  Corporal Navarro's status?

18              MR. GODDESS:  At the time he wrote that

19  memo?

20              MR. MARTIN:  Yes.  Thank you.

21              THE WITNESS:  By this time, I had seen a

22  list of officers who were eligible for promotion, I

23  think, down through the top 10 or 15.  And I can't say I

24  paid a whole lot of attention to who the top five were.


0


Guy H. Sapp                    41


1   But subsequent to this memo and the promotion of Sergeant

2   Treadwell, I was aware of the fact that Corporal Navarro

3   was not in the first five on the list at that point.

4   BY MR. MARTIN:

5       Q.    What did that mean to you?

6       A.    That if he was not in the first five that he

7   could not be promoted.  The county procedure is that you

8   have to be in the top five in order to be considered for

9   promotion and that the colonel has the ability to take

10  anyone within the top five.

11      Q.    And if there are three positions that are to be

12  filled, you don't look at the top five, correct, you look

13  beyond the top five?

14      A.    What we did was, each time there was a promotion,

Page 38

053106gs aa

15  we asked the colonel and then the lieutenant colonel in

16  two subsequent promotions to focus on the top five and

17  make a decision.  Having made that decision, if there was

18  another promotion to move the sixth person on the list

19  into that group of five and then rediscuss the promotion

20  so that each time you made a promotion you were only

21  looking at the top five.

22      Q.   Are you saying that your review of the list told

23  you that Navarro was not eligible to be promoted?

24      A.   Not prior to.  I got an E-mail from human

Guy H. Sapp                    42

1   resources that gave me a list of 10 to 15 people -- I

2   can't remember how many -- who were eligible on that

3   sergeant's list.  And I don't know that I ever sat there

4   and counted down to see how many would be considered, if

5   there was one, how many, if two, how many, and if three.

6   That was not my reason for requesting the list.

7       Q.   Did you have an understanding that Colonel

8   McAllister wanted to promote Corporal Navarro to

9   sergeant?

10      A.   No.

11      Q.   Did you ever learn that?

12      A.   Yes.

13      Q.   When did you learn that?

14      A.   In subsequent discussions.  Probably after the

15  lawsuit was filed, it became clear that that was the

16  colonel's intent.  When the colonel and I talked early in

Page 39

053106gs aa

17   my tenure, he mentioned that he wanted to promote an

18   Hispanic, a female and an African-American. And to the

19   best of my memory, he never told me who they were.

20      Q.   Did you look to figure out who was who?

21      A.   I had that list. But, frankly, I couldn't tell

22   who was Hispanic and who was black. Because of the

23   people on the list at that point, I think the only one I

24   knew was Corporal Navarro. And the reason I knew him, he

Guy H. Sapp                              43

1    worked directly across the hall. I'd seen him on TV.

2       Q.   What was your understanding as to his background?

3       A.   That he was Hispanic.

4       Q.   So on June 29 when you issued this memo to the

5    colonel, you were not aware that the colonel had wanted

6    to, intended to promote Colonel Navarro?

7       A.   Corporal Navarro, no.

8       Q.   As I understand, you said you didn't understand

9    that he wanted to promote him until sometime after the

10   lawsuit was filed?

11      A.   Yes. And I don't know where I heard it from then

12   because I didn't have much contact with Colonel

13   McAllister after July the 24th.

14      Q.   Is that when he was put on leave?

15      A.   He agreed to go on paid administrative leave.

16      Q.   July 24th?

17      A.   That's correct.

18      Q.   Now, going back to this memo of June 29, is it

Page 40

053106gs aa

19  fair to say that the sergeant positions, although not

20  having been filled at that point, were in the budget or

21  had been approved?

22      A.    The budget was approved sometime, I want to say,

23  in April because, late April, early May, because I was

24  not, I don't believe I was even working for the county

Guy H. Sapp                    44

1   yet and/or -- I didn't make the presentation.  Colonel

2   McAllister did because I had nothing to do with the

3   formation of the budget.  Somebody could probably give

4   you that date when the budget presentation was made for

5   public safety.

6           But my understanding, as time went on, was

7   that the number of positions in public safety is a factor

8   in determining whether or not sufficient monies are

9   placed into the personnel line, and that the numbers are

10  only critical leading up to the passage of the budget.

