# EXHIBIT 7

0601v1ds 1r

Volume One                                              1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,         )
      Plaintiff,                   ) Civil Action
v.                                 ) No. 05-565 GMS
CHRISTOPHER A. COONS,              )
individually and in his            )
official capacity; GUY H. SAPP,    )
individually and in his official   )
capacity; and NEW CASTLE           )
COUNTY, a municipal corporation,   )
                                   )
      Defendants.                  )

    Deposition of DAVID SINGLETON taken pursuant to
notice at the law offices of Margolis Edelstein,
1509 Gilpin Avenue, Wilmington, Delaware, beginning
at 2:00 p.m. on Thursday, June 1, 2006, before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

    JEFFREY K. MARTIN, ESQ.
    Margolis Edelstein
      1509 Gilpin Avenue
      Wilmington, Delaware 19806
      for the Plaintiff Trinidad Navarro

    MICHELE ALLEN, ESQ.
    JUDITH A. HILDICK, ESQ.
    New Castle County Law Department
      87 Reads Way
      New Castle, Delaware 19720-1648
      for the Defendant New Castle County

    JEFFREY S. GODDESS, ESQ.
    Rosenthal, Monhait & Goddess, P.A.
      919 N. Market Street, Suite 1401
      Wilmington, Delaware 19801
      for the Defendants Christopher A. Coons
      and Guy H. Sapp


        WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

Volume One                                              2


1          DAVID SINGLETON,

2     the witness herein, having affirmed

Page 1

0601v1ds lr

21  somebody about this; I need to send somebody a note
22  about this; I need to see somebody about this topic.
23  So that would be a major part of my notes. And I
24  would also, if a significant decision was reached, I

David Singleton                               57


1   would take notes -- I'd make note of that.
2       Q.  So was it your routine practice to take notes,
3   not minutes, but notes at meetings such as this?
4       A.  Most of the time, most of the time. Not
5   always.
6       Q.  Did Allison Levine, when she met with you, talk
7   to you about any comments that she made to Trini
8   Navarro about not being on Chris' team but rather
9   being on McAllister's team?
10      A.  I don't know that she used those specific
11  words. I am having trouble because those are the
12  words that were subsequently alleged in the lawsuit.
13  So I am not sure -- I don't think she used those
14  specific words, but I think she indicated that she had
15  urged Corporal Navarro to establish a better -- a
16  closer working relationship with her.
17      Q.  Did you have any concerns about the nature of
18  the conversation between Levine and Navarro when you
19  met on that occasion?
20      A.  Yes, I did.
21      Q.  What were your concerns?
22      A.  My concern was that she was becoming involved
23  in a -- getting caught in the middle IS a better way
24  to put it of personnel issues within the Police

David Singleton                               58
Page 48

0601v1ds 1r

```
 1      Department that was not a good place for her to be.
 2      Given the paramilitary structure of the Police
 3      Department, for her to offer any advice to a corporal
 4      in the Police Department gave me some discomfort.  So,
 5      yes, I was -- I was not, not pleased to hear of the
 6      conversation.
 7          Q.  Did you express that to her?
 8          A.  I believe I did.
 9          Q.  Did you have any further meetings with -- let
10      me strike that.  Let me go back and ask you.  I
11      understand you believe that you had expressed your
12      displeasure to her.  Do you recall, what, if any,
13      response she may have had?
14          A.  No, I don't.
15          Q.  Do you recall any other conversation that any
16      of you may have had during that meeting relating to
17      this situation rather than county and general county
18      topics?
19          A.  No, I don't.
20          Q.  What further contact, if any, did you have with
21      Allison Levine?
22          A.  On this topic, you mean, or in general?
23          Q.  Well, let's start in general.  Did you have
24      much further contact with her?
```

David Singleton                                              59

```
 1          A.  Yeah.  Maybe you can help me.  What was the
 2      timing?  How long after that was the lawsuit filed?
 3      As I remember, it was fairly quick.
```

Page 49

```
                         0601v1ds 1r
 4     Q.   Early August.
 5     A.   Okay.  So it was a month later.  I don't
 6  remember any discussion specific to this topic during
 7  that time period.  Not to say there couldn't have been
 8  some, but I don't recall any rehash of that.
 9          I do recall soon after the -- I recall
10  several conversations after the lawsuit was filed.
11     Q.   With Allison?
12     A.   Yes.
13     Q.   Allison Levine.  Okay.  And you said several
14  conversations with her.
15     A.   Well, I recall one specifically in which I met
16  with her and told her that we had decided to accept
17  her resignation.
18     Q.   Speaking euphemistically, of course?
19     A.   How?
20     Q.   I mean, had she offered her resignation or are
21  you just --
22     A.   She had verbally offered it.
23     Q.   Okay.
24     A.   She verbally offered it to the County
                   David Singleton                   60


 1  Executive.  And I met with her perhaps a day or two
 2  later to tell her after reflection that we decided it
 3  was appropriate to accept her resignation.
 4     Q.   What did you tell her?
 5     A.   That's what I told her.
 6     Q.   Did you give her any further explanation?
 7     A.   I indicated to her that the comments attributed
 8  to her were totally inconsistent with the viewpoint of
```

0601v1ds lr

9   the County Executive and his administration, and that
10  it was intolerable to have the communications director
11  for the County expressing, in an official capacity, to
12  be expressing views that were inconsistent with the
13  administration's views.
14      Q.   Did you have any reason to believe that her
15  comments were inaccurate?
16      A.   Yes.
17      Q.   What is your basis for that?
18      A.   The basis is that, just what I said it is, that
19  suggesting that a corporal in the Police Department
20  needed to get on the Coons team if he wanted to
21  advance is simply not the way Chris Coons or I or this
22  administration believe in conducting public business.
23  In point of fact, there is no "team" for rank and file
24  merit system employees of the County. They're

David Singleton                                61


1   expected to perform their duties, and they are not
2   expected to exhibit personal or political loyalty to
3   the County Executive.
4       Q.   What other conversations do you recall having
5   with Ms. Levine?
6       A.   Well, that was -- that was probably the last
7   one.  She left that same day.
8       Q.   Did she express any regret?
9       A.   She did.
10      Q.   Did she express that any of the comments
11  attributed to her were inaccurate?
12      A.   She expressed that they had been taken out of
13  context.

Page 51

0601v1ds 1r

14 Q. Did she give you any further explanation for
15 that?
16 A. I think she -- what she was trying to convey
17 was that she when she had used the word "team" it was
18 in a very metaphorical sense and not in an expectation
19 that Corporal Navarro would be disloyal to his
20 immediate superiors and loyal to the County Executive,
21 that that was not literally what she meant by it. But
22 it was clearly, in my mind, it was clearly a very poor
23 choice of words. And not a choice of words that
24 reflected, as I said, what are the beliefs of the

David Singleton                                    62

1 County Executive or the administration.
2 Q. Do you recall telling Ms. Levine at any point
3 to be careful with Trini?
4 A. I don't recall that specifically.
5 Q. Let me shift gears here in a couple of -- I am
6 winding down my questioning.
7     Have you ever made any negative comments
8 about Trini Navarro?
9 A. Well, I described for you earlier two
10 situations that might be characterized that way, one
11 of which, as I said, when I learned that he had been
12 ordered not to keep Ms. Levine informed, I retracted.
13 I don't recall on any occasion making any broad
14 characterization of his skills, his performance, his
15 personality. I simply don't have the information to
16 make any informed comments.
17 Q. When I was asking you before about your
18 involvement, if any, in the internal investigations of