# EXHIBIT 8

062806ss aa

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,          )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Civil Action No.
                                    )      05-565 GMS
CHRISTOPHER A. COONS,               )
individually and in his official)
capacity; GUY H. SAPP,              )
individually and in his official)
capacity; and NEW CASTLE            )
COUNTY, a municipal corporation,)
                                    )
            Defendants.             )

        Deposition of STUART SNYDER taken pursuant to
notice at the offices of Rosenthal, Monhait & Goddess,
Suite 1401, 919 Market Street, Wilmington, Delaware,
beginning at 1:30 p.m. on Wednesday, June 28, 2006,
before Anne L. Adams, Registered Professional Reporter
and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware   19806
          for the Plaintiff,


        JEFFREY S. GODDESS, ESQ.
        ROSENTHAL, MONHAIT, GROSS & GODDESS
          919 Market Street, Suite 1401
          Wilmington, Delaware 19899-1070
          for Defendants Coons and Sapp,

----------------------------------------------------

                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

062806ss aa

1
2
APPEARANCES CONTINUED....

3          MEGAN SANFRANCESCO, ESQ.
           JUDITH A. HILDICK, ESQ.
4          NEW CASTLE COUNTY LAW DEPARTMENT
           87 Reads Way
5          New Castle, Delaware  19720
           for New Castel County.

6

7                      STUART SNYDER,

8          the witness herein, having first been

9          duly sworn on oath, was examined and

10         testified as follows:

11                     EXAMINATION

12   BY MR. GODDESS:

13      Q.   Major Snyder, first, have you ever been involved

14   in civil litigation and had your deposition taken?

15      A.   Yes.

16      Q.   So you are generally familiar with the concept

17   where I ask questions.  You answer to the best of your

18   ability.  Don't strain or, you know, estimate if you

19   don't know an answer.  And then when I'm done, Jeff

20   Martin has an opportunity to ask you questions as well

21   from Corporal Navarro's point of view in the case.

22             MR. MARTIN:  Wouldn't it be appropriate to

23   pass the baton to the county on this?

24             MR. GODDESS:  Okay.


☐


                 Stuart Snyder              3


1             MR. MARTIN:  I'm asking.

                 Page 2

062806ss aa

18    sued because he feels he was deprived a promotion.

19        Q.    And --

20        A.    I'm not sure on what grounds.  But that's my

21    understanding at this point.

22        Q.    Have you ever had any conversations with Corporal

23    Navarro about, well, about this lawsuit?

24        A.    No, other than I'm sure he has -- well, I know


                        Stuart Snyder              12


1    he's mentioned to me that he had filed one or maybe he

2    was telling me he was going to file one and then he told

3    me he did.  I can't remember specific conversations.  But

4    I'm certain that he has mentioned it to me, yes.

5        Q.    Working backwards, did he ever talk to you about

6    his desire for a promotion from corporal to sergeant?

7        A.    Yeah.  I can remember him saying he hopes he gets

8    promoted when the list came out where he was one of the

9    eligible people.

10        Q.    By that, you mean he was reasonably toward the

11    top?  I mean, there was no in or out, was there, on

12    eligible or ineligible?

13        A.    No, he was reasonably towards the top.  With the

14    number of vacancies versus the number of people on the

15    list, there was a fair -- well, there was a definite

16    chance that he could be promoted.

17        Q.    Did he ever get more precise with you -- this is

18    before filing the lawsuit -- saying, you know, I really

19    have a chance now and what is the delay all about?

062806ss aa

20    A.    Yeah.  I can remember him -- you know, again, I

21    can't remember specifics of the conversation like dates,

22    times who said what to whom.  But I can safely say that I

23    can remember him feeling some frustration about not being

24    promoted, particularly when there were open positions and

Stuart Snyder                13

1    he was eligible.

2        Q.    If you don't socialize with him, I would assume

3    that conversation took place at the police department?

4        A.    Yes.

5        Q.    Did it take place in your office?  Do you have

6    any recollection of that?  Or a hallway conversation?

