## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORPORAL TRINIDAD NAVARRO,  :
           :
   Plaintiff,     :  C.A. No. 05-565 GMS
           :
   v.      :  JURY TRIAL DEMANDED
           :
CHRISTOPHER A. COONS,   :
individually and in his official capacity; :
GUY H. SAPP, individually and in his :
official capacity; and NEW CASTLE :
COUNTY, a municipal corporation, :
           :
   Defendants.    :

## REPLY BRIEF IN SUPPORT OF DEFENDANTS CHRISTOPHER A COONS, GUY H. SAPP AND NEW CASTLE COUNTY'S MOTION FOR SUMMARY JUDGMENT

Michele D. Allen, Assistant County Attorney (#4359)
Judith A. Hildick, First Assistant County Attorney (#3244)
Megan Sanfrancesco, First Assistant County Attorney (#3801)
New Castle County Law Department
87 Reads Way
New Castle, DE 19720
(302) 395-5130
*Attorneys for New Castle County and Christopher A. Coons and E. Ronald Frazier in their Official Capacities*

Jeffrey S. Goddess, Esq.(#630)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
*Attorney for Christopher A. Coons and Guy H. Sapp in their Individual Capacities*

Dated: June 7, 2007

# TABLE OF CONTENTS

**PAGE**

Table of Contents.................................................................................................i

Table of Citations ...............................................................................................ii

I.    PLAINTIFF CANNOT SUSTAIN A CLAIM UNDER 42 U.S.C.§1983 AGAINST
      COONS AND SAPP/FRAZIER IN THEIR OFFICIAL CAPACITIES AS IT IS
      DUPLICATIVE OF THE CLAIM AGAINST THE COUNTY ...........................................2

II    THERE IS NO EVIDENCE THAT PLAINTIFF ENGAGED IN PROTECTED
      ACTIVITY SUFFICIENT TO INVOKE THE PROTECTION OF THE FIRST
      AMENDMENT..........................................................................................................2

      A.    Plaintiff cannot show that he engaged in protected activity; however assuming the
            Court finds that he did, he cannot show that the protected activity was a
            motivating factor in Defendants' decision .................................................................7

      B.    Defendants would have taken the same action absent Plaintiff's allegedly
            protected conduct.......................................................................................................9

III.  THERE IS NO EVIDENCE THAT THE COUNTY ACTED PURSUANT TO A
      CUSTOM OR POLICY OF ENGAGING IN RETALIATORY ACTS SUFFICIENT TO
      IMPOSE LIABILITY UNDER 42 U.S.C. § 1983...............................................12

IV.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ......................................13

V.    THERE IS NO EVIDENCE THAT THE CONDUCT OF DEFENDANTS COONS AND
      SAPP WARRANTS THE IMPOSITION OF PUNITIVE DAMAGES .............................18

VI.   CONCLUSION..........................................................................................................19

## TABLE OF CITATIONS

### CASES

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986) ........................................................1,

*Board of Cty. Commr's of Bryan County v. Brown,* 520 U.S. 397, 405 (1997) ................................12

*Bulkoski v. Bacharach, Inc.,* 1 F.Supp. 2d 484, 487 (W.D.Pa. 1997), aff'd, 149 F.3d 1163 (3d Cir. 1998) ........................................................................................4, 5

*Busey v. Board of County Cm'rs of County of Shawnee, Kansas,* 277 F.Supp.2d 1095 (D.Kan. 2003) ........................................................................................5

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) ........................................................13

*Clark v. Modern Group Ltd.,* 9 F3d 321, 326 (3d Cir. 1993) ........................................................1, 2

*Correa v. Fischer,* 982 F.2d 931 (5th Cir. 1993) ........................................................5

*DeFiore v. Vignola,* 823 F.Supp. 315 (E.D.Pa. 1993) ........................................................6

*Deibler v. City of Rehoboth Beach,* 790 F.2d 328 (3d Cir. 1986) ........................................................6

*Gronowski v. Spencer,* 424 F.3d 285 (2d Cir. 2005) ........................................................5, 6

*Hill v. Scranton,* 411 F.3d 188 (3d Cir. 2005) ........................................................7

*Kentucky v. Graham,* 473 U.S. 159, 165 (1985) ........................................................2

*Love-Lane v. Martin,* 355 F.3d 766, 783 (4th Cir. 2004) ........................................................2

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) .....1

*Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 694 (1978) ................2,

*Moore v. Bd. Of Educ. of City of Chicago,* 300 F.Supp.2d 641, 646 (N.D. Ill. 2004)........................2

*Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir. 1981)........................................................13

*Ota P'ship v. Forcenergy, Inc.,* 237 F.Supp.2d 558, 561 n. 3 (E.D.Pa. 2002) ................................4, 12

*Reed v. Agilent Technologies, Inc.,* 174 F.Supp.2d 176 (D.Del.2001) ........................................................1,

*Quiroga v. Hasbro,* 934 F.2d 497, 500 (3d Cir. 1991) ........................................................1, 4

*Satterfield v. Borough of Schuylkill Haven,* 12 F.Supp.2d 423, 431 (E.D.Pa. 1998) ........................2, 13

*Smith v. Wade,* 461 U.S. 30, 56 (1983).........................................................................................19

*Speziale v. Bethlehem Area Sch.Dist.,* 266 F.Supp.2d 366, 371 n.3 (E.D.Pa. 2003).........................4

*Whitfield v. Pennsylvania Gas Works,* 1997 WL 732463 (E.D.Pa. 1997).........................................7

## FEDERAL STATUTES

42 U.S.C. §1983 ................................................................................................................2, 11, 12, 19

## FEDERAL RULES OF CIVIL PROCEDURE

8(A)(2) .........................................................................................................................................12

In his Answering Brief, Plaintiff presents approximately twelve pages of facts in an attempt to lend credence to the claims made in the Amended Complaint (and those now made for the first time on summary judgment). However, these facts, even if true, fail to add any weight to his claims. The plethora of facts described by Plaintiff are clearly an attempt to distract and confuse the Court regarding the material facts and issues of the case. When all of the unsupported allegations, mere speculation and distortions of evidence are removed, it is clear that Plaintiff has failed to produce any facts that would support his retaliation claim based on his right to freedom of association.

