**EXHIBIT G**

1  Q. And were you aware that the analysis that was
2  done by way of the report dated April 7, 2006, indicated
3  that there were at least several sergeant positions that
4  were not filled?
5  A. I don't specifically recall that. I did not
6  review that report in advance of today's deposition.
7  Q. So you don't remember one way or another as to
8  whether --
9  A. No.
10  Q. The report says what it says. And I'm not sure
11  we need to go through that?
12  A. To give you some general context on the report,
13  the tough situation we faced was having an ongoing budget
14  deficit. And we were looking for outside professional
15  advice on how to ensure that we were moving as many
16  officers on the street and to patrol as possible. Those
17  are always contentious decisions in a department. My
18  understanding was the director and acting chief thought
19  this was a good path forward for helping make that
20  decision.
21  Q. The PERF study?
22  A. Yes.
23  Q. Speaking of staffing, what is your understanding,
24  if any, as to the staffing of the New Castle County

21

1  Police Department since July 1 of last year?
2              MR. GODDESS:  Objection.  That's too vague
3  for a fair answer.
4              MR. MARTIN:  You may answer.
5              MR. GODDESS:  What is your impression of
6  staffing; that's the question?
7              MR. MARTIN:  Yeah.  You can interpose an
8  objection, but that doesn't take him off the hook in
9  terms of providing a response.
10             THE WITNESS:  Are you asking about the
11 adequacy of staffing levels?
12 BY MR. MARTIN:
13    Q.   Yes, sir.
14    A.   Or quality and caliber of the staff?
15    Q.   No, the accuracy of the numbers of officers out
16 on the street.
17    A.   There have been consistent concerns expressed by
18 the general populous and by my senior leadership team and
19 by me about the number of officers that we are able to
20 put on patrol in response to calls for service.
21    Q.   Okay.  Are you aware, for example, that since
22 July 1 of last year the police department lost 19
23 officers?
24    A.   Yes.

1  practices.  There was just a broad scale of concerns
2  across several departments.
3      Q.   Going back to the complaint, that last line on
4  Paragraph 14 involving Director Sapp advising the
5  sergeants to be patient and that there would be three
6  sergeant promotions at the beginning of the new fiscal
7  year, which I understand is July 1?
8      A.   That's correct.
9      Q.   Did you have any understanding of that, that
10 Director Sapp made these statements to those who were
11 seeking promotion?
12     A.   Only from having read it in the complaint and
13 depositions.
14     Q.   Do you have any reason to believe that that was
15 not true?
16     A.   No.
17     Q.   On Paragraph 16, Chief McAllister submitted a
18 memo to Director Sapp requesting that the three positions
19 be released so he could exercise his authority to promote
20 them.  Was that something that you had any knowledge of?
21     A.   No.
22     Q.   Let's go down to Paragraph 18 with regard to a
23 telephone call received by Corporal Navarro from Cris
24 Barrish and the News Journal.  Did you become aware of

1  director communicating with the CAO, and that there were
2  going to be tensions as long as Corporal Navarro and she
3  were in different lines of control within the department.
4  Q.  Do you have any understanding as to why or how
5  Allison Levine knew that the sergeant positions would not
6  be filled in late June of 2005?
7  A.  I'm not -- I can't speak to her specific
8  knowledge or how she might have known that.
9  Q.  That's not something that you and she discussed?
10 A.  No.
11 Q.  Because as far as you are concerned, that was a
12 decision that was being made down the line?
13 A.  That was a budgetary and operational issue that,
14 yes, would have been made, I would expect, between the
15 director and chief.
16 Q.  You talked earlier about the role of the director
17 and the CAO specifically with regard to promotions.  What
18 I did not ask you specifically is whether you believe you
19 have authority to influence the promotions in the police
20 department?
21 A.  I think I have a responsibility not to influence
22 the promotions in the police department in any way that
23 reflects either -- I should just stop there.  I think I
24 have a responsibility not to be engaged in promotional

1  decisions within the middle ranks of police department.
2  Q. Have you, during your tenure as county executive,
3  been involved in any of these promotion or non promotion
4  decisions in the police department?
5  A. Only to the extent I previously stated, which is
6  to give input to folks such as Charlotte Crowell, who is
7  the CHRO, or Guy Sapp or to David about minimizing the
8  involvement of the executive office or the folks outside
9  the department in the details of promotions.
10         I actually made a specific comment on the
11 recent group of promotions. Several of these officers I
12 don't know and wouldn't recognize. And I commented that
13 I thought that was a good thing. Not that I don't know
14 them in detail, but that clearly a promotion decision was
15 being made here without any opinion having been expressed
16 or direct involvement by me as county executive.
17 Q. Do you recall exchanging letters or perhaps
18 E-mails with then Chief McAllister regarding the proposed
19 promotion of Elmer Setting?
20 A. It is only through reviewing his deposition that
21 I understand him, Colonel McAllister, to have understood
22 a conversation we had in my office as council president.
23 He understood it to have been a conversation focused on
24 now Captain Setting. It was a conversation about

1  promotion to lieutenant colonel.
2          I do recall an exchange of letters between
3  us.  I thought Colonel McAllister significantly
4  overreacted to a conversation in which I was giving him
5  general direction or input since I was council president,
6  that I thought he should be very careful and thoughtful
7  about who he chose to promote to lieutenant colonel
8  because it would send a message internally and externally
9  and that he needed to consider balancing his mix of book
10 smarts and administrative skills with someone who had
11 strong operating skills and respect within the department
12 for their patrol experience.
13         Colonel McAllister, I believe, was well
14 aware that there was some controversy inside and outside
15 of county government about his relative youth and lack of
16 experience on the street.  He, as the executive officer
17 to former Colonel Cunningham, was recognized as having
18 strong administrative skills.  But there was some real
19 concern, at least on my part, that I shared with him that
20 the department also needed someone with strong operating
21 skills.  And I urged him to take that into account.
22    Q.   Do you recall ever discussing Corporal Navarro
23 with your executive staff?
24    A.   Only following the filing of the suit.

```
 1      Q.   Do you recall discussing Corporal Navarro with
 2   Director Sapp?
 3      A.   Again, only specifically after the filing of this
 4   lawsuit and fairly briefly at that.
 5      Q.   What was the substance of that conversation?
 6      A.   Surprise at the filing of the lawsuit.
 7      Q.   Did you tell Director Sapp not to trust Corporal
 8   Navarro?
 9      A.   I don't recall that.
10      Q.   Did you ever speak to Dru Outten about Corporal
11   Navarro?
12      A.   Yes.
13      Q.   And when did you speak with him?
14      A.   I remember only one specific conversation.
15      Q.   Was that before or after the lawsuit?
16      A.   Before.
17      Q.   And what was the nature of that conversation?
18      A.   It was following a public event.  I believe it
19   was the ground-breaking for the public safety building.
20   Lieutenant Outten called simply to convey that I might
21   want to pass on to Allison that -- how to put it
22   appropriately?  Some comments were made by several
23   officers about her that were, perhaps, inappropriate for
24   a professional setting, comments about a married woman,
```