IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CORPORAL TRINIDAD NAVARRO,** : <br> : <br> **Plaintiff,** : <br> : <br> v. : <br> : <br> **CHRISTOPHER A. COONS,** : <br> **individually and in his official capacity;** : <br> **GUY H. SAPP, individually and in his** : <br> **official capacity; and NEW CASTLE** : <br> **COUNTY, a municipal corporation,** : <br> : <br> **Defendant.** : <br> : | C.A. No. 05-565 (GMS) <br><br> JURY TRIAL DEMANDED |

## PLAINTIFF'S TRIAL BRIEF

I. **Nature of Case:**

Corporal Trinidad Navarro ("Plaintiff" or "Navarro") filed this lawsuit against Defendants Christopher Coons ("Coons"), Guy Sapp ("Sapp"), and New Castle County ("NCC") on the basis of violations of his First Amendment rights to political association/retaliation. Plaintiff's rights were trammeled by Defendants after he cast his political support in various manners for Tom Gordon ("Gordon") and Sherry Freebery ("Freebery").

Gordon and Freebery were political rivals of Defendant Coons and during the course of Freebery's run for County Executive in the Primary Election of 2004 against Defendant Coons, County employees were labeled as either Freebery or Coons supporters. Plaintiff was no exception and following Coons' election to County Executive, Plaintiff was viewed as working outside the Coons camp, on what Coons supporters entitled the "McAllister Team" referring to Chief of Police David McAllister.

McAllister was a Gordon and Freebery supporter and upon information and belief, those officers remaining in the New Castle County Police Department ("NCCPD") who supported Gordon and Freebery were labeled as not being on the Coons team and being on the McAllister team.

In 2005, pursuant to the promotions practice of the NCCPD, Plaintiff applied for and was selected by the Chief of Police to be promoted to Sergeant on or about July 1, 2005. However, just days prior to the announcement of his promotion, the New Castle County Executive Branch, including Defendants Coons and Sapp, eliminated the two budgeted positions for Sergeant. Therefore, Plaintiff was not promoted. Plaintiff asserts that the elimination of the positions was due to his political support of Gordon and Freebery; being viewed as being on the McAllister team and not on the Coons team.

## II.   **Facts to be Established by the Plaintiff:**

Plaintiff began employment with NCC on or around September 30, 1991. Thereafter he entered the Police Academy in or around January, 1992 and began working patrol in or around May, 1992. Plaintiff has been employed with NCC for approximately fourteen (14) years.

Plaintiff worked in patrol until October 1998 when he was selected for the Public Information Officer ("PIO") position. Plaintiff currently is the PIO for NCC's Police Department.

In the fall of 2004, Plaintiff tested for the position of police Sergeant with NCC. The testing process, administered by NCC's Human Resources Department, consists of a written examination, an oral board style interview and the addition of seniority points.

The written test and oral interview each represent 47.5% of the overall score with seniority points accounting for 5% of the overall score. The oral interview panel for the fall 2004 testing consisted of Lieutenant Wendy Hudson, Lieutenant Robert Schreiber, and Captain Elmer Setting.

At the completion of the testing process, a certified ranking list was established to rank each officer's overall score. Plaintiff received the rank of twelve (12), meaning eleven (11) officers scored higher than him and approximately seventy-five (75) officers scored lower than Plaintiff.

The NCC Police Directives state that the Chief of Police has the discretion to choose whomever he/she desires for promotion, as long as the officer is ranked as one (1) of the top five (5) candidates on the certified listing. On or about December 12, 2004, the Chief of Police, Colonel David F. McAllister, (hereinafter "McAllister") promoted the following officers from the certified list: Jamie Dolan, Michael Donovan, Dominique Gregory, Joseph Merriggi, Wayne Pennington, and Robert Schlecker. At that time, McAllister filled four vacant Sergeant positions and over-promoted two additional Sergeants to fulfill management needs.

