IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL TRINIDAD NAVARRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  05-565 GMS |
| | ) | |
| CHRISTOPHER COONS, GUY H. SAPP, | ) | |
| and NEW CASTLE COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM

**I.   INTRODUCTION**

The plaintiff, Trinidad Navarro ("Navarro"), a Corporal with the New Castle County Police Department ("NCCPD"), filed the above-captioned action on August 4, 2005, alleging that Christopher Coons ("Coons"), Guy H. Sapp ("Sapp"), and New Castle County (the "County") (collectively, the "defendants") retaliated against him by failing to promote him to sergeant when he spoke out on issues of public concern, in violation of the First Amendment and 42 U.S.C. § 1983 (Counts I and II).  (D.I. 1 ¶¶ 30-47.)  Thereafter, on August 2, 2006, Navarro filed a motion to amend the complaint, which the court granted on November 20, 2006.  The amended complaint claims that the defendants' conduct violated the First Amendment Political Association Clause (Count II).  (D.I. 65 ¶¶ 41-50.)

Presently before the court is the defendants' motion for summary judgment.  (D.I. 85.)  For the following reasons, the court will grant the motion in part and deny the motion in part.

**II.   BACKGROUND**

A.      **Procedural Background**

As previously stated, the original complaint was filed on August 4, 2005. On July 17, 2006, the defendants filed a motion for summary judgment on all claims and counts of the complaint. (See D.I. 58, 59.) The plaintiff did not respond to the motion for summary judgment but, instead, filed a motion to amend the complaint to add a First Amendment political association retaliation claim. On November 20, 2006, the court held a conference with the parties to discuss the pending motion for summary judgment and motion to amend. At that time, the court orally granted the defendants' motion for summary judgment and the plaintiff's motion to amend.[1] The court also deemed the amended complaint filed. The second amended complaint contains all of the same factual allegations and two claims: a First Amendment political association claim (Count II) and a 42 U.S.C. § 1983 claim for retaliation/failure to promote in violation of the First amendment.

B.      **Factual Background**

The following facts are taken from the parties' submissions and do not constitute findings of fact. The events averred in Navarro's complaint occurred during Coons' first year as New Castle County Executive.

1.      The Parties

Navarro has been a police office with the NCCPD for 15 years, and currently holds the position of Public Information Officer ("PIO") for the New Castle County Department of Public Safety (the "Department"). (D.I. 86, at 5; D.I. 91, at 10.) As PIO, Navarro's duties and

---

[1] In making its ruling, the court relied on the Supreme Court's decision in *Garcetti v. Ceballos*, --- U.S. ---, 126 S.Ct. 1951 (2006),which limits the free speech rights of public officials and, in this case, precluded the plaintiff's Free Speech retaliation claims (Claims I and II of the original complaint).

responsibilities include promoting the Department, protecting it from negative press, and informing the media of day-to-day operations, arrests, and programs. (D.I. 86, at 5.)

Coons is the County Executive for New Castle County, and his administration began on January 4, 2005. (D.I. 86, at 5.) Coons succeeded Tom Gordon ("Gordon") as County Executive. In the primary election, Coons ran against Gordon's Chief Administrative Officer, Sherry Freebery ("Freebery"). According to Navarro, a bitter rivalry developed between the Coons and Freebery camps during the course of the race, and many county employees were identified with the candidate they supported. (D.I. 91, Ex. 9 ¶¶ 4-5.) Navarro alleges that he became identified as a Freebery supporter. (Id. ¶ 6.)

Coons appointed Sapp as Director of Public Safety for New Castle County on April 18, 2005. (D.I. 86, at 5.) Part of Sapp's duties and responsibilities included supervising the Chief of Police and keeping the Chief Administrative Officer apprised of significant events within the Department. (Id. at 5-6.)