11  And once the budget passes -- and I guess this is county

12  wide because, again, I still have trouble understanding

13  this way of doing business -- but that once the budget

14  passes, the numbers become immaterial and it's the money

15  that you have.  And it's based upon the money as to

16  whether or not you can over fill, over promote, whatever

17  you want to do.

18           As long as you have the money within the

19  department, you are permitted to make those kind of

20  adjustments at any point in the budget year, which is

Page 41

053106gs aa

21   what I understand occurred in December.  In the fiscal
22   year, '05, budget, there were 36 sergeants.  And the
23   colonel decided to go to 38 and promoted two additional
24   sergeants in December of '04.  The budget that passed for

Guy H. Sapp                    45

1    '06 included 38 sergeants.
2              And by the time June 29th arrived and I
3    issued this memorandum, I had heard from many, many
4    sources, both internal and external, that the most
5    critical need in the police department, at that point,
6    was for patrol officers.  And this was given the fact
7    that we had 12 vacancies at that point in time.  We were
8    not going to start in academy until, at the earliest,
9    November or December.  And that eventually got pushed off
10   until March.  And that we could ill afford to lose more
11   patrol officers.
12             Throughout my first two or three months, the
13   CAO and I discussed this.  And my recommendation to him
14   was that, at least for the time-being, we not fill the
15   37th and 38th position.  And we were in the process of
16   attempting to secure a contract to follow up on the
17   Southern Institute Study that had been conducted in 2000.
18   It was our intent, as part of that process, to have
19   whoever won the contract look at the authorized strength
20   of the department and the strength within each of the
21   ranks in the department.  And that was the second reason
22   that I didn't feel it was appropriate to move forward

Page 42

053106gs aa
23    with the two additional positions until we had that

24    report in hand.


☐

Guy H. Sapp                    46

1      Q.    And that report was eventually done by PERF; was

2    it not?

3      A.    That's correct.

4      Q.    And that was issued April of '06?

5      A.    That's correct.

6      Q.    But you did make more sergeants in December; did

7    you not, without having that report?

8      A.    We filled up to the 36th sergeant.  In other

9    words, we didn't increase the authorized strength beyond

10    36.  We filled up to the 36th and left the 37th and 38th

11    vacant pending the PERF report.

12      Q.    Isn't it fair to say that you had, before June

13    29, had promised that there would be three new sergeants

14    made at the time of the new fiscal year on July 1, 2005?

15      A.    In a meeting held, called by the colonel, Colonel

16    McAllister, through the FOP, President Ellwein, and I

17    think involving the top 10 officers on that list, we sat

18    with them and discussed the fact that there was one

19    opening by virtue of the '05 budget and there were two

20    openings by virtue of the '06 budget for which he had

21    over promoted in December.

22              And Colonel McAllister made the statement

23    that he and I had been working on this issue and that it

24    was our intention to promote three sergeants after the

Page 43

053106gs aa

Guy H. Sapp                           47

1    1st of the fiscal year.  And, at some point, it came

2    around to me.  And I said that is my intention.

3        Q.    And you communicated that intention?

4        A.    I did.

5        Q.    To the people who were --

6        A.    In attendance.

7        Q.    And they included those who stood to be promoted?

8        A.    That's correct.

9        Q.    So you made that statement to them that that was

10   your intention?

11       A.    And that was in mid May.  Exact date, I can't

12   remember now.

13       Q.    And then it was on June 29 by way of memo that

14   you decided not to make those promotions?

15       A.    After consulting with the CAO and receiving his

16   concurrence, I issued this memo saying that we would not.

17   I met with those same parties -- it wasn't everyone that

18   attended the first meeting, but I met with the same group

19   of officers in my office.  I believe it was that

20   afternoon.  I apologized for my statement in May.  I told

21   them that I had learned more information since then, that

22   it had changed the backdrop against which I had

23   originally intended to make those promotions and that, at

24   this point, would not be move forward with the additional

053106gs aa

Guy H. Sapp                                    48

1    two promotions.

2                I was asked, at that point, if I would

3    guarantee that all the rest of the sergeants' promotions

4    would be filled. And I said, having learned a lesson in

5    this situation, I won't make guarantees. We'll fill them

6    as they come open or advise you that we will not be

7    filling them.