7        A.    No, probably hallway or in front of his desk.

8    Because many times I would have to go in and see the

9    colonel or the colonel's secretary, administrative

10   assistant, which is Betty, or sometimes deal with Trini

11   on some issues that he might be releasing.

12       Q.    Like a public release you mean?

13       A.    Yeah, or doing a story on not so much a press

14   release, but I have had contact with him about doing some

15   releases that have to do with programs, community

16   services does or issues like that.  I don't really deal

17   with him much on the daily news releases.

18       Q.    When he was expressing frustration, at that time,

19   were you aware of where he stood on the promotion list?

20       A.    I'm pretty sure I did.

21       Q.    As we sit here today, do you remember where he

062806ss aa
22    was?

23        A.    No, I couldn't give you a number.  I know he

24    wasn't at the top.  I knew he wasn't like number one,


Stuart Snyder                    14

1     number two.  But I also knew he wasn't at the bottom.  I

2     knew he was somewhere in the mix.

3         Q.    So is it your understanding -- or let me pose it

4     this way.  It does not appear -- from just looking at the

5     raw numbers.  I wasn't involved in this at all.  He was

6     never passed over in that sense.  He was never like

7     eighth and they appointed the guy or female that was

8     ninth.  He was never passed over.  He was in a group of

9     five, but he was never passed over.  Is that square with

10    your recollection?

11        A.    I would need all the stuff in front of me.  I

12    can't say that as a fact.

13        Q.    I don't know what all the stuff is.  I've got

14    some stuff.

15        A.    It would be the promotion list and what vacancies

16    were available at what times.  That's what I mean by

17    stuff.

18        Q.    I've got some of that stuff.  And we will be

19    going over it.  So is it your general impression that he

20    was passed over?

21        A.    Yes, I would say so, at least in my opinion.

22        Q.    And what is that based on?

23        A.    That would be based on two people that were

Page 13

062806ss aa
24    promoted.  I believe one of them was below him on the

Stuart Snyder                    15

1    list, which would have been Sergeant Feeser.  Now, wait a

2    minute.  She wasn't promoted at that time.  Sergeant

3    Joseph was one that comes to mind.

4                Generally speaking, when presented with the

5    list, when staff would meet and consider promotions,

6    without being part of the testing process, without

7    working daily closely with most of the candidates, I have

8    to put my faith in the rank order of the list unless I

9    have information or a feeling based on performance,

10   performance that I'm aware of one of the candidates

11   either being good or bad.

12               And in Corporal Navarro's case, at least I

13   felt that one of the sergeants that got promoted probably

14   was not as good a candidate as Corporal Navarro.

15       Q.    And was that one of the folks you just mentioned?

16       A.    Yes.  That would be Sergeant Joseph.  And that's

17   because he did work for me.  So I can say, in his case,

18   that I felt that he was not the best candidate to be

19   promoted.

20       Q.    What is your understanding as to why Corporal

21   Navarro wasn't promoted?

22       A.    My understanding?

23       Q.    What do you think?

24       A.    What do I think?  I think that sergeants'

Page 14

062806ss aa

Stuart Snyder                16

1    positions were held in abeyance; in other words, not

2    filled in order not to promote him or in order to

3    eliminate the possibility that he gets promoted.

4        Q.    And do you have any understanding as to why that

5    occurred?

6        A.    As to why?

7        Q.    Yeah.

8        A.    I don't know the reason why.  But I know that my

9    understanding is the direction came from the public

10   safety director.

11       Q.    Guy Sapp?

12       A.    Yes.

13       Q.    The direction to, that there weren't going to be

14   three promotions, that there would only be one, that was

15   the timing?

16       A.    Yeah.  I'm not a hundred percent certain of the

17   numbers.  But, yes, I know he did reduce the numbers of

18   promotions as opposed to available positions, budgeted

19   positions.

20       Q.    Do you have any understanding as to why Guy Sapp

21   did that, Director Sapp did that?