In an effort to distract the Court from the law of the case, the Plaintiff has provided sensational facts to create a smoke and mirrors effect to hide the fact that he has no substantiated facts to support his theory that he was retaliated against by the Defendants due to his political association. In sum, Plaintiff's brief lacks any evidence concerning his actual political association that the Court could even weigh, as Plaintiff has utterly failed to respond to the arguments presented in Defendants' Opening Brief that there must be some act of political association beyond mere friendship and loyalty in order to assert a retaliation claim based on freedom of association.

Once the moving party meets their burden on summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleading." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The non-moving party instead "must set forth specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. 574, 587 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson*, 477 U.S. at 248. Plaintiff's submission contains no more than mere speculation which would not be admissible at trial. Therefore, Plaintiff cannot withstand summary judgment. *See Reed v. Agilent Technologies, Inc.*, 174 F. Supp. 2d 176 (D. Del. 2001)(absent evidence of discrimination, allegations are insufficient to withstand summary judgment); *Quiroga v. Hasbro*, 934 F.2d 497, 500 (3d Cir.1991) (conclusory allegations and vague assertions will not withstand a motion for summary judgment); *see also Clark v. Modern Group Ltd.*,

9 F.3d 321, 326 (3d Cir.1993) (evidence offered in opposition of a motion for summary judgment must be admissible evidence).

I.    **PLAINTIFF CANNOT SUSTAIN A CLAIM UNDER 42 U.S.C. § 1983 AGAINST COONS AND SAPP/FRAZIER IN THEIR OFFICIAL CAPACITIES AS IT IS DUPLICATIVE OF THE CLAIM AGAINST THE COUNTY**

Plaintiff contends that the official capacity claims against Defendants Coons and Sapp/Frazier cannot be dismissed because Defendants have offered no defense available to the County to support such a dismissal. *Answering Brief* at 23. Plaintiff ignores well settled precedent that official capacity suits against government officials "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690 n. 55 (1978). Therefore, where a local government entity is also a defendant in a lawsuit, claims against individual actors in their official capacities are redundant. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985)(noting that official capacity suits are to be treated as a suit against the entity rather than a suit against the official personally); *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp.2d 423, 431 (E.D.Pa. 1998)(claims against borough council members in their official capacity were properly dismissed as redundant and unnecessary where suit was also brought against borough); *Moore v. Bd. of Educ. Of City of Chicago*, 300 F.Supp.2d 641, 646 (N.D. Ill. 2004)(plaintiff's official capacity claims deemed redundant where local board of education was also a defendant); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004)(district court's dismissal of official capacity claim was affirmed where local government entity had also been sued). As the County is currently a defendant in this suit, the claims against Coons and Sapp/Frazier in their official capacities should be dismissed.

II.    **THERE IS NO EVIDENCE THAT PLAINTIFF ENGAGED IN PROTECTED ACTIVITY SUFFICIENT TO INVOKE THE PROTECTION OF THE FIRST AMENDMENT.**

The issue of protected activity in Plaintiff's Answering Brief appears designed to confuse the Court and complicate the subject to the point where the Court might simply deny summary judgment

rather than face the arduous task of sorting the smoke and mirrors from any argument of substance. In fact, it seems that Plaintiff has finally recognized the deficiencies in his own case, insofar as he now raises additional allegations that were absent from both the original Complaint, filed on August 4, 2005, and his Amended Complaint, deemed filed on November 20, 2006. Prior to Plaintiff's Answering Brief, the entire political association claim centered on Plaintiff's relationship with David McAllister, as alleged in both the Amended Complaint and Plaintiff's own deposition testimony. *Amended Complaint* at ¶s 20-22, 42-50; *Navarro Depo.* 279.[1] The entirety of the discovery conducted by Defendants was based upon Plaintiff's allegations that it was this relationship with McAllister, political or otherwise, that resulted in his alleged deprivation of the Sergeant position.

Plaintiff claims that he was retaliated against because he was a member of the "McAllister team," a so-called political group, and his loyalty to McAllister. *Amended Complaint* at ¶42-43. In an effort to support this claim in his Answering Brief, Plaintiff goes on for over two pages regarding the relationship between the current administration and former Chief McAllister[2]. All of the facts in this section regarding McAllister are immaterial and wholly irrelevant to Plaintiff's claim. The facts do not support nor allege that McAllister was a political candidate, nor do they support or allege how his friends would be considered a political group as initially plead. The only value that is offered by these facts is shock value and they are completely immaterial to the instant motion. Even if the facts were viewed in the light most favorable to Plaintiff, they still fail to offer any support of his claims. At best, the facts in regards to McAllister tend to illustrate a difficult or estranged relationship between McAllister and the Coons Administration. Plaintiff provides no facts which support that McAllister was a political candidate or party which Plaintiff supported.