As a result of McAllister filling the four (4) budgeted positions and the two (2) additional promotions, the NCC had a compliment of thirty-eight (38) Sergeants, two (2) more than the thirty-six (36) that were budgeted for by the New Castle County Council (hereinafter "Council") for fiscal year 2004. All of the officers who were promoted by McAllister were in the top five on the certified listing, but were not always in the first position.

Coons began his term as County Executive in 2005. During this election, Plaintiff did not support Coons, but instead supported his political rival Sherry Freebery. Plaintiff had also supported another political rival of Coons, former County Executive Tom Gordon. Following Coons election, Plaintiff did not offer his political support and was viewed as not being a political supporter of Coons because Plaintiff remained loyal to Col. McAllister, a Gordon political appointee.

In the spring of 2005, McAllister submitted the police budget to the Council and the County Executive. In the budget, McAllister requested two (2) additional Sergeant positions for fiscal year 2005 which began July 1, 2005. In May 2005, the budget was approved by Council and the County Executive authorizing a total of thirty-eight (38) Sergeant positions.

Since the last promotions in December 2004, three (3) Sergeants terminated their employment with the Defendant, making available three (3) vacant positions. In the beginning of May 2005, Plaintiff contacted the following six (6) officers who were eligible for the now available Sergeant positions: Patricia Davies, Richard Dunning, Wendy Feeser, L. Rob Joseph, Joseph Trala and John Treadwell. All of the officers, with the exception of Richard Dunning, agreed to collectively contact the Fraternal Order of Police (hereinafter "FOP") to inquire about the available Sergeant positions.

On or about May 16, 2005, Plaintiff and the above-listed officers met with McAllister and Sapp. During the meeting, McAllister and Sapp indicated that the Police Department had only one vacant, budgeted Sergeant position. They indicated the position would not be filled until the new fiscal year due to a $500,000.00 operating deficit. McAllister further advised he sought two (2) additional Sergeant positions for the

upcoming fiscal year. Sapp asked the Sergeant candidates to be patient and wait until the new fiscal year, at which time they would promote three (3) individuals to the rank of Sergeant.

On May 20, 2005, the FOP submitted a memorandum to McAllister requesting that one (1) Sergeant position be filled immediately. The memo further stated, "if the two Sergeant positions are approved for the next fiscal year, we ask that those positions be filled, without a Chief's interview."

On June 27, 2005, McAllister submitted a memorandum to Sapp formally requesting the three (3) positions be released to him so that he could exercise his authority to promote three (3) eligible officers to the rank of Sergeant.

Upon information and belief, McAllister met with Sapp on two separate occasions to discuss promotions. McAllister advised Sapp he intended to promote a black male, a Hispanic male, and a female from the current certified list. Plaintiff was the only Hispanic male on the certified list eligible for promotion. Moreover, McAllister told Plaintiff that Plaintiff was one the individuals that he intended to promote.

On June 26th and/or June 27th, Plaintiff received a telephone call from Cris Barrish (hereinafter "Barrish"), a reporter from the News Journal. Barrish posed specific questions to Plaintiff regarding the alleged initials of McAllister referred to in the federal indictment involving former County Executive Tom Gordon (hereinafter "Gordon") and former Chief Administrative Officer Sherry Freebery (hereinafter "Freebery"). At the conclusion of the telephone conversation, Plaintiff immediately notified McAllister and informed him of the inquiry from Barrish. Plaintiff's intention was to advise McAllister that the integrity of the Police Department and NCC was being questioned. McAllister

thereafter notified Sapp, who, based upon information and belief, notified the County Executive. Plaintiff went through his proper chain of command for notification purposes regarding the contact from Barrish.

Later that same date, Plaintiff received an unpleasant telephone call from Ms. Allison Levine (hereinafter "Levine"), County Executive Director of Communications. Levine angrily inquired about the telephone call from Barrish and reminded Plaintiff that he was required to contact her regarding any media inquiries relating to the pending Gordon and Freebery indictment. Plaintiff informed Levine that she was not in his chain of command, therefore he was not required to notify her of the telephone call. She informed Plaintiff that the incident was unacceptable and indicated that Plaintiff had several bosses who were above McAllister.