    2.    The County Promotional Process

Directive 34 of the County Police Directives provides that the Chief of Police or his or her designee shall issue promotions below the rank of captain, and that all promotions shall be made from certified individuals on current promotional lists. (D.I. 86, at 6.) Section 26.03.501 of the New Castle County Code addresses the filling of vacancies and provides that, in order to fill a vacancy, a requisition is required that must be signed by the Chief Human Resources Officer, the Chief Financial Officer and the Chief Administrative Officer. (D.I. 86, Ex. B at 4.) When a personnel requisition is received, The Chief Human Resources Officer must certify the top five names from the promotional and open-competitive lists. (Id.) If multiple vacancies need to be filled, the Chief

must certify the top five names plus one additional name for each additional vacancy. (Id.)

Individuals become certified for the sergeant's position by taking an examination, which consists of a written part and an oral board review. (D.I. 86, at 6-7.) Navarro had taken the sergeant's exam multiple times, scoring well enough in the fall of 2004 to be eligible for a promotion in Fiscal Year 2006. (Id. at 6.)

3. Available Sergeant Positions for Fiscal Year 2006 and the Failure to Promote Navarro to One of Those Positions

In Fiscal Year 2005, which ran from July 1, 2004 to June 30, 2005, there were 36 recommended sergeant positions. (Id. at 7.) In December 2004, then current Police Chief David McAllister ("McAllister") promoted four people to the rank of sergeant, meeting the total of 36 sergeants. McAllister also over-promoted two sergeant positions by trading in two patrol officer positions, thereby bringing the total number of sergeants to 38. (Id.) McAllister was able to over-promote because the funds to pay for all of the positions were within the Department's budget for that fiscal year. (Id. at 8.)

In Fiscal Year 2006, which began on July 1, 2005, 38 sergeant positions were recommended in the budget. (Id.) On May 20, 2005, the President of the Fraternal Order of Police (the "FOP") sent a memorandum to McAllister, discussing the promotional process and open positions for sergeant. (D.I. 86, Ex. M.) The memorandum questions the need for additional sergeants, but concludes that "the FOP requests that the current open sergeant's position be filled immediately . . . . If two additional sergeants' positions are approved for the next fiscal year, we ask that those positions be filled . . . ." (Id. at 2.) According to Navarro, in late June 2005, McAllister, advised him that he planned to promote, "a black, an Hispanic, and a woman" to the three promotional spots that had been budgeted. (D.I. 91, at 12.) Navarro was the only Hispanic on the list of candidates

eligible for promotion to sergeant. (Id.) McAllister also advised Sapp that he intended to promote Navarro and two other candidates to sergeant, and Sapp initially agreed to promote the three candidates. (Id.) Navarro alleges, however, that Sapp was persuaded to change his mind following a meeting with Chief Administrative Officer David Singleton ("Singleton") at the Government Center. (Id.)

On June 27, 2005, McAllister sent a memorandum to Sapp, requesting that he release the three budgeted requisitions for sergeant promotions. (D.I. 86, at 9.) After receiving McAllister's request, Sapp met with Singleton, on June 29th, to discuss whether or not additional requisitions for sergeant should be released. (Id.) At the meeting, Sapp and Singleton determined that only one requisition would be released, because there was a greater concern for patrol officers on the street than supervisory sergeant positions. (Id.) Navarro avers that Sapp's "stance changed" after the meeting. (D.I. 91, at 14.) Navarro alleges that it was only after the meeting with Singleton that Sapp first gave notice that the two sergeant positions would not be filled. (Id.) Navarro contends that Sapp's decision made "no economic sense" or practical sense. (Id. at 14-15.) Additionally, Navarro contends that the decision to withhold the positions was made by the Government Center, which is not supposed to be involved in decisions regarding promotions within the police department. (Id. at 17.)

On June 29, 2005, Navarro met with Coons' Communication Director, Allison Taylor Levine ("Levine"). According to Navarro, Levine discussed with him the "'clear tension'" between the administration and the police department, and the fact that Coons was not happy with either McAllister or Navarro. (Id. at 16.) Navarro alleges that Levine contacted him at Coons' direction and cautioned him against "being on the losing team, 'the McAllister team.'" (Id.) Further, Navarro

5

alleges that Levine urged him to be on "'Chris' team'" instead. According to Navarro, Levine informed him "'that's how politics work,'" and that "'Chris butters the bread.'" (Id. at 16-17.) Navarro alleges that it is his support of McAllister and the Gordon/Freebery administration and his non-support of Coons that resulted in his failure to be promoted to the position of sergeant.