8                So while Corporal Navarro looked for a

9    commitment from me to move forward with promoting, any

10   openings that occurred afterwards, I could not make that

11   commitment. There were two subsequent promotions.

12       Q.   Now, you said that this decision announced on

13   June 29th -- and by the way, was Corporal Navarro in

14   attendance when you made this apology?

15       A.   He was.

16       Q.   Now, this was your decision not to make these

17   other two sergeant promotions, correct?

18       A.   I made that statement in the meeting. And I did

19   that because -- the colonel and I did not agree on this

20   decision. He advocated for the two sergeants and did not

21   agree with my position. I wanted to make it clear to

22   that group that this was coming from the director's

23   office and that no way had the colonel conceded or been

24   involved in a consensus process to reach this decision.

053106gs aa

1          And I made that statement because, in my

2   experience with the Wilmington Police Department, in all

3   the training that I had as a sergeant and as a manager,

4   you always take responsibility for the bad news and you

5   always share the good news. And I didn't want to leave

6   any doubt in the officer's mind in that meeting that this

7   was something that the colonel had embraced.

8          Having said that, the chief administrative

9   officer was fully aware of the memo that was going to be

10  sent out. And I say that because when I met with him on

11  the 29th, before or after we had this discussion with

12  Allison Levine, I previewed the draft language I was

13  going to use in this memo. And he thought that it should

14  be shorter and more succinct. And I made those changes

15  before issuing that memo that afternoon.

16     Q.   I'm sorry. What does this have to do with

17  Allison Levine? I missed that.

18     A.   I'm just saying that it occurred the same day on

19  the 29th. So at some point as we are trying to work

20  through that, we discussed the memorandum that I was

21  going to issue on the sergeants' positions. He looked at

22  it, offered some amendments, and I incorporated those

23  amendments into the memo that was handed to Colonel

24  McAllister later that day.

Guy H. Sapp                    50

1     Q.   As I understand it, I think you have so
                    Page 46

053106gs aa

2    testified -- and correct me if I'm wrong -- when you met
3    with these officers who were to find out that they were
4    not going to be promoted, at least at that point, you
5    told them that it was your decision and your decision
6    only?

7        A.    That's correct.  The message I was trying to
8    impart was that this was coming from me and not the
9    colonel.  I didn't want the colonel to, in any way, be
10   blamed for this.  He fought hard and vigorously to
11   preserve these two positions.  And it was only after what
12   I learned between joining the county April the 18th and
13   my recommendation to the CAO on June the 29th that we not
14   proceed with those two promotions, that we made the final
15   decision.  I didn't want any of the officers thinking
16   that it was their chief undercutting them.

17       Q.    As I think I understand, you met with the CAO
18   before you issued this memo.  You said he helped edit the
19   memo for you?

20       A.    That's correct.

21       Q.    And so that decision was made on June 29th; it
22   was not made before that?

23       A.    That's correct.

24       Q.    Is there any reason why Allison Levine knew about

                        Guy H. Sapp              51

1    that decision on the morning of the 29th?
2        A.    No.  She couldn't have known about the final
3    decision because it wasn't reached until after her
                        Page 47

053106gs aa

4     meeting.  At least that's my understanding and my

5     recollection of how that day progressed.  Because I was

6     in my office in the morning.  The colonel came in before

7     lunch, was upset.  At some point, I took the information

8     he relayed, went to the Government Center, met with the

9     CAO.  We had the discussion with Allison Levine Taylor.

10    And at some point, I went back with this edited version

11    of the memo and handed that to Colonel McAllister.

12            So I can't think of how she would have known

13    about a final decision that wasn't reach until sometime

14    after we met with her.  That's my recollection.  And I

15    would not have told her.

16    Q.   Do you know whether Mr. Singleton told her?

17    A.   No, I don't.

18    Q.   And as I understand the process, it was begun by

19    Colonel McAllister talking with you being upset about, or

20    asking whether you were going to promote these other two?

21    A.   Our discussions about promotions began probably

22    in the second or third week that I was in the job.

23    Because there had been an opening since March.  And that

24    would have been for the 36th sergeant who retired.


Guy H. Sapp                          52


1            One of the other factors that I was

2     struggling with at that point was, probably the third or

3     fourth week in, I'm told we have a $500,000 deficit in

4     the department of public safety.  And I told the colonel

5     that I was having some real problems with promoting the

                        Page 48