22       A.    I know what reason he gave.  But it didn't, his

23   reasoning was the, at least what he told us, was because

24   he felt it was more important to leave patrol officers as

062806ss aa

Stuart Snyder                    17

1    patrol officers as opposed to sergeants, even though I
2    countered his argument with what I felt made sense.
3        Q.   Did you have a one-on-one conversation or a
4    conversation where that was discussed?
5        A.   Yes.  I believe it was in a staff meeting.  It
6    wasn't one-on-one.
7        Q.   And do you recall when the staff meeting
8    occurred?
9        A.   No, I couldn't give you a date.
10       Q.   Would there be some way to get into that, to try
11   to dig into that date?  Let me ask this:  Was McAllister
12   the chief then?
13       A.   No.
14       Q.   McLaren was the chief?
15       A.   The acting chief, yes.
16       Q.   Was it a regular staff meeting, I mean, in the
17   sense -- well, were there regular staff meetings every
18   Tuesday morning at 8 or something like that?
19       A.   Yeah, there were.  But there would be others.  It
20   would be impossible for me to pinpoint the date and time
21   when this meeting occurred.
22       Q.   I know.  I'm not trying to exhaust your
23   recollection here.  Would there be papers or calendars or
24   anything available?

Stuart Snyder                    18

Page 16

062806ss aa

1      A.    The only thing that would be -- not that I would
2    have.   I mean, I write notes on my desk blot calendar
3    like staff meeting.  And I actually do save my old
4    calendar blotters.  But it would probably just say staff
5    meeting, but not staff meeting regarding Trini Navarro.
6      Q.    Do you think the decision to not go with those
7    three promotions at that point, to just go with one, was
8    because of Navarro personally?
9      A.    Well, it was certainly the conclusion I drew
10    based on the decision that was made.  I mean, there was
11    no way I know for certain.  But, you know, I have been
12    doing this job a long time.  And my argument -- I'm not
13    going to say argument.  My statements to Guy Sapp in that
14    meeting were such that it didn't make sense not to fill
15    the positions because they would be making acting
16    sergeants on the road anyway.
17            And acting sergeants probably only do 50
18    percent of the job that a full supervisor does because
19    acting sergeants generally don't get involved in
20    disciplines, writing evaluations, sensitive matters.
21    Because they could be an acting sergeant one day and then
22    they are back to patrolman the next day.  So work wise,
23    it's definitely more efficient to promote and get a
24    hundred percent work out of that person than use actors


Stuart Snyder                    19


1    and get 50 work out of that person.
2      Q.    If the decision was made to go with one promotion
                        Page 17

062806ss aa

3   instead of three, there was someone else besides Trini

4   Navarro who then did not get a promotion?

5      A.   Yes.

6      Q.   Do you think there was any focus or thought of

7   depriving that person of a promotion too?

8      A.   Could be.  I mean, there is nothing that I know

9   of.  But --

10     Q.   What do you know of in Trini Navarro's case?  Do

11  you know he was promised a promotion?

12     A.   No.

13     Q.   Do you think he was highest on the available list

14  at that point in time?

15     A.   I don't recall.

16     Q.   What makes you think it was Trini?

17     A.   Trini what?

18     Q.   That Trini would have gotten a promotion but for

19  this decision.

20     A.   I didn't say that he would.  I just said that I

21  thought this decision deprived him of that.  Obviously,

22  if you can only promote one when you've got three slots,

23  there's two people that don't get promoted and he's one

24  of them.

Stuart Snyder                    20

1      Q.   You are sort of going by arithmetic.  But you are

2   not saying anything -- and I'm not faulting that.  But so

3   your answer is based on, essentially, a process

4   elimination?