Furthermore, in an attempt to support his claim Plaintiff creates a bullet point list of other officers who have allegedly been retaliated against because of their friendship with McAllister.

---

[1] Plaintiff Trinidad Navarro deposition excerpts are found at Exhibit A.
[2] Although not a material fact it should be noted that former Chief McAllister was not terminated but resigned. *McAllister Depo.* 7.

*Answering Brief* at 18-19.  First and foremost these facts are wholly irrelevant as they do not apply to

Plaintiff or any other parties to the instant case.  The bullet points are merely unsupported and

unsubstantiated allegations and, as stated supra, such conclusory allegations and vague assertions

cannot withstand a motion for summary judgment.  *Quiroga* at 500.  However, for purposes of

summary judgment assuming that the facts are true, they still fail to provide any supported acts of

retaliation.  Moreover, the mere bullet points fail to show how any of the officers engaged in

protected activities other than being friendly with McAllister, which is not a Constitutionally

protected right.

Plaintiff only now argues, for the very first time in his Answering Brief, that, in addition to

Plaintiff's relationship with McAllister, it was Plaintiff's "support of" former County Executive

Thomas Gordon ("Gordon") and former Chief Administrative Officer and County Executive-

candidate Sherry Freebery ("Freebery"), that "inspired Defendants to retaliate against him by

denying his promotion to sergeant."  *Answering Brief* at 24.  The Court must not permit Plaintiff to

continue to pursue his lawsuit in this cat-and-mouse manner, time and time again[3].  District Courts

have broad discretion to disallow the addition of new theories of liability at the eleventh hour.  *See,*

*e.g., Speziale v. Bethlehem Area Sch. Dist.*, 266 F.Supp.2d 366, 371 n. 3 (E.D.Pa.2003) (Plaintiff's

counsel cannot reasonably expect to amend the complaint after the close of discovery merely by

raising new arguments in the responsive papers to a motion for summary judgment.); *Ota P'ship v.*

*Forcenergy, Inc.*, 237 F.Supp.2d 558, 561 n. 3 (E.D.Pa.2002) (holding that a new claim that was first

raised in opposition to a motion for summary judgment was "too late"); *Bulkoski v. Bacharach, Inc.*,

1 F.Supp.2d 484, 487 (W.D.Pa.1997) (holding that after a summary judgment argument, "[i]t is too

---

[3] As the Court will recall, Defendants filed a Motion for Summary Judgment with respect to Plaintiff's original free speech claim on July 17, 2006.  *D.I.* 58.  Plaintiff never responded in any manner to that Motion, but instead filed a Motion to Amend the Complaint, requesting the opportunity to pursue a First Amendment political association claim, in addition to the First Amendment free speech claim.  At the Pre-Trial Conference conducted on November 20, 2006, Plaintiff finally withdrew his free speech claim which he knew to be without merit, and was permitted by the Court to pursue a political association claim.  However, Plaintiff deliberately chose to continue to rely solely upon the facts pled in the original Complaint to support the new political association claim.

late for plaintiff to change his theory of the case"), aff'd, 149 F.3d 1163 (3d Cir.1998) (table decision).

Moreover, beyond the fact that Plaintiff failed to timely allege any political association claim with respect to his "support of" Gordon and Freebery, he actually testified as to his lack of support for candidate-Freebery. For example, Plaintiff testified that he did not make financial contributions to any candidate in the 2004 primary or general election for County Executive, in which Freebery was a candidate. *Navarro Depo.* 286. Nor did he attend any fundraisers for her campaign. *Id.* at 282. Further, Plaintiff could not even recall if he voted for Freebery in the primary election, but interestingly enough he did specifically recall voting for Coons in the general election. *Id.* With respect to his alleged support of Gordon, or lack thereof as the case may be, Plaintiff testified only that he was "friendly with Tom Gordon". *Id.* at 279. But friendship does not a political association claim make. *See Busey v. Board of County Com'rs of County of Shawnee, Kansas,* 277 F. Supp. 2d 1095 (D. Kan. 2003); *Correa v. Fischer,* 982 F.2d 931 (5th Cir. 1993 ).

Now, however, after making blanket allegations regarding his alleged support of McAllister and also Freebery and Gordon, Plaintiff speciously attempts to analogize his situation to cases in which political association claims were sustained. However, each case on which Plaintiff attempts to rely is inapposite. First, Plaintiff offers *Gronowski v. Spencer,* 424 F.3d 285 (2d Cir. 2005). In *Gronowski,* the plaintiff sued the City of Yonkers and its Republican mayor for terminating her position after plaintiff assumed a leadership position with the Yonkers Democratic Party and actively supported a political rival of the mayor. The differences between *Gronowski* and the instant case couldn't be greater. In *Gronowski,* no one disputed that the plaintiff actually engaged in politically protected activities by functioning as leadership of the Democratic Party and by serving as the campaign treasurer for the mayor's rival. Instead, the crux of the argument centered on the extent to which the mayor knew of plaintiff's activity, bore animosity toward her because of it and was accordingly involved in the City's determination to terminate the plaintiff. The Plaintiff in the

instant case however, has failed to establish a fundamental factor - that any of his actions, beliefs or speech actually constitute politically protected activity. Reliance on *Gronowski* is tantamount to putting the cart before the horse.