Also during the telephone conversation, Levine asked Plaintiff about an upcoming article featuring McAllister in the *Delaware Today* magazine. Plaintiff advised Levine that he, in fact, knew about the article and explained to her his limited involvement in the story. Levine again appeared to be very agitated because Plaintiff had not advised her of the *Delaware Today* article. Plaintiff advised Levine that he would not, in good conscience, do anything to assist her or the administration to ruin McAllister's reputation. At the conclusion of the telephone call, Plaintiff suggested that he and Levine meet in person to discuss what she described as a bad situation in which he [Plaintiff] was involved.

On or about June 29, 2005, Plaintiff met with Levine. She candidly informed Plaintiff that he was perceived as a person who could not be trusted due to his loyalties to McAllister. She further stated that he [Plaintiff] was not liked by the County Executive

or his administration and that he was on the losing team and his career would be harmed if Plaintiff continued to stay on the "McAllister team." Levine also stated that "[Plaintiff] would have a long and difficult seven years ahead of him assuming Executive Coons seeks re-election." Levine indicated she believed McAllister would soon be arrested for the alleged DELJIS violations and indicated if he went down, Plaintiff would go down with him.

Plaintiff told Levine that he was tired of the politics associated with his position and commented, "I want out of it." Levine's response was, "well, you still have six years until you can retire." Plaintiff then clarified, that he did not want to leave the police department, but possibly wanted out of the PIO position. Levine suggested that Plaintiff seek a job transfer to another job within the County rather than stay as the PIO to avoid being labeled as "not on Chris' team." Plaintiff understood this suggestion to get away from McAllister and be loyal to Coons, not McAllister.

Levine went on to say that she heard Plaintiff had been the PIO for so many years, because "you do as you are told to do." She then advised Plaintiff that she had heard rumors regarding Plaintiff's involvement in an investigation relating to a murder that occurred in Las Vegas, Nevada. Plaintiff advised Levine that she had gotten her rumors crossed and indicated Plaintiff did not personally know anyone involved in the murder investigation. The allegation was that Plaintiff flew to Las Vegas, Nevada to influence the investigation regarding Lisa D. Moseley. Plaintiff had no involvement in this incident and denied having done so.

During this conversation with Levine, they discussed his possible promotion to Sergeant. Plaintiff advised Levine that he had heard the requisition for Sergeants was

going to be withheld by the administration essentially negating the possibility of Plaintiff's promotion. Levine replied, "well, that's how politics work." Plaintiff then told her, politics should not be involved in any promotional opportunity. Levine responded, "well, Chris [referring to County Executive Coons] butters the bread."

At the end of the conversation, Levine stated she had several candid conversations with the County Executive and advised him, "Trini is one of the few people who I can depend on to get the job done." Levine indicated that she frequently commented to the County Executive about Plaintiff's performance as the PIO. Levine stated, "I think you [Plaintiff] do an excellent job with the media dating all the way back to the days when I was a reporter at the News Journal."

Based upon information and belief, the statements made by Levine to Plaintiff during the conversations set forth herein reflect statements made by Coons to Levine.

Later in the day, on June 29, 2005, Sapp forwarded a memorandum to McAllister stating, "I have reviewed the police department's staff requirements and determined that the need to maintain patrol officer strength is more critical than the need for Sergeants. Therefore, at this time, I will not authorize the requisitions of two of the Sergeant positions requested in your memorandum." The memorandum was forwarded to the FOP Board of Directors and the top seven (7) officers on the list.

On June 30, 2005, John Treadwell was promoted to the rank of Sergeant after Sapp released only one requisition. On June 30 or July 1, 2005, Sapp met with the remaining six (6) officers and apologized for making a "mistake." He said he should not have promised to make the three promotions. Sapp, who had no authority to withhold police promotions, went on to say he [Sapp] might not allow any further promotions due

to the police officer staffing shortage. Sapp further stated that this was his and only his decision to withhold the promotions.