### III.    STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact – meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 256-57 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is

not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, the Third Circuit has advised that "[c]ases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) (citing *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998)).

The defendants move for summary judgment, asserting: the court should dismiss the claims against Coons and Frazier[2] in their official capacities, because they are duplicative of the municipal claims against the County; the court should dismiss the section 1983 claim against the County, because the plaintiff has failed to plead or present any record evidence of a County custom or policy of political discrimination; the court should dismiss the political discrimination claims, because the plaintiff did not engage in protected activity and, even assuming that he did engage in protected activity, he cannot show that it was a motivating factor in the defendants' decision not to promote him; the court should dismiss the political association claims because the defendants would have made the same decision absent any protected activity; the court should dismiss the individual claims against Coons and Sapp because they are entitled to qualified immunity; and the record is devoid of evidence to support the plaintiff's request for punitive damages against the Coons, Sapp, and the County.

**IV.    DISCUSSION**

---

[2] Sapp resigned from his position as Director of Public Safety for the County on July 14, 2006, and was replaced by E. Ronald Frazier ("Frazier"). Pursuant to Federal Rule of Civil Procedure 25(d)(1), "[w]hen a public officer is a party to an action in his official capacity and during its pendency . . . resigns . . . the action does not abate and the officer's successor is automatically substituted as a party." Accordingly, Frazier is substituted as Sapp's successor with respect to the official capacity claims and all references to Sapp pertain only to individual claims against him.

  **A.**  **Official Capacity Claims Against Coons, Frazier, and the County**

  1.  Coons and Frazier

The defendants first argue that the court should dismiss the official capacity claims against Coons and Frazier, because they are duplicative of the claims against the County. That is, the defendants contend that it is well-settled law that claims against government officials in their official capacities are equivalent to claims against the government entity. While the plaintiff "takes no issue" with the defendants' contention regarding the duplicity of claims, he asserts, without citation to any authority, that the court should not dismiss the official capacity claims against Coons and Frazier, because they have not raised any defenses against municipality liability. The court is somewhat perplexed by the plaintiff's response and has endeavored, without success, to determine exactly what the plaintiff is arguing. Regardless, the court finds the argument without merit, given the fact it is well-established that official capacity suits against government officials "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 n. 55 (1978); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . . It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Here, the plaintiff has essentially sued the County twice on the same claims – the section 1983 claim against the County and the section 1983 claim against Coons and Frazier. Thus, the court will grant

this aspect of the defendants' motion.

    2. The County

The defendants further argue that the court should dismiss the plaintiff's section 1983 claim against the County for two reasons. First, the defendants contend that the plaintiff has failed to sufficiently plead a *Monell* claim. Additionally, the defendants contend that there is no record evidence to support a *Monell* claim.

A *Monell* claim is a claim brought under section 1983 against a local government body or supervising employee "where the alleged unconstitutional action [complained of] was the result of the execution or implementation of a policy, ordinance, regulation, or custom officially adopted or promulgated by that body's officers." *Monell*, 436 U.S. at 690. Put another way, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Here, the amended complaint is devoid of any averment that the court could logically construe as stating a *Monell* claim. In fact, the plaintiff raises *Monell* and discusses official county policy for the first time in his answering brief to the defendants' motion for summary judgment. His *Monell* theory of liability comes too late though and, as a result, he has failed to establish the elements necessary to hold the County liable for the decision not to promote him. *See Bulkoski v. Bacharach, Inc.*, 1 F. Supp. 2d 484, 487 n. 6 (W.D. Pa. 1997) (concluding that it was too late for the plaintiff to change his theory of the case at the summary judgment stage). Accordingly, the court will grant the defendants' motion for summary judgment on this ground alone, and need not reach the defendants' argument regarding the

lack of record evidence supporting a *Monell* claim.