Page 18

062806ss aa

5    A.    Right.  If there was four promotions in this
6    office and there is six of the seven of us sitting here
7    and then you say we are only going to fill one of the
8    positions, then there is going to be several people
9    denied that position.
10    Q.    Do you think it was intentional to deprive Trini
11    Navarro of a promotion?
12    A.    I can't draw that conclusion specifically.  But I
13    believe it's certainly possible.
14    Q.    What would -- let's use the word like hunch.
15    What is your hunch?
16    A.    My hunch is yes.
17    Q.    What is that based on?
18    A.    My hunch is based on the current administration,
19    meaning Guy Sapp as my closest contact because he's a
20    politically appointed person by Mr. Coons.  Several
21    things happened when the new administration came in that
22    I look at as, to use a term -- and I don't know if it's a
23    proper term -- but meddling in simple department matters
24    such as who drives what car based on what I perceived as


Stuart Snyder                21

1    a, at least a dislike of Colonel McAllister by the
2    administration.
3                Things like who gets what car, bringing in
4    outside consultants to, I guess, assess and determine a
5    promotional process, the director meeting with myself,
6    Major Hedrick and Lieutenant Colonel McLaren saying he's

Page 19

062806ss aa

7       got pressure to transfer Captain Setting, who I believe

8       is a close friend of then Colonel McAllister, creating a

9       bifurcated command structure.

10              And by that I mean, there were two

11      lieutenants pulled out from under police control and

12      given direct access to the county executives almost like

13      a separate police command structure.  All these things

14      were instituted, as my perception of working there 30

15      something years under probably seven, eight, nine

16      different chiefs, directors, county executives, for that

17      matter, as direct influence or interference with the

18      day-to-day type operations of the police department.

19              I view car assignments, internal transfers,

20      promotions, at least the front line supervisory ranks to

21      be things that should and could be handled by the police

22      department itself without interference.

23          Q.   And you view that -- you used the word maybe a

24      couple times -- interference and meddling?  You've used

Stuart Snyder                    22

1       those words.

2           A.   I'm trying not to be judgemental.

3           Q.   Oh, really?

4           A.   I'm trying not to say what they said or what they

5       did was wrong.  I'm just saying that they became

6       involved.  That's my point here is that became involved

7       in issues that typically are handled within the police

8       department.  So that's why I didn't say they did awful

062806ss aa

9   things.  They interjected control in places that

10  traditionally didn't have that control.

11      Q.   Well, the immediate preceding county exec and CAO

12  came out of the police department, right?

13      A.   Uh-huh.

14              MR. MARTIN:  Please try to say yes or no.

15              THE WITNESS:  I'm sorry.

16              MR. MARTIN:  And while I've got the mic here

17  for a moment, please, also try to listen to Mr. Goddess.

18  Let him complete his question before you respond simply

19  because the court reporter can't take two people at one

20  time.

21              THE WITNESS:  Sure.

22  BY MR. GODDESS:

23      Q.   You just said you don't want to be judgemental or

24  you are trying not to be judgemental.  You just observed

Stuart Snyder                    23

1   this level of interference and meddling, right?

2       A.   Yes.

3       Q.   Did you have any personal feelings about it?  Did

4   you think it was unfair to your department?

5       A.   Yes.

6       Q.   Did you express those views to anyone?

7       A.   Lieutenant Colonel McLaren.

8       Q.   And did the subject of promotions -- this is a

9   broad subject.  We could be here for a long time about

10  like what did you talk to McLaren about.  But did the

Page 21

062806ss aa

11    subject of promotions ever come up in conversation

12    between you and Colonel McLaren?

13        A.    Yes.

14        Q.    And the subject of sergeant promotions in

15    particular?

16        A.    Yes.

17        Q.    What did you say him to about sergeant

18    promotions?

19        A.    I said the same thing that I had said to -- in

20    fact, I believe Lieutenant Colonel McLaren was probably

21    in the room when I mentioned to Guy Sapp that it just

22    made a lot more sense to fill the open slots, more

23    efficient for the work force to do that.  So that's what

24    I mentioned to Lieutenant Colonel McLaren.



Stuart Snyder                    24


1        Q.    Did you ever have, outside of that staff meeting,

2    did you ever have any conversations with Lieutenant

3    Colonel McLaren on the promotional issues?

4        A.    I can't recall any specifically, but I wouldn't

5    say no.  I probably speak to him daily as well.  And this

6    issue was probably a year or more ago.  So I would

7    venture to say yes.