Plaintiff also refers to *DeFiore v. Vignola*, 823 F.Supp. 315 (E.D.Pa. 1993), to support the proposition that political loyalty to an elected official who subsequently loses an election is considered a protected activity. However, in *DeFiore*, the Court determined that dismissal was premature insofar as the defendant claimed that the plaintiff held a position for which political affiliation was a valid requirement and the parties had not yet taken any discovery related to the validity of any claim or defense. Plaintiff's reliance on *DeFiore* in the instant case is desperate and misplaced. Defendants in this case have not disputed that Plaintiff is a public employee and that he worked in a position that does not require political affiliation. Further, discovery has now concluded, leaving the Plaintiff with an absence of facts to support his claim. Consequently, *DeFiore* is inapplicable.

Finally, Plaintiff points to *Deibler v. City of Rehoboth Beach*, 790 F.2d 328 (3d Cir.1986) to establish the concept that the right of political association extends beyond the mere formation of a political group, to include the availability of political opportunity for the group. In *Deibler*, the plaintiff alleged that a provision in the City's charter that required candidates for political office to be non-delinquent in their taxes violated his right to political association and equal protection. While the Third Circuit found such a requirement to be violative of plaintiff's Fourteenth Amendment right to equal protection, it also determined that neither the right to political association nor the right to participate in political activities is absolute, and consequently, the Court held that the challenged requirement did "not inhibit the formation of a political association" and did not violate plaintiff's First Amendment rights. *Id.* at 333. Plaintiff's reliance upon *Deibler* is as futile as was his reliance on the previous two cases.

Conversely and not surprisingly, Plaintiff failed to address or distinguish any of the numerous cases cited by the Defendants in their Opening Brief to support the argument that Plaintiff did not engage in any protected activity. Based upon the abundance of precedent to disprove Plaintiff's claims, and based upon Plaintiff's inability to support his allegations, Defendants are entitled to summary judgment on this issue.

A.    **Plaintiff cannot show that he engaged in protected activity; however assuming the Court finds that he did, he cannot show that the protected activity was a motivating factor in defendants' decision.**

Plaintiff erroneously states that this factor must be determined by a jury. *Answering Brief* at 29. However, in *Hill v. Scranton,* 411 F.3d 188 (3d Cir. 2005), the Court rejected the contention "that courts may never grant summary judgment on either the second or third steps of the [retaliation] analysis." *(citing Curinga v. City of Clarton,* 357 F. 3d 305, 310 (3d Cir. 2004) *(citiation omitted)).* *See also Whitfield v. Pennsylvania Gas Works*, 1997 WL 732463 (E.D.Pa. 1997)(plaintiff's political discrimination claim dismissed at summary judgment). Assuming for purposes of summary judgment that Plaintiff's activity of being friends with and loyal to McAllister was a protected activity, Plaintiff still fails to show that it was a motivating factor in the decision to reduce the number of eligible Sergeant positions.

Plaintiff presumes that the police department made this decision in an effort to retaliate against Plaintiff – a decision which affected not only Plaintiff, but all other candidates who were eligible to be promoted. Yet, the only facts Plaintiff cites in support of this conclusory allegation are statements by Levine and Snyder which fail to support the allegation at hand.

Plaintiff cites to certain statements allegedly made by Levine in her capacity as an "arm" of Chris Coons.[4] While Levine could fairly be viewed as an "arm" of Coons in her capacity as Communications Director for the County, she was not acting as such but as an individual involved in

---

[4] Although Plaintiff claims that these communications with Plaintiff came at the specific request of Coons, citing Exhibit 2 at 36 for this proposition, this exhibit fails to support this contention.

a private conversation with Plaintiff at the local Dunkin Donuts at his behest. Interestingly, many of the allegations in the Amended Complaint derive from this conversation with Levine. But according to Levine, Plaintiff "pointedly asked [her] to come to Dunkin Donuts so that he could get [her] to say things that would give him fodder for a lawsuit." *Levine Depo. 55-56*[5]. Levine did testify that Coons had indeed been unhappy with Plaintiff in certain respects, namely, his failure to contact the Executive Office regarding certain media contacts. *Levine Depo. 33-34.* There was also a concern from Coons and others that Plaintiff may have been involved in campaigning on County time – the subject of a pending Federal indictment against Gordon and Freebery. *Levine Depo.* 28-31, 33-34. Assuming these facts as true for purposes of summary judgment, Coons, as County Executive, was certainly permitted to express displeasure on performance issues and possibly criminal activities of a police officer. However, even if Coons was upset about these issues, Plaintiff fails to show how such displeasure was somehow a motivating factor in the decision to reduce the number of eligible sergeant positions – a decision in which Coons was not a participant. Although Plaintiff would ascribe Levine's statement about "that's how politics work" to the decision not to fill the sergeant positions, Levine specifically explained that this was not what she meant. *Levine Depo.* 79; *Answering Brief* at 16.

Plaintiff's reliance on Snyder's unsupported, conclusory statement that the sergeant positions were not filled so as to not promote Plaintiff is similarly misplaced. *Answering Brief* at 30. Snyder has no factual support for this statement. In fact, he admits that this belief was his own conclusion, and that there was no way to know for certain that this was the case. *Snyder Depo.* 18.[6] Moreover, when specifically asked if Plaintiff would have gotten the promotion but for the decision, Snyder responded, "I didn't say that he would. I just said that I thought this decision deprived him of that." *Snyder Depo.* 19. It is undisputed that reducing the number of sergeant positions deprived Plaintiff

---

[5] Allison Taylor Levine deposition excerpts are found at Exhibit B.
[6] Stuart Snyder deposition excerpts are found at Exhibit C.

and other candidates of the opportunity to be promoted. When asked if the decision to reduce the number of sergeants was intentional to specifically deprive Plaintiff of a promotion, Snyder responded, "I can't draw that conclusion, but I believe it's certainly possible." *Snyder Depo.* 20.