Plaintiff specifically asked Sapp if that meant he [Sapp] would simply allow the current certified list to expire if no additional officers were hired. Sapp replied that he could not make any decisions at the present time, but mentioned the lack of a current certified list for the rank of Lieutenant. He did, however, state that he was working on a fair promotional process with the assistance of an outside agency.

### III. <u>Plaintiff's Theory of the Case</u>

#### a. *<u>Plaintiff Engaged in Political Activity</u>*

The freedom of association cuts two ways. In the first and most obvious manner in which one exercises his right to political association is to support a particular political candidate, party or faction. The second and less obvious manner of political association is when one chooses to disassociate oneself from a particular political candidate, party or faction. Here, Plaintiff engaged in constitutionally protected activity in both manners. First, he chose to support Defendant Coons' political rivals, Gordon and Freebery. This political support was also manifest in Plaintiff's loyalty to Col. McAllister, a Gordon political appointee. However, he also chose *not* to actively lend his political support and loyalty to Coons once Coons took office as County Executive.

In this case, it is clear that Plaintiff was a political supporter of Gordon and Freebery and supported them openly. McAllister was appointed by Gordon and was a holdover from the Gordon administration once Coons took over as County Executive. It was immediately apparent after Coons took over that McAllister and others on the police

force, loyal to McAllister, Gordon and Freebery were disfavored by the Coons Administration. This group included Plaintiff and Plaintiff paid the price for his political support of the outgoing administration by losing his promotion.

In an attempt to diminish Plaintiff's support of Gordon and Freebery, Defendants make much ado about Plaintiff being on the so-called "McAllister team." However, it was Coons' own spokeperson, Allison Taylor-Levine who christened the name "McAllister team." What is significant, as well as abundantly clear, in this regard is that those on the McAllister team *were not* on the Coons team. In other words, the members of the McAllister team were not political supporters of Coons. Also abundantly clear is the fact that if you were not on the Coons team, your position as well as any promotional opportunities were in danger; or as Ms. Levine said, "Chris butters the bread."

      b.    *Defendants' argument that they would have taken the same action absent Plaintiff's political activity is pretext*

Defendants' arguments that Cpl. Navarro did not get promoted due to budgetary constraints defies logic when viewing the facts of this case. The promotions, including Cpl. Navarro's promotion, had already been approved by County Council and the County Executive in that year's budget prior to Defendants' retaliatory conduct against Plaintiff.

Furthermore, a Sergeant makes only 5% more than a patrol officer. Cutting back by only two sergeant positions would save little money for an entity such as New Castle County with the operating budget of $230 million. In fact, patrol officers actively working in the capacity of a Sergeant, but who have yet to be promoted, still earn a Sergeant's salary. As such, cutting the promotions likely saved the County *no money*, because the County would be making, and paying, patrol officers as Sergeants in the field regardless. To the contrary, it is actually more efficient to make the promotions official

10

and get 100% effort from the Sergeants than make patrol officers acting Sergeants who typically only put forth 50% effort.

Defendants' argument that, "after serious consideration," Sapp and Singleton determined that there was a greater need for "patrol strength" than additional supervisors also lacks logic when considered with the facts of the case. In the patrol unit, sergeants are working sergeants and actually *are* part of the patrol strength. Moreover, according to the individual who arguably would have the most knowledge of the strengths and weaknesses of the police force, Chief McAllister, there were plenty of patrol officers to meet the County's needs, but the Sergeants were the ones being taxed in that there were not enough supervisors to go around. Finally, the Police Executive Research Forum ("PERF") Report discredits Sapp's opinion that the New Castle County Police Department did not need more supervisors. Specifically, the PERF Report indicates several locations where Sergeants were expressly needed.

   c.   *The Decision to Not Promote Plaintiff Constitutes County Policy*

The facts in this case will show Coons and Sapp's direct involvement in the policy making to retaliate against their political foes. As this policy was implemented, albeit not "official" written policy, it nevertheless constitutes the County's policy or custom.