### B.     Political Association Claims

The defendants next contend that they are entitled to summary judgment on Navarro's political association discrimination claims. The Supreme Court has held that the First Amendment protects public employees from discharge and other hiring decisions conditioned on political affiliation, unless the government can demonstrate that party affiliation is a proper requirement for the position. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990). Adhering to this principle, the Third Circuit employs a three-part test to determine whether a plaintiff has established a claim of discrimination based on political patronage or affiliation in violation of the First Amendment. To make out a *prima facie* case, a plaintiff must show that "(1) he was employed at a public agency in a position that does not require political affiliation, (2) he was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007) (citing *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)). Once a plaintiff makes this showing, a defendant may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

In the present case, the parties agree that Navarro was employed in a position that does not require political affiliation. Thus, the first part of the test is met. The defendants contend, however, that Navarro has not presented enough evidence to meet the second and third parts of the test. More specifically, the defendants argue that Navarro's support of McAllister or the "McAllister team" is not support of a political party as contemplated by that term's definition, but merely loyalty to a

politically controversial third party, which is not protected activity. Further, the defendants argue that, even if Navarro could demonstrate that he engaged in protected activity, he has not produced enough evidence for a reasonable jury to conclude that his association with the "McAllister team" was a motivating factor in the decision not to promote him (or the other candidates). Finally, the defendants contend that, assuming Navarro has made out a *prima facie* case of discrimination, they would have taken the same action – that is, withholding a promotion from him.

Conversely, Navarro asserts that the defendants have taken a narrow view of the facts, and that it is his support of prior County Executive Gordon, Coons' political rival, Sherry Freebery, and former Chief McAllister that caused the defendants to retaliate against him by denying his promotion to sergeant. Specifically, Navarro asserts that the defendants knew of his political affiliation with Gordon, Freebery, and McAllister and exhibited animosity toward him because of the affiliation. He also asserts that he was warned to cease those political affiliations, and that, shortly thereafter, he did not receive his promised promotion. With these arguments in mind, the court proceeds to the second and third parts of the test for a *prima facie* case of discrimination.

The first determination that the court must make is whether Navarro's previously discussed affiliations constitute protected activity. After having considered those affiliations, as well as the relevant law, the court is persuaded by Navarro's position. The Third Circuit has given a broad interpretation to First Amendment political affiliation, and has held that a plaintiff can meet the second part of a *prima facie* political discrimination claim if he "suffers because of active support for a losing candidate within the same political party," *see Robertson v. Fiore*, 62 F.3d 596, 600-01 (3d Cir. 1995), fails "to support the winning candidate," *see Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987), or fails "to engage in any political activity whatsoever." *Bennis*, 823 F.2d at 727 n. 4.

In the present case, although the court believes it is a close call, it finds that Navarro has presented sufficient evidence in the form of testimony that he supported McAllister and the Gordon/Freebery administration, and did not support Coons. (See D.I. 91, Ex. 5, at 63:24-64:14 ("I spoke up at the PIO meetings in defense for Dave McAllister and the Police Department. . . . I indicated that there may not even be a federal trial with respect to Tom [Gordon] and Sherry [Freebery] because . . . many of the things [he] read in the indictment . . . were frivolous.")). Thus, given the Third Circuit's broad interpretation of First Amendment protection, the court concludes that Navarro has presented enough evidence to reach the jury on the issue of whether his support of the losing team, i.e. the "McAllister team," is protected activity.

Having determined that Navarro has presented sufficient evidence to demonstrate that he engaged in protected activity, the court now turns to whether he has presented enough evidence to demonstrate that his political allegiance to McAllister and the Gordon/Freebery administration was a substantial or motivating factor in the defendants' decision not to promote him. "[I]mplicit in th[is] prong is a requirement that the plaintiff produce sufficient evidence to show [that] the defendant knew of [the] plaintiff's political persuasion," which requires proof of both knowledge and causation. *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002). Thus, in order to survive the motion for summary judgment, Navarro must show that the defendants knew of his allegiance to McAllister and Gordon/Freebery and failed to promote him as a result of that allegiance.