8        Q.    It was most directly of all the majors -- well,

9    there is only two of them.  It was more directly in your

10    line of work if you were over human resources?

11        A.    Right.

12        Q.    The whole timing of promotional exams, the
Page 22

062806ss aa

13    structure of exams?

14        A.    Actually, those issues have been traditionally

15    handled -- in other words, the content of the exams, the

16    timing and actually the administration of the exams were

17    handled by county human resources, not police department

18    human resources.

19        Q.    So what was taken away or what was the change in

20    that round of sergeant promotions?  I got the impression

21    from an earlier answer you gave that there was some

22    change this time.

23        A.    The change was that the positions weren't filled.

24    There were open positions.  There were eligible

Stuart Snyder                    25

1    candidates.  And we were told by the director that --

2    and, actually, initially he told us he wasn't filling any

3    of them and then, at least a few weeks later, decided it

4    was okay to fill one.

5        Q.    Did you ever speak of any of this with Trini

6    Navarro?

7        A.    No, I don't believe so.

8        Q.    My question wasn't precise.  When I said did you

9    ever relay any of this, the word "this" is pretty vague

10    as I think about it.  But did you ever talk with Trini

11    Navarro about your perception of Director Sapp and what

12    his role was and how he went about making decisions?

13        A.    I can't recall specific -- well, I can't recall a

14    specific conversation.  But I know I've mentioned to the

Page 23

062806ss aa

15   lieutenant colonel that I felt that Mr. Sapp was speaking

16   for the, at least whoever his boss was, which I would

17   assume is David Singleton.  I don't know who Mr. Sapp

18   confers with at the Government Center.  But at least in

19   this instance for the promotion, it seemed like there was

20   an awful lot of delay, consternation, et cetera, from

21   Director Sapp in making a decision to promote any

22   sergeants or one sergeant or three sergeants.

23              And, as a matter of fact, when there was one

24   sergeant promoted -- we met as staff, the lieutenant


Stuart Snyder                    26


1    colonel -- I believe it was unanimous when we promoted

2    Sergeant Davies.  And Director Sapp was notified within a

3    couple hours of the promotion yet she wasn't promoted for

4    more than a week.  And Lieutenant Colonel McLaren

5    explained to me that before the promotion was made, that

6    he and Director Sapp had to present the promotion to

7    Mr. Singleton.

8              And I asked Lieutenant Colonel McLaren, what

9    do you mean present?  This is a first line supervisor

10   that we all agreed on.  The director was fully aware of

11   the promotion to make sure we didn't promote a desk

12   chair.

13              And it was particularly frustrating to

14   staff.  You got the whole staff that meets, decides

15   something.  The lieutenant colonel knows it.  Director

16   Sapp knows it.  Yet a week goes by because this promotion

Page 24

062806ss aa

17  had to be presented to the CAO.  And I don't know what

18  presented means other than given to him for his ultimate

19  approval.

20          So this is one specific step by step

21  instance where I would say there was absolutely

22  interference or interjection by county administration

23  into a first line supervisor promotion.

24      Q.   Sergeant Davies did get the promotion?

☐

Stuart Snyder                    27

1      A.   Yes.

2      Q.   Did you talk about that to Trini Navarro?

3      A.   Talk about that?

4      Q.   About the perceived delay on Tricia Davies'

5  promotion.

6      A.   I don't recall specifically talking to him about

7  it.

8      Q.   I'm going to read a little passage from --

9      A.   I'm not saying it didn't happen.  But I have a

10  lot of conversations a lot of time with a lot of people.

11     Q.   Let me see if this jogs your recollection,

12  either, oh, yes that's right, or, you know, I still don't

13  understand that.  This is from Corporal Navarro's

14  deposition.