There is simply no genuine issue of material fact to be left to a jury regarding Plaintiff's allegation that the number of sergeant positions were reduced in an effort to retaliate against him because of his alleged friendship with and loyalty to McAllister. Even viewing all facts in the light most favorable to Plaintiff, no reasonable juror could conclude that Plaintiff's friendship and loyalty to McAllister was a motivating factor to deprive not only plaintiff, but several other officers, an opportunity to be promoted.

**B.     Defendants would have taken the same action absent Plaintiff's allegedly protected conduct.**

As stated *supra*, this issue may be properly raised and addressed at summary judgment. The decision to reduce the number of sergeant positions was based on budgetary and staffing needs. However, Plaintiff asserts that such a decision defies logic in light of budgetary needs at that time. *Answering Brief* at 31. He claims that there could not be any budgetary concerns because the positions were previously budgeted and because the police department was using acting Sergeants during that time. *Id.* However, plaintiff fails to understand the budgetary process.

When the Coons Administration took office in January 2005, they only had a few months to review the entire County budget and make any immediate and necessary changes before the budget was presented for a vote in April 2005. *Strine Affidavit,* ¶ 5.[7] In an effort to address the operating imbalance in the General Fund all General Managers were required to make a reduction to their Fiscal Year ("FY") 2006 budgets. *Strine Affidavit,* ¶ 6. Additionally, there were several departments, aside from the Police Department, that had vacant positions in the FY 2006 budget that were not filled as a result of projected budget problems in the FY 2006 year. *Strine Affidavit,* ¶ 7.

---

[7] The Affidavit of Michael Strine, Chief Financial Officer, is found at Exhibit D.

As a result, there was a net reduction of twenty seven (27) County positions deleted in the FY 2006 budget; there was no position growth in FY 2007 budget, and in FY 2008, there were forty two (42) positions eliminated. *Strine Affidavit*, ¶¶ 8-10. Moreover, in November 2006, a County-wide hiring freeze was imposed. *Strine Affidavit*, ¶ 11 . Clearly, the Coons Administration had budgetary concerns when they took office, which were unfortunately later revealed in a projected 47 million dollar deficit. *Strine Affidavit*, ¶ 6. Therefore, Plaintiff's proclaimed self-importance that the two sergeant positions were not filled in an attempt to retaliate against him is an obvious ill-fated attempt to support his retaliation claim.

Plaintiff also attempts to rebut Defendants' statement that the decision to not fill the two sergeant positions was for economic reasons by stating that the police department was temporarily filling sergeant vacancies with acting sergeants. *Answering Brief* at 14. However, Plaintiff fails to comprehend the necessity and purpose of acting sergeants. It is undisputed that at the time Plaintiff was eligible to be promoted, acting sergeants were being used during any given shift. Acting Sergeants are still being used by the Police Department. The purpose of green-carding an officer to an acting sergeant is to ensure that there are an adequate number of sergeants available for any given shift. *McLaren Depo. 59*;[8] *Sapp Depo. 53*.[9] An acting sergeant may be needed because a sergeant is off on vacation, or out on disability, Family Medical Leave Act leave, sick leave, or training purposes. *Id.* For purposes of the instant matter, the important fact is that at no time during the FY 2006 or 2007 budgets were sergeants permanently green-carded for a total in excess of thirty-six sergeants. *Strine Affidavit*, ¶ 13. Moreover, an acting sergeant is a temporary position that will no longer be needed when another sergeant returns from leave. There will always be a need for a few acting sergeants regardless of the total number of sergeants authorized. *Strine Affidavit*, ¶ 14.

---

[8] Scott McLaren deposition excerpts are found at Exhibit E.
[9] Guy H. Sapp deposition excerpts are found at Exhibit F.

Plaintiff also contends that the need for patrol strength, as opposed to additional supervisors, "lacks logic," citing his own opinion that acting sergeants are part of the patrol strength and McAllister's opinion that there were not enough sergeants to go around. *Answering Brief* at 32. The desire to increase patrol strength was generally understood throughout the County. *Coons Depo.* 20-21;[10] *Levine Depo.* 78-79, 84; *Sapp Depo.* 73. Plaintiff now attempts to use an overly-broad definition of "patrol strength" to support his claim. However, from the outset, the definition of patrol strength used by the Coons Administration referred to officers regularly on the street, and did not contemplate the inclusion of sergeants in that definition. *Coons Depo.* 20-21; *Sapp Depo.* 73. The difference in these concepts is illustrated in Sapp's deposition testimony: "I was concerned about the authorized strength of the patrol level, which is where the rubber meets the road so to speak. They are the officers that handle the complaints, and are on the street." *Sapp Depo.* 73. Plaintiff claims that the Police Executive Research Forum ("PERF") Report contradicts Sapp's opinion on this issue. However, the report is merely a recommendation which was not presented to the County until June 2006. Nevertheless, the PERF report stated that overall, as of February 9, 2006, the current County police force structure complied with commonly accepted standards for law enforcement agencies. *See PERF Report,* Ex. H, p. 4. Moreover, the report doesn't contradict Sapp's opinion. Rather, it recognizes that both specialized and patrol squads have adequate and appropriate levels of management and supervision, at the reduced number of sergeants, and goes on to offer recommendations for enhancements in these areas. *Id.* at 5. Once again, Plaintiff attempts to create confusion where none formally existed in an attempt to hoodwink this Court into denying summary judgment.