Ample factual support exists in the record to support the theory that after Coons became County Executive, it became County policy or custom to retaliate against those not supportive of him politically. Allison Taylor Levine inferred that Chris Coons "buttered the bread" for those who supported him with policy decisions rewarding them for that support. Those statements made by Ms. Levine came directly from the County

11

Executive, Defendant Coons. Moreover, Chief McAllister testified that it was Coons who was making the decisions for the New Castle County Police Department.

Major Snyder testified that it was Sapp, a Coons political appointee, who decided to hold back the Sergeant promotions. Acting Chief McLaren also testified that Sapp participated in the decisions for and against promotion and approved those decisions. McLaren continued, testifying that the final authority for promotions went through the Public Safety Director, Defendant Sapp, through the Chief Administrative Officer and finally through the County Executive, Defendant Coons.

      d.    <u>Coons and Sapp are Not Entitled to Qualified Immunity Because Plaintiff's Right to Political Association was Clearly Established</u>

The relevant inquiry on the issue of whether Coons and Sapp are entitled to qualified immunity is: whether a reasonable officer in Coons or Sapp's position would have understood that his actions were prohibited.

With respect to Defendant Coons, by his own admission he recognizes that politics should not be a consideration in an employment decision. Moreover, as a graduate from law school, an attorney and member of the Delaware bar, it is virtually a given that Defendant Coons is aware of such a basic Constitutional right, and even if it were the case that he did not, a reasonable county executive overseeing a county with a $230 million budget *should* be aware that employment decisions must be free from political association constraints.

With regard to Defendant Sapp, as Director of Public Safety in charge of a $108 million budget, overseeing the police department, emergency medical services, communications, emergency 911 and crossing guards, with a total of over 600 people working under him, would have known that the law requires that any employment

decision be free from political association influence. Moreover, the record evidence in this case establishes that he did, in fact, know that Plaintiff should have been promoted. But following conversations with individuals higher up in the Coons administration, he succumbed to pressure and changed his mind.

  e. *Punitive Damages Must be Available Against*

Punitive damages may be awarded in a § 1983 action when the defendants exhibit "reckless or callous disregard of, or indifference to, the rights or safety of others." *Smith v. Wade,* 461 U.S. 30 (1983). Here, sufficient evidence exists to support a finding of punitive damages against Coons and Sapp. Defendants conspired together to deny Plaintiff a promotion that had already been promised to him and that was already budgeted for, in violation of his right to freedom of association.

  f. *Damages*

Due to Defendants' unlawful actions, Plaintiff has suffered a loss in wages, loss in pension benefits, loss in self esteem, damage to his personal and professional reputation, emotional distress and humiliation. Therefore, Plaintiff must be compensated for all of these losses.

  g. *Attorneys' Fees and Costs*

If Plaintiff is the prevailing party at trial he is statutorily entitled to recover reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Respectfully submitted,

/s/ Jeffrey K. Martin

Jeffrey K. Martin, Esquire (# 2407)
Timothy J. Wilson, Esquire (#4323)
MARTIN & WILSON, P.A.
1509 Pennsylvania Avenue
Wilmington, Delaware 19806
jmartin@martinandwilson.com
twilson@martinandwilson.com
(302)777-4681
*Attorneys for Plaintiff*

Dated: September 5, 2007

## **CERTIFICATE OF SERVICE**

Please take notice that the undersigned did hereby forward copies of Plaintiff's Trial Brief via CM/ECF on this 5th day of September, 2007 to the following:

Megan Sanfrancesco, Esquire
Judith Ann Hildock
New Castle County Law Department
87 Reads Way
New Castle, DE 19720

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
TIMOTHY J. WILSON, ESQUIRE
DE Bar I.D. No.: 4323
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
E-mail: twilson@martinandwilson.com
Attorney for Plaintiff