Here, the court again finds that it is a close call, but concludes that Navarro has presented

enough circumstantial evidence from which a reasonable jury could conclude that the defendants knew of his allegiance to McAllister and Gordon/Freebery and failed to promote him as a result of that allegiance. For example, Navarro testified at deposition that he "spoke up at the PIO meetings in defense for Dave McAllister," and that he "indicated that there may not even be a federal trial with respect to Tom [Gordon] and Sherry [Freebery] because . . . many of the things [he] read in the indictment . . . were frivolous." (D.I. 91 Ex. 5, at 63:24-64:14.) He also testified that he had a conversation with Levine, who stated to him, as an arm of the administration, "that it would not be in [his] best interest to stay on the McAllister team," and that it would be unwise "to be labeled as someone not on Chris' team." (Id. at 106:23-107:2.) Regarding the conversation with Levine, Navarro additionally testified that "she indicated that [he] was not liked by the administration; that [he] was on the losing team; that if Dave McAllister went down, [he] would go down with him," and that he "should try to get another job somewhere else in the County so [he] wouldn't show [his] allegiance to Dave McAllister . . . ." (Id. at 112:13-19.) Finally, Navarro testified that Levine, when discussing the promotions being held, stated "well, that's how politics worked," (id. at 115:11-116:1), and "Chris [Coons] butters the bread," (id. at 116:15), which he interpreted to mean "if [Coons] didn't want [him] promoted, that wasn't going to happen." (Id. at 116:23-24.)

Levine's testimony indicates that "it became clear that there was some tension between the executive branch, between the administration and the police department, and it became more challenging to work with Trini [Navarro] . . . ." (D.I. 91 Ex. 2, at 25:19-23.) Further, Levine testified that Coons was upset with Navarro because he "believed that he [Navarro] had been involved in criminal activities," such as "campaigning on county time." (Id. at 31:12-21.) When viewing this testimony in the light most favorable to Navarro, as the court must do at the summary

13

judgment stage, a reasonable jury could find that the defendants had knowledge of his affiliation with McAllister and Gordon/Freebery, and that he was not promoted because of that affiliation.[3]

Finally, the court turns to the defendants' *Mount Healthy* argument. The defendants assert that they are entitled to summary judgment even if Navarro has demonstrated a *prima facie* case of discrimination because they would have made the same decision not to promote him absent any alleged protected conduct. In fact, the defendants contend that Navarro did not receive a promotion because of budgetary restraints and/or the need for more patrol officers. Coons further contends that there is no evidence that he took any actions with respect to Navarro, the requisition process, or the promotions.

Navarro, on the other hand, argues that the Sergeant positions were already approved and budgeted. He further argues that Sapp initially agreed to promote three candidates selected by McAllister (which included Navarro), but changed his mind after meeting with Chief Administrative Officer Singleton at the Government Center. To support his arguments, Navarro relies on McAllister's deposition testimony regarding Sapp's evolving position with respect to the promotions. Specifically, McAllister testified that, after meeting with Sapp, the Fraternal Order of Police, and the eligible candidates for promotion, it was decided that three candidates would be

---

[3] The defendants point to testimony by Coons and Levine, arguing that it is inconsistent with Navarro's testimony and theory of the case. The main flaw in the defendants' argument, however, is the fact that they discount the plaintiff's own deposition testimony regarding conversations between he and Levine. Essentially, the defendants are inviting the court to weigh the evidence, which is improper in deciding a motion for summary judgment. At this stage of the proceeding, Navarro need only demonstrate a *prima facie* case of discrimination by pointing to evidence which raises disputed issues of material fact regarding whether the defendants knew of his political affiliation and whether he was not promoted as a result of that affiliation. Moreover, the court concludes that it is best to submit this issue to the jury in a case like this, where so much of the evidence is testimonial in nature and contradictory.