15          MR. MARTIN:  What page, please?

16     Q.   Beginning of Page 24.  Referring to David

17  Singleton, chief administrative officer.

18              "He is directly involved in our promotions.
                        Page 25

062806ss aa

10      Q.    Yes.

11      A.    Like right before it comes out on paper?  My

12  impression is somebody at the Government Center and my

13  guess, my assumption would be Dave Singleton.

14      Q.    What do you base your assumption on?

15      A.    I base my assumption on -- I believe I was pretty

16  specific with the Trish Davies promotion, that staff had

17  met along with Guy Sapp and yet the promotion itself

18  didn't take place for a week.  And that promotion was

19  commensurate with the presentation of, quote, Lieutenant

20  Colonel McLaren, the presentation of Trish Davies'

21  promotion to Mr. Singleton before it was finally allowed.

22      Q.    Okay.  Now, in terms of transfer of officer

23  decisions, who has been making them?

24      A.    For the most part, the lieutenant colonel and

Stuart Snyder                    55

1   staff.  Actually, there is only one specifically that I

2   could say, that I could say I feel that there is

3   influence from the Government Center staff.  And that

4   would be the transfer of Captain Setting.

5              And, specifically, Lieutenant Colonel

6   McLaren, myself and Major Hedrick met with Guy Sapp.  For

7   several weeks he had mentioned thoughts of moving some of

8   the staff around.  And we finally met with Mr. Sapp, I'm

9   guessing, in January.  And the three of us, meaning

10  myself, Lieutenant Colonel McLaren, and Major Hedrick

11  have a probably combined police experience of 80, 90

Page 51

062806ss aa

12    years, all of which on the New Castle County Police, said
13    at this time we don't think staff should be transferred,
14    especially with a new chief coming.

15              And Guy Sapp alluded to us that, he said to
16    us, I have been getting pressure to make this move.  And
17    every scenario of staff transfer that he spoke about,
18    every single scenario had Captain Setting leaving patrol
19    and going to records.

20    Q.    What was your understanding, if any, as to what
21    Mr. Sapp was referring to when he said pressure?

22    A.    I would assume his boss.

23    Q.    And his boss was?

24    A.    Singleton.  I mean, unless his wife was telling

Stuart Snyder                    56

1     him to do it.  My assumption would be his boss when he
2     said he's under pressure.  He did not specifically say
3     Mr. Singleton.

4     Q.    Do you have an understanding as to who made the
5     ultimate decision as to transferring Captain Setting?

6     A.    It would have had to have been Mr. Sapp.  Because
7     the three of us, myself, lieutenant colonel and the other
8     major, had all said we didn't recommend doing it at that
9     time.

10    Q.    So it was not done within the New Castle County
11    Police Department, correct?

12    A.    Correct.

13    Q.    So it was Sapp.  Could it have been Singleton?
                        Page 52

062806ss aa

14    A.    Could have.

15    Q.    How do you view Captain Setting's transfer?

16    A.    Given the circumstances of the three of us

17  strongly recommending not to transfer at the time, and

18  every scenario that Mr. Sapp presented to us involved

19  Captain Setting going to records, I would say punitive in

20  some nature to significantly reduce his command.

21    Q.    You said punitive.  Would you also say

22  retaliatory?

23    A.    I couldn't say retaliatory because I don't know

24  of anything that he did to Sapp.


Stuart Snyder                    57


1    Q.    Or how about Singleton?

2    A.    I don't know of anything he did to Singleton.

3    Q.    What was your understanding, if anything, as to

4  Captain Setting's relationship with Colonel McAllister?

5    A.    I understand that they were personal friends.

6    Q.    Do you believe that that may have played any role

7  in the transfer of Captain Setting?

8    A.    It's possible.  I'm not aware of any performance

9  issue that would have necessitated his transfer.

10    Q.    So I just asked but transfers.  Promotional

11  decisions we've discussed.  What about decisions for

12  advanced training within the department, who makes those

13  decisions?

14    A.    Ultimately the chief.

15    Q.    Do those issues go beyond the police department

Page 53