In sum, Plaintiff has not provided sufficient support for his conclusion that the decision not to fill the two Sergeant positions was done to prevent him from being promoted. As such, there are no genuine issues of material fact on this issue to prevent dismissal via summary judgment.

---

[10] Christopher Coons deposition excerpts are found at Exhibit G

III.   **THERE IS NO EVIDENCE THAT THE COUNTY ACTED PURSUANT TO A CUSTOM OR POLICY OF ENGAGING IN RETALIATORY ACTS SUFFICIENT TO IMPOSE LIABILITY UNDER 42 U.S.C. § 1983**

Again, although not entirely coherent from his Answering Brief, Plaintiff, for the first time, alleges that liability against the County is proper because Sapp and Coons' decision not to promote Plaintiff to sergeant represents an official County policy of retaliating against "political foes." *Answering Brief* at 32. Plaintiff then attempts to further this new theory with his belief that this policy of retaliation was not just against political foes, but more specifically, those political foes that were supportive of Gordon and Freebery. *Id.* at 32, 34. The Amended Complaint is utterly devoid of any allegations that Defendants acted pursuant to any such County custom or policy. Moreover, there is no evidence that Plaintiff's not being promoted to sergeant provides a basis for liability against the County pursuant to the rigorous standards of culpability and causation set forth in *Board of Cty. Commr's of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

Plaintiff contends that he has met his burden of "notice pleading" on this newly-created claim, citing the alleged conversation between Plaintiff and Levine contained in paragraphs 21-27 of the Amended Complaint. *Answering Brief* at 32-34. However, contrary to the pleading requirements of Fed. R. Civ. P. 8(a)(2), these allegations fail to give Defendants fair notice that Plaintiff is pursuing a claim against the County and County officials that is based upon a policy of discriminating against "political foes," let alone those political foes that were supportive of Gordon and Freebery. Gordon and Freebery are not even mentioned in the Amended Complaint, except in paragraph 18 relative to the pending federal indictment against them. New theories of liability cannot be raised to defeat summary judgment. *See Ota. P'ship*, 237 F. Supp.2d at 561 n.3 (new claim that was first raised in opposition to a motion for summary judgment was not only "too late" but was also devoid of any factual support). Clearly, Plaintiff's attempt to introduce new theories of liability that have not been properly raised in the pleadings would be unduly prejudicial and improper at this point in the proceedings where the complaint has been amended, the parties have completed

discovery, the defendants have filed for summary judgment, and trial is approaching. *See Satterfield*, 12 F.Supp.2d at 433 (plaintiff's attempt to introduce new claim in response to defendant's motion for summary judgment was barred for failure to timely assert claim).

Even assuming that the pleadings were sufficient to put Defendants on notice of such a claim, Plaintiff has proffered no evidence that would support these allegations. It is well settled that "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but...must set forth specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (*citing Catrett v. Johns-Manville Corp.*, 756 F.2d 181, 184 (1985)). Plaintiff offers passages from the testimony of Levine, McAllister, Snyder and McLaren in an attempt to bolster these new allegations. *Answering Brief* at 32-34. However, all of the cited testimony, even if true, fails to support the existence or even an inference of an "official policy" of retaliation. Defendants should not have to search in the amass of facts included in Plaintiff's Answering Brief for every legal theory that Plaintiff might try to turn into a cognizable claim, but in any event Plaintiff's submissions are insufficient to show a genuine issue of material fact as to the issue of whether Plaintiff's not receiving a promotion to sergeant was due to a County policy of retaliating against "political foes." Therefore, all that remains is Plaintiff's own opinion and belief that such a policy exists. Plaintiff cannot rely on bare assertions, conclusory allegations, or mere suspicions in order to survive a summary judgment motion. *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981). Without more, Plaintiff fails to establish the elements necessary to hold the County liable to plaintiff (or by extension, Defendants Coons or Sapp/Frazier, in their official capacities).

## IV.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

In his Answering Brief, Plaintiff acknowledges the two-part test for determining whether an individual defendant should be dismissed from a case on the basis of qualified immunity. Yet, he

tries to quickly step over this test, and wholly fails to answer the challenges made by the individual Defendants related to their argument for qualified immunity.

Plaintiff has failed to refute Defendants' assertion that Coons not only did not commit any constitutional violation or that he personally had nothing to do with Plaintiff not being promoted, thus satisfying the first part of the qualified immunity analysis. *See Opening Brief* at 18. There is no evidence that Coons had anything to do with the critical events in the spring of 2005, when the decision was made to fill only one sergeant position. Instead, Plaintiff refers not to Coons, but to "the Coons administration," and ties in nothing about promotions aside from general assertions that "the administration" was upset with Plaintiff. *Answering Brief* at 35.

This provides a virtual textbook illustration of the wisdom of the rationale behind the qualified immunity doctrine. As the Chief Executive of County government, Coons could face myriad suits by disgruntled employees if he were to be personally exposed for every personnel and policy decision taken by members of his administration even when, as here, the record is clear that he had no first-hand involvement in the action alleged. To take one final look at the record about this:

- Coons believed it was his responsibility not to influence promotions in the police department, not to be engaged in promotional decisions in the middle ranks of the police department. *Coons Depo.* 45-46.

- Coons in fact mentioned to Singleton and Sapp and the chief human resources officer that the executive office and others outside the police department should minimize their involvement in promotions. *Coons Depo.* 46.