promoted after July 1, 2005. (D.I. 91 Ex. 3, at 25:10-15.) McAllister testified that, close to the July 1 promotion date, Sapp determined that the force needed more patrol officers and not more sergeants and, as a result, only one promotion would be released. (Id. at 25:16-21.) McAllister further testified that Sapp's position seemed to change during the course of their discussions regarding the promotions. According to McAllister, first Sapp agreed to promote three candidates to sergeant, "[t]hen he came back and said no, let's not do it, it's because of money." (Id. at 28:5-8.) McAllister testified that he looked into the fiscal aspect and discovered that it "didn't make sense," because it was "a nominal bit of money." (Id. at 28:9-13.) When McAllister relayed this to Sapp, the position changed from fiscal concerns to "we need more patrol officers than we need the sergeants." (Id. at 28:13-15.) Regarding the change in position, McAllister testified that Sapp "was on board to promote," but then "would sort of go over to the Government Center, then he would come back and his sort of stance [on the issue] would have changed." (Id. at 35:6-10.)

The foregoing testimony presented by Navarro leads the court to conclude that a reasonable jury could disbelieve the defendants' assertion that they would not have promoted Navarro because of budgetary restraints and/or the need for more patrol officers. The court bases its ruling on McAllister's testimony regarding Sapp's change in position as a result of his meetings at the Government Center. In other words, when viewing the evidence in the light most favorable to Navarro, a reasonable jury could conclude that the defendants would not have made the decision to withhold the promotion in the absence of his political affiliation. Accordingly, summary judgment on this ground is inappropriate.

### C.   Qualified Immunity

The defendants also argue that they are shielded from suit by reason of qualified immunity. A two-part test is used to determine whether the official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 200-02 (2001). First, the court must determine whether the official's conduct violated a constitutional right. *Id.* at 201. If no constitutional right is violated, there is no necessity for further inquiries concerning qualified immunity. *Id.* If a violation occurred, then the court's second task is to determine whether the constitutional right was clearly established at the time of the official's action. *Id.* This inquiry requires that "the contours of the right . . . be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (internal citation omitted). "That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). In other words, the doctrine of qualified immunity protects the officer from liability if "the officer's mistake as to what the law requires is reasonable." *Saucier*, 533 U.S. at 205.

In the present case, because disputed issues of material fact exist regarding Navarro's alleged first amendment political association violation, the answer to the first question depends upon the resolution of those factual disputes.[4] Thus, granting summary judgment on qualified immunity is premature at this stage of the case, and must wait for factual development at trial. Therefore, the court will deny the motion for summary judgment on the issue of qualified immunity.

---

[4] In making their arguments, the defendants presume that being a member of the "McAllister team" is not protected conduct. As previously discussed, however, Navarro vigorously contests that assertion and points to sufficient circumstantial evidence to support his theory of the case.

16

### D. Punitive Damages

Finally, the defendants argue that the court should dismiss the plaintiff's request for punitive damages against Coons and Sapp in their individual capacities. "[P]unitive damages may be awarded under section 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involved reckless or callous indifference to the federally protected rights of others.'" *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Here, because the court will allow the political association discrimination claims to go to the jury, it is up to the jury members to decide, if they find a constitutional violation, whether Navarro has demonstrated that the defendants' conduct in not promoting him was motivated by evil intent, or involved reckless or callous disregard to his constitutional rights. Granting summary judgment on this issue would involve weighing the testimonial evidence presented and making credibility determinations, which is clearly the province of the factfinder – the jury. Thus, the court will deny this aspect of the defendants' motion.

## V. CONCLUSION

For the aforementioned reasons, the court will grant in part and deny in part the defendants' motion for summary judgment. The court will grant the motion with respect to the official capacity claims against Coons, Frazier, and the County, and the deny the motion in all other respects.

Dated: September 7, 2007               /s/ Gregory M. Sleet
                                       CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORPORAL TRINIDAD NAVARRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No.  05-565 GMS |
| ) | |
| CHRISTOPHER COONS, GUY H. SAPP, ) | |
| and NEW CASTLE COUNTY, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' Motion for Summary Judgment (D.I. 85) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to the official capacity claims against Coons, Frazier, and the County. The motion is DENIED in all other respects.

Dated: September 7, 2007          /s/ Gregory M. Sleet
                                  CHIEF, UNITED STATES DISTRICT JUDGE