- Coons had not been aware that McAllister had sent a memo to Sapp requesting the release of three sergeant slots. *Coons Depo.* 32.

- Coons would have expected that the decision on how many slots to be released was a budgetary and operational issue that would have been made between the Director of Public Safety and the Chief of Police. *Coons Depo.* 45.

- Prior to the presentation of the Fiscal Year 2006 budget, Coons and his administration sought to address the operating budget by directing General Managers to reduce their overall budgets on a County-wide basis, as opposed to individual departmental positions. *Strine Affidavit*, ¶¶ 5, 6.

· Coons did not recall ever discussing Plaintiff with Sapp (until the instant lawsuit.) *Coons Depo.* 47-48.

· Sapp was thoroughly cross-examined by Plaintiff's counsel and made no mention of conversations with Coons about Plaintiff, nor having heard any comments or impressions from others attributable to Coons vis-a-vis Plaintiff. They never even spoke about him.[11]

Unlike Coons, Sapp was involved in the decision about the number of promotional slots, but he was not focused on Plaintiff, let alone Plaintiff's politics. This, too, was avoided by Plaintiff in his Answering Brief. Amorphous, general references to Sapp making his decision after speaking with "individuals higher up in the Coons administration" cannot substitute for facts of record to raise a case that Sapp committed a constitutional violation for which he should face personal liability. Sapp, who had begun with the County just several months earlier, was attempting to get acquainted with the Police Department and its budgetary processes, and the record is devoid of anything to suggest that Sapp retaliated against Plaintiff, or retaliated against McAllister through Plaintiff, to get back at those who supported Freebery - Coons' primary election opponent nine months earlier. *See* discussion *supra*.

It is hypothetical in the extreme to go on to the second step of the two-step qualified immunity analysis, particularly with respect to evaluating the actions of Coons since, as thoroughly documented, he had nothing to do with the decision to authorize one promotional slot instead of three in June of 2005. However, the individual defendants do not shy from the second step of the qualified immunity analysis. That is because if the Court, despite the silent record which Plaintiff had every opportunity to develop, were nonetheless to find that Coons and Sapp violated Plaintiff's constitutional rights, such a finding would depend on perceptions which were not self-evident and "clearly established" at the time. It was not "clearly established" in the case law – and, as discussed above, not clear in the case law now – that loyalty to one's department head – to the point of ignoring

---

[11] Which makes it absolutely incredible for Plaintiff to assert, in the tail-end of his brief, that "[t]hey [(Coons and Sapp)] conspired together to deny Plaintiff a promotion." *Answering Brief*, p. 36.

edicts from the office of the County Executive – constitutes protected "political association." And it is not clear – because it is not the law – that any policy decisions affecting a department headed by an individual who was in better graces with the former administration means that every action taken with respect to that department is inherently "political retaliation." Indeed, if this were so, then everyone who could later wrap himself or herself in the mantle of political activism would have, in addition to merit system protection and union protection, the ability to claim constitutional "foul" and tie up individual defendants, including a County Executive who actually had nothing to do with the decision.

The very eleventh-hour nature of the effort by Plaintiff to shift the gravamen of his case should be enough to demonstrate that the political violations now being alleged were not "clearly established" at the time. What is now alleged as a political rights violation of constitutional dimension was not alleged as such in the original complaint. Nor was it added for over a year as the case was pending, even after discovery had closed. Nor was it alleged – at least, not clearly – in the Amended Complaint, nor did Plaintiff develop that line when discovery was re-opened, nor did his testimony at a follow-up deposition bring in the "political aspects" which he tries to inject, most belatedly, in a conclusory affidavit with his Answering Brief. Almost by definition, one should not be able to expose government officials to personal liability for not having the insight to see that a constitutional wrong is being committed when the Plaintiff and his own counsel never had such an insight themselves for months.

Perhaps the most telling illustration of the house-of-cards nature of Plaintiff's current strained theory about "political retaliation" comes from the deposition testimony of Levine. Plaintiff cites extensively to this deposition, particularly her testimony concerning a private conversation she had with Plaintiff at his request on June 29, 2005. But Plaintiff has ignored other passages of her deposition testimony which bear on the topic at hand:

16

Q.     When you and Trini talked about the process for selecting a sergeant
       and the process for having openings, do you recall making a statement
       to the effect that, "Well, that's how politics works"?

A.     I don't remember making that statement in that context.  I may have
       used that turn of phrase, but I don't believe that politics plays a role in
       the promotion process, so I don't think I would have said that in that
       context.

                              *    *    *

Q.     I'm just going to touch back on a line of questioning that Mr. Martin
       asked you, and I think your answer was you didn't recall, and maybe
       just asking might jog it a little bit.  Did Mr. Navarro ever explain to
       you in any words, as you recall, an explanation as to, "Well, even if
       you don't get the next promotion, you'll get a further promotion, you
       have a shot at a further promotion," and he responded negatively to
       that.  Do you remember any of the words he said about that, about
       why his chances were so bad if he didn't get this one shot, his chances
       were so bad?

A.     I think it had something to do with the test scores were only good for
       so long, but I don't remember specifically.  There were some reason
       that he wouldn't be eligible after that particular cycle.

Q.     Okay.  And he thought the African-American, by virtue of having the
       African-American gentleman, by virtue of having been passed over,
       would probably get the next available spot?

A.     By virtue of being African-American and by virtue of being passed
       over.

Q.     And that had nothing to do with any anti-Navarro sentiments on the
       part of the executive office, correct?

A.     I don't think so.

Q.     Did he attribute it to that, that he would appoint the African-American
       because they don't like me?

A.     No, no.

Q.     Okay.  How about his, let's say, pessimistic assessment of his chances
       going forward to get the remaining, any further promotions before
       that list expired.  Did he say that anyone had it in for him, that he'd
       never get another position, another shot at a promotion because of
       that?

A.     I don't remember him saying that.

Q.     So the matter of the reduction in promotional opportunities and the
       curtailing of his chance, we'll say, or his pessimistic assessment of his
       chances to get a promotion, did he ever ascribe that to any negative
       sentiments by Coons or Singleton or Sapp?  Or was promotion a
       separate topic?

A.     I don't remember him attributing it to anybody in the administration.

Q.     More to how the system works, he would attribute it more to how the
       system works?

A.     Yes.  And that reminds me, the phrase about "that's how politics
       works," that – when I said that, I was referring to the change in the

                                    17

> number of sergeant positions, because what I was attempting to say
> was that the number of sergeants needed had changed. The
> administration decided fewer sergeants were needed because they
> wanted more patrolmen to stay on, and there was – because there was
> a change in the administration, there was a change in the number of
> sergeants required from a policy point of view.

*Levine Depo.*, 49; 76-79.

In summary, there is no evidence that Coons did anything with respect to sergeant

promotions in June, 2005; and while Sapp had limited involvement, it was not focused on Plaintiff

nor on his loyalty to McAllister. Even if the Court were to contemplate a contrary conclusion on the

latter, and find that Sapp retaliated against Plaintiff, then even still it was certainly not clear at the

time that loyalty to McAllister equated to constitutionally-protected political loyalty. Accordingly,

Coons and Sapp are entitled to dismissal on qualified immunity.

## V.  THERE IS NO EVIDENCE THAT THE CONDUCT OF DEFENDANTS COONS AND SAPP WARRANTS THE IMPOSITION OF PUNITIVE DAMAGES

In his Answering Brief, Plaintiff, for the first time, claims that Sapp and Coons "conspired

together to deny Plaintiff a promotion" such that punitive damages are warranted. *Answering Brief* at

36. Once again, Plaintiff attempts to introduce a new theory in his Answering Brief that had

heretofore never been mentioned - a "conspiracy" between Sapp and Coons. As stated *supra*, new

theories of liability cannot be raised to defeat summary judgment. Nevertheless, this "conspiracy

theory" is totally unsupported by the record, and the actions taken by Coons and Sapp do not rise to

the level of wrongdoing deserving of punitive damages.

Even assuming *arguendo* that the Court finds that Plaintiff engaged in protected activity and

that this protected activity somehow motivated Defendants not to fill the Sergeant positions, the

record does not support the finding that defendants acted with evil motive or intent or with reckless

or callous indifference necessary to justify punitive damages. There is simply no evidence to support

any "conspiracy theory" and as indicated above, Plaintiff's Answering Brief relies on mere

speculation and unsubstantiated allegations that Defendants acted to deprive him of his

constitutionally protected rights. Plaintiff has not even attempted to explain *how* Coons or Sapp's conduct rises to the level of willful, wanton and malicious conduct as alleged in the Amended Complaint, let alone the stringent standard for punitive damages in § 1983 cases articulated in *Smith v. Wade*, 461 U.S. 30, 56 (1983)(noting that defendant's conduct must be shown to be motivated by evil motive or intent, or reckless or callous indifference to warrant punitive damages). In sum, given the evidence in the record, no reasonable jury could conclude that either Coons or Sapp acted with the requisite culpability to justify an award of punitive damages.

## VI. CONCLUSION

For the reasons set forth in Defendants' Motion for Summary Judgment (D.I. # 86) and set forth above, Defendants request that the Court enter summary judgment in their favor and against Plaintiff on all counts of the Amended Complaint.

Respectfully submitted,

/s/ Megan Sanfrancesco
Michele D. Allen, Assistant County Attorney (#4359)
Judith A. Hildick, First Assistant County Attorney (#3244)
Megan Sanfrancesco, First Assistant County Attorney (#3801)
New Castle County Law Department
87 Reads Way
New Castle, DE 19720
(302) 395-5130
*Attorneys for New Castle County and Christopher A. Coons and E. Ronald Frazier in their Official Capacities*

and

/s/ Jeffrey S. Goddess
Jeffrey S. Goddess, Esq.(#630)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
*Attorney for Christopher A. Coons and Guy H. Sapp in their Individual Capacities*

Dated: June 7, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL TRINIDAD NAVARRO, | : | |
| | : | |
| Plaintiff, | : | C.A. No. 05-565 GMS |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| CHRISTOPHER A. COONS, | : | |
| individually and in his official capacity; | : | |
| GUY H. SAPP, individually and in his | : | |
| official capacity; and NEW CASTLE | : | |
| COUNTY, a municipal corporation, | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Megan Sanfrancesco, County Attorney hereby certify that on June 7, 2007, I electronically filed the foregoing "Reply Brief in Support of Defendants' Motion for Summary Judgment" with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire
Timothy J. Wilson, Esquire
Law Office of Martin and Wilson
1509 Gilpin Avenue
Wilmington, DE 19806

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070

    /s/  Megan Sanfrancesco
MEGAN SANFRANCESCO
First Assistant County Attorney
(Delaware Bar I.D. No. 3801)
New Castle County Law Department
87 Reads Way, New Castle, DE 19720
Telephone: (302)